# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LISA RANSOM** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-843 RMC |
| | ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Center for Nonprofit Advancement (the "Center"), by its attorneys,

moves for summary judgment and, as grounds therefor, states as follows:

1. There is no genuine issue as to any material fact.

2. The Center is entitled to judgment as a matter of law.

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.

By    /s/ Charles H. Fleischer

     Charles H. Fleischer, D.C. Bar No. 4341

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
tel: (301) 986-4056 / fax: (301) 951-0555
e-mail: cfleischer@ofqlaw.com

*Attorneys for defendant*

## REQUEST FOR HEARING

Defendant requests an opportunity to be heard on this motion.


/s/ Charles H. Fleischer
Charles H. Fleischer

-2-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LISA RANSOM** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-843 RMC |
| | ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

# MEMORANDUM OF POINTS AND AUTHORITIES
# IN SUPPORT OF DEFENDANT'S MOTION
# FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

Table of Contents                                                                     i

Table of Authorities                                                                 iii

I.  Statement of the Case                                                             1

    A.  Nature of the Case                                                         1

    B.  Procedural History                                                       1

    C.  Summary of Facts                                                         2

        1.  The Center                                                       3

        2.  Ransom's Hiring                                                  4

        3.  Ransom's Work Deficiencies                                       5

        4.  Ransom's Termination                                             7

        5.  Ransom's Claims of Discrimination                                8

II.  Argument                                                                        12

    A.  The Center Did Not Discriminate                                          12

        1.  There Is No Direct Evidence of Discrimination                    14

        2.  There Is No Indirect Evidence of Discrimination                  17

            a.  The Center's Pre-Termination Actions Were Not Adverse        17

            b.  The Center Had Legitimate Reasons to Fire Ransom            19

    B.  The Center Did Not Retaliate                                            21

        1.  § 1981 Does Not Prohibit Retaliation                             21

Page

2.  Ransom Cannot Establish a Prima Facie Case                          22

    a.  Ransom's Activities Were Not Protected                     22

    b.  The Center Acted Prior to Any Protected Activity           23

3.  The Center Had Legitimate Reasons to Fire Ransom                    24

C.  Ransom Fails to State a Claim of Negligent Supervision              24

1.  The Claim Is Preempted by the Human Rights Act                      24

2.  The Handbook Is Not a Contract                                       25

3.  The District's Workers' Compensation Act Bars the Claim             26

III.  Conclusion                                                         26

# TABLE OF AUTHORITIES

<u>Page</u>

<u>Statutes</u>

28 U.S.C. § 1367 ............................................................................................................ 2

42 U.S.C. § 1981 (Civil Rights Act of 1866) ........................................... 1 & *passim*

42 U.S.C. § 2000e, *et seq*. (Title VII) ................................................... 13 & *passim*

D.C. Code § 2-1401.01, *et seq*. (Human Rights Act) ...................................... 1, 24

D.C. Code § 32-1501, *et seq*. (Workers' Compensation Act) ............................ 26

<u>Cases</u>

*Anderson v. Group Hosp., Inc*., 820 F.2d 465 (D.C.Cir. 1987) ........................... 13

*Barnette v. Chertoff*, 453 F.3d 513 (D.C.Cir. 2006) .......................................... 17

* *Boulton v. Institute of Int'l Edu*., 808 A.2d 499 (D.C. 2002) ......................... 26

*Broderick v. Donaldson,* 437 F.3d 1226 (D.C.Cir. 2006) ...................... 18, 22, 23

*Brown v. Small*, __F.Supp.2d __, 2007 WL 158719 (D.D.C. No. 05-1086, decided Jan. 19, 2007) .................................................................................. 16

*Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006) ......... 21

*Carl v. Children's Hosp*., 702 A.2d 159 (D.C. 1997) ...................................... 25

*Carney v. American Univ*., 151 F.3d 1090 (D.C.Cir. 1998) ........................ 21, 22

*Childers v. Slater*, 44 F.Supp.2d 8 (D.D.C. 1999) .......................................... 18

* *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268 (2001) ............ 15, 22, 23, 24

*Coghlan v. American Seafoods Co.*, 413 F.3d 1090 (9th Cir. 2005) ................. 13

*Czekalski v. Peters*, __ F.3d __, 2007 WL 283443 (D.C.Cir. No. 05-5221,
    decided Feb. 2, 2007)    13, 20

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)    18

*George v. Leavitt*, 407 F.3d 405 (D.C.Cir. 2005)    15, 22

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*,
    284 F.Supp.2d 15 (D.D.C. 2003)    13

*Hussain v. Nicholson*, 435 F.3d 359 (D.C.Cir. 2006)    16

*Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362 (D.C. 2003)    26

*Keeley v. Small*, 391 F.Supp.2d 30 (D.D.C. 2005)    18

*Local Union 1261, Dist. 22, United Mine Workers of America v. Federal
    Mine Safety & Health Review Comm.*, 917 F.2d 42 (D.C.Cir. 1990)    21

*Mastro v. Potomac Elec. Pwr. Co.*, 447 F.3d 843 (D.C.Cir. 2006)    14

*Mazloum v. District of Columbia*, 442 F.Supp.2d 1 (D.D.C. 2006)    24

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)    14, 17, 22

*Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549 (D.C.Cir. 1997)    18

*Murray v. Gilmore*, 406 F.3d 708 (D.C.Cir. 2005)    14

*Patrick v. Principi*, 275 F.3d 44, 2001 WL 1223858 (5th Cir. 2001)    24

*Quick v. Wal-Mart Stores, Inc*., 441 F.3d 606 (8th Cir. 2006)    15

*Raggs v. Mississippi Pwr. & Light Co.*, 278 F.3d 463 (5th Cir. 2002)    13

*Rand v. CF Indus., Inc.*, 42 F.3d 1139 (7th Cir. 1994)    13

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C.Cir. 2006)    22

*Roney v. Illinois Dept. of Trans.*, __ F.3d __, 2007 WL 117501 (7th Cir. 2007)    22

*Runkle v. Gonzales*, 391 F.Supp.2d 210 (D.D.C. 2005)                    18

*Vitikacs v. American Legion*, 2003 WL 22004935 (D.C.Super. No.
    02-CA-10202, decided June 8, 2003)                    25

\* *Waterhouse v. District of Columbia*, 124 F.Supp.2d 1 (D.D.C. 2000),
    *aff'd*, 298 F.3d 989 (D.C.Cir. 2002)                    13, 15

*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C.Cir. 2002)                    14

\* *Welzel v. Bernstein*, 436 F.Supp.2d 110 (D.D.C. 2006)                    22, 22, 24

*Wilson v. Legal Assistance of N. Dakota*, 669 F.2d 562 (8th Cir. 1982)                    13

# I.  Statement of the Case

## A.  Nature of the Case

Plaintiff Lisa Ransom ("Ransom"), who is African American, worked as a senior manager for the Center for Nonprofit Advancement ("Center"), from September 8, 2003 until she was fired on June 15, 2004. [1]  Ransom claims that she was treated differently from her white colleagues because of her race, in violation of federal and District of Columbia law. She also claims illegal retaliation and negligent supervision.

The Center denies all claims.

## B.  Procedural History

Ransom initially filed discrimination charges against the Center with the District of Columbia Office of Human Rights ("OHR").  When mediation of those charges proved unsuccessful, OHR investigated.  On May 8, 2006, while the investigation was pending, and without withdrawing her OHR charge, Ransom filed her complaint in this Court. [2]

The complaint is in five counts: Counts I and II allege disparate treatment discrimination based on race and retaliation in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq.* ("HRA"); Counts III and IV allege similar discrimination and retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); and Count V

---

[1] The Center was formerly known as the Washington Council of Agencies.  It is referred to in the record by that name and "WCA" as well as the "Center" and "CNA".

[2] In her OHR charge, Ransom alleged sexual orientation discrimination as well as race discrimination.  Only the race issue was renewed in this Court.

alleges common law negligent supervision. Subject matter jurisdiction over the state law claims is based on 28 U.S.C. § 1367.

After the District Court complaint was filed, OHR issued a determination letter dated June 3, 2006, finding no probable cause for any of Ransom's discrimination claims. Ransom did not seek reconsideration. The Center then moved to dismiss Ransom's HRA claims on the ground that Ransom was limited to Superior Court judicial review of OHR's determination and she could not file a new, independent action. By Order filed August 25, 2006, acting on the Center's unopposed motion, the Court dismissed Counts I and II. Thus only the § 1981 and negligent supervision claims remain for decision.

Pursuant to the Court's Scheduling Order, discovery closed on January 10, 2007. Prior to that date the parties exchanged initial disclosures and written discovery. The Center also took Ransom's deposition. No other discovery was sought. A post-discovery status conference, scheduled for January 26, 2007, was continued when Ransom's counsel failed to appear. Dispositive motions are due by February 9, 2007.

## C. Summary of Facts

The pertinent facts are set forth in detail in the Center's accompanying Statement of Material Facts Not in Dispute and are summarized briefly below. Supporting record references are included in the Statement of Material Facts; for readability, record references have generally been omitted here.

### 1.  The Center

The Center, where Ransom worked from September 8, 2003 to June 15, 2004, is a tax-exempt, nonprofit corporation headquartered in the District.  It was founded 28 years ago to serve the local nonprofit community through education, nonprofit community building, and group purchasing.  Its members, numbering approximately 1000, are in turn nonprofit organizations located in the District, Montgomery and Prince George's Counties, Maryland, and northern Virginia.

During Ransom's employment, the Center's 13-member volunteer board consisted of six African Americans, six whites, and one Latino.  During that same period, the Center's paid staff was similarly diverse: seven African Americans, seven whites, and one Latina.  All employees were at-will, as specified in its Personnel Handbook.

In addition to its at-will provisions, the Personnel Handbook disclaimed any intent to create a contract of employment; it reserved the Center's right to modify the Handbook; it contained equal-opportunity and non-discrimination-in-employment provisions; it reserved the Center's right to take appropriate corrective action (including termination) with respect to employee performance issues; and it provided grievance procedures for employees who disputed a termination or other corrective action.

All employees are required, on being hired, to acknowledge having received and read the Personnel Handbook.  Ransom did so in writing.

## 2.  Ransom's Hiring

Ransom applied to the Center in the summer of 2003 and was later interviewed by Jeff Kost ("Kost"), the Center's Deputy Executive Director.  A follow-up interview was conducted by Kost, Betsy Johnson ("Johnson"), the Center's long-time Executive Director, and a Center board member.  Johnson and Kost then jointly decided to hire Ransom, offering her the position of Director of Public Policy and Community Relations – a senior management position which reported to Kost.

The position for which Ransom was hired had become vacant upon the death in childbirth of Phyllis Campbell Newsome.  Newsome was African American, as is every other person who has occupied the position since its creation in 1990.

As Director of Public Policy and Community Relations, Ransom was required to play an active role with the Center in supporting and communicating with local nonprofits; to analyze and evaluate issues for the local nonprofit sector; to monitor policy and legislation relevant to local nonprofits; to develop and maintain strong relationships with policy makers in all local jurisdictions; and to establish, develop and maintain strong constituent relations. The position required her to be able to work with people and to have strong written and oral communication skills.  Although the position covered the entire local region, the Center relieved Ransom of responsibility for northern Virginia because it was unable to provide her with an assistant.

### 3. Ransom's Work Deficiencies

The Center never formally evaluated Ransom because her nine-month tenure fell between the Center's annual evaluations, held in June or July. Nevertheless, after Ransom had worked at the Center for about four months, both Johnson and Kost concluded that Ransom was not making adequate progress toward meeting her responsibilities, that she was unfocused in her work, and that she moved from one activity to another without any plan or priority. Kost, her immediate supervisor, specifically criticized her in e-mails dated January 13, 2004, February 25, 2004, and April 14, 2004, and in a memo dated May 12, 2004.

The Center also received a number of complaints about Ransom from various outside sources beginning in the late fall of 2003. They included reports that she provided inaccurate information about the Center's commitment to participate in a coalition; that she performed poorly at a congressional briefing; that she submitted an unrealistic budget proposal for a conference; that she failed to follow up with a member nonprofit that was having difficulties with a Montgomery County official; and that her performance at an event she facilitated was unsatisfactory. [3]

Ransom's work habits were subject to criticism as well, in that, despite an office culture of openness and face-to-face communications, Ransom generally operated with her door closed and she generally communicated with other staff by e-mail. Johnson and Kost told her that these habits signal to people she is inaccessible.

---

[3] These performance issues are described in detail in paragraphs 25 through 41 of the Center's accompanying Statement of Material Facts Not in Dispute.

Hoping that Ransom might succeed despite her shortcomings, Johnson and Kost decided to provide closer supervision in the form of regular, weekly meetings. Such supervision was not unique at the Center: Kost had done the same thing with another of his direct reports, who is a white male.

Some nine meetings were held among Ransom, Johnson and Kost between January 14 and May 27, 2004. Ransom resisted the meetings, seeing "nothing constructive" about them and characterizing them as "hostile," "verbally abusive," "humiliat[ing]," "tortu[rous]," and full of "negative energy." Ransom Dep. 34, 215-216, 233-34 [Apx. 19, 99a-99b, 114-15]. [4] And she refused to sign on to a list of objectives that Johnson and Kost presented at the meetings. Ransom Dep. 153-156, 219-235 [Apx. 81-84, 100-116]. Given Ransom's attitude, it is not surprising that the meetings were a failure.

Ransom's insubordination in refusing to agree to Johnson's and Kost's specific work objectives is echoed in two other incidents. In one incident, Kost expressed disappointment over Ransom's failure to produce a satisfactory article concerning an issue in which the Center was interested. Ransom replied: "[T]his is not the type of work that I'm compelled to write." Ex. 29 [Apx. 175]. In a second incident of insubordination, the Center wanted to publish photographs of staff contributors to the Center's newsletter. Ransom refused to allow use of a photograph taken by the Center's photographer because of a medical problem affecting her appearance, so Kost asked her to provide an alternate photo. Ransom

---

[4] "Apx. __" refers to the Appendix accompanying the Center's Motion for Summary Judgment. "Ex. __" refers to exhibits marked at Ransom's deposition.

responded: "[O]n the advice of counsel, I am electing not to have my photographic image used in any way either in print or on the Web by WCA at this time."  Ex. 37 [Apx. 181].

### 4. Ransom's Termination

In early to mid-May 2004 Johnson and Kost, who together had hired Ransom, jointly decided to fire her.  At the time, Ransom was working on a 1½-day conference being co-sponsored by the Center, scheduled for June 10-11, 2004.  Because terminating Ransom at that time could have jeopardized the Center's role as co-sponsor and jeopardized the conference itself, Johnson and Kost delayed firing her until after the conference.

On June 15, 2004, Johnson and Kost met with Ransom in Johnson's office and told her the Center was terminating her employment.  Kost then handed Ransom a written notice of termination.  The notice stated that the termination was

> based on the lack of progress you made against the objectives we agreed to during out meetings from March 12-May 27 . . . [in] the following key areas of responsibility ...:
>
> - Prioritization of staff requests and long term projects ...
> - Responding to assignments in a timely manner ...
> - Attentiveness to deadlines ...
> - Providing leadership in public policy on behalf of WCA.

Ex. 52 [Apx. 201].  Specific examples of her failures were included under each of the first three bulleted points.

Ransom's replacement as Director of Public Policy and Community Relations, who like Ransom was hired by Johnson and Kost, is African American.  As mentioned above,

-7-

every person who has held the position of Director of Public Policy and Community Relations since its creation in 1990 has been African American.

Ransom has since taken a full-time job with another nonprofit in the area, earning a substantially higher salary than the salary she was paid at the Center and enjoying benefits comparable to those at the Center.

## 5. Ransom's Claims of Discrimination

Ransom admits that she has never heard Johnson or Kost use a racial epithet; that no one has ever told her that Johnson or Kost used a racial epithet; and that she has never heard anyone use a racial epithet in Johnson's or Kost's presence. Ransom Dep. 112-19 [Apx. 63-70]. Furthermore, she did not perceive any discrimination at the Center for at least the first few months of her employment. Ransom Dep. 30-31, 189-90, 175, 213 [Apx. 16-17, 86a, 96-97, 99]. Even when Kost began expressing dissatisfaction with her work, she attributed the criticisms to a misunderstanding and to confusion on his part, not to racism. Ransom Dep. 30-31, 189-190, 213 [Apx. 16-17, 96-97, 99].

But when Johnson and Kost imposed the weekly meeting requirement in an attempt to improve her performance, she concluded that the workplace was permeated with discrimination. She now identifies the following matters as racially motivated:

*Johnson's and Kost's demeanor.* According to Ransom, Johnson's and Kost's demeanor toward her changed. At deposition she was not able to say when the change occurred, nor was she able to give specific examples except to say that Kost was moody and sometimes unfriendly to her. Ransom Dep. 29-33 [Apx. 15-18].

-8-

*Kost's afraid-to-go statement.*  Ransom invited Kost to attend a state-of-the-county function with her in Prince George's County.  Kost declined, saying (according to Ransom), "I'm afraid to go there," which Ransom took to be a racist comment.  Ransom acknowledges, however, that in declining her invitation Kost made no reference to race.  Ransom does not in fact know why Kost declined.  Shortly thereafter, Kost did attend a conference in Prince George's County with Ransom.  Ransom Dep. 25-26, 115-16 [Apx. 11-12, 66-67]. [5]

*Kost's refusal to engage in joint activities.*  Ransom's complaint alleges that at a May 27 meeting with Johnson and Kost she "expressed concerns that Kost was consistently unwilling to engage in joint activities" with her.  Cmplt. ¶ 14.  When asked at deposition about the allegation, Ransom could not recall whether or not she actually said that at the meeting.  And when asked what joint activities she might have been referring to, she testified, "One comes to mind . . . a State of the County lunch or brunch with me in Prince George's County," in response to which Kost allegedly made his afraid-to-go comment.  She could not recall any similar incidents, and she does not know whether he accepted similar invitations from other senior staff members.  Ransom Dep. 24-26 [Apx. 10-12].

*Kost's sitting with white colleagues at a conference.*  Ransom claims that at the June 10-11 conference Kost attended with her, she arranged to seat Kost "at a table full of funders," all or most of whom were African American.  Kost decided to sit with his

---

[5] Kost denies saying he was afraid to go to Prince George's County, but instead said, "I'm afraid I can't go" or words to that effect. Kost Aff. ¶ 22 [Apx. 151-52]. For summary judgment purposes only, the Center accepts Ransom's version.

colleagues, all of whom were white according to Ransom.  Kost did not say that his seating choice was race-based.  Ransom Dep. 115-16 [Apx. 66-67].

*Weekly meetings*.  Ransom claims that being required to attend weekly meetings with Johnson and Kost and being asked to sign on to objectives at those meetings amounted to discrimination because no similar requirements were imposed on white senior staff members. Ransom Dep.  27-28, 33-34, 46-47, 146-147 [Apx. 13-14, 18-19, 30-31, 79a-79b].  In fact, Kost had imposed a similar weekly meeting requirement on a white male who also reported to him.  Kost Aff. ¶ 17 [Apx. 150].

*Lack of support*.  Ransom believed at the time of her hire that she was supposed to have an assistant, but she was never allowed to hired one.  At deposition she could not identify any other Center employee who was allowed to hire an assistant, she acknowledged that her job was unique, and she conceded that due to the lack of an assistant, the Center reduced her workload by relieving her of any responsibilities for the Center's Virginia members.  Ransom Dep. 35-36, 39-40, 101-02 [Apx. 20-21, 23-24, 56-57].

*Scott incident*.  An African American colleague of Ransom named Carlottia Scott was asked to conduct a training session at the Center.  During a break in a preparatory meeting in the Center's conference room among Scott, Ransom, and another Center employee, and while Scott was alone in the Center's interior office area, Scott was stopped and questioned by Center employee Jeremy Baird about her presence in the Center's offices.  Baird and Scott had never previously met.  Baird had taken the same action approximately 10 times with both white and African American visitors whom he did not recognize.  When Johnson was told

that Scott was upset by the incident, she called Scott and apologized.  Johnson Aff. ¶ 32b [Apx. 140-41]; Ransom Dep. 52-58 [Apx. 36-42]; Baird Dep. 45-47 [Apx. 130-32].

*Terry incident*.  An African American colleague of Ransom's named William Terry was asked to conduct a training session at the Center.  During a preparatory meeting in the Center's conference room among Terry, Ransom, and another Center employee who is Latina, and while Terry was using his cell phone, Kost interrupted to ask if he could use the conference room earlier than scheduled.  He hoped get early use of the conference room because a number of guests of his had already arrived and were filling the Center's reception area.  Kost said nothing of a racial nature during the interruption.  Johnson Aff. ¶ 32a [Apx. 140]; Kost Aff. ¶ 21 [Apx. 151]; Ransom Dep. 125-29 [Apx. 71-75].

*Trent incident*.  Ransom invited a Rev. Earl Trent, who is African American, to be the invocation speaker at a function in which she was involved.  A Center employee named Barbara Mendoza, who was serving as receptionist for the function, charged Rev. Tent the regular admission price.  When Ransom complained to Mendoza, Mendoza explained that she charged him because she did not recognize him.  Mendoza made no reference to Rev. Trent's race and she has never made a racially derogatory comment in Ransom's presence.  There were other African American presenters at the function whom Mendoza did not charge.  When Ransom additionally complained to Johnson, Johnson refunded the charge to Rev. Trent.  Johnson Aff. ¶ 32c [Apx. 141]; Ransom Dep. 42-45 [Apx. 26-29].

The very first time Ransom raised any issue concerning racism with Center officials was at a May 27 meeting among her, Johnson and Kost, although her recollection of the

meeting is now vague.  At that meeting she called Kost racist and she may also have expressed concern and dissatisfaction over her relationship with Kost and over treatment of African American trainers and presenters.  Johnson Aff. ¶ 35 [Apx. 142]; Kost Aff. ¶ 23 [Apx. 152]; Cmplt. ¶ 14; Ransom Dep. 24-26 [Apx. 10-12].  But despite her alleged concerns and dissatisfaction, she never invoked the Center's grievance procedures.  Johnson Aff. ¶¶ 40, 41 [Apx. 142-43].

Ransom did file a charge of discrimination with OHR on or about June 4, 2004, complaining not only of racial, but also of sexual orientation discrimination.  (The charge was later amended to reference her June 15 firing.)  The Center did not learn of the charge until it was served on June 17 – two days *after* Ransom's termination and about a month after Johnson and Kost had decided to fire her.  Johnson Aff. ¶ 43 [Apx. 143]; Kost Aff. ¶ 30 [Apx. 153]; Ransom Dep. 136-37 [Apx. 76-77].

## II.  Argument

With dismissal of Counts I and II, the only remaining claims are race discrimination under § 1981 (Count III), retaliation under § 1981 (Count IV), and negligent supervision (Count V).  These claims are considered separately below at headings A, B and C.

## A.  The Center Did Not Discriminate

Section 1981 assures that all benefits, privileges, terms and conditions of employment will be enjoyed free of racial discrimination.  The standards applied in evaluating a claim of race discrimination in employment under §1981 are the same as those applied in actions

under Title VII. [6] *Raggs v. Mississippi Pwr. & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002); *Wilson v. Legal Assistance of N. Dakota*, 669 F.2d 562, 563 (8th Cir. 1982). Specifically, both require an adverse employment action, *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F.Supp.2d 15, 25-27 (D.D.C. 2003), and both require proof of intentional discrimination, *Anderson v. Group Hosp., Inc*., 820 F.2d 465, 468 (D.C.Cir. 1987).

It is undisputed that Johnson and Kost, who allegedly took adverse employment actions against Ransom for discriminatory reasons, are the same persons who personally interviewed and hired Ransom. When as here a "same actor" inference applies, the fact-finder is not permitted to find discrimination and the employer is entitled to summary judgment. *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1096-97 (9th Cir. 2005); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994); *Waterhouse v. District of Columbia*, 124 F.Supp.2d 1, 12-13 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C.Cir. 2002), and cases cited therein. *See Murray v. Gilmore*, 406 F.3d 708, 715 (D.C.Cir. 2005) (referencing *Rand's* same actor inference with approval). *Cf. Czekalski v. Peters*, __ F.3d __, 2007 WL 283443 *8 (D.C.Cir. No. 05-5221, decided Feb. 2, 2007) (supervisor's having previously promoted plaintiff and recommended her for pay increase is "probative evidence against the claim that he harbored a general animus against female employees"; however, in light of evidence that proffered reasons for transfer were false, supervisor not immunized from liability for subsequent discrimination).

---

[6] 42 U.S.C. § 2000e, *et seq*. (hereinafter, "Title VII").

In addition, Ransom was replaced by an African American. While Ransom is not required to show that she was replaced by someone *outside* her protected class, *Mastro v. Potomac Elec. Pwr. Co.*, 447 F.3d 843, 850 (D.C.Cir. 2006), the fact that she was replaced by someone *within* her protected class "cuts strongly against any inference of discrimination" and justifies summary judgment for the employer. *Murray*, 406 F.3d at 715.

Apart from these threshold considerations, Ransom cannot make out a prima facie case of discrimination, either directly or indirectly, and she cannot overcome the Center's legitimate, non-discriminatory reasons for its actions.

## 1. There is No Direct Evidence of Discrimination

To establish a prima facie case of employment discrimination under Title VII (and therefore under § 1981), Ransom must show that (1) she belongs to a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action despite her qualification; and (4) the adverse employment action was based on the characteristic that placed her in the protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Discrimination may be proved by direct evidence of discriminatory animus, or indirectly using the three-part, burden-shifting test of *McDonnell Douglas*. *Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C.Cir. 2002).

Here, there is simply no evidence of discriminatory animus. Ransom concedes, for example, that she has never heard Johnson or Kost use a racial epithet; that no one has ever told her that Johnson or Kost used a racial epithet; and that she has never heard anyone use a racial epithet in Johnson's or Kost's presence. Ransom Dep. 112-19 [Apx. 63-70].

-14-

The incident that comes closest to discriminatory animus is Kost's alleged statement, in response to Ransom's invitation to attend a Prince George's County function, that he was afraid to go there. Assuming for summary judgment purposes only that Kost said exactly what Ransom attributes to him, the statement is ambiguous as to racial content and is at worst a stray remark not nearly sufficient to meet a summary judgment motion. Ransom herself does not know why Kost declined her invitation, nor does she know whether he accepted similar invitations from other senior staff. Ransom Dep. 25-26 [Apx. 11-12]. Belying any inference of racism that might be drawn from the afraid-to-go remark, shortly thereafter Kost did in fact attend a conference in Prince George's County with Ransom. Moreover, Ransom offers no link between the remark and termination, the only adverse employment action she suffered.

> *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 609 (8th Cir. 2006) is instructive:
>
> [D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. Direct evidence of employment discrimination must be distinguished from stray remarks in the workplace, statements by non-decision makers, or statements by decision makers unrelated to the decisional process.

Citation and quotation marks omitted; alteration in original. *Accord, Waterhouse,* 124 F.Supp.2d at 12. *See Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 271 (2001) ("no reasonable person could have believed that the single incident ... [involving an ambiguous exchange with sexual innuendo between two males in the presence of a female] violated Title VII's standard"); *George v. Leavitt*, 407 F.3d 405, 417 (D.C.Cir. 2005) (plaintiff's being told

-15-

three times by co-workers to go back where she came did not create an abusive work environment and did not even support a reasonable belief of discrimination).

None of the other incidents to which Ransom points even hints at any racial animus. A good example is the requirement that she participate in weekly meetings with Johnson and Kost. Ransom claims the requirement was imposed on her for discriminatory reasons, but her only basis is that she is African American and she believes (incorrectly) that no one else faced a similar requirement. Ransom Dep. 46-47 [Apx. 30-31].

As further examples, Ransom concludes that the Scott, Terry and Trent incidents were race-based, but again her only ground is that the three visitors are black. The Center employees who were directly involved said absolutely nothing of a racial nature during those incidents and they offered reasonable explanations for their conduct. Isolated instances of rudeness – if that is even a fair description of the employees' conduct – do not equate with racism. *Burkhart v. W.M.A.T.A*, 112 F.3d 1207, 1215 (D.C.Cir. 1997) (general rudeness caused plaintiff to suffer humiliation, not discrimination).

In summary, the only support Ransom offers for her direct case is her own speculation that certain workplace conduct was racially motivated. But speculation cannot establish a direct case of discrimination. *Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C.Cir. 2006) ("[I]n deciding whether there is a genuine issue of material fact, the court must assume the truth of all statements proffered by the non-movant *except for* conclusory allegations lacking any factual basis in the record") (emphasis in original); *Brown v. Small*, __ F.Supp.2d __, 2007 WL 158719 (D.D.C. No. 05-1086, decided Jan. 19, 2007) ("[T]he nonmoving party may not

rely solely on allegations or conclusory statements.  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor") (citation omitted).

### 2.  There Is No Indirect Evidence of Discrimination

Under the *McDonnell Douglas* framework, applicable when direct evidence of discriminatory animus is lacking, Ransom bears the initial burden of establishing a prima facie case, meaning she must prove by a preponderance of the evidence that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination.  If Ransom can satisfy these elements, then the burden shifts to the Center to articulate a non-discriminatory reason for its decision.  Ransom can then try to show that the articulated reason is pretextual.  *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C.Cir. 2006).

### a.  The Center's Pre-Termination Actions Were Not Adverse

The pre-termination issues that Ransom cites – being criticized for her work; being required to attend weekly meetings and sign off on workplace objectives; being subjected to a supervisor's moodiness or unfriendliness; having a supervisor turn down a work-related invitation and opt against suggested seating arrangements at a conference; and being denied an opportunity to hire an assistant (while at the same time having one's workload reduced) – are not materially adverse employment actions.  They are instead the ups and downs employees must deal with from time to time at work .

-17-

In *Keeley v. Small*, 391 F.Supp.2d 30, 43 (D.D.C. 2005), this Court observed that "criticism is part of the ordinary tribulations of the workplace for which Title VII does not provide a remedy) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), internal quotation marks omitted). Furthermore, "conduct that sporadically wounds or offends, but does not hinder an employee's performance does not rise to the level of adverse action." *Id.* (citing *Childers v. Slater*, 44 F.Supp.2d 8, 19 (D.D.C.1999), internal quotation marks and text alteration indicators omitted).

In *Runkle v. Gonzales*, 391 F.Supp.2d 210, 226 (D.D.C. 2005), this Court observed that "[b]eing subject to scrupulous monitoring does not constitute an adverse action because it is part of the employer's job to ensure that employees are safely and properly carrying out their jobs" (citation and internal quotation marks omitted).

In *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556-57 (D.C.Cir. 1997), the D.C. Circuit joined its sister courts, saying:

> Perhaps in recognition of the judicial micromanagement of business practices that would result if we ruled otherwise, . . . changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.

And in *Broderick v. Donaldson,* 437 F.3d 1226, 1233 (D.C.Cir. 2006), the D.C. Circuit stated: "[N]ot everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit."

-18-

On this record, the only Center action that could qualify as adverse is its firing Ransom.  That action is discussed below.

### b.  The Center Had Legitimate Reasons to Fire Ransom

The termination was of course adverse, but there can be no inference of discrimination from that action alone: both Ransom's predecessor and her successor as Director of Public Policy and Community Relations were African American.  And even if an inference of discrimination could be drawn from the termination, the Center had articulable, non-pretextual reasons – indeed, it had compelling reasons – to fire Ransom.

Approximately four months after her hire, both Kost (Ransom's immediate supervisor) and Johnson (the Center's Executive Director and its most senior staff member) concluded that "Ransom was not making adequate progress toward meeting her responsibilities, that she was unfocused in her work, and that she moved from one activity to another without any plan or priority."  Johnson Aff. ¶ 24 [Apx. 137]; Kost Aff. ¶ 11 [Apx. 147].  These are not after-the-fact rationalizations: the record contains contemporaneous, written statements critical of Ransom's work.  And while Johnson's and Kost's conclusions may be subjective, they are buttressed by criticisms of Ransom from outside the Center.

Although Ransom alleges in her complaint that the termination was "without prior warning" (Cmplt. ¶ 15), in fact her work had been strongly criticized by both Johnson and Kost.  *E.g.* Ransom Dep. 229 [Apx. 110] ("They were extremely critical of my work . . .").

By scheduling weekly meetings and developing specific, measurable objectives, Johnson and Kost went to extraordinary lengths to help Ransom succeed.  The meeting

regimen failed, however, because of Ransom's resistance and her perception that the meetings were unconstructive, hostile, verbally abusive, humiliating, torturous, and full of negative energy. Her penchant for e-mail and her closed-door policy gave Johnson and Kost concern that Ransom would be seen as inaccessible. They counseled her on that issue as well.

Finally, there was Ransom's insubordination: her e-mail to Kost that a writing project he assigned her "is not the type of work that I'm compelled to write;" her e-mail refusing, "on advice of counsel," to provide a photograph for use in conjunction with a newsletter article; and, most blatant, her repeated refusal to sign onto the specific work objectives Johnson and Kost had developed for her. No employee can fairly expect to keep a job and at the same time reject her employer's workplace goals. [7]

The Center's Personnel Handbook makes clear that all Center staff members are employed at will and that, upon identifying performance issues or other problems, the Center may determine and implement an appropriate response, including termination. That aptly describes what happened here.

---

[7] *Cf. Czekalski*, 2007 WL 283443 *5-6 (sole grounds for employer's transfer of employee were four alleged performance deficiencies, each of which was shown to be false; employer's later clarification of deficiencies "represented nothing more than back-pedaling").

**B. The Center Did Not Retaliate**

**1. § 1981 Does Not Prohibit Retaliation**

Unlike Title VII, § 1981 does not include a separate retaliation provision.  Although some circuits have permitted retaliation claims under § 1981, this circuit have never expressly ruled on the issue.  *See Welzel v. Bernstein*, 436 F.Supp.2d 110, 115-17 (D.D.C. 2006) (citing *Carney v. American Univ.*, 151 F.3d 1090 (D.C.Cir. 1998)). [8]

The Center submits that this circuit, if squarely faced with the question, would as a matter of law reject a retaliation claim grounded on § 1981.  As the D.C. Circuit has recognized, the first rule of statutory construction is to read the statute.  *Local Union 1261, Dist. 22, United Mine Workers of America v. Federal Mine Safety & Health Review Comm.*, 917 F.2d 42, 45 (D.C.Cir. 1990) ("If the first rule of statutory construction is 'Read,' the second rule is 'Read On!'").  The complete absence of any retaliation provision in § 1981, in contrast with Title VII's explicit retaliation provision, compels the conclusion that while Title VII covers retaliation, § 1981 does not.

*Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006), supports this approach.  In *Burlington* the Supreme Court carefully compared Title VII's discrimination provision with its retaliation provision, concluding that because the wording in the two provisions differs, the scope of the two provisions must differ as well.  *Burlington*, 126 S.Ct. at 2411-12.

---

[8] In *Carney* the employer failed to raise the issue on appeal, leading the D.C. Circuit to assume, without deciding, that § 1981 allows retaliation claims.  *Carney*, 151 F.3d at 1094-95.

### 2.  Ransom Cannot Establish a Prima Facie Case

Alternatively, assuming for summary judgment purposes only that § 1981 would support a retaliation claim, Title VII's analytical framework, including the *McDonnell Douglas* burden-shifting scheme, would likely apply.  *See Carney*, 151 F.3d at 1094; *Welzel,* 436 F.Supp.2d at 117.  To establish a prima facie case of retaliation under Title VII, a plaintiff must provide evidence that he was engaged in protected activity, that his employer took a materially adverse action against him, and that a causal connection exists between the two.  42 U.S.C. § 2000e-3(a); *Broderick*, 437 F.3d at 1231-32 (identifying the three elements of a Title VII retaliation case).  *See Burlington*, 126 S.Ct. at 2415 (adopting the D.C. Circuit's analysis in *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C.Cir. 2006)).  Failure to satisfy any one element of a prima facie case is fatal to an employee's retaliation claim. *Roney v. Illinois Dept. of Trans.*, __ F.3d __, 2007 WL 117501 *2 (7th Cir. 2007).

### a.  Ransom's Activities Were Not Protected

For activity to be protected, the plaintiff must reasonably believe that the underlying employment practice which he is complaining about or opposing is unlawful.  *Breeden*, 532 U.S. at 271; *George*, 407 F.3d at 417.  In *Breeden* the Supreme Court held that no reasonable person could have believed that a single incident involving an ambiguous exchange with sexual innuendo between two males in the presence of a female violated Title VII.  And in *George* the D.C. Circuit held that the incidents which plaintiff complained about – being told three times by co-workers to "'go back where she came from' . . . could not reasonably be thought to constitute an abusive working environment in violation of Title VII."  As a result,

the employee's retaliation complaint in *George* "did not constitute opposition to a practice made unlawful by Title VII."

As shown in Argument Section A-2-a above, the underlying incidents on which Ransom based her May 27 complaints and her June 4 OHR filing cannot support a reasonable belief that § 1981 was violated.

And even if Ransom had a reasonable basis for her belief, simply expressing "concerns" and "dissatisfaction" is not a complaint within the meaning of retaliation jurisprudence. As the Court pointed out in *Broderick*, 437 F.3d at 1232, "Not every complaint garners its author protection under Title VII. . . . While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." In that case the plaintiff's failure to complain that she was being currently discriminated against doomed her retaliation claim.

### b. The Center Acted Prior to Any Protected Activity

Johnson and Kost made the decision to terminate Ransom in early to mid-May, prior to the May 27 meeting and prior to the June 4 OHR filing. Having already made the decision, the Center had no obligation to suspend a previously planned employment action upon discovering that the employee has engaged in protected activity; an employer's proceeding with such action "is no evidence whatever of causality." *Breeden*, 532 U.S. at 272. More generally, an employee cannot immunize herself from implementation of an employment decision by complaining of discrimination and filing an administrative charge:

-23-

> Under Title VII, an employee who is being criticized for performance issues may not refuse to address these issues, and instead, file a Title VII action in an obvious attempt to immunize herself from any adverse action. Filing a Title VII action is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination.

*Welzel*, 436 F.Supp.2d at 128 (citation and internal quotation marks omitted).

Ransom's June 4, 2004 OHR charge provides her no protection for the additional reason that, as a matter of undisputed fact, the Center did not learn of the charge until June 17, 2004, two days *after* Ransom was fired. *See Patrick v. Principi*, 275 F.3d 44, __ , 2001 WL 1223858 *5 (5th Cir. 2001) (decision-makers' lack of knowledge of protected activity "weakens any causal link between the activity and the" adverse action, justifying summary judgment); *Mazloum v. District of Columbia*, 442 F.Supp.2d 1, 12-14 (D.D.C. 2006) (a defendant's awareness that the plaintiff engaged in protected activity is essential to establish a prima facie case of retaliation under the HRA); *Breeden*, 532 U.S. at 273 (suggesting that lack of knowledge of protected activity would be a defense to a retaliation claim).

### 3.  The Center Had Legitimate Reasons to Fire Ransom

Finally, as shown in Argument Section A-2-b above, Ransom was terminated for legitimate, non-pretextual reasons.

## C.  Ransom Fails to State a Claim of Negligent Supervision

### 1.  The Claim Is Preempted by the Human Rights Act

Count V alleges that the Center "failed to enforce their [sic] policies of non-discrimination and non-retaliation against Plaintiff's supervisors, thereby breaching its

duty of care in the supervision and maintenance of its personnel." The "policies of non-discrimination and non-retaliation" to which Ransom refers in Count V are those contained in the Center's Personnel Handbook. Ransom Dep. 49 [Apx. 33].

The Center's policies, as expressed in its Handbook, simply repeat *statutory* non-discrimination requirements, violations of which give rise to *statutory* remedies which supersede any common law remedies that might otherwise be available. *See Carl v. Children's Hosp.*, 702 A.2d 159, 171 (D.C. 1997) (Ferren, J., concurring) ("[W]e would be entirely off base if we were not to conclude that the [District of Columbia] Council had preempted, for example, the legal fields represented by the exhaustive list of Human Rights Act prohibitions against discrimination in employment ..."); *Vitikacs v. American Legion*, 2003 WL 22004935 * 4 (D.C.Super. No. 02-CA-10202, decided June 8, 2003) (Kravitz, J.) (common law count of wrongful discharge, based on public policy stated in HRA, dismissed for failure to state a claim).

### 2. The Handbook Is Not a Contract

To the extent Ransom's Count V claim is based on Center policies that are independent of any statutory requirements, those policies are not contractual and they cannot be enforced against the Center. The Center's Personnel Handbook says:

> **This Employee Handbook is intended to serve as a guideline, describing the basic personnel policies and practices ordinarily applied by WCA. It is not intended to create and is not a contract of employment. No contractual rights are conferred on the employee by this Employee Handbook; its provisions shall not constitute contractual obligations enforceable against WCA. The employees of the Washington Council of Agencies are terminable-at-will, meaning that either the employee or**

**WCA may terminate the employment relationship at any time, with or without cause.**

Ex. 11 [Apx. 157]; bold and underscored text in original. These provisions are sufficient as a matter of law to preclude the creation of implied contractual obligations. *Boulton v. Institute of Int'l Edu.*, 808 A.2d 499, 505 (D.C. 2002).

### 3.  The District's Workers' Compensation Act Bars the Claim

Finally, Ransom's common law negligence claims are barred by the exclusivity provisions of the District of Columbia Workers' Compensation Act, D.C. Code § 32-1501, *et seq.* Specifically, § 32-1504 provides that an employer's statutory, no-fault liability for compensable injuries "shall be exclusive and in place of all liability of such employer to the employee ...." *See Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362, 373-74 (D.C. 2003) (unless workplace injuries are "clearly" not compensable, the Department of Employment Services has primary jurisdiction). [9]

### III.  Conclusion

For all the foregoing reasons, the Court should grant the Center's motion for summary judgment.

---

[9] *Joyner* held that common law claims should be stayed, not dismissed, pending action by the Department of Employment Services. Here, however, any Workers' Compensation Act claim Ransom may have had is long since barred by the one-year limitation in D.C. Code § 32-1514.

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.


By ____/s/ Charles H. Fleischer_____
        Charles H. Fleischer, D.C. Bar No. 4341

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
tel: (301) 986-4056 / fax: (301) 951-0555
e-mail: cfleischer@ofqlaw.com

*Attorneys for defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LISA RANSOM** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-843 RMC |
| | ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to LCvR 7(h), defendant Center for Nonprofit Advancement (the "Center"), by its attorneys, submits this Statement of Material Facts Not in Dispute. [1]

1.    The Center is a tax-exempt, District of Columbia nonprofit corporation headquartered in the District of Columbia.  Johnson Aff. ¶ 3 [Apx. 133]. [2]

2.    The Center was founded in 1979 to serve the nonprofit community in the Washington metropolitan area through education, advocacy, nonprofit community building, and group purchasing.  Johnson Aff. ¶¶ 3, 5 [Apx. 133-34].

3.    The Center has approximately 1000 members, each of which is, in turn, a non-profit organization.  Johnson Aff. ¶ 4 [Apx. 134].

---

[1] The Center was formerly known as Washington Council for Agencies.  It is referred to in the record by that name and "WCA" as well as the "Center" and "CNA".

[2] "Apx. __" refers to the Appendix accompanying the Center's Motion for Summary Judgment.  "Ex. __" refers to exhibits marked at the deposition of plaintiff Lisa Ransom.

4.  The Center is governed by a Board of Directors.  Johnson Aff. ¶ 2 [Apx. 133].

5.  During the period that plaintiff Lisa Ransom ("Ransom") was employed by the Center, the Center's Board of Directors consisted of six African-Americans, six Caucasians, and one Latino.  Johnson Aff. ¶ 6 [Apx. 134].

6.  The Center has a paid staff, headed by its Executive Director who reports to the Board of Directors.  Betsy Johnson ("Johnson") has been the Center's Executive Director since 1988.  Johnson Aff. ¶ 2 [Apx. 133].

7. During the period that Ransom was employed by the Center, the Center had up to 15 employees.  Of those 15, seven were African-American, seven were white, and one was Latina.  Johnson Aff. ¶ 6 [Apx. 134].

8.  During the period that Ransom was employed by the Center, the Center had a Personnel Handbook which contained the following relevant provisions:

> **This Employee Handbook is intended to serve as a guideline, describing the basic personnel policies and practices ordinarily applied by WCA [i.e. the Center].. <u>It is not intended to create and is not a contract of employment</u>.  No contractual rights are conferred on the employee by this Employee Handbook; its provisions shall not constitute contractual obligations enforceable against WCA.  The employees of The Washington Council of Agencies are terminable at-will, meaning that either the employee or WCA may terminate the employment relationship at any time, with or without cause.**
>
> **The Washington Council of Agencies reserves the right to make changes, from time to time, with or without notice, in the policies and practices described in this Handbook**. . . . [Sec. II; bold and underscored text in original].

\* \* \*

-2-

WCA is committed to a policy of equal employment opportunity, and does not discriminate in the terms, conditions or privileges of employment on account of race ... or otherwise as may be prohibited by federal or state law. [Sec. III].

* * *

When performance issues are identified with respect to an employee, . . . or when for any reason the employment relationship has become problematic from the point of view of WCA, any of a variety of steps might be taken, up to and including termination. . . .  WCA reserves its right to determine what it believes is an appropriate response, and to implement it. [Sec. VII].

* * *

Employees . . . who have been employed for at least six consecutive months and who are dismissed from employment may use the Grievance Procedures described in Section IX below to challenge the dismissal. . . .  [Sec. VIII-D].

* * *

If an employee feels that inappropriate corrective action or any improper action has been taken against him/her, and the employee has been unable to resolve the matter informally by speaking with the supervisor, the employee has ten business days from the taking of the action to pursue the matter by filing a written grievance with the Executive Director. . . .

If the employee has a complaint about the Executive Director, the employee shall take up that complaint directly with the Executive Director. If that does not resolve the matter, the employee has ten business days to choose to pursue the matter by making a written complaint about the matter to the Board President. . . . [Sec. IX].

Johnson Aff. ¶¶ 7, 8 [Apx. 134-35]; Ransom Dep. 110 [Apx. 61]; Ex. 11 [Apx. 157].

-3-

9. Every Center employee is required, on being hired, to acknowledge in writing that he or she has received and read the Center's Personnel Handbook. Johnson Aff. ¶ 9 [Apx. 135].

10. The Center evaluates its employees annually in late June or early July. Johnson Aff. ¶ 10 [Apx. 135].

11. The Center's office suite at 1666 K Street, N.W., Washington, DC includes a conference room that provides a connection between the common hallway and the Center's interior office space. Johnson Aff. ¶ 11 [Apx. 135].

12. On a number of occasions, unauthorized persons have gained access to the Center's interior office space and have been seen in private offices and using telephones. Building management has also warned of thefts in other suites in the building. As a result, the Center's employees have assumed responsibility to stop and question persons within the Center's interior offices whom they do not recognize. Johnson Aff. ¶ 12 [Apx. 135]; Baird Dep. 45-47 [Apx. 130-33]. [3]

13. Former Center employee Jeremy Baird was among the Center employees who stopped and questioned persons within the Center's interior offices whom he did not recognize. During the course of Baird's employment at the Center's K Street offices, he stopped and questioned approximately 10 such persons, including both white and African American persons. Baird Dep. 45-47 [Apx. 130-33].

---

[3] "Baird Dep." refers to the deposition of Jeremy Baird, a former Center employee, taken in *Hall v. Center for Nonprofit Advancement*, U.S. Dist. Ct. for D.C. No. 06-806.

14.  In mid-2003, Ransom applied to the Center for the position of Director of Public Policy and Community Relations.  The position had become vacant due to the death of Phyllis Campbell Newsome ("Newsome") in childbirth.  Johnson Aff. ¶ 13 [Apx. 135].

15.  Newsome, who was African American, had held the position of Director of Public Policy and Community Relations for eight years prior to her death.  Johnson Aff. ¶ 14 [Apx. 135;  Ransom Dep. 65 [Apx. 43].

16.  The Center interviewed Ransom twice.  The first interview was by Jeff Kost ("Kost"), the Center's Deputy Executive Director.  The second interview was by Kost, Johnson, and Angela Jones Hackley ("Hackley"), then a Center board member and an official of the DC Action for Children.  Johnson Aff. ¶ 15 [Apx. 136]; Kost Aff. ¶ 4 [Apx. 146]; Ransom Dep. 109 [Apx. 60].

17.  Hackley is African American.  Johnson Aff. ¶ 17 [Apx. 136].

18.  On or about August 13, 2003, Johnson and Kost jointly decided to offer Ransom the position of Director of Public Policy and Community Relations.  Johnson Aff. ¶ 18 [Apx. 136]; Kost Aff. ¶ 5 [Apx. 146].

19.  By letter dated August 13, 2003, the Center offered Ransom the position of Director of Public Policy and Community Relations.  Ransom accepted the offer and began working for the Center on September 8, 2003.  Ransom Dep. 105, 110 [Apx. 58, 61]; Ex. 10 [Apx. 155].

20. Coincident with her being hired, Ransom received and receipted for a copy of the Center's Personnel Manual.  Johnson Aff. ¶ 20 [Apx. 136]; Kost Aff. ¶ 7 [Apx. 146]; Ransom Dep. 110-11 [Apx. 61-62]; Ex. 12 [Apx. 172].

21. As Director of Public Policy and Community Relations, Ransom was considered a member of senior staff.  She reported to Kost, who in turn reported to Johnson.  Johnson Aff. ¶¶ 16, 19 [Apx. 136].

22. As Director of Public Policy and Community Relations, Ransom was required to "play an active role with . . . [the Center]. in supporting and communicating with local nonprofits on local issues" and to perform various specific responsibilities, including analyzing and evaluating issues for the local nonprofit sector; monitoring policy and legislation relevant to local nonprofits; developing and maintaining strong relationships with policy makers in all local jurisdictions; and establishing, developing and maintaining strong constituent relations.  The position required her to be able to work with people and to have strong written and oral communication skills.  Johnson Aff. ¶ 21 [Apx. 136-37]; Kost Aff. ¶ 8 [Apx. 146-47]; Ex. 10 [Apx. 155].

23. Although Ransom's position included a requirement that she interact with Center members in the District of Columbia, Montgomery and Prince George's Counties, Maryland, and northern Virginia, the Center expressly relieved her from interacting with the Center's northern Virginia members.  Johnson Aff. ¶ 22 [Apx. 137]; Kost Aff. ¶ 9 [Apx. 147]; Ransom Dep. 102 [Apx. 57]; Ex. 10 [Apx. 155].

24. Ransom's position at the Center was unique in that, among other things, she spent more time than any other employee in the field addressing public policy matters for Center members. Ransom Dep. 36, 39-41 [Apx. 21-25].

25. After Ransom had worked at the Center for about four months, both Johnson and Kost concluded that Ransom was not making adequate progress toward meeting her responsibilities, that she was unfocused in her work, and that she moved from one activity to another without any plan or priority. Johnson Aff. ¶ 24 [Apx. 137]; Kost Aff. ¶ 11 [Apx. 147].

26. Kost, as Ransom's supervisor, criticized Ransom's work in writing in the following instances:

a. Ransom resisted Kost's suggestion that she expand the base of support in opposition to a proposal pending before the Montgomery County Council. Kost specifically criticized Ransom concerning this matter in an e-mail dated January 13, 2004. Kost Aff. ¶ 11a. [Apx. 147]; Ransom Dep. 180-82 [Apx. 88-90]; Ex. 27 [Apx. 174].

b. With respect to that same Montgomery County Council proposal, Kost and Ransom exchanged e-mails on February 25, 2004, in which Kost stated he was "disappointed ... [Ransom was] not able to find a way to talk about this ... [in a] timely paragraph," that Kost was "obviously not communicating what I need from you," and that "[t]his is an ongoing story, but if we don't tell it as time ... passes, we're missing the boat." Ransom responded that she had insufficient time to focus on and research the matter and that "this is

not the type of work that I'm compelled to write."  Kost Aff. ¶ 11b. [Apx. 148]; Ransom

Dep. 185-86 [Apx. 93-94]; Ex. 29 [Apx. 175].

       c.  In an exchange of e-mails between Ransom and Kost on April 14, 2004,

Kost was critical of Ransom's work on an article in an upcoming issue of a Center electronic

newsletter (called an "E-genda").  Kost stated: "If you are reading any of the previous E-

gendas, you would find that we don't publish full articles.  We write brief paragraphs and

then lead people to a link for more information.  We have had this discussion before."  Kost

Aff. ¶ 11c. [Apx. 148]; Ransom Dep. 212-13 [Apx. 98-99]; Ex. 32 [Apx. 179].

       d.  Ransom failed to consult with Kost and Johnson regarding issuance of a

public policy alert and she failed to produce a timely alert.  Kost expressed his criticism in

a memo to Johnson dated May 12, 2004.  Kost Aff. ¶ 11d. [Apx. 148]; Ex. 50 [Apx. 200].

      27.  Prior to Kost's criticisms, Ransom had perceived no discrimination in Johnson's

or Kost's treatment of her.  Ransom attributes Kost's criticisms to a misunderstanding and

to confusion on his part, not to racism.  Ransom Dep. 189-90, 213 [Apx. 96-97, 99].

      28.  A number of Center members complained to the Center about Ransom's work.

Specifically:

       a.  In the late fall of 2003, Michael E. Young of the United Communities

Against Poverty telephoned Johnson to question and complain about information given him

by Ransom concerning the Center's commitment to participate in a coalition.  Johnson Aff.

¶ 25a. [Apx. 138].

b.  In the late fall of 2003 or early winter of 2004, Sheri Brady, formerly with the National Council of Nonprofit Associations, told Johnson that Ransom did not do a good job on a congressional staff briefing she (Ransom) had conducted.   Johnson Aff. ¶ 25b. [Apx. 138].

c.  In the early spring of 2004, Mac Ramsey of The Arc of Prince George's County called Johnson to complain about an unrealistic budget that Ransom had prepared for an upcoming conference.   Johnson Aff. ¶ 25c. [Apx. 138].

d.  A member nonprofit called Ransom with a problem it was having with a Montgomery County official (an official whose staff Ransom already knew).  Ransom met with a staff member for the official and reported back to Johnson that the member nonprofit had misbehaved and would "not get anywhere" with the official.  Ransom ceased all further effort to resolve the matter and never followed up with the member nonprofit.  Johnson Aff. ¶ 25d. [Apx. 138].

e.  Johnson met with Hackley, a Center Board member and an official of the DC Action for Children, on or about June 6, 2005 and told her that Ransom was going to be fired.  Hackley supported the decision and said that Ransom had not done a good job at an event she (Ransom) had facilitated.   Johnson Aff. ¶ 25e. [Apx. 138].

29.  Ransom was often late in accomplishing administrative duties, such as getting short pieces about her work to Kost for inclusion in the Center's newsletter; getting reports to Johnson in preparation for Board of Director meetings; and getting time sheets in. Johnson Aff. ¶ 26 [Apx. 139].

30. On May 27, 2004 Johnson requested all senior staff to submit reports by close-of-business June 1 for inclusion in Johnson's quarterly report to the Board. After several follow-up requests by Kost, Ransom submitted her report on the afternoon of June 3. Ransom's report failed to identify issues, it failed to state any planned action, and it contained no analysis of her meetings during the quarter. Johnson Aff. ¶ 27 [Apx. 139].

31. Most of the Center's staff, including Johnson and Kost, keep their office doors open except when dealing with personnel issues or other confidential or highly sensitive matters. They also communicate with fellow staff members in a face-to-face manner. Johnson Aff. ¶ 28 [Apx. 139]; Kost Aff. ¶ 15 [Apx. 149].

32. Ransom frequently worked with her office door shut and she communicated with staff members mostly via e-mail. Johnson and Kost criticized Ransom for these work habits, telling her they "breed misunderstandings" and "signal" that Ransom is "inaccessible." Johnson Aff. ¶ 28 [Apx. 139]; Kost Aff. ¶ 15 [Apx. 149-50]; Ransom Dep. 244-245 [Apx. 124-25].

33. By mid-January 2004, Johnson and Kost decided that Ransom might benefit from closer supervision in the form of regular, weekly meetings. From January through May 2004 nine such meetings took place, on January 14, February 20, March 12, April 8, April 27, April 28, May 7, May 17 and May 27. Johnson Aff. ¶ 29 [Apx. 139]; Kost Aff. ¶ 16 [Apx. 150]; Ransom Dep. 46-47, 231-232 [Apx. 30-31, 112-13].

34. Kost had imposed the same weekly meeting requirement on another person he supervised, who is a white male. Kost Aff. ¶ 17 [Apx. 150].

35.   In preparation for the March 12 meeting, Kost developed a written list of objectives for Ransom, with deadlines for each objective.  The objectives were discussed at the meeting.  Following the meeting, Kost compiled his, Johnson's and Ransom's comments regarding the status of the objectives.  Johnson Aff. 30 [Apx. 140]; Kost Aff. ¶ 18 [Apx. 150]; Ransom Dep. 227-236 [Apx. 108-17]; Ex. 39 [Apx. 186].

36.   Kost followed this same procedure for subsequent meetings among Johnson, Kost and Ransom.  Johnson Aff. ¶ 30 [Apx. 140]; Kost Aff. ¶ 18 [Apx. 150]; Ransom Dep. 223-240 [Apx. 104-21]; Ex. 39, 40, 41, 43, 44, 45 [Apx. 186, 188, 190, 193, 196, 198].

37.   Kost repeatedly asked Ransom to sign the compilations to indicate she agreed with the objectives and their status.  Ransom refused to do so.  Kost documented Ransom's refusal in a memo dated May 5, 2004 to Betsy Johnson.  Kost Aff, ¶ 19 [Apx. 150]; Ransom Dep. 153-56, 223-35 [Apx. 81-84, 104-116]; Ex. 42 [Apx. 192].

38.   On April 14, 2004, Kost directed Ransom either to allow the Center to use a photograph of her taken by a Center photographer, or to provide the Center with another photograph.  The photograph was to be used in the Center's newsletter and on its website.  Kost Aff. ¶ 12 [Apx. 149]; Ex. 38 [Apx. 185].

39.   Ransom refused Kost's directive, responding that "on the advice of counsel, I am electing not to have my photographic image used in any way ... at this time."  Kost Aff. ¶ 12 [Apx. 149]; Ransom Dep. 219-23 [Apx. 100-104]; Ex. 37, 38 [Apx. 181, 185].

40.   Ransom does not claim that Kost's directive regarding use of Ransom's photograph was racially motivated.  Ransom Dep. 227 [Apx. 108].

41.  At numerous meetings with Ransom during the late winter and spring of 2004, Johnson and Kost repeatedly told Ransom that her work was deficient.  Johnson Aff. ¶ 31 [Apx. 140]; Kost Aff. ¶ 20 [Apx. 151]; Ransom Dep. 229-30 [Apx. 110-11].

42.  During Ransom's employment at the Center:

a.  An African American colleague of Ransom's named William Terry was asked to conduct a training session at the Center.  During a preparatory meeting in the Center's conference room among Terry, Ransom, and another Center employee who is Latina, and while Terry was using his cell phone, Kost interrupted to ask if he could use the conference room earlier than scheduled because a number of guests of his had already arrived.  Kost said nothing of a racial nature during the interruption.  Johnson Aff. ¶ 32a. [Apx. 140]; Kost Aff. ¶ 21 [Apx. 151]; Ransom Dep. 125-29 [Apx. 71-75].

b.  An African American colleague or Ransom's named Carlottia Scott was asked to conduct a training session at the Center.  During a break in a preparatory meeting in the Center's conference room among Scott, Ransom, and another Center employee, while Scott was alone in the Center's interior office area, Scott was stopped and questioned by Center employee Baird.  Baird and Scott had never previously met.  Baird had taken the same action approximately 10 times with both white and African American visitors whom he did not recognize.  When Johnson was told that Scott was upset, she called Scott and apologized. Johnson Aff. ¶ 32b. [Apx. 140-41]; Ransom Dep. 52-58 [Apx. 36-42]; Baird Dep. 45-47 [Apx. 130-32].

c.  Ransom invited a Rev. Earl Trent, who is African American, to be the invocation speaker at a function in which she was involved.  A Center employee named Barbara Mendoza, who was serving as receptionist for the function, charged Rev. Tent the regular admission price.  When Ransom complained to Mendoza, Mendoza said she did not recognize Rev. Trent; she did not say she charged him because he is African American. When Ransom complained to Johnson, Johnson refunded the charge to Rev. Trent.  Mendoza did not charge other presenters at the function, including African American presenters. Mendoza has never made a racially derogatory comment in Ransom's presence.  Johnson Aff. ¶ 32c. [Apx. 141]; Ransom Dep. 42-45 [Apx. 26-29].

d.  Ransom invited Kost to attend a state-of-the-county function with her in Prince George's County, which Kost declined.  Ransom does not know the reason Kost declined her invitation.  In declining, Kost made no mention of race.  Kost later attended a conference in Prince George's County which Ransom helped organize.  Kost Aff. ¶ 22 [Apx. 151-52]; Ransom Dep. 25-26, 115-16 [Apx. 11-12, 66-67].

e.  At the Prince George's County conference that Ransom helped organize, Ransom suggested that Kost sit at a table with attendees who were all or predominantly African American, but Kost chose to sit with his colleagues, who were all or predominantly white.  Kost did not say that he made the choice for racial reasons, saying only that he chose to sit with his colleagues.  Ransom Dep. 115-16 [Apx. 66-67].

43.  In early to mid-May 2004 Johnson and Kost jointly decided to fire Ransom. Johnson Aff. ¶ 35 [Apx. 142]; Kost Aff. ¶ 23 [Apx. 152].

44. At the time Johnson and Kost decided to fire Ransom, Ransom was working on a 1½-day conference being co-sponsored by the Center, scheduled for June 10-11, 2004. Because terminating Ransom at that time could have jeopardized the Center's role as co-sponsor and jeopardized the conference itself, Johnson and Kost delayed firing her until after the conference. Johnson Aff. ¶ 35 [Apx. 142]; Kost Aff. ¶ 23 [Apx. 152].

45. On May 27, 2004, at one of Johnson's and Kost's supervisory meetings with Ransom, Ransom called Kost unprofessional and racist. That meeting occurred after Johnson and Kost had decided to fire Ransom. Johnson Aff. ¶ 36 [Apx. 142]; Kost Aff. ¶ 24 [Apx. 152].

46. On June 15, 2004, Johnson and Kost met with Ransom in Johnson's office and told her the Center was terminating her. Kost then handed Ransom a written notice of termination. Johnson Aff. ¶ 37 [Apx. 142]; Kost Aff. ¶ 25 [Apx. 152]; Ransom Dep. 76, 259 [Apx. 47, 128]; Ex. 52 [Apx. 201].

47. The Center never formally evaluated Ransom because she was hired after the 2003 evaluations took place and she was terminated before the 2004 evaluations took place. Johnson Aff. ¶ 38 [Apx. 142]; Kost Aff. ¶ 26 [Apx. 152].

48. At no time during her employment by the Center did Ransom complain to Johnson, Kost, or any Center director or officer that she was suffering employment discrimination because of her race or because of any other protected characteristic. Johnson Aff. ¶ 39 [Apx. 142]; Kost Aff. ¶ 28 [Apx. 152-53].

49.  At no time during her employment by the Center did Ransom file a written grievance with the Executive Director.  Johnson Aff. ¶ 40 [Apx. 142].

50.  At no time after her termination on June 15, 2004 did Ransom use the Center's grievance procedures to challenge her dismissal.  Johnson Aff. ¶ 41 [Apx. 143].

51.  On June 17, 2004, the Center received a copy of a charge Ransom had filed with the District of Columbia Office of Human Rights.  Johnson Aff. ¶ 43 [Apx. 143].

52.  Prior to receipt of Ransom's charge on June 17, 2004, the Center was unaware that Ransom had filed any such charge.  Johnson Aff. ¶ 43 [Apx. 143]; Kost Aff. ¶ 30 [Apx. 153]; Ransom Dep. 136-37 [Apx. 76-77].

53.  Ransom has never heard Johnson or Kost use a racial epithet; no one has ever told Ransom that Johnson or Kost used a racial epithet; and Ransom has never heard anyone use a racial epithet in Johnson's or Kost's presence.  Johnson Aff. ¶ 42 [Apx. 143]; Kost Aff. ¶ 29 [Apx. 153]; Ransom Dep. 117-19 [Apx. 68-70].

54.  On or about October 1, 2004 Johnson and Kost hired Lee Mason (an existing Center employee) to take the position of Director of Public Policy and Community Relations.  Mason is African American.  Johnson Aff. ¶ 44 [Apx. 143]; Kost Aff. ¶ 27 [Apx. 152].

55.  Every person who has held the position of Director of Public Policy and Community Relations since its creation in 1990 has been African American.  Johnson Aff. ¶ 45 [Apx. 143].

-15-

56.  Between June 2004 and June 2005 Ransom promoted her personal consulting business, known as The Ransom Group, through which she obtained some work and earned some fees.  Ransom Dep. 66, 80-83 [Apx. 44, 48-51].

57.  In June 2005, Ransom became a full-time employee of the Center for Policy Alternatives in Washington, DC at an annual salary of $82,000 and with benefits comparable to those she had while previously employed by the Center.  Ransom Dep. 8-11 [Apx. 2-5].

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.


By ____/s/ Charles H. Fleischer_____
Charles H. Fleischer, D.C. Bar No. 4341

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
tel: (301) 986-4056 / fax: (301) 951-0555
e-mail: cfleischer@ofqlaw.com

*Attorneys for defendant*

-16-