# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LISA RANSOM** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-843 RMC |
| | ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## APPENDIX TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PART A

Apx. Page

Ransom deposition excerpts                                           1

### PART B

Baird deposition excerpts                                           129

Johnson affidavit                                                   133

Kost affidavit                                                      145

Exhibit 10 – offer letter dated 8-13-03 and job description         155

Exhibit 11 – Center Personnel Handbook dated Oct. 2001             157

Exhibit 12 – Ransom receipt for Handbook dated 9-8-03              172

Exhibit 13 – e-mail dated 8-17-03, Ransom to Kost                  173

|  | Apx. Page |
|---|---|
| Exhibit 27 – e-mail dated 1-13-04, Kost to Ransom | 174 |
| Exhibit 29 – e-mails dated 2-25-04 between Kost and Ransom | 175 |
| Exhibit 32 – e-mails dated 4-14-04 between Kost and Ransom | 179 |
| Exhibit 37 – e-mail dated 4-14-04, Ransom to Kost | 181 |
| Exhibit 38 – memo dated 4-14-04, Kost to Ransom | 185 |
| Exhibit 39 – objectives March 12-June 30 | 186 |
| Exhibit 40 – objectives review dated 4-8-04 | 188 |
| Exhibit 41 – objectives review dated 4-8-04 | 190 |
| Exhibit 42 – memo dated 5-5-04, Kost to Johnson | 192 |
| Exhibit 43 – objectives review dated 5-7-04 | 193 |
| Exhibit 44 – objectives review dated 5-17-04 | 196 |
| Exhibit 45 – objectives review dated 5-27-04 | 198 |
| Exhibit 50 – memo dated 5-12-04, Kost to Johnson | 200 |
| Exhibit 52 – termination letter dated 6-14-04 | 201 |

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
LISA RANSOM,                  :
                              :
          Plaintiff,          :
                              :
v.                            :  Case No.
                              :  1:06-CV-843 RMC
CENTER FOR NONPROFIT          :
ADVANCEMENT,                  :  VOLUME I
                              :
          Defendant.          :
                              :
- - - - - - - - - - - - - - - x

          Wednesday, October 25, 2006

          Bethesda, Maryland

DEPOSITION OF:

          LISA RANSOM

     a Plaintiff in the above-entitled cause,

called for examination by counsel for the Defendant,

pursuant to notice and to agreement of counsel as to

time and place, at the law offices of Oppenheimer,

Fleischer & Quiggle, P.C., 7700 Old Georgetown Road,

Suite 800, Bethesda, Maryland 20814-6100, commencing

at 10:35 a.m., before Marney Alena Mederos, RPR, a

Notary Public in and for the State of Maryland, when

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 8

1          Q      And your current business address?

2          A      For The Ransom Group, 13035 Silver

3     Maple Court.

4          Q      Are you now employed?

5          A      Yes, I am.

6          Q      Who do you work for?

7          A      I work for the Center for Policy

8     Alternatives.

9          Q      What is their address?

10         A      1875 Connecticut Avenue, Northwest,

11    Washington, D.C.

12         Q      When did you start there?

13         A      June 2005.

14         Q      Do you remember the exact date?

15         A      Maybe the 8th.

16         Q      Are you full time?

17         A      Yes, I am.

18         Q      What is your title?

19         A      Senior director, state action network.

20         Q      Tell me what you do at that place.

21         A      I'm responsible for establishing

22    network relationships with state legislators around

Page 9

1    the country.

2            Q      Does that involve travel?

3            A      Yes, it does.

4            Q      How many days a week are you typically

5    on travel?

6            A      In terms of trips, 10 to 15, 20 trips a

7    year.

8            Q      Okay.  And that would be a couple days

9    at a time?

10           A      Three to four days.

11           Q      Who is your immediate supervisor there?

12           A      Tim McFeeley.

13           Q      How do you spell his last name, please?

14           A      M-c-F-e-e-l-e-y.

15           Q      What is his title?

16           A      Executive director.

17           Q      So you report to the executive

18   director?

19           A      That's correct.

20           Q      And I take it he's the chief -- the

21   chief paid staff member?

22           A      Yes, that's correct.

Page 10

1        Q      Is the Center for Policy Alternatives a

2    nonprofit organization?

3        A      Yes, it is.

4        Q      Is it a member of CNA?

5        A      The Washington Council of Agencies?

6        Q      Yes, ma'am.

7        A      Yes, it is.

8        Q      Just for the record, as you know,

9    Washington Council of Agencies has changed its name

10   to the Center for Nonprofit Advancement.

11            If I refer to CNA or the Center, I mean

12   what you used to call the Washington Council of

13   Agencies, okay?

14       A      I understand.

15       Q      Okay.  What is your salary at the

16   Center for Policy Alternatives?

17       A      82,000.

18       Q      Was that your starting salary?

19       A      Yes, it was.

20       Q      What benefits do you have?

21       A      Health, dental, standard -- a standard

22   benefits package.

Page 11

1          Q    Are they the same or different from the

2     benefits you had at the Washington Council of

3     Agencies?

4          A    Comparable.

5          Q    When did you apply to the Center for

6     Policy Alternatives?

7          A    I believe it was late spring of '85.

8          Q    Of '85?

9          A    2005.  Sorry.

10         Q    Okay.  How did you hear about the job?

11         A    I saw it on a website, but I can't

12    recall which one.

13         Q    Okay.  What is your date of birth,

14    please?

15         A    09/06/61.

16         Q    Have you ever testified in court

17    before?

18         A    Yes, I have.

19         Q    What was the nature of that?

20         A    I believe I was a witness in a child

21    custody case.

22         Q    Nothing to do with your family?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT        October 25, 2006

Page 13

1          A      I have not.

2          Q      Okay.  Have you ever been a party to a

3     lawsuit before other than this case?

4          A      I have not.

5          Q      I'm going to ask you, Ms. Ransom, to

6     look at a number of exhibits.  The court reporter

7     has been kind enough to premark these.  I'm going to

8     show you Exhibit 1, and I would like to have you

9     look at it, please.

10               Ma'am, you're welcome to read the whole

11    thing if you want.  I'm only going to ask you about

12    specific provisions in that, and that might save

13    time.

14               Can you identify Exhibit 1 as the

15    Complaint that was filed on your behalf in this

16    lawsuit?

17         A      Yes.

18         Q      If you would look at paragraph number 6

19    on page 2 of Exhibit 1, I'm going to read the first

20    sentence aloud.  Quote, of eight senior staff

21    positions during the time of Ms. Ransom's

22    employment, six were filled with white employees,

Page 14

1    including the executive director, and then it gives

2    her name.

3              I would like you to identify for me the

4    eight senior staff positions you are referring to

5    there and who occupied them.

6         A    May I refer to Mary Elizabeth Johnson

7    as Betsy Johnson?

8         Q    Sure.

9         A    Betsy Johnson.

10        Q    And give me titles.  Betsy?

11        A    Executive director.

12        Q    Okay.

13        A    Jeff Kost, deputy director, external

14   relations.

15        Q    Okay.

16        A    Susan Sanow, and she was the deputy

17   director, but I can't recall what the last part of

18   her title was.

19        Q    Okay.

20        A    Dawn Abrahamsen, and she was the

21   director of the group buying program.

22        Q    Okay.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 15

1        A      Rick Rose, director of communications.

2        Q      Okay.

3        A      Stephanie Smith, and she was director

4   of membership.

5               And Barbara Mendoza, who was the office

6   manager.

7        Q      And yourself?

8        A      I thought -- let me clarify the

9   question.  I thought your question was to name the

10  six white directors.  Was that your question?

11       Q      No.  Well, that's fine.

12              What I really asked you was to identify

13  the eight people you're referring to here

14  (indicating).

15       A      Oh, I'm sorry.

16              Arminda Valles-Hall, director of

17  education.

18              And myself, director of policy.

19       Q      Okay.  You and Arminda -- I'm going to,

20  just for convenience, use first names -- are women

21  of color?

22       A      That's correct.

Page 16

1        Q     And the other six are white?

2        A     That's correct.

3        Q     Okay.  Eight is all the senior staff

4   positions that you know about?

5        A     It's been a minute, so let me remember.

6        Q     Sure.

7        A     There were two managers, but they were

8   not senior staff positions.

9        Q     How do you define senior staff

10  positions?

11       A     By title of director or executive

12  director with the exception of the finance office,

13  which is a different dynamic altogether.

14       Q     What was the racial composition of the

15  finance office when you were there?

16       A     I believe Barbara Mendoza was the

17  office manager, and she dealt with all

18  administrative accounting.  And Karen Bailey was the

19  accountant for the group buying service, if I am not

20  mistaken.

21       Q     And Ms. Bailey is what race?

22       A     African-American.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 24

1        Q      Was this one in a series of weekly

2    meetings that they had asked you to attend?

3        A      It may have been.

4        Q      In the paragraph in the Complaint,

5    you're describing -- if I'm reading it correctly,

6    you're describing certain events at the meeting.

7    You say, for example, that the Plaintiff, you,

8    expressed concerns that Kost was consistently

9    unwilling to engage in joint activities with

10   Plaintiff, you.

11              Did you say that at the meeting?

12       A      I don't recall.  I may have.

13       Q      As you sit here today, do you know what

14   joint activities that the Complaint is referring

15   to?

16       A      Would you repeat the question?

17       Q      Yes.

18              As you sit here today, do you know what

19   joint activities that the Complaint is referring

20   to?

21       A      One comes to mind.

22       Q      What is that?

Page 25

1        A     I invited him to attend a State of the

2    County lunch or brunch with me in Prince George's

3    County, Maryland, since the organization had stated

4    in the goals that they wanted to do outreach in

5    Prince George's County and they had not sufficiently

6    done so, and Mr. Kost elected not to attend.

7        Q     Okay.  Can you think of any other

8    activities which you asked him to attend that he

9    declined?

10       A     It was not unusual for me to ask him to

11   attend a number of things, so -- and it was not

12   unusual for him to say no, so I did it as a

13   courtesy.  I can't recall those right at this

14   point.

15       Q     Okay.  Did he accept similar

16   invitations from other senior staff?

17       A     I don't know.

18       Q     So you don't know whether his declining

19   was simply because of scheduling problems or other

20   reasons, do you?

21       A     Not based on his response.

22       Q     I didn't ask the question -- you do or

LISA RANSOM                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             October 25, 2006

Page 26

1    you don't know the reason he declined?

2        A    I don't know.

3        Q    Okay.  The second -- go ahead.  If you

4    think of something further to add to an answer,

5    please feel free to do so.

6        A    No.  Go ahead.

7        Q    Okay.  Further in paragraph 14, again,

8    you're referring to what you said at the May 27

9    meeting.  And it says here, "Plaintiff further

10   expressed, among other things, concern and

11   dissatisfaction that she was held to a different

12   standard than her white colleagues."

13           Tell me which white colleagues you're

14   referring to, please.

15       A    I don't understand the question.

16       Q    Paragraph 14 of the Complaint,

17   Exhibit 1, says that at the meeting, you expressed

18   concern -- a number of concerns.

19       A    Uh-huh.

20       Q    One of those concerns, according to

21   paragraph 14, is that you were held to a different

22   standard than your white colleagues.  That's what it

Page 27

1    says here.

2                  I want to know who the white colleagues

3    are.

4         A     I would say the majority, if not all,

5    of them.

6         Q     They would be the people that you named

7    earlier?

8         A     Yes.

9         Q     The six white people who constitute

10   senior staff?

11        A     Yes.

12        Q     You were held to a different standard

13   than those six?

14        A     Yes.

15        Q     Okay.  In what way?  Can you give me

16   examples, please?

17        A     To my knowledge, none of my white

18   colleagues were to asked to meet weekly with the

19   executive director to go over their work product.

20        Q     When did the weekly meetings -- when

21   were you first asked to begin meeting weekly?

22        A     I think it was in the spring.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 28

1          Q      Of 2004?

2          A      Yes.

3          Q      Would mid-March 2004 be accurate?

4          A      It may be.

5          Q      All right.  So you started at

6    Washington Council of Agencies on September 8 of

7    2003; is that right?

8          A      Yes.

9          Q      So you were not asked to attend any

10   weekly meetings during the period of September

11   through mid-March; is that right?

12         A      Not with the executive director and the

13   deputy director.

14         Q      And those are the meetings that you say

15   distinguish your treatment from the treatment of

16   your white colleagues?

17         A      Yes.

18         Q      Okay.  And so you weren't asked to

19   attend any meetings between September and mid-March;

20   is that right?

21         A      I'm not clear on what -- I'm not clear

22   on where you're going.

Page 29

1      Q      Well, where I'm going is another

2   question.

3      A      I'm trying to understand how to respond

4   to you.

5      Q      Sure.

6             You are saying that -- what you're

7   talking about here in paragraph 14 is that you were

8   treated differently from white colleagues because

9   you were asked to attend weekly meetings with Betsy

10  and Jeff; is that right?

11     A      Yes.

12     Q      Okay.  And those weekly meetings

13  started in or about mid-March of 2004?

14     A      Yes.

15     Q      Are there any other ways in which you

16  were treated differently from your white

17  colleagues?

18     A      Just in demeanor.

19     Q      Can you give me specifics, please?

20     A      I don't know how to describe demeanor.

21     Q      Whose demeanor?

22     A      Demeanor of Jeff Kost, demeanor of

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                     October 25, 2006

Page 30

1    Betsy Johnson on occasion, demeanor of Rick Rose.

2         Q    When did their demeanor -- let's start

3    with Jeff.

4              When did Jeff's demeanor toward you --

5    let me ask that question differently.

6              You're saying there is a difference in

7    how Jeff treated you in his demeanor and how he

8    treated his white colleagues?

9         A    Yes.

10        Q    When did that start?

11        A    I don't exactly recall.

12        Q    Did it start day one?

13        A    No.

14        Q    Can you give me an estimate?  Was it

15   after a month, after two months, after three

16   months?

17        A    It evolved.  I can't tell you.  I can't

18   give you an estimate.

19        Q    And the same question as to Betsy

20   Johnson's demeanor toward you.  When did you notice

21   a difference between her demeanor toward you and her

22   demeanor toward white employees?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 31

1          A       I can't give you a date.

2          Q       Okay.  Did it start at the beginning?

3                  MR. TEMPLE:  The beginning of?

4                  BY MR. FLEISCHER:

5          Q       Your employment at Washington Council

6    of Agencies.

7          A       I don't believe so.

8          Q       Okay.  And how about Mr. Rose?  When

9    did you notice a difference in how he treated you

10   from how he treated white colleagues?

11         A       Shortly after his hire.

12         Q       When was he hired?

13         A       Shortly before I was terminated.

14         Q       Within a month of your termination?

15         A       Maybe a few months.  I can't give you

16   exact --

17         Q       Can you give me any specific examples

18   in this demeanor differential, if you will?  Did he

19   grimace when he saw you and smile when he saw other

20   people?  I mean, how did you act differently toward

21   you?  Let's start with Mr. Kost.

22         A       Are you asking me to describe

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 33

1        Q     Okay.  But he was always friendly to

2    his white colleagues?  Is that the difference?

3        A     I never witnessed any unpleasantness

4    with his white colleagues.

5        Q     Are there any other ways in which you

6    were held to a different standard from your white

7    colleagues?  We've talked about the demeanor of

8    several of the senior people, we've talked about

9    your being asked to attend weekly meetings beginning

10   in March.  Are there any other ways in which you

11   were treated differently from your white

12   colleagues?

13       A     Just the process of weekly evaluation.

14   I'm asked to come into a meeting to review the work

15   I'm doing, and there are evaluation forms that I'm

16   asked to sign, allegedly so we're all on the same

17   page, to go over work that I've already done or am

18   doing.

19            And having not received any written

20   review in the probationary period and being told my

21   work is fine, these forms just emerge and we're

22   going through these forms every week for work that

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 34

1    I'm producing.

2         Q      Okay.  And that started in March of

3    2004?

4         A      In the spring of 2004, yes.

5         Q      Mid-March was our best guess?

6         A      That was your best guess.

7         Q      And do you agree with that?

8         A      I'll agree with that.

9         Q      Okay.  So it was the meetings and what

10   took place at the meetings, namely evaluating your

11   work and asking you to sign those evaluations?

12        A      Yes.

13        Q      Okay.  There are --

14        A      And the negative energy in those

15   meetings.  They were very hostile.

16        Q      The meetings were always the three of

17   you:  you, Betsy, and Jeff?

18        A      Yes.

19        Q      Who was hostile?

20        A      Both Betsy and Jeff were very hostile.

21        Q      Can you give me specifics or give me

22   examples?

LISA RANSOM                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            October 25, 2006

1       A    I was constantly told that I wasn't

2  doing what I was doing, I wasn't doing what I was

3  tasked to do, and I was doing it and documenting it

4  and showing the documentation and told I shouldn't

5  document it, and it made no sense.  It was

6  confusing.

7       Q    Okay.  Are there any other ways in

8  which you were treated differently from your white

9  colleagues?

10      A    When you speak to someone negatively,

11  when you can't provide the support you're

12  requested -- when you don't do what you say you're

13  going to do in terms of providing support but I see

14  my colleagues receiving the support they request,

15  that's a problem.

16      Q    Give me examples, please, of the

17  support that you didn't get that other colleagues

18  did.

19      A    Part of my job description and set in

20  my goals and part of the interview process was that

21  I was supposed to receive an assistant, because my

22  job required that I be out in the field a great

LISA RANSOM                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 36

1    deal.

2              I was never allowed to make a hire

3    ever.  I was constantly told, "Well, let's see where

4    we are down the road."  I asked if it was a

5    budgetary issue, and I was told it wasn't.

6         Q    Who was allowed to hire an assistant?

7         A    I don't know that anyone else had a

8    need to hire.  I think your question to me was, were

9    differences made, and my -- in terms of support,

10   that was the type of support I needed.  Other people

11   may have needed different types of support.

12        Q    Okay.

13        A    But for my department, that was what I

14   needed.

15        Q    Okay.  So the hiring of an assistant

16   was unique to your position?

17        A    It was.

18        Q    Okay.  Anything else?  We've got lack

19   of support, we've got demeanor, and we've got

20   attendance at these weekly meetings which you were

21   being evaluated and asked to sign the evaluations.

22   Any other ways in which you were treated differently

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 38

1          Well, if I'm tasked to be out of the

2     office and you want me to share with you the

3     discussions that I'm having out of the office with

4     nonprofits and I don't want to lose information, I'm

5     trying to do the best thing that I can to bring you

6     up to speed.  That does not mean that when I am able

7     to be in the office that I wasn't constantly in

8     Betsy's office and constantly in Jeff's office

9     giving them verbal updates to supplement my written

10    updates.

11         Q     All right.  If I can try to summarize

12    that, you're saying that you were treated

13    differently because you received criticism about

14    your scheduling and being in and out of the office;

15    is that fair to say?

16         A     Which is a part of the job.

17         Q     Okay.  Did your white colleagues who

18    behaved similarly not receive criticism?

19         A     My colleagues were able to have

20    adjusted schedules to accommodate their personal

21    agendas, which is fine if that's what you choose to

22    do.

LISA RANSOM                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT         October 25, 2006

Page 39

1           But if what I am doing is what I am

2     tasked to do and you criticize what I do, because

3     there are 24 hours in a day and I'm spending about

4     12 of them doing what is required for WCA and I'm

5     told that I am not effectively managing my time,

6     there is no consideration or leeway for me doing

7     what I'm doing for the benefit of the organization

8     when other people are allowed to have much more

9     flexible schedules for their personal agendas.

10          Q     Did anyone else's job require them to

11    be in the field as much as you were required to be?

12          A     That depends.

13          Q     Why?

14          A     Because you're asking me to give you

15    information about someone's formal job description.

16    I can't do that.

17          Q     What I'm trying to find out is how you

18    were treated differently from your white

19    colleagues.

20          Was your job unique?

21          A     My job was to maintain relationships

22    with members, with organizations and address their

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                October 25, 2006

Page 40

1    public policy concerns.

2          Q      Did anyone else have similar

3    obligations?

4          A      Not as it relates to public policy.

5    But we had membership recruitment, and membership

6    did not recruit with the same kind of outgoing

7    agenda.  But membership was headed by, for a while,

8    the membership manager and then a membership

9    director and manager, both white, both gay, and the

10   level of recruitment that occurred there did not

11   compare to the amount of outreach I was tasked to

12   do.

13          If we are a membership organization,

14   you would think membership would be active.  That

15   was not the case.  In fact, I recruited members on

16   behalf of membership.

17          Q      Is it fair to say that no one spent as

18   much time -- of this group of eight people that

19   we've identified earlier, no one spent as much time

20   in the field as you did; is that fair to say?

21          A      That's almost fair to say.  I would say

22   Arminda spent a good amount of time out but not for

LISA RANSOM                                            LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 41

1    the same purposes.

2          Q     Now, paragraph 14 of Exhibit 1 also

3    says that African-American trainers and presenters

4    were not treated appropriately.

5                Who are you talking about there?

6          A     I'm talking about Carlottia Scott and

7    William or Billy Terry.

8          Q     Anybody else?

9          A     Not as it relates to trainers.

10         Q     Well, is there anybody else who is in

11   this category, trainers and presenters, not treated

12   properly?

13         A     Can you tell me what paragraph that is,

14   please?

15         Q     Paragraph 14 of Exhibit --

16         A     Okay.  Okay.

17               MR. TEMPLE:  That's the Complaint,

18   right?

19               MR. FLEISCHER:  Yes.

20               THE WITNESS:  I would include in that

21   the Rev. Dr. Earl Trent as a presenter.

22               BY MR. FLEISCHER:

Page 42

1        Q    E-a-r-l?

2        A    Uh-huh.

3        Q    T-r-e-n-t?

4        A    Yeah, T-r-e-n-t.  The Rev. Dr. Earl

5   Trent.

6        Q    Okay.  I'm going to ask you about

7   Mr. Taylor (sic) and Ms. Scott later.

8             Tell me about Dr. Trent.

9        A    No.  Mr. Terry.

10       Q    Terry, I'm sorry.

11       A    Uh-huh.

12       Q    I'll ask you about Mr. Terry and

13   Ms. Scott later.

14             Tell me about Rev. Dr. Trent.

15       A    Dr. Trent was contacted by me when I

16   worked with Arminda Valles-Hall to put the annual

17   meeting together, which was the responsibility of

18   Jeff Kost.  We needed an invocation presenter, and

19   we realized that one had not been secured.  So I

20   contacted Dr. Trent and asked him if he would be

21   kind enough to present at the last minute.

22             He agreed, but it wasn't so last minute

Page 43

1    that the organization wasn't aware, because he was

2    listed in the program at the top of the page, and

3    everyone in the organization -- in this organization

4    had reviewed the program.

5              I was responsible for dealing with the

6    awards program.  And as I was bringing presenters or

7    awardees into the ballroom, it was a little walk.

8    So the staff at the front desk, which would include

9    Barbara Mendoza, who handled the receipts and the

10   money and the checks, greeted Dr. Trent.

11             And I came downstairs to escort him up,

12   and he informed me that he had to write a check for

13   admittance.  And I said, "What do you mean you had

14   to write a check?  You're the invocation speaker."

15             And so I approached Ms. Mendoza, who

16   said, "Well, I didn't know who he was, and he said

17   he was the invocation speaker, and I just made him

18   pay."

19             I said, "Well, we have to reimburse

20   him, because he's doing us a favor.  He actually

21   rearranged his schedule to provide support for WCA

22   at the last minute, and I told you and everyone here

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                October 25, 2006

Page 44

1      to expect him -- because everyone had a list of who

2      to expect -- and you charged him to come in the

3      door."

4                    And WCA subsequently did reimburse him.

5            Q      Okay.

6            A      No other presenter was charged, no

7      other.

8            Q      What was the racial composition of the

9      presenters?  Were they all white, other than

10     Dr. Trent?

11           A      No.

12           Q      What was the racial composition?

13           A      It was a mixed racial composition.

14     I'll have to think.  It was some time ago.

15                  Shapiro was white, Ewell was black,

16     Mike Subin was white.  Well, Shapiro and Subin are

17     Jewish.  Mike Rious, who represented Congressman

18     Williams, was black.  And I think I'm missing

19     someone, but I can't recall who it is.

20                  And for me, though, the difference was

21     I was at the door to bring all the presenters up.  I

22     just couldn't get to Dr. Trent in time.

LISA RANSOM                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             October 25, 2006

Page 45

1          Q      Why do you think Ms. Mendoza treated

2     Dr. Trent differently on the basis of his race?   Is

3     that what you think?

4          A      Yes.

5          Q      Why do you think that?

6          A      I think it's the culture of the

7     organization.

8          Q      Has Ms. Mendoza ever made a

9     racially-derogatory comment in your presence?

10         A      No.

11         Q      Has she ever said she charged Dr. Trent

12    because he was black?

13         A      No.

14         Q      Let's talk about the weekly meetings

15    and evaluations that you were -- go ahead.

16         A      But what she said was, "I didn't know

17    who he was when he identified himself," and that's a

18    problem to me.

19         Q      All right.  I don't understand what

20    that has to do with race.

21                Did you complain to anyone else at

22    Washington Council of Agencies about Ms. Mendoza's

Page 46

1    behavior?

2          A    Yes.

3          Q    To whom did you complain?

4          A    Betsy Johnson.

5          Q    And what did Ms. Johnson say?

6          A    She said, "We'll reimburse

7    Rev. Trent."

8          Q    And she did?

9          A    Yes.

10         Q    Let me go back to the weekly meetings

11   and evaluations that you were required to attend.

12               We agreed that they started about

13   mid-March after you had been with the Washington

14   Council of Agencies for roughly six months?

15         A    (Witness nods head.)

16         Q    Is it your belief that that requirement

17   was imposed on you because you are African-American?

18         A    Yes.

19         Q    Tell me why you think that.

20         A    Because no other director experienced

21   that evaluation process, to my knowledge, but me.

22         Q    Did Ms. Valles-Hall experience that

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 47

1    process?

2            A    I'm not aware of that.

3            Q    So your basis for saying that it was

4    racially motivated is because it happened to you

5    alone and you are African-American; is that right?

6                 MR. TEMPLE:   Objection.

7                 BY MR. FLEISCHER:

8            Q    You can answer.

9            A    Not if there's an objection.

10                MR. TEMPLE:   You can answer.

11                BY MR. FLEISCHER:

12           Q    Yes.  In fact, you should.

13           A    Yes.

14           Q    So I've got it right?

15           A    (Witness nods head.)

16           Q    Is that right?

17           A    Yes.

18           Q    Okay.  Would you look at paragraph

19   number 22 of Exhibit 1, please?

20           A    (Witness complies.)

21           Q    I'm going to read it aloud.  Quote,

22   Defendant treated Plaintiff differently from

LISA RANSOM                                        LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 48

1    similarly-situated white employees in their

2    assignments and performance evaluation criteria,

3    closed quote.

4            Are you saying anything different here

5    from what we've already talked about?

6        A    No.

7        Q    Okay.  So whatever you're saying here,

8    we've already covered?

9        A    Yes.

10        Q    Okay.  Look at 27, please.

11        A    (Witness complies.)

12        Q    You refer there to expressing concerns

13    about racial bias and discrimination against

14    Plaintiff and African-American volunteer trainers.

15            It's the same question that I asked you

16    before.  Are you saying anything different here from

17    what we've already talked about?

18        A    Different from what?

19        Q    From what you've just told me about.

20    In terms of trainers, we've talked about Dr. Trent,

21    we've talked about Ms. Scott, and we've talked about

22    Mr. Terry.

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             October 25, 2006

Page 49

1        A     No, we didn't talk about Mr. Terry and

2    Ms. Scott.

3        Q     Well, we've mentioned them.

4              Is there anybody else -- any other

5    trainer that you're referring to here?

6        A     No.

7        Q     Okay.  Paragraph 29, please, of

8    Exhibit 1 -- I'm going to ask you about that later.

9              Would you look at paragraph 37, please?

10       A     (Witness complies.)

11       Q     Paragraph 27 (sic) says --

12             MR. TEMPLE:    37?

13             BY MR. FLEISCHER:

14       Q     37 -- I beg your pardon -- says that

15   the Defendant failed to enforce policies of

16   nondiscrimination and nonretaliation.

17             Are you referring to the policies that

18   are in WCA's personnel handbook?  Is that what

19   you're referring to?

20       A     Yes.

21       Q     If you look a little further down that

22   page, you are requesting compensatory damages in the

LISA RANSOM                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            October 25, 2006

Page 50

1    amount of $250,000.

2                    Can you tell me what that 250 consists

3    of?

4                    MR. TEMPLE:  It says in excess of.

5                    BY MR. FLEISCHER:

6         Q    Okay.  Can you tell me what your damage

7    claim consists of?  How do you get to that number?

8                    MR. TEMPLE:  Objection.

9                    THE WITNESS:  I lost my job --

10                   BY MR. FLEISCHER:

11        Q    So salary would be part of it?

12        A    -- I depleted all my resources, I lost

13   my benefits, my health insurance.

14        Q    So we have salary and benefits.

15             Anything else?

16        A    My ability to pay bills, my credit

17   rating, all manner of things were threatened and

18   damaged as a result of this.

19        Q    Anything else?

20        A    Isn't that enough?

21        Q    It may be, but is there anything else?

22        A    Forgive me.  This just makes me angry.

Page 51

1               My professional credibility was

2       damaged.

3          Q    Anything else?

4          A    That's enough.

5          Q    Okay.

6               MR. TEMPLE:  Can we take a five-minute

7       break?

8               MR. FLEISCHER:  Sure.

9               (Recess taken 11:32-11:40.)

10              BY MR. FLEISCHER:

11         Q    Ms. Ransom, would you look at

12      Exhibit 4, please?

13         A    (Witness complies.)

14         Q    Have you seen that before today?

15         A    This is the Complaint?

16         Q    No.  It's a filing that your attorneys

17      were required to make in court as part of the

18      process of this case.

19         A    Yes.

20         Q    You've seen it before today?

21         A    (No response.)

22         Q    You've seen it before today?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 52

1        A     Yes.

2        Q     If you turn to page 2, you identify

3   Ms. Scott as having personal knowledge of being

4   subjected to racial stereotyping and discrimination

5   when she visited Defendant's facility.

6              Tell me what you know about that.

7        A     The situation?

8        Q     Yes, ma'am.

9        A     I invited Carlottia Scott -- I asked

10  her if she would be willing to provide training.  I

11  think -- I can't recall what the exact training was

12  for that particular workshop, but it was around

13  understanding the government, advocacy, et cetera,

14  for pro bono complimentary training, and she agreed

15  to do so.

16              I asked her to come in and meet with

17  Arminda, because Arminda oversees the training

18  component, and we met.  We had a very productive

19  meeting.  And toward the end of the meeting, not

20  quite the end, we had some things to wrap up, and

21  Arminda needed to step away for a moment and somehow

22  I had to give something to Betsy.  I remember having

Page 53

1   to take something to Betsy, and Carlottia needed to

2   use the rest room.

3          I went to Betsy's office and did

4   whatever I needed to do there very briefly and came

5   back, and Carlottia was in the room where we left

6   her but she was enraged.  That would not be too mild

7   a term.  She was enraged.  And I'm asking her what's

8   wrong, and she tells me that she was confronted in

9   the hallway of our office by my colleague, Jeremy

10  Baird.

11         Q    Did she use his name?

12         A    I don't recall.  I don't recall.

13         Q    Well, I'm going to ask you in a minute

14  how you found out it was Mr. Baird, but go ahead.

15  Continue describing the incident, please.

16         A    She said that she was confronted by a

17  young man who came out of an office that was next to

18  my office, because she knew where my office was.

19  And by the description she gave, it was Jeremy's

20  office.

21         She said that he confronted her and

22  wanted to know who she was and what she was doing in

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 54

1     the hallway, and that if she was supposed -- if she

2     was there to do some training, that she's supposed

3     to use another entrance and she's not supposed to

4     come through this office.

5              I don't know -- I did not witness the

6     conversation, but it was enough to have just set her

7     off, because she said it was so racially

8     inflammatory that she had to consider -- reconsider

9     doing the training for us.

10             I apologized profusely and Arminda

11    apologized profusely.  We didn't know what had

12    occurred, but we knew that -- I've known Carlottia

13    for many, many years, and there was no way that --

14    to go to the ladies room and come back in that short

15    period of time, it was just thoroughly upsetting,

16    and she was upset.  It took us fifteen minutes to

17    just calm her down.

18             Because the training component fell

19    under Arminda's department, she, I believe,

20    approached Betsy about it.  I wanted to do it, and

21    she said, "Well, no.  This falls under my

22    department, so I should do it.  That would be the

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT         October 25, 2006

Page 55

1    appropriate protocol."

2              But I was embarrassed, because when you

3    bring somebody into your organization to provide a

4    service and they agree to provide a service that

5    they would normally receive a hefty fee for for free

6    and they are treated in an abominable fashion,

7    there's no excuse for that.

8         Q    Did you discuss this incident with

9    Mr. Baird?

10        A    I did not.

11        Q    Did you discuss it with Mr. Kost?

12        A    I did.

13        Q    Tell me what you said to Mr. Kost.

14        A    I described the situation, which I

15   believe he was well aware of.

16        Q    Why did you believe that?

17        A    When I left --

18             MR. TEMPLE:  Hang on.  Did you finish

19   the first question before you interrupted?

20             MR. FLEISCHER:  I don't know.

21             MR. TEMPLE:  I think you have to let

22   her finish.

LISA RANSOM                                               LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 56

1                 BY MR. FLEISCHER:

2        Q     Okay.  Go ahead.  I interrupted your

3    answer.

4                 THE WITNESS:  Would you repeat what I

5    have?

6                 (Whereupon, the reporter read back.)

7                 THE WITNESS:  I described the

8    situation, which I believe he was well aware of when

9    it occurred, and his response was one of, this isn't

10   a big deal.  I can't tell you his exact words, but

11   his response was, this isn't a big deal.

12                BY MR. FLEISCHER:

13       Q     Why did you believe he was aware of

14   that?

15       A     When I left the conference room to go

16   to Betsy's office, Jeff was sitting in Jeremy's

17   office.  When I came back from Betsy's office, Jeff

18   was still sitting in Jeremy's office.  So for that

19   incident to occur in that short period of time, he

20   had to be sitting in Jeremy's office when it

21   happened.

22       Q     Did Mr. Kost suggest that you speak

Page 57

1    with Mr. Baird about it?

2         A    Yes, he did.

3         Q    Did you do that?

4         A    I told him that -- my response to him

5    was that I thought it was inappropriate because I

6    was not his supervisor, and that I would prefer to

7    follow the chain of office protocol, which is why I

8    brought it to him.

9         Q    Is it your belief that Mr. Baird's

10   actions, as they were told to you, were racially

11   motivated?

12        A    Absolutely.

13        Q    And why do you think that?

14        A    An African-American woman with

15   dreadlocks walks in his office that he does not know

16   and that is his initial response to someone, and

17   he's a membership manager?  That was ridiculous.

18        Q    Had Ms. Scott ever been to the

19   Washington Council of Agencies before?

20        A    She had not.

21        Q    Do you know whether she and Mr. Baird

22   had ever met before?

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 58

1        A      I don't believe they had.

2        Q      All right.  Had she and Mr. Kost ever

3    met before?

4        A      I don't believe they had.

5        Q      Do you know whether Mr. Baird had

6    confronted others whom he did not recognize in the

7    hallway?

8        A      I never heard of a similar incident,

9    but I do know they knew I was meeting with Ms. Scott

10   before she arrived.

11       Q      Would you look at page 3 of Exhibit 4,

12   please?

13       A      (Witness complies.)

14       Q      Under Roman numeral III, it refers to

15   damages in excess of $300,000.

16              Do you see that?

17       A      Yes.

18       Q      Do you know why your damage claim went

19   from in excess of 250,000 in Exhibit 1 to in excess

20   of 300,000 in Exhibit 4?

21              MR. TEMPLE:  It keeps going up.  This

22   was written a month after that.  Now it's 600,000.

LISA RANSOM                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             October 25, 2006

Page 65

1   calendar.

2       Q    Okay.  The copy of Exhibit 6 as it was

3   provided to me ends with April.

4            Do you know, is there -- are there

5   pages for May and June?

6       A    Well, what is here is probably what I

7   had, and I don't have May and June.

8       Q    I take it you did keep the calendar for

9   May?

10      A    What do you mean?

11      Q    You did continue to use Outlook for

12  appointment scheduling during the month of May of

13  2004?

14      A    I don't recall.

15      Q    Ms. Newsome, you replaced her?

16      A    Yes.

17      Q    What was her race; do you know?

18      A    She was African-American.

19      Q    Okay.  Had you ever met her?

20      A    Yes.

21      Q    Under what circumstance?

22      A    She used to work on Capitol Hill.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 66

1          Q      Who did she work for?

2          A      Albert Wynn.

3          Q      And you were at that time working for

4     whom?

5          A      I can't recall if I was still on the

6     Hill or not.

7          Q      Go back to Exhibit 5, please.  If we

8     look at page 5, Interrogatory Number 6, I ask about

9     whether you've been self-employed, and your answer

10    is -- I'm not going to read the whole thing --

11    Plaintiff states that she has been self-employed

12    between September 2004 and the date of service of

13    these interrogatories.

14            Is the self-employment the work you do

15    under the trade name The Ransom Group?

16         A      Yes.

17         Q      When did you form The Ransom Group or

18    when did you start doing business under that name?

19         A      I believe it was November 2001.

20         Q      Tell me what The Ransom Group does,

21    please.

22         A      It's a public policy and public

Page 72

1      Q     What was the nature of the therapy?

2  What part of your body was being treated?

3      A     Neck and back.

4      Q     When did you start that physical

5  therapy?

6      A     I don't remember the exact -- actually,

7  I don't -- I remember going to physical therapy and

8  I remember that it was cold.  I remember that, but I

9  can't give you the dates right now.

10     Q     Was it before you started with WCA?

11     A     No.

12     Q     It was while you were employed at WCA?

13     A     Yes.

14     Q     What event, if any, occurred which

15  prompted you to start physical therapy?

16     A     I woke up in pain one day and stiffness

17  and realized I had been eating Advil for about two

18  or three weeks and thought that was a problem.

19     Q     Okay.  The Advil was the problem or the

20  Advil was --

21     A     No.  I thought that the fact that I was

22  taking it to address the pain and I couldn't figure

LISA RANSOM                                        LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT               October 25, 2006

Page 74

1    can see it, but I can't remember the name.  But I

2    can tell you who owns it is a gentleman named Ed

3    Lee.  It's in Silver Spring and it's a physical

4    therapy center.

5          Q     What is the name of your physical

6    therapist?

7          A     I can't remember his name.  I can't

8    remember his name.

9          Q     Are you still undergoing physical

10   therapy?

11         A     I am not.

12         Q     When did you stop?

13         A     I stopped while I was at WCA.

14         Q     Okay.  So sometime during the period of

15   your employment there, you started and then stopped

16   physical therapy?

17         A     That's correct.

18         Q     Approximately how long did the therapy

19   last?  How many months were you in therapy?

20         A     I'm not sure.  Four weeks, maybe five,

21   something like that.

22         Q     Did it do the trick?

LISA RANSOM                                                LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            October 25, 2006

Page 76

1          Q      Number 4, applications for employment

2     at any time after September 2003, have you produced

3     everything that you're aware of?

4          A      Yes.

5          Q      Number 5, written employment offers,

6     and your response is, "Plaintiff is in the process

7     of locating any written employment offers she may

8     have received.  If any such documents exist, they

9     will be produced in a supplemental production."

10               Have you found any employment offers?

11         A      Not at this time.

12         Q      All right.  Let me just get a little

13    history here.  You were terminated on June 15 of

14    2004?

15         A      Uh-huh.

16         Q      I'm sorry, you have to say yes.

17         A      Yes.  I'm sorry.  I apologize.

18         Q      Prior to that time while you were an

19    employee of WCA, had you begun a job search?

20         A      I had not.

21         Q      After your termination, did you begin a

22    job search?

Page 80

1        A    Yes.

2        Q    Was The Ransom Group active between

3   your termination from WCA and your being hired by

4   your present employer?

5        A    Yes.

6        Q    Approximately what was its revenues

7   during that period of time?  That's June 15, '04

8   until June of '05, so approximately a year.

9        A    Well, it wasn't a year for me, because

10  it took me quite a few months to calm down and

11  refocus and be emotionally stable enough to be able

12  to go back out and work to recruit clients.  So I

13  would say more like the winter and spring of 2005.

14       Q    All right.  So between June 15 of 2004

15  and, let's say, January of 2005, The Ransom Group

16  was not active?

17       A    Yes, it was.  I had one client at that

18  time.

19       Q    When did you secure that client?

20       A    Late fall.  It was a last-minute

21  client.

22       Q    A last-minute client, did you say?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 81

1          A     Yes.

2          Q     When did you start seeking clients

3    after your termination from WCA?

4          A     I got on the phone and called as many

5    people as I could as soon as the situation

6    occurred.  So in terms of seeking clients, I started

7    in July.

8          Q     All right.  You told me a moment ago --

9    and I understand what you're saying, or I think I

10   understand -- that you were upset --

11         A     Yes.

12         Q     -- and you needed to settle down and

13   prepare yourself to go back out into the world, as

14   it were?

15         A     Well, understand that I didn't take on

16   any clients while I was at WCA, and any clients that

17   I would have taken on, I didn't.  So I had kind of

18   put the company to bed for a minute.  And had I

19   known that I was going to have this experience, I

20   would have maintained a client base, but I didn't,

21   so it forced me to regroup.

22               So to have to go back out into the

LISA RANSOM                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             October 25, 2006

Page 82

1    world and tell people, oh, I'm no longer working but

2    I'm going to pick up clients again meant that folks

3    then had to become comfortable with me in terms of

4    my ability to be stable in providing consulting

5    work.  So while I was on the phone saying I'm

6    looking for work, that doesn't necessarily mean I

7    received it.

8           Q    Okay.  So you started that in July --

9           A    Yes.

10          Q    -- of 2004?

11          A    Yes.

12          Q    And you picked up a last-minute client

13   in the fall of 2004?

14          A    Yes.

15          Q    And then you started actively engaging

16   in business --

17          A    Yes.

18          Q    -- sometime in January of 2005?

19          A    Yes.

20          Q    Okay.

21          A    January, February, yes.

22          Q    You went to work for your present

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 83

1    employer in June of 2005?

2         A    That's correct.

3         Q    What has since happened to The Ransom

4    Group?

5         A    The Ransom Group is -- has not taken on

6    any clients of late.

7         Q    So it's back on hold again?

8         A    It's back on hold again because of the

9    nature of the work that I do and the amount of

10   travel that I do.

11        Q    During the period when you were job

12   searching, did you incur any expenses associated

13   with your searching?

14        A    Printing, postage, those types of

15   expenses.

16        Q    Printing of resumes?

17        A    Yes.

18        Q    Mailing of resumes?

19        A    Yes.

20        Q    Anything else?

21        A    Maintaining my Internet service to be

22   able to search and transportation back and forth.

LISA RANSOM                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            October 25, 2006

Page 89

1    center.

2         Q      Have you incurred any other medical

3    expenses that you claim were the result of

4    discrimination you suffered at Washington Council of

5    Agencies?

6         A      Not that I can recall, no.

7         Q      Other than the documents that you have

8    already produced for me and the ones you promise to

9    produce, do you have any other documentation that

10   supports the dollar amount that you're claiming in

11   this lawsuit?

12        A      No.

13        Q      The meeting that you had with Mr. Kost

14   in November or December of 2003 at which he told you

15   that you were doing just fine and so forth, is that

16   on your calendar?

17        A      It wasn't a meeting.

18        Q      Okay.  Tell me how it came about.  Was

19   it just a casual encounter?

20        A      It was a casual encounter.  I

21   approached him and asked him what I needed to do to

22   prepare for my probationary evaluation, and I

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 90

1    believe we were standing in the hallway when he

2    said, "Oh, you don't have anything to worry about.

3    You're fine.  You don't have anything to worry

4    about."

5           Q      Would you look, please, at Exhibit 7?

6           A      (Witness complies.)

7           Q      Is this a copy of the resume you were

8    using when you were interviewing with Washington

9    Council of Agencies?

10          A      Yes, it is.

11          Q      Was it accurate at that time?

12          A      Yes, it was.

13          Q      If I'm reading this correctly, you were

14   with the National Congress for Community Economic

15   Development from October of '95 through February of

16   2002?

17          A      That's correct.

18          Q      Why did you leave them?

19          A      The organization downsized

20   considerably.

21          Q      Who was your immediate supervisor at

22   the time you left them?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 99

1    or another or it was likely to end one way or

2    another?

3             A       Yes, when they terminated me.

4             Q       Prior to that time, you had no

5    intention of leaving?

6             A       I had no intention of leaving.

7             Q       Prior to that time, were you aware of

8    your -- you reported to -- let me strike that.

9                     You reported to Jeff Kost?

10            A       Yes.

11            Q       Prior to your being terminated, did

12   you -- were you aware of any dissatisfaction by Jeff

13   Kost of your job performance?

14            A       Yes.

15            Q       When did you become aware of

16   dissatisfaction?

17            A       In an earlier -- one of the earlier

18   weekly meetings when I learned from Betsy and Jeff

19   that, according to Jeff, I had not been having

20   weekly discussions with him or -- let me strike

21   that -- regular discussions with him about the

22   meetings I had out of the office, and that was not

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 100

1    true.

2              He basically said he didn't know what I

3    was doing, and I knew that was not true, and I

4    realized it was that he didn't understand what I was

5    saying to him in the political relationship as it

6    related to what the nonprofits were sharing with

7    me.

8              So every meeting that I had with Jeff

9    would end in, "Well, we need to discuss this with

10   Betsy," and I realized he could not give me any

11   political counsel whatsoever.  But at the same time,

12   he didn't want me to talk to Betsy by myself.

13             And at some point, Betsy said, "Well,

14   you can come and sit and talk with me."  So I would

15   talk to her separately and I would talk to Jeff, and

16   then they got together and Betsy was saying that she

17   didn't know what I was doing because Jeff had no

18   idea what I was doing.  It wasn't because I wasn't

19   telling him.  It was because he didn't understand

20   what I was telling him.

21        Q    And this was during -- this occurred to

22   you that he was dissatisfied with your work in one

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 101

1      of your weekly meetings?

2            A      Yes.

3            Q      I think we established earlier that

4      those weekly meetings started in or around the

5      middle of March of 2004?

6            A      Yes.

7            Q      Was it one of the earlier weekly

8      meetings, one of the middle weekly meetings, or

9      later?  When was it?

10            A      I think it was in the earlier weekly

11      meetings, but I can't be certain.

12            Q      Are there any inaccuracies that you're

13      aware of in Exhibit 8, your later resume?

14            A      Would you define inaccuracy, please?

15            Q      Let me ask the question differently.

16                   Is there anything in Exhibit 8 that

17      isn't completely reflective of the facts?

18                   MR. TEMPLE:  Hold on a second.

19                   Objection.  Form.

20                   THE WITNESS:  The only caveat I would

21      say is that while I was tasked to cover Montgomery

22      County, Prince George's County, Maryland, the

LISA RANSOM                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 102

1    District of Columbia, and the areas of Arlington,

2    Alexandria, and Fairfax, which was part of my job

3    description, I was told by Betsy and Jeff that until

4    I had an assistant that I didn't need to deal with

5    Virginia.  So I didn't deal with Virginia, because I

6    waited for an assistant that I didn't receive.

7                  BY MR. FLEISCHER:

8         Q     So your focus, as it turned out, was

9    the District of Columbia and Montgomery and Prince

10   George's Counties?

11        A     That's correct.

12        Q     Other than that, is there anything in

13   this resume that is untrue or misleading?

14        A     No.

15        Q     Is there anything that's omitted from

16   this resume that would -- anything that's omitted

17   from this resume?

18        A     A resume is a summary of what you do,

19   so this is a summary of what I do or what I did.

20        Q     All right.  Would you look at

21   Exhibit 9, please?

22        A     Uh-huh.

LISA RANSOM                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             October 25, 2006

Page 105

1    yes.

2        Q      And the other letters that you don't

3    have copies of, did you generate those letters from

4    that same home computer?

5        A      Yes.

6        Q      Have you searched that computer to see

7    whether copies of the letters are there?

8        A      That computer has been disposed of.  It

9    was broken.  I got rid of it.  I got a new computer.

10       Q      Did you write any letters using the new

11   computer?

12       A      No.  I didn't purchase the new computer

13   until after I got my new job.

14       Q      Would you look at Exhibit 10, please,

15   for me?

16       A      (Witness complies.)

17       Q      Can you identify this as the offer

18   letter that you received from Washington Council of

19   Agencies?

20       A      This is the offer letter that I

21   received.

22       Q      And the second page is a job

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 106

1    description?

2          A       It is a job description.

3          Q       Is it a description for -- what was

4    your title when you were hired?

5          A       Director of public policy and community

6    relations, and then they included the word advocacy

7    at some point.

8          Q       Your starting salary was 56,000 --

9          A       Yes, it was.

10         Q       -- per year?

11         A       Uh-huh.

12         Q       Did that change while you were there?

13         A       No, it did not.

14         Q       The job description that's attached to

15   page -- attached to Exhibit 10, is that an accurate

16   description of the job as you actually performed

17   it?

18         A       This isn't the same job description.

19   The job description that I received noted that I

20   would have the assistance of a public policy

21   associate.

22         Q       Do you have that -- have you produced

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                October 25, 2006

                                                    Page 109

1    It doesn't jump out at me, but I know this is not

2    accurate.

3         Q     Were you told at the time you

4    interviewed that a college degree was a

5    prerequisite?

6         A     No.

7         Q     Who interviewed you?

8         A     Jeff Kost initially interviewed me, and

9    then I was interviewed on a second interview by Jeff

10   Kost, Betsy Johnson, and Angela Jones, who is a

11   member of the board of directors.

12        Q     Had you known Ms. Jones prior to that

13   interview?

14        A     I had not.

15        Q     How long was the first interview?

16              MR. TEMPLE:  Objection.

17              MR. FLEISCHER:  Grounds, Counsel?

18              MR. TEMPLE:  Relevance.

19              Go ahead.  You can answer.

20              THE WITNESS:  It was a standard

21   interview time, 30, 45 minutes.

22              BY MR. FLEISCHER:

LISA RANSOM                                               LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            October 25, 2006

Page 110

1         Q      And how about the second one?

2         A      Maybe a little longer, because it was

3    three people.

4         Q      In either of the interviews, was your

5    education discussed?

6         A      No.

7         Q      How soon after the second interview

8    were you offered the job?

9         A      It wasn't very long.  I think within

10   that week.

11        Q      And how soon after receiving the offer

12   did you accept it?

13        A      I believe I accepted it the following

14   day, but I'm not sure.  I didn't accept it right

15   away.

16        Q      Would you look at Exhibit 11, please?

17        A      (Witness complies.)

18        Q      Can you identify Exhibit 11 as a copy

19   of WCA's personnel handbook?

20        A      That's what it appears to be, yes.

21        Q      Did you receive a copy of the handbook

22   coincident with you starting your job?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 111

1        A      Yes, I did.

2        Q      If you would look at Exhibit 12 for me,

3    please, can you identify that?

4        A      Yes.

5        Q      Is that a receipt for a copy of the

6    handbook?

7        A      Yes, it is.

8        Q      And that's your signature on

9    Exhibit 12?

10       A      Yes, it is.

11       Q      And if you would look at Exhibit 13,

12   please, can you tell me what that is?

13       A      This is an e-mail that I sent to Jeff

14   in response to him forwarding me a letter of

15   employment.

16       Q      Okay.  You say in the e-mail, quote,

17   I've reviewed the manual and will bring the letter

18   and manual form with me on Monday, closed quote.

19              Have you reviewed the manual?

20       A      I have reviewed the manual, yes.

21              (Discussion off the record.)

22              BY MR. FLEISCHER:

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 112

1          Q      At any time during your tenure at

2     Washington Council of Agencies, have you ever heard

3     Jeff Kost use a racial epithet?

4          A      No.

5          Q      Have you ever heard him make a

6     derogatory remark about African-Americans?

7          A      In my opinion, yes.

8          Q      Tell me about it.

9          A      When I invited him to attend the State

10    of the County brunch for Prince George's County,

11    which was a targeted area where very little outreach

12    had been done, I said, "Jeff, why don't you come

13    with me, because this would be a great opportunity

14    for you to meet county council members, county

15    officials, and funders."

16              And he stood at my door, because Jeff

17    rarely came into my office, and said, "Oh, I'm

18    afraid."

19              And I looked at him and said, "What do

20    you mean?  What are you afraid of?"  No, I said,

21    "What do you mean?"

22              And he said, "I'm afraid."

Page 113

1          What is there to be afraid of, aside

2     from this is a predominantly African-American

3     county.  He would not have been afraid to go to

4     Montgomery County, but I took his statement to mean

5     he was afraid to go to Prince George's County

6     because the county executive and the majority of the

7     county council were African-American.  What would

8     there be to be afraid of in an area you say you want

9     to target?

10         Q     Did he say anything else in that

11    exchange that you've just described to me?

12         A     No, he didn't.  He just walked away.

13         Q     Did you confront him with what you

14    perceived to be racism?

15         A     No, I didn't.

16         Q     Go ahead.

17         A     But this was following the Carlottia

18    Scott incident.  And so for me, it was just a

19    pattern of behavior that I -- and it was also

20    following the Billy Terry incident, so it was a

21    pattern of consistent behavior.

22         Q     We haven't talked about the Billy Terry

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 114

1    incident, but we will.

2                   What did Jeff have to do with the

3    Carlottia Scott incident?

4         A       Your earlier comment to me was did I

5    speak to Jeff, and I said I did.   And then he asked

6    me to speak to Jeremy, and I said that I thought

7    that was inappropriate protocol because I am not

8    Jeremy's supervisor, which is why I'm going to you

9    with this.

10                  So in reporting it, he did nothing at

11   all as it relates to the Carlottia Scott incident.

12   If he is supervising me and I bring in someone that

13   is contributing to my department and he's supposed

14   to have oversight over it and that person is treated

15   poorly and I bring it to his attention and he does

16   nothing, that's a problem.

17        Q       All right.   We'll talk about the Terry

18   matter in a bit.

19                  You've mentioned Terry, you've

20   mentioned Carlottia Scott, and you've mentioned

21   Mr. Kost telling you that he was afraid to accompany

22   you to Prince George's County?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 115

1       A       Uh-huh.

2       Q       Has Mr. Kost, other than those three

3    matters, said or done anything derogatory toward

4    African-Americans in your presence?

5       A       In terms of avoiding them.  For

6    instance, Mr. Kost was responsible for development

7    at the Washington Council of Agencies.  And during

8    the Empowerment conference, I was able to seat him

9    at a table full of funders, including Freddie Mac,

10   where he was -- I told him, "I've got a seat for you

11   near the Freddie Mac program officer.  This will be

12   a great opportunity for you to talk to them."

13              He elected to sit at a table with his

14   colleagues, all white, rather than sit at a table

15   full of funders, but he's responsible for funding

16   and this was an opportunity for him to make inroads

17   to raise money for WCA, which was the purpose of me

18   supporting my supervisor in his role of

19   fund-raising.  It just so happened that the program

20   officers for the organizations that were there were

21   African-American.

22      Q       When was this?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 116

1          A       This was during the Empowerment

2     conference in June.  I want to say June 10th and

3     11th, I think, but I'm not quite sure on the dates.

4          Q       When he said he was afraid to accompany

5     you to Prince George's County, did he say because

6     that county is predominantly African-American?

7          A       I asked him what he meant, and he

8     repeated his statement.

9          Q       Did he say he was afraid because that

10    county is predominantly African-American?

11         A       He did not say that.

12         Q       When you suggested he sit at a

13    particular table and he chose to sit at another

14    table, did he say that he was making that choice

15    because he didn't want to sit with

16    African-Americans?

17         A       No, he did not say that.  What he said

18    was that he chose to sit with his colleagues, who

19    were all white.

20         Q       Have you ever heard Mr. Kost make a --

21    use an epithet or make a derogatory remark about

22    Hispanics or Latinos?

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT        October 25, 2006

Page 117

 1        A    No.

 2        Q    Has anyone ever told you that Mr. Kost

 3   used an epithet or a derogatory remark that was

 4   racist?

 5        A    No.

 6        Q    Have you ever heard anyone else in

 7   Mr. Kost's presence use a racial epithet?

 8        A    I have not.

 9        Q    Have you ever heard anyone else in

10   Mr. Kost's presence say something derogatory about

11   African-Americans or Latinos or Hispanics?

12        A    No.   But then I was not in his presence

13   very often, except usually in a one-on-one

14   environment, unless it was a staff meeting.

15        Q    Did you ever hear anyone at a staff

16   meeting say something racist or derogatory toward

17   African-Americans or Hispanics?

18        A    No.

19        Q    Betsy Johnson was the executive

20   director at the WCA the whole time you were there?

21        A    Yes, she was.

22        Q    Have you ever heard her use a racial

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                    October 25, 2006

Page 118

1    epithet?

2            A      No.

3            Q      Have you ever heard her say something

4    derogatory about African-Americans or Latinos or

5    Hispanics?

6            A      Not directly.

7            Q      Has anyone ever told you that

8    Ms. Johnson used a racial epithet?

9            A      I've been told that Ms. Johnson has

10   made interesting cultural comments.

11           Q      Tell me about that.

12           A      My colleague met with Ms. Johnson and

13   had expressed some concerns about the exchanges that

14   they had -- Arminda Valles-Hall -- and was very hurt

15   when told that her perspective must be a cultural

16   thing.

17           Q      And who told you about that

18   conversation?

19           A      Arminda told me about that

20   conversation.

21           Q      Other than that conversation, has

22   anyone ever told you that Ms. Johnson used a racial

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                    October 25, 2006

Page 119

1    epithet or said something derogatory about

2    African-Americans or Hispanics or Latinos?

3            A    I guess it's just subject to

4    interpretation.  During our mediation, she made some

5    very interesting comments about, well, she was just

6    a Southern white woman and this is how she was

7    raised and so this is the way she thought things

8    should be.  I'm paraphrasing, but that was the gist

9    of her comment.  She said it.  No one told me.

10           Q    And that was the mediation in this

11   case?

12           A    Yes, it was.

13           Q    Have you ever heard anyone else use a

14   racial epithet in Ms. Johnson's presence?

15           A    I have not.

16           Q    Have you ever heard anyone else say

17   something derogatory about African-Americans or

18   Latinos or Hispanics in Ms. Johnson's presence?

19           A    I have not.

20           Q    Would you take a look, please, at

21   Exhibit 14?

22           A    (Witness complies.)

LISA RANSOM                                             LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            October 25, 2006

Page 125

1              (Whereupon, Mr. Temple is no longer

2              present at the deposition, and Mr. Blue

3              is now present.)

4              (Whereupon, the reporter read back.)

5              THE WITNESS:  No.

6              BY MR. FLEISCHER:

7         Q    I was then asking you about the deputy

8    director's inappropriate behavior relative to

9    African-Americans, and I asked you have we already

10   talked about everything you're referring to here,

11   and then you said, if I recall, well, we haven't

12   talked about the Billy Terry incident.  So let's do

13   that now.  Tell me about the Billy Terry incident.

14        A    Billy Terry is a government affairs

15   manager for Van Scoyvoc & Associates.  He is a

16   colleague of mine.  I asked him if he would be

17   willing to come in and do a training for my

18   colleague, Arminda, for her program.  I'm trying to

19   remember what it was on now.  I think it was the

20   flow of federal dollars or something like that for

21   nonprofits, how to access grants, earmarks, that

22   type of thing.

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 126

1          He agreed to do it pro bono.  He came

2     in to meet with us to give us an overview of what he

3     proposed in terms of the training, what materials he

4     would use, how he would present.  And in the middle

5     of his presentation -- I would say two-thirds of the

6     way through, Jeff walked into the meeting room, the

7     conference room, and told us that he had people

8     waiting to come into the conference room.

9          And my colleague, Arminda, told him

10    that we reserved this room for this amount of time,

11    and your folks are -- I think they were like 25,

12    30 minutes early, and she said, "Would you ask them

13    to wait in the lobby?"  Wait a minute.  Let me take

14    that back.

15          Barbara Mendoza came in first and then

16    Jeff came in, because I remember there were two

17    interruptions, and I couldn't remember why there

18    were two interruptions.  But I remember him coming

19    in and saying, "I have people waiting."

20          And Arminda's response to him was,

21    "Well, we're not finished with the meeting.  We

22    have the room until 3:30."  And Jeff's response was

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 127

1    his standard response.  He kind of huffed, spun off

2    on his heel, and closed the door somewhat loudly.

3              Now, I've never seen him act that way

4    in front of any other trainer -- any other potential

5    trainer.  I didn't even understand that behavior,

6    but it was embarrassing, because you're bringing

7    someone in, a lobbyist from one of the major firms

8    in the country, to offer to volunteer work and in

9    the middle of their presentation he doesn't even

10   introduce himself.

11             As far as Mr. Terry was concerned, he

12   didn't know who he was.  He just came in and

13   interrupted the meeting very rudely with no respect

14   to him, no respect to us as colleagues, spun out,

15   and was gone.

16             Arminda was upset, and we were very

17   apologetic -- very apologetic to Billy.  And, you

18   know, he was very gracious, but it was

19   embarrassing.

20             So, again, that was a situation where

21   Arminda said, "This is my training, and I will

22   address this," and I believe she did.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 128

1          Q       Who was in the room when Mr. Kost came

2     in?

3          A       Arminda, myself, and Mr. Terry.

4          Q       You said that Ms. Mendoza had --

5     Ms. Mendoza had come into the room earlier?

6          A       Yes.

7          Q       Did that have anything to do -- why did

8     she come in?

9          A       She came in to tell us that there were

10    people that were there waiting to use the room, and

11    Arminda's response to her was that the room had been

12    reserved for the time that we were in it and they

13    were extremely early.

14         Q       Was Ms. Mendoza rude?

15         A       She was not.

16         Q       How soon after she came in did Mr. Kost

17    come in?

18         A       One or two minutes.

19         Q       How long was Mr. Kost in the room, ten

20    seconds?

21         A       Twenty, thirty seconds, maybe.

22         Q       Mr. Kost has testified that he looked

LISA RANSOM                                                LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 129

1    into the room and saw a gentleman.  He didn't know

2    it was Mr. Terry, but he saw a gentleman on his cell

3    phone, and that's when he came in.

4              Is that true, as far as you know?

5         A    Yes, it was.

6         Q    Mr. Terry was on a cell phone when

7    Mr. Kost came in?

8         A    Yes, he was.  He was checking his

9    office to check on materials for us.  He said, "Let

10   me check on this," whatever it was, and placed a

11   quick call.

12        Q    Did Mr. Kost say anything of a racial

13   nature when he came in?

14        A    No.  He didn't even say excuse me.

15        Q    Assuming that Mr. Kost behaved rudely,

16   what leads you to believe that he was racially

17   motivated?

18        A    I've seen his interaction with other

19   trainers at WCA.  With other white trainers, he was

20   always gracious, always polite.

21        Q    At the time he interacted with other

22   white trainers, did he know that they were

LISA RANSOM                                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                         October 25, 2006

Page 136

1      Q      Do you know when Washington Council of

2  Agencies learned about your Complaint to OHR, the

3  Office of Human Rights?

4      A      I do not know when they learned about

5  it.

6      Q      When did you file it?

7      A      In April.

8      Q      Do you have any basis to think that

9  they knew about it on June 15th when you were

10  fired?

11      A      I think it's probable.

12      Q      Is that just a guess on your part?

13      A      I think it's probable.

14      Q      Why do you think it's probable?

15      A      It was a long process, it was tedious,

16  and I think that they were aware.  I think that they

17  have very good relationships with offices in the

18  District government, and I think they were aware.

19      Q      Has anyone ever told you that they were

20  aware?

21      A      No.

22      Q      Have you seen any document which would

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 137

1      indicate they were aware by June 15th?

2            A      No.

3            Q      Why do you think your firing was as a

4      result of your complaints?  How do you make the

5      link?

6            A      I don't understand that question.

7            Q      Okay.  Well, you say that your firing

8      was a result of your having taken certain actions?

9            A      I think that I worked really hard and I

10     produced the work that I was tasked to do, and I

11     think that there was no justification for their

12     rationale, because I was able to document the work

13     that they asked for.

14            I also think that the more I was able

15     to document and justify and show my work and that it

16     was the work they asked for, there was this -- this

17     wasn't what they wanted, and I didn't know why it

18     wasn't what they wanted.  It didn't make any sense.

19     If you ask me to do a job, I'm going to do it.  And

20     it was clear that the more I did what they asked me

21     to do, the more uncomfortable they were with me

22     doing it.

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                October 25, 2006

Page 138

1          And so I followed their procedure as it

2     related to the handbook, and I asked -- I sent a

3     memo, I was able to relay the work that I had

4     completed, I asked for a neutral mediator and was

5     told I couldn't have one.  I asked to go through the

6     process with the governance of the board and was

7     told I couldn't do that, that the buck stops with

8     me, as Betsy Johnson told me.

9          Q    Well, let me ask my question again and

10    try to make it clearer.

11          You claim here that your termination

12    was the result of your having taken certain earlier

13    actions, and you've told me that -- and I've asked

14    you why you link those two.

15          You've told me that your work was

16    satisfactory --

17          A    Yes.

18          Q    -- at least in your mind?

19          A    Yes.

20          Q    So that's one reason why you think the

21    firing must have been as a result of your having

22    taken these previous actions?

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 139

1        A      I think that when I state that my work

2    was satisfactory and I understand that they feel

3    that there was a problem, when I ask for a mediator

4    to address it and they deny me that, that's a

5    problem, because I'm seeking a positive resolution

6    so that we can move forward and they're telling me

7    that they are not in agreement in seeking a positive

8    resolution.

9        Q      Has Betsy or Jeff ever told you that

10   you were being fired because you had made previous

11   complaints?

12       A      No.

13       Q      Have you ever seen a document which

14   would indicate that your firing was motivated by

15   your having made previous complaints?

16       A      No.  They told me I wasn't a good fit

17   for the organization.

18       Q      Has anyone else other than Betsy and

19   Jeff ever told you that you were fired because you

20   had made previous complaints?

21       A      No.

22       Q      Would you take a look, please, at

LISA RANSOM                                        LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             October 25, 2006

Page 146

1        THE WITNESS:  The standard by which he

2    and Betsy had weekly meetings was racist.  I

3    attempted frequently to have a rapport with him.  He

4    was not responsive to that.  His weekly meetings

5    were joint meetings with Betsy.

6             BY MR. FLEISCHER:

7        Q    Ms. Ransom, it seems like senior

8    management at Washington Council of Agencies spent

9    an extraordinary effort to help you succeed.

10            Do you disagree with that?

11       A    Yes.

12       Q    Would you look at page 6 of Exhibit 16,

13   please?

14       A    (Witness complies.)

15       Q    The bottom paragraph in the middle of

16   it, you refer to mistreatment of voluntary skilled

17   professionals I brought to WCA.

18            Are you talking here about Mr. Terry

19   and Ms. Scott and Dr. Trent?

20       A    Yes.

21       Q    Anybody else?

22       A    Not that I can recall.

LISA RANSOM                                        LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 147

1           MR. BLUE:  Counsel, I don't mean to

2    interrupt.  Exactly where are you?

3           MR. FLEISCHER:  Page 6 of

4    Exhibit 12 (sic) in the middle of that bottom

5    paragraph.

6           MR. BLUE:  12?

7           MR. FLEISCHER:  Exhibit 16.  I beg your

8    pardon, page 6 of Exhibit 16.

9           MR. BLUE:  Which paragraph?

10          MR. FLEISCHER:  The bottom paragraph.

11          MR. BLUE:  Okay.  Thank you.

12          BY MR. FLEISCHER:

13      Q     In that same sentence, it says, quote,

14   senior management's negative manipulation and

15   omission of verbal interaction, closed quote.

16          I have no idea what you mean by that.

17   Tell me what you mean by that, please.

18      A     I'm referring to the meetings of senior

19   management of which Arminda and I were excluded,

20   where Betsy Johnson would hold meetings with all the

21   senior directors except Arminda and I in my last few

22   months at WCA, closed-door meetings.

LISA RANSOM                                                LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 152

1        Q     And I take it wasn't Ms. Johnson either

2    who told you that?

3        A     No, it wasn't Ms. Johnson, and I can't

4    recall at this time who.  I remember feeling taken

5    aback, because I didn't understand that, but it felt

6    ominous to me.

7        Q     Have you had any further -- did you

8    have any further conversations with Ms. Smith about

9    that?

10       A     No.

11       Q     How about with Ms. Johnson?

12       A     No.

13       Q     If you would turn to page 8 of

14   Exhibit 16, please.

15       A     (Witness complies.)

16       Q     The first full paragraph starting

17   "regarding my termination," do you see that?

18       A     Yes.

19       Q     The second sentence says, "At no time

20   did I ever agree verbally or in writing to any list

21   of objectives offered by senior management."

22             Tell me what you mean by that.

LISA RANSOM                                                   LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                   October 25, 2006

Page 153

1        A      At the beginning of these weekly

2    meetings, Jeff Kost presented me with a list of

3    objectives that he and Betsy wanted me to follow.

4    As I reviewed the list, they were exactly what I was

5    already doing, but they wanted me to sign off on

6    this list.

7               And Betsy explained that this was not a

8    form of evaluation, but just a way to keep us all on

9    the same page.  And my response was, "If this is not

10   a form of evaluation and I'm already doing this

11   work, then I'm not comfortable signing off on

12   this."

13       Q      Did you think it was unreasonable for

14   your employer to ask you to agree to a list of

15   objectives?

16       A      I had already agreed to a list of

17   objectives and had implemented them.  I agreed to

18   those objectives in the goal chart, which I was

19   following through on and they were aware of.

20       Q      And it was, therefore, unreasonable for

21   them to ask you to reaffirm that list of

22   objectives?

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 154

1          A      It was -- in the sense that they

2    evaluated me in a -- there was -- I need a minute.

3               The format in which they chose to

4    evaluate me was unique in that no other person in

5    that organization was evaluated under the same

6    structure, terms.  No other person in that

7    organization received that same evaluation structure

8    and criteria, and to be singled out --

9          Q      So you refused to agree to the list of

10   objectives because you felt you were being singled

11   out in a unique way?

12         A      No.  I agreed to do all the work that

13   was presented and had been doing the work.  I

14   refused to sign a document that I thought was being

15   used as a tool against me.

16         Q      Well, it says here that at no time did

17   I ever agree verbally -- I assume you mean orally --

18   or in writing to any list of objectives offered by

19   senior management.

20               So not only would you refuse to sign

21   it, but you also refused to simply acknowledge that

22   those were your objectives.

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 155

1              That's what this says to me.  Is that

2      what you meant?

3              A      No.

4              Q      Tell me what you meant then.

5              A      The specific list of objectives

6      provided by Jeff Kost was the work that I had

7      already done or was in the midst of doing as it

8      related to the organizational goals.  I had agreed

9      to do it and I was doing it.

10             This was a separate document that was

11     repetitive in nature.  And because it was repetitive

12     in nature and required my signature for work I had

13     already done, I was uncomfortable signing it.

14             Q      So you refused to sign it because it

15     was repetitive?

16             A      And because I was told it was not going

17     to be used as an evaluation tool against me, but it

18     was, in fact, an evaluation tool.

19             Q      Is it unreasonable for an employer to

20     evaluate its employees?

21             A      It is not; however, there's nothing in

22     the WCA handbook that says that it is appropriate to

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 156

1   evaluate me on a weekly basis, particularly when

2   there was no written evaluation as it relates to my

3   probationary period.  And if there had been an

4   issue, they would have notified me at that time.

5           When I inquired about the status of my

6   probationary period, I was told that I was fine.  To

7   come back in the middle of a year when, in fact, the

8   handbook says something different, that's counter to

9   what the handbook says and to what their policies

10  are.

11      Q     In your view, is that sufficient ground

12  for you to refuse to sign?

13      A     Yes.

14      Q     Would you look at page 10, please, of

15  Exhibit 16?  It's the last page.

16      A     (Witness complies.)

17      Q     About halfway down that first full

18  paragraph, it says, "Mr. Kost berated my 20 years of

19  Congressional experience."

20          Tell me how he berated your 20 years of

21  Congressional experience.

22      A     Paraphrasing in a discussion about my

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT        October 25, 2006

Page 170

1        Q    And then it goes on, "Yes, I'm working

2    on new possibilities."

3             Tell me what you meant by that.

4        A    I don't know what I meant by that or I

5    don't recall what I meant by that.  That was a very

6    hurried time.

7        Q    Were you considering taking a job with

8    The 21st Century Foundation?

9        A    Oh, no.  They're in New York.  I don't

10   even remember seeing Jennifer.

11       Q    Would you take a look at Exhibit 20,

12   please?

13       A    (Witness complies.)

14       Q    I can tell you I'm only going to ask

15   you about paragraph 6, but you're welcome to review

16   it.

17       A    I'm done.

18       Q    Can you identify this as an e-mail that

19   you sent to Jeff with a CC to Betsy on March 23?

20       A    Yes.

21       Q    All right.  Paragraph 6 indicates that

22   you have engaged two new trainers, Carlottia Scott

Page 171

1    and William Terry?

2         A    Uh-huh.

3         Q    I take it they were still both on board

4    as of March 23?

5         A    Yes.

6         Q    Okay.  And the incidents that you

7    described to me earlier involving Ms. Scott and

8    Mr. Terry occurred prior to March 23, did they not?

9         A    Yes, only because it took a tremendous

10   amount of convincing.

11        Q    Would you look at Exhibit 21, please?

12        A    (Witness complies.)

13        Q    Is that an e-mail that you sent to

14   Arminda in January of 2005?

15        A    It is.

16        Q    Look at the header, please.  Is that

17   your home e-mail?

18        A    It is.  It was.

19        Q    It was until when?

20        A    I have another home e-mail address now.

21        Q    Does the W-o-t-o-r-s-o-n have any

22   meaning?

LISA RANSOM                                           LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 175

1          A      I did not.

2          Q      Nothing positive or negative?

3          A      Nothing.

4          Q      At this point, had you encountered any

5     racism at WCA?

6          A      In my first 30 days?

7          Q      Yes, ma'am.

8          A      No.

9          Q      Would you look at 23, please?

10         A      (Witness complies.)

11         Q      Can you identify this, please, for me?

12         A      This is a memo that I wrote to Jeff.  I

13    don't know where he was that I welcomed him back, so

14    I can't speak to that, but I requested a meeting to

15    talk about the expenses related to my department.

16         Q      Did such a meeting take place?

17         A      I don't recall.  I don't remember.

18         Q      All right.  It says in the first

19    paragraph that you want a meeting, quote, to discuss

20    my advocacy and community relations agenda and the

21    needs for the coming year, closed quote, and then

22    you go on and say another issue, which you then

SLR REPORTING
(301) 340-0042

Apx. 86a

LISA RANSOM                                           LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                  October 25, 2006

Page 179

1    Q    Did you tell Betsy or Jeff that you

2    needed physical therapy because of racism at work?

3    A    I told them that I was in pain and my

4    doctor had directed me to take physical therapy.

5    Q    Did you tie the pain to racism at

6    work?

7    A    I tied the pain to the fact that I was

8    having a physical problem due to stress and other

9    things, I imagine.

10   Q    What else were you going through at the

11   time?

12   A    Nothing else.  Just work.

13   Q    Did you tell Betsy or Jeff that the

14   pain and the therapy was connected to racism at

15   work?

16   A    I did not tell them that.

17   Q    When did you separate from your

18   husband?

19   A    Why is that relevant?

20   Q    Please answer my question.

21   A    I divorced in 1997.

22   Q    Would you look at Exhibit 27?

Page 180

1          A       (Witness complies.)

2          Q       Can you tell me what it is, please?

3          A       This is an e-mail that I sent to Jeff

4    as a follow-up to a meeting that I attended in

5    Rockville at The Jewish Community Center among

6    Montgomery County nonprofits as it relates to

7    Proposition 15, I think it was.  And I believe the

8    discussion was around having the nonprofits of

9    Montgomery County sign on to a letter opposing

10   Proposition 15.  I think that's what it was.

11         Q       All right.  Am I correct in describing

12   Exhibit 27 as also including an e-mail from Jeff to

13   you?

14         A       Yes.

15         Q       And Jeff is, if I'm understanding this

16   correctly, suggesting that you have a broader base

17   of signatories for the letter; is that correct?

18         A       That is what he is suggesting, that the

19   letter have a broader base.

20         Q       In all the files that I've produced and

21   that you've produced, this is the first one in which

22   I'm aware that Jeff seems to be expressing some

Page 181

1    dissatisfaction with your work or -- maybe that's

2    even too strong of a word -- some disagreement with

3    your approach.

4              Are you aware of any earlier e-mails of

5    that tenor?

6         A    I am not.

7         Q    Are you aware of any earlier

8    conversations between you and Jeff in which he

9    expresses dissatisfaction with your work or

10   disagreement with your approach?

11        A    I am not.

12        Q    Do you agree with my reading of this

13   e-mail that it expresses dissatisfaction with some

14   aspect of your work or disagreement with your

15   approach on this letter matter?

16        A    No, I do not.

17        Q    Okay.  He's simply suggesting to get a

18   broader base of signatories?

19        A    No, he is not simply suggesting that.

20   I attended the meeting and I conveyed to him what

21   occurred in the meeting.  He took what I said out of

22   context.  I explained the process and procedure that

Page 182

1    the groups were comfortable with.  Under the

2    circumstances, they were concerned about their

3    individual funding.  I also understood WCA's

4    position in trying to maneuver nonprofits to do

5    something that they themselves had decided they did

6    not want to do.

7            And I reported back to him making it

8    clear to him that I had talked to, and was

9    continuing to talk to, nonprofits as -- not just the

10   ones here, because the people he's referring to were

11   people that I knew before I came to WCA.  So his

12   e-mail when I received it didn't make any sense,

13   which is why I sent the response that I did.

14       Q      So he misunderstood your earlier report

15   to him?

16       A      Yes.

17       Q      Do you think he intentionally

18   misunderstood your earlier report?

19       A      I have no idea.

20       Q      Do you have any reason to think his

21   misunderstanding was intentional?

22       A      I think he didn't understand a good

Page 183

1    deal of what I told him most of the time.

2         Q    And do you think that misunderstanding

3    was intentional?

4         A    I can't answer that.  I don't know.  I

5    don't know.

6         Q    The issue that's being referred to in

7    Exhibit 27, did you and he sort that out?

8         A    There were additional meetings that I

9    encouraged him to come to that he didn't come to.

10   What ultimately happened was a rally was held at the

11   county council for an evening hearing where all the

12   nonprofits came together and testified before the

13   county council.  And, in fact, Betsy Johnson

14   attended that rally with me.

15        Q    Did you and Jeff get on the same

16   wavelength around this issue?

17        A    I think the issue got transferred to

18   Betsy.

19        Q    Did you and Betsy have any

20   misunderstanding as to the issue?

21        A    No.

22        Q    Look at 28, please.

LISA RANSOM                                         LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          October 25, 2006

Page 184

1           A       (Witness complies.)

2           Q       I should have told you that I'm just

3     going to ask you about the earlier e-mail that

4     starts on the bottom and continues over to the

5     second page, the October 24th e-mail.

6                   Can you identify the second e-mail on

7     Exhibit 28 as an e-mail that you sent to Betsy and

8     Jeff on or about October 24, 2003?

9           A       Yes.

10          Q       And you had been with WCA for --

11          A       Just about a month.

12          Q       -- a month and a half, September 8th to

13    October 24th?

14          A       Yes.

15          Q       At the close of the e-mail, you say,

16    "Thank you, thank you for all of your guidance and

17    support."

18                  Did you mean that?

19          A       I was courteous.  That's professional

20    courtesy for me.

21          Q       Did you mean it?

22          A       I try to mean what I say.

Page 185

1          Q      Look at Exhibit 29, please.

2          A      (Witness complies.)

3          Q      Can you tell me what Exhibit 29 is,

4     please?

5          A      It's an e-mail to Jeff Kost about a

6     piece that I wrote that he asked for regarding

7     Proposition 15 in Montgomery County.

8          Q      All right.  Would it be more accurate

9     to describe Exhibit 29 as an exchange of e-mails

10    between you and Jeff concerning Article 15 --

11         A      Yes.

12         Q      -- between February 24 and February 25?

13         A      Yes.

14         Q      If you turn to the second page, the

15    e-mail that begins about two-thirds of the way down,

16    it says, "Lisa, I am disappointed that you're not

17    able to find a way to talk about this."

18                Is this the first time he's used

19    disappointment in relation to some work you're

20    doing?

21         A      I don't recall.  I don't recall.

22         Q      Did that word have any impact on you?

LISA RANSOM                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 186

1    Did it jump out at you?

2          A     It upset me.

3          Q     And what did you do about it?

4          A     I spoke to him, which then made me

5    probably wonder why he sent me an e-mail like this

6    when I had just spoke to him.

7          Q     Okay.  What did you do after you got

8    the e-mail, after he expressed disappointment in

9    you?

10         A     I responded to his e-mail, because it

11   seemed that he was more comfortable writing than it

12   was talking, so I responded to his e-mail with an

13   e-mail.

14         Q     All right.  And your response to that

15   e-mail is the one that begins on the first page of

16   Exhibit 29, "Jeff, I'll be happy to take a few

17   minutes"?  Is that your response?

18         A     Yes.

19         Q     And you're telling him that, quote,

20   writing requires both time for focus and

21   substance/research?

22         A     Yes.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 187

1          Q      Did you think he was unaware that

2    writing requires time for focus and

3    substance/research?

4          A      Yes.

5          Q      And then his response to that is the

6    e-mail just above it.  "We need to talk.  I am

7    obviously not communicating what I need from you."

8                 Did you interpret this as his being

9    frustrated?

10         A      Yes.

11         Q      And in your response to him, the e-mail

12   just above that, you say, among other things, "I am

13   desperately trying in my 48-hour day to review the

14   FEC's proposed advisory opinion that has the

15   potential to gag nonprofits.  That's more of an

16   issue of value to our members than to WCA's goal to

17   empower nonprofits as it relates to policy."

18                Are you telling him what issues are

19   important and what aren't?

20         A      I am telling him as a follow-up to the

21   conversation that I believe occurred between his

22   e-mail and mine that Proposition 15 had already

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                     October 25, 2006

Page 189

1          Q      You and he had a disagreement about

2      what he wanted you to do; is that fair to say?

3          A      No.  I think we had a misunderstanding.

4          Q      But he was your boss, and he had a --

5          A      He was my supervisor.

6                 MR. BLUE:  Let him finish the question.

7                 BY MR. FLEISCHER:

8          Q      Supervisor, fine.

9                 And as your supervisor, he had a right

10     to tell you what it is he wanted you to do, did he

11     not?

12         A      Yes, he did.  However, I did ask him

13     for guidelines that he did not provide.

14         Q      Was his position -- as uninformed as it

15     may have been about how to address Resolution 15,

16     was his position motivated by racism?

17                MR. BLUE:  Objection.

18                Answer if you can.

19                THE WITNESS:  I don't know.  You'll

20     have to ask him.

21                BY MR. FLEISCHER:

22         Q      I will, but I'm asking you now.

LISA RANSOM                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           October 25, 2006

Page 190

1              Do you think --

2        A    I said I don't know.

3        Q    Okay.  Look at Exhibit 30 for me,

4    please.

5        A    (Witness complies.)

6             MR. FLEISCHER:  Off the record.

7             (Recess taken 4:23-4:25.)

8             BY MR. FLEISCHER:

9        Q    Have you had a chance to look at

10   Exhibit 30, Ms. Ransom?

11       A    Briefly.

12       Q    Okay.  Can you tell me what it is,

13   please?

14       A    It looks like a summary of the work --

15   it's a summary of the work that I did from December

16   to March that I prepared for Betsy and Jeff.

17       Q    Okay.  And this was done at their

18   request or Betsy's request?

19       A    Yes.

20       Q    Tell me how the request came about.

21   How did she ask you, when did she ask you, and so

22   forth?

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                    December 21, 2007

Page 212

1          Q.    Can you identify those e-mails, Ms.

2    Ransom?

3          A.    I'm trying to understand the

4    difference between the two.

5          Q.    I believe 32 includes 31.

6          A.    So I don't need to look at 31?

7          Q.    I guess that's the case, yes.

8          A.    All right.

9          Q.    Can you identify those e-mails?

10         A.    I'm familiar with this exchange.

11         Q.    Is it fair to describe this as an

12   exchange of e-mails between you and Jeff Kost?

13         A.    Yes.

14         Q.    And is it fair to say that they relate

15   to an article about FEC proposed rule making?

16         A.    Yes.

17         Q.    Having read these e-mails, is your

18   recollection refreshed that you in fact did write an

19   article on that topic?

20         A.    I obviously did, but I don't recall

21   the content of the article.

22         Q.    Do you recall Jeff being unhappy with

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            December 21, 2007

Page 213

1    your work on this particular topic?

2              MR. TEMPLE:  Objection to form.  I

3    don't understand.  You're talking about the article?

4              MR. FLEISCHER:  Yes.

5         BY MR. FLEISCHER:  (RESUMED)

6         Q.   Do you recall Jeff being unhappy with

7    your work on the article?

8         A.   I recall Jeff being confusing about

9    this work.

10             Q.   He was confusing in his directions to

11   you?

12        A.   Yes.

13        Q.   You don't recall his being unhappy

14   with your work on the article?

15        A.   I recall him being confusing and

16   unpleasant.

17        Q.   Towards you?

18        A.   Yes, in my inquiry.

19        Q.   Your inquiry about what?

20        A.   What he wanted.

21        Q.   If you look at the top e-mail in bold,

22   the one that begins now that Rick is on board, do

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                   December 21, 2007

Page 215

1    his response that you can tie to racial motivation?

2              A.    Let's start with the opening sentence.

3              Q.    Okay.

4              A.    Now that Rick is on board, we're

5    working on policies and procedures.

6              Q.    Um-hum.

7              A.    As a supervisor for both Rick and for

8    me, Jeff never ever spent any constructive time,

9    although I sought it, seeking out direction, policy

10   format, procedures on how he wanted things done,

11   because he didn't know.

12             He, however, spent an inordinate

13   amount of time daily with Rick.  And I don't just

14   mean office time; coffee break time, lunch time.

15   They were joined at the hip.

16             He was also joined at the hip with

17   other members of WCA staff, but none of them look

18   like me, yet I was under his direct supervision.

19   And when I sought his counsel, I was always given a

20   vague response with no substance.

21             Q.    By April 14th, you had begun your

22   weekly meetings with Jeff and Betsy, had you not?

LISA RANSOM                                                LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            December 21, 2007

Page 216

1              A.    I think so.

2              Q.    And that doesn't qualify as

3     constructive time?

4              A.    Oh, no, there was nothing constructive

5     about that time.   It was very verbally abusive.

6              Q.    You did a congressional staff

7     briefing, did you not, on the proposed federal

8     election commission rule making?

9              A.    When you say I did, what do you mean?

10             Q.    You conducted a briefing.   You briefed

11    people at Congress.

12             A.    I participated in a collective meeting

13    held by WCA members and offered an aspect at the

14    briefing of the impact to nonprofits to

15    congressional staff.

16             Q.    Did Jeff attend that briefing in which

17    you participated?

18             A.    He came in in the last 15 minutes of

19    the session.

20             Q.    Did he hear you present?

21             A.    I believe that he did.

22             Q.    Did Sheri Brady attend that briefing?

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 219

1         And I begrudgingly agreed with the

2    stipulation that if I did not like the photo, I

3    would not want the photo used in any way.

4         When I saw the photo, it was terribly

5    unattractive.  If my job -- if part of my job is my

6    image and how I project to others, I don't want

7    something that distorts my facial features

8    presented.  That causes harm to me professionally

9    and emotionally.

10        And so I told them that they couldn't

11   use the photo, and that again I would be willing to

12   provide a photo or have a photo done, but that they

13   could not use that photo.

14        Q.   Do you recall sending an e-mail to

15   Jeff on April 14, 2004, saying, quote, on the advice

16   of counsel, I am electing not to have my

17   photographic image used in any way either in print

18   or on the Web by WCA at this time?

19        A.   Yes.

20        Q.   Let me show you the e-mail, which I

21   have marked as 37.  You're welcome to read the

22   entire e-mail.  I want to ask you about the photo

LISA RANSOM                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 220

1    matter and I want to ask you about something on the

2    bottom of the next to last page and then the last

3    page.  But you're welcome to read the entire thing

4    if it helps you put it in context.

5                    (Witness reading document)

6             Q.   Can you identify this as an e-mail

7    that you sent to Jeff Kost?

8                    MR. TEMPLE:  She's not finished

9    reading it.

10                   MR. FLEISCHER:  I'm sorry.  She looked

11   up at me.

12                   MR. TEMPLE:  Are you finished reading

13   it?

14                   THE WITNESS:  No, I'm not.

15                   MR. FLEISCHER:  I'm sorry, she looked

16   up.  I thought she was finished.

17           BY MR. FLEISCHER:  (RESUMED)

18           Q.   Can you identify Exhibit 37 as an

19   e-mail from you to Jeff Kost?

20           A.   Yes.

21           Q.   You were responding to a memo that

22   Jeff left on your desk earlier or on your chair

LISA RANSOM                                         LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT       December 21, 2007

Page 221

1    earlier that day?

2           A.    Yes, I was.

3           Q.    Is Exhibit 38 what you were responding

4    to?

5           A.    Yes.

6           Q.    Is Exhibit 39 also what you were

7    responding to, a request that you sign off on a list

8    of policy objectives?

9           A.    Yes.

10          Q.    So your e-mail of the 14th, Exhibit

11   37, is responding to 38 and 39; is that right?

12          A.    Yes.

13          Q.    Now, does your e-mail, Exhibit 37, say

14   anything about your willingness to have your photo

15   used after your medical condition resolves?

16          A.    Clarify your question, please.

17          Q.    Yes.  Does Exhibit 37 say anything

18   about your willingness to have your photo used after

19   your medical condition resolves?

20          A.    It doesn't say that in this e-mail.

21   It was said to Jeff, because the comment was in this

22   e-mail that I was willing to have a photo taken for

LISA RANSOM                                           LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 222

1    Washington Counsel of Agencies to use once my face

2    had healed or to be photographed when the board was

3    photographed.

4                So if I am making that suggestion, if

5    I am making those suggestions, I'm clearly saying

6    that I didn't have a problem with having my

7    photograph used; I had a problem with the photograph

8    being used, or else I would never have made the

9    offers.

10              Q.    Okay.  You say in Exhibit 37 that your

11   response at least as to the photograph issue is on

12   advice of counsel.

13              A.    That's correct.

14              Q.    Did you have an attorney at that time?

15              A.    I contacted an attorney.

16              Q.    I can't ask you and I won't ask you

17   what advice that attorney gave, but what I want to

18   know is when you contacted an attorney?

19              A.    That day.

20              Q.    Who was the attorney?  Who who was the

21   attorney?

22              A.    Georgia Goslee (phonetic).

LISA RANSOM                                               LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 223

1          Q.    Right below the sentence that I'm

2    referring to, and I'm going to quote, regarding the

3    draft you've prepared stating the list of objectives

4    for the director of public policy and community

5    relations, I am acknowledging receipt of the

6    document but cannot sign it.

7               Is that what you told to Jeff?

8          A.    Yes.

9          Q.    You were unwilling to sign a list of

10   objectives that he had prepared?

11         A.    Yes.

12         Q.    Would you turn to the next page,

13   please.

14         A.    Can we go back to this document,

15   please?

16         Q.    I'm not asking you any questions about

17   it.

18         A.    I'm asking you to give me some clarity

19   about the origin of the document.

20         Q.    I'll relay that to your counsel.  I am

21   not here to answer questions.  I'm sorry.

22              If you would look at Exhibit 37,

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 224

1    please, at the third page of Exhibit 37.  At the

2    bottom of the third page, the last paragraph, the

3    last sentence, quote, I am willing to meet with

4    Betsy and you and possibly a neutral mediator to

5    determine a mutually productive solution to address

6    our current situation.

7             Did I read that correctly?

8        A.   Yes, you did.

9        Q.   What were the issues that you

10   suggested be mediated?

11       A.   They were numerous.  I was producing

12   the work I was tasked to do but being told that I

13   wasn't, even though I was producing it and

14   documenting it.  I was unable to have a constructive

15   conversation with Jeff Kost, because I found that

16   everything I told him never went to Betsy.

17            I would speak to Betsy about the same

18   situation.  Some of her comments were conciliatory,

19   but I realized that in this whole collective

20   meeting, it was like I had done no work.

21            I also understood that the document I

22   asked you about had been created from material that

SLR REPORTING
(301) 340-0042

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                   December 21, 2007

Page 225

1    came out of a workshop conducted by Arminda Hall

2    that Jeff had just restructured, and that this was

3    not a standard evaluation process used by the

4    Washington Counsel of Agencies.

5                    It was one that was created

6    specifically to address whatever issue Betsy and

7    Jeff appeared to have, although it made no sense to

8    me, because based on what they were asking I had

9    already done that work and had documented it.

10            Q.    Any other issues?  Any other issues

11   that you were seeking mediation on?

12            A.    I was seeking mediation on the

13   treatment that I received in that office.  I wanted

14   to understand why a double standard was practiced

15   with me, but I didn't see that occur with Rick or

16   Jeremy or anyone else.

17            Q.    Any other issues on which you were

18   seeking mediation?

19            A.    I'm not sure that I really understand

20   the question given that I have answered it.

21            Q.    I want to be sure you have.  That's

22   all.  Your e-mail says --

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT         December 21, 2007

Page 226

1                    MR. TEMPLE:  Wait a minute, she can

2       finish her answer.  You cut her off.

3                    MR. FLEISCHER:  I'm sorry.  Go ahead.

4                    THE WITNESS:  I mean, you're asking me

5       if I'm seeking mediation on any issues.  I'm seeking

6       mediation on their treatment of me as a professional

7       and a director and an organization where I'm

8       producing at capacity with no assistance, although

9       assistance had been promised and committed

10      throughout the interview and hiring process.

11                   And I'm not getting the support that

12      the organization committed to going into the deal,

13      but I'm still producing the work that I would have

14      had to produce with an assistant.

15                   I'm seeking mediation on their tone,

16      their demeanor, their disrespectful behavior.  And I

17      felt that I was not safe in my workplace.  And I

18      needed someone that was neutral that could navigate

19      a conversation without dire consequences, which I

20      always felt that I was dealing with whenever I had a

21      conversation with them.

22                   BY MR. FLEISCHER:  (Resumed)

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              December 21, 2007

Page 227

1          Q.   Anything else?

2          A.   That's enough.

3          Q.   When you say you felt you were not

4     safe, did you feel physically threatened?

5          A.   I did not feel physically threatened.

6     I felt professionally threatened, financially

7     threatened.  I felt that my reputation and

8     credibility was threatened by their actions and with

9     their lack of action.

10         Q.   Was Jeff racially motivated, in your

11    opinion, by wanting to use your photo in the

12    newsletter and on the Web site?

13         A.   I can't speak to that.

14         Q.   Okay.  Let me look at the objectives,

15    Exhibit 39, please.

16         A.   Is there a reason why I can't continue

17    to review that document?

18         Q.   You're welcome to.

19         A.   Thank you.

20         Q.   I just want to focus my questions and

21    your attention on 39.

22         A.   Okay.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            December 21, 2007

Page 228

1          Q.    Why were you unwilling to sign Exhibit

2    39?

3          A.    When I reviewed this document, it had

4    come after I had completed the content of this

5    document and submitted it quite a few times, number

6    one.  Number two, I had come through my three-month

7    evaluation and was told that I was just fine and

8    didn't need to be evaluated.

9               Then I'm presented with a document

10   that is clearly a tool for establishing a track

11   record of deficiency, and I knew that I had no

12   deficiency and I understood what the tool was.

13               And if I'm already doing this work,

14   why would I agree to sign this?

15          Q.    You viewed Exhibit 39 as redundant?

16   Is that a fair word?

17          A.    I viewed your Exhibit 39 as a tool for

18   grounds to establish a paper trail to say I agree to

19   certain things that I had already completed.  But

20   since people doing the evaluating were subjective,

21   how do I prove it other than to continue to provide

22   a paper trail of documentation for work completed?

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            December 21, 2007

                                                           Page 229

1                    I also knew that no other employee in

2        the organization was subjected it this kind of

3        evaluation process.

4                    Q.    How was this document presented to

5        you?

6                    A.    It was presented to me in a meeting

7        with Betsy and Jeff.

8                    Q.    When was that meeting as you recall?

9                    A.    In the spring.  I don't recall the

10       date.

11                   Q.    How long did the meeting take?

12                   A.    Over an hour and a half.  And it was a

13       painful, railing hour and a half of basically

14       telling me I was incompetent.

15                   Q.    Who called the meeting?

16                   A.    Betsy and Jeff.

17                   Q.    And where did it take place?

18                   A.    In Betsy's office.

19                   Q.    And at that meeting Betsy and Jeff

20       were critical of your work?

21                   A.    They were extremely critical of my

22       work, but the criticism was not specific.  What I

LISA RANSOM                                                     LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                    December 21, 2007

Page 230

1    received was from Betsy is you're not meeting with

2    the nonprofits.

3                    Betsy, I am meeting with the

4    nonprofits.  I am meeting with nonprofits that are

5    in the WCA system in three jurisdictions where my

6    predecessor only covered one and a half.  I am

7    meeting in three jurisdictions with no staff support

8    as committed.

9                    I am meeting with government officials

10   in all three jurisdictions; Washington, Montgomery

11   County and Prince George's County while I'm meeting

12   with nonprofits based on those organizations or

13   those elected officials' availability and

14   willingness to schedule, which means that if they

15   want to schedule at seven o'clock in the morning,

16   I'm at a meeting at seven o'clock in the morning.

17                    And if they want to schedule at five

18   in the evening, I'm at a meeting at five in the

19   evening.

20        Q.    But you disagreed and I gather you

21   disagreed strongly with their criticism?

22        A.    At first I was stunned by their

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            December 21, 2007

Page 231

1    criticism, because it didn't make sense to me given

2    that I had already done and had documented what I

3    had done and submitted it.  Not only did I document

4    it in my reports, but I documented in my financial

5    reimbursement records, which they obviously agreed

6    that I had done them because they reimbursed me for

7    them.  So it made no sense at all.

8              Q.    How many weekly meetings did you have

9    with Betsy and Jeff between the period March of 2004

10   and the day you were terminated?

11             A.    That's a little redundant, because a

12   weekly meeting is a weekly meeting.

13             Q.    But it didn't happen.  It didn't

14   happen.  That's my point.

15             A.    Actually, it did happen with the

16   exception of the week I believe before the

17   empowerment conference.

18             Q.    All right.  So it's your testimony

19   that you met once a week throughout this period with

20   one exception?

21             A.    Unless they canceled a meeting.  I

22   made myself available because they required that I

LISA RANSOM                                                      LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                    December 21, 2007

Page 232

1    do so.

2              Q.    That wasn't my question.  My question

3    was how many meetings took place?

4              A.    I don't recall the count.  If it was a

5    weekly meeting, in my mind we met weekly.  But if

6    they for some reason were unable to meet or if I was

7    in the process of this conference, I don't believe

8    the week before the conference I met with them, but

9    I can't recall.  I'm not sure.

10             Q.    Do I understand that there was a

11   weekly meeting scheduled, sometimes it happened and

12   sometimes it didn't?

13             A.    Yes.

14             Q.    What was the schedule?  Was there a

15   specific day and time?

16             A.    The meetings were usually in the

17   afternoon.  I can't tell you what was the specific

18   day, because it may be that Betsy would go to her

19   calendar and looked to see what day the following

20   week worked for her as opposed to we're going to

21   meet on this day at this time.

22             Q.    So a subsequent meeting was scheduled

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 233

1    at the meeting taking place?  Is that typically what

2    happened?

3              A.    That's what I recall.

4              Q.    Okay.  And that would be the routine

5    to schedule the weekly meeting, which then sometimes

6    got canceled for one reason or another?

7              A.    I don't recall many cancellations.

8              Q.    Okay.

9              A.    They were too painful for me to think

10   to -- actually, they were painful enough to block

11   out.

12              You know, let me say this.  The

13   process of those weekly meetings is very similar to

14   the process of what's happening here today.  It's

15   like reliving a rape.  You have to go through this

16   process of pain, humiliation, verbal abuse, torture.

17   That's the same process that we're dealing with here

18   today.  That's what those meetings were like for me.

19              And the fact that they could go on for

20   an hour to two hours was ridiculous, because the

21   purpose of those meetings from where I sat, given

22   the lack of information, content, direction,

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              December 21, 2007

Page 234

1    anything that I consistently asked for, was that

2    basically you are not a good fit for this

3    organization without any clarity as to really

4    telling me why.

5              Q.    Let the record show that I have not

6    misbehaved in any way despite the suggestion.   Your

7    counsel is here and he hasn't objected.

8              A.    I didn't say that you did anything

9    physically.   I'm telling you what this experience is

10   like.

11             Q.    Would you look at Exhibit 40, please.

12   Can you identify Exhibit 40?

13             A.    It's a familiar piece.  It's the same

14   piece as Exhibit 39 except it has my handwriting on

15   it.

16             Q.    That was one of my questions.   Is all

17   the handwriting on the document yours?

18             A.    Yes.

19             Q.    Just below the heading I see the date

20   April 8.  Is that the date this took place?

21             A.    If that's the date on the form, yes.

22                   MR. TEMPLE:   Where do you see that?

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 235

1              MR. FLEISCHER:  Objectives review

2      date.

3              BY MR. FLEISCHER:  (RESUMED)

4              Q.    And right below that I see initials.

5      Are those your initials?

6              A.    Yes, they are.

7              Q.    Did Betsy or Jeff ask you to sign

8      Exhibit 40?

9              A.    I'm sure they did.

10             Q.    And your response?

11             A.    That I would not sign this.

12             Q.    For the reasons you have given before?

13             A.    That's correct.

14             Q.    Would you look at Exhibit 41, please.

15     Can you identify Exhibit 41?

16             A.    Not really.

17             Q.    I'm going to suggest to you -- but if

18     this doesn't reflect your recollection, that's fine.

19     I'm going to suggest to you that Jeff typed up his

20     notes from an April 8th meeting and presented it to

21     you in this form for your review and signature.

22     Does that sound right?

LISA RANSOM                                         LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT        December 21, 2007

Page 236

1              MR. TEMPLE:  Objection.

2              THE WITNESS:  I can't respond to that.

3         BY MR. FLEISCHER:  (RESUMED)

4         Q.   You don't know?

5         A.   I don't know.

6         Q.   You see italicized sentences under

7    each of the numbered objectives.  You see numbered

8    objectives and then see the word status and then you

9    see an italicized sentence or two.  Do you see that?

10        A.   Yes.

11        Q.   If you focus on the italicized

12   sentences, do they accurately reflect the status of

13   the objectives as you reported them to Jeff on April

14   8?

15        A.   I can't answer that question.

16        Q.   And the reason you can't answer it?

17        A.   Because I don't recall.  I would need

18   to go back and look at my reimbursements and my

19   schedule and other documents that indicate where I

20   was that week as it relates to meetings.

21        Q.   Let me try to identify what you would

22   need to look at in order to be able to answer my

Page 237

1    question.   Your reimbursement schedules?

2              A.    That would be one thing.

3              Q.    Anything else?

4              A.    The reports that I submitted.

5              Q.    These are written reports you

6    submitted to Jeff and Betsy?

7              A.    Written reports I submitted to Jeff

8    and Betsy.  But I have to tell you when I look at

9    this it's so suspect because I have had experiences

10   where I've conveyed things to Jeff and his written

11   response would not be what I said to him.  So I

12   can't tell you with any accuracy that I think that

13   this is correct content.

14             Q.    Do you recall Jeff presenting this to

15   you and asking you to sign it?

16             A.    You've asked me that question and I

17   told you I don't know.

18             Q.    Is there anything else you would need

19   to look at?  You identified two types of documents.

20   Is there anything else you would need to look at to

21   determine whether these italicized sentences

22   accurately reflect the status reports you gave to

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 December 21, 2007

Page 238

1    Jeff and Betsy on April 8?

2              A.   My e-mails, probably.

3              Q.   Are those all documents that you have?

4              A.   I don't have access to anything other

5    than what I have submitted.

6              Q.   Okay.  Would you look at Exhibit 43,

7    please.  Can you tell me what that is?

8              A.   It's the same document that you handed

9    me previously only a later version of it, and my

10   responses to you will be the same.

11             Q.   Okay.  Look at Exhibit 44, please.

12             MR. TEMPLE:  There is no Exhibit 42.

13             MR. FLEISCHER:  Yes.  I skipped a few.

14             MR. TEMPLE:  Okay.

15   BY MR. FLEISCHER:  (RESUMED)

16             Q.   Can you identify that exhibit, ma'am?

17             A.   It's going to be the same answer if

18   you keep handing me the same document.

19             Q.   I want to be clear that it's not the

20   same document.  In fact, it has a different date on

21   it.

22             A.   No, no.  I apologize.  Please

LISA RANSOM                                           LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                  December 21, 2007

Page 239

1    continue.

2            Q.    The document that I just showed you is

3    dated May 17.  Having pointed that out to you, is

4    your answer still the same?

5            A.    The documents you've handed me for

6    April 8, May 7 and May 17th are all the same type of

7    document with Jeff's response.  And I can't tell you

8    that this is accurate.

9            Q.    Okay.  In each case you do not recall

10   Jeff handing those documents to you for signature;

11   is that correct?

12           A.    I can't say that he did or he didn't.

13   I don't remember this.

14           Q.    And to be clear, in each case you

15   don't recall whether the italicized status report is

16   an accurate reflection of what you told Jeff at the

17   particular meeting; is that correct?

18           A.    Yes.

19           Q.    I have one more.

20           A.    Of the same document with a different

21   date?

22           Q.    Yes, ma'am.

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                December 21, 2007

Page 240

1        A.    Okay.

2        Q.    That is Exhibit 45, which is dated May

3    27.  Can you identify Exhibit 45 as akin to the

4    other documents we've just looked at?

5        A.    I would say that they are akin to the

6    documents that I looked at previously.  I make an

7    exception on point number 8 of this document,

8    however.

9        Q.    You do recall reporting on objective 8

10   on May 27?

11       A.    I reported on every single dollar that

12   I raised to both Betsy and Jeff and the human

13   service coalition on a daily basis.  So I don't

14   quite -- I mean, this just tells me that there is a

15   problem, because every time we got a dollar that

16   came in from a funder for that event, I noted it and

17   made sure everybody knew about it.

18           So to say that there was not an

19   accurate reporting, it makes it suspect to me.

20       Q.    Other than that, would your answers be

21   the same about whether Jeff asked you to sign it,

22   whether they are accurate reflections of what you

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 242

1          A.    Yes.

2          Q.    Did Betsy Johnson tell you e-mails and

3    closed doors breed misunderstandings?

4          A.    Yes.

5          Q.    And then next to number two it says,

6    the document exists so that Betsy and Jeff can keep

7    up with what's going on.  What document is being

8    referred to here?

9          A.    They are referring to this document.

10         Q.    The objective exhibits that we've been

11   looking at?

12         A.    Yes, that's correct.

13         Q.    Did Betsy tell you at that meeting,

14   wants more focus on the WCA members?

15         A.    Yes, which was confusing to me because

16   that's who I was meeting with.

17         Q.    Below that paragraph it says, what

18   disturbs Betsy is that, and what did Betsy say after

19   that?

20         A.    I don't recall.

21         Q.    Did Betsy tell you, quote, doesn't

22   feel that we are on the same page, believes I am

LISA RANSOM                                        LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT               December 21, 2007

Page 243

1    unfocused for WCA, closed quote?

2            A.    She probably did.

3            Q.    Reading down a few lines, quote,

4    having trouble determining my skills and ability and

5    hence have not been able hire -- did I read it

6    correctly?

7            A.    Able to hire an assistant.

8            Q.    Did Betsy say that to you?

9            A.    Yes -- no, Jeff may have said that to

10   me.  It was one of the two.  I don't know which one.

11   When they start tag teaming you, it's very hard to

12   recall who says what.

13           Q.    And then reading down a little bit

14   further, quote, was opposed to WCA participation in

15   the FEC briefing because it took a day away from

16   local nonprofits, closed quote.

17                 Did I read that correctly?

18           A.    You read that correctly.

19           Q.    And did Betsy or Jeff say that to you?

20           A.    Yes.

21           Q.    Which one?

22           A.    I don't know.

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT           December 21, 2007

Page 244

1          Q.    Is this the first time you heard that?

2    Had you previously heard from Betsy or Jeff that

3    they were opposed to your participation in the FEC

4    briefing?

5          A.    It may have been the first time I

6    heard it.  I find it ironic, though, because having

7    left, Betsy jumped head first into that.  And I

8    found that she was very much involved in this FEC

9    briefing dynamic.

10         Q.    Turn to the next page, please, of

11   Exhibit 46.  About a quarter of the way down the

12   page, problem with closed door, sign, and I can't

13   read the rest of it.  Can you read the rest of that?

14         A.    You mean at the top?

15         Q.    Yes.

16         A.    They had a problem with me keeping my

17   office door closed.

18         Q.    Let me just see if we can read it

19   first and then we can talk about what it means.  It

20   says problem with closed door.  Can you read the

21   rest of those?

22         A.    Signals that people.  I wrote

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT            December 21, 2007

Page 245

1    signature but I meant signals.

2                    MR. TEMPLE:  It says problem with door

3    closed, not that it make a difference.

4                    BY MR. FLEISCHER:  (RESUMED)

5           Q.    I'm sorry, did I misread it?

6           A.    Closed door.

7           Q.    Did Betsy or Jeff raise that issue

8    with you at the meeting?

9           A.    Yes, they did.

10          Q.    And what did they say it signals to

11   people?

12          A.    I think, and I'm paraphrasing because

13   I don't know their exact words, but it implied that

14   I was inaccessible.

15          Q.    Now, just below that there are two

16   lines of handwriting.  Would you read those aloud,

17   please?

18          A.    Discussion, things that should be

19   talked about.

20          Q.    Yes, ma'am.

21          A.    Doesn't like to see cliques.

22          Q.    Okay.  Did somebody say that to you at

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT             December 21, 2007

Page 248

1    asked.

2           So it didn't -- I knew that in that

3    situation there was just no way that I could trust

4    him to convey my work, because he didn't understand

5    what I was doing.  He didn't have a sufficient

6    policy background to have a clue about what I was

7    doing, which always takes me back to I wasn't quite

8    clear why he was my supervisor at all, because my

9    predecessor answered directly to Betsy.

10          Q.    If I understand what you're saying,

11   the trouble and the lack of trust was Jeff's failure

12   or inability to convey to Betsy what it was you were

13   doing?

14          A.    That's correct.

15          Q.    Just below that, it says Betsy doesn't

16   feel that I'm focused on WCA public policy matters.

17   Did Betsy say that to you?

18          A.    Yes.

19          Q.    And then the next line, Betsy stated

20   that she is completely behind.  Did Betsy say that?

21          A.    Yes.

22          Q.    Who's behind, Betsy or you?  Let me

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT          December 21, 2007

Page 249

1    rephrase that.  Was Betsy suggesting that she,

2    Betsy, was behind or that you were behind?

3           A.    No, that she is behind.

4           Q.    She, Betsy?

5           A.    Um-hum.

6           Q.    Then the next line, could you read

7    that aloud, please?

8           A.    Three of us are going to have to work

9    on a way.

10          Q.    Who said that?

11          A.    I don't know.

12          Q.    Do you know what it means?

13          A.    I guess the idea was to try to resolve

14   whatever they thought was the deficiency or whatever

15   I thought was the lack of assistance by coming up

16   with a mutually productive outcome.

17          Q.    Then below that Betsy states that

18   neither she nor Jeff are against me.  Did Betsy say

19   that?

20          A.    She said that, which I thought was

21   quite interesting.  She did say that.  Because why

22   would you make a statement like that if you didn't

Page 259

1          Q.    Were you given a letter of termination

2    at that meeting?

3          A.    I was given a letter of termination at

4    that meeting.

5          Q.    Look at Exhibit 52, please.  Can you

6    identify Exhibit 52 as the letter you were given at

7    the termination meeting?

8          A.    I believe it is.

9          Q.    Were you given an opportunity to

10   resign at the meeting?

11         A.    Yes, I was.

12         Q.    Did you accept that?

13         A.    I did not.

14         Q.    Why not?

15         A.    Having received this letter and

16   knowing I was going to be terminated regardless, I

17   knew that if I resigned I would not be eligible for

18   unemployment, which was interesting.

19         Q.    Exhibit 52 says down at the bottom of

20   the first page, as severance pay you will receive

21   credit for one month of employment, closed quote.

22              Were you offered a month of severance?