## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LISA RANSOM** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-843 RMC |
| | ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## APPENDIX TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PART A

Apx. Page

Ransom deposition excerpts                                                     1

### PART B

Baird deposition excerpts                                                     129

Johnson affidavit                                                             133

Kost affidavit                                                                145

Exhibit 10 – offer letter dated 8-13-03 and job description                   155

Exhibit 11 – Center Personnel Handbook dated Oct. 2001                        157

Exhibit 12 – Ransom receipt for Handbook dated 9-8-03                         172

Exhibit 13 – e-mail dated 8-17-03, Ransom to Kost                             173

| | Apx. Page |
|---|---|
| Exhibit 27 – e-mail dated 1-13-04, Kost to Ransom | 174 |
| Exhibit 29 – e-mails dated 2-25-04 between Kost and Ransom | 175 |
| Exhibit 32 – e-mails dated 4-14-04 between Kost and Ransom | 179 |
| Exhibit 37 – e-mail dated 4-14-04, Ransom to Kost | 181 |
| Exhibit 38 – memo dated 4-14-04, Kost to Ransom | 185 |
| Exhibit 39 – objectives March 12-June 30 | 186 |
| Exhibit 40 – objectives review dated 4-8-04 | 188 |
| Exhibit 41 – objectives review dated 4-8-04 | 190 |
| Exhibit 42 – memo dated 5-5-04, Kost to Johnson | 192 |
| Exhibit 43 – objectives review dated 5-7-04 | 193 |
| Exhibit 44 – objectives review dated 5-17-04 | 196 |
| Exhibit 45 – objectives review dated 5-27-04 | 198 |
| Exhibit 50 – memo dated 5-12-04, Kost to Johnson | 200 |
| Exhibit 52 – termination letter dated 6-14-04 | 201 |

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,          :

5                               : Civil Action No.

6         Plaintiff       : 05-7238

7 vs.                           :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9         Defendant.            :

10 _____:

11                               X

12         Wednesday, April 5, 2006

13         Washington, D. C. 20005

14     The deposition of, JEREMY BAIRD, witness, was

15 called for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 12:05

20 o'clock p.m.,  when were present on behalf of the

21 respective parties:

22

23

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

1    A              No.

2    Q              Or Arminda?

3    A              No.

4    Q              Lisa Ransom?

5    A              No.

6    Q              Other than the incident with the
7 late information from Arminda, would you say you had a
8 good working relationship with her?

9    A              For the most part.   There were
10 challenges like with any relationship, by it was a good
11 working relationship.

12              MR. TEMPLE:   No further questions.

13              MR. FLEISCHER:   Mr. Baird, I have a
14 couple questions.

15              CROSS EXAMINATION

16              BY MR. FLEISCHER:

17    Q              Let me take you back to the time
18 when you stopped a woman in the hall, whom you later
19 learned was named Carlotta Scott.   Where was Ms. Scott
20 when you stopped her?

21    A              As I recall, she was at the
22 entrance to the conference room from the main hall way of
23 our suite.

1    Q        This was within CNA's offices?

2    A        Correct.

3    Q        Why did you stop her?

4    A        She was not -- I did not recognize

5 her as a staff person or as a subtenant.  She was an

6 unknown person in our space.

7    Q        Did you stop her because she was

8 African American?

9    A        No.

10   Q        As of that time, had you stopped

11 other people who were in your suite?

12   A        Yes.

13   Q        About how many?

14   A        I don't remember.

15   Q        Can you give me a rough estimate?

16 Fewer than ten, more than ten?

17   A        I would say over a span of time,

18 that we have been in that space, probably about ten.

19   Q        Is it your practice to stop people

20 whom you do not recognize when you see them in your

21 suite?

22   A        Yes.

23   Q        Why is that your practice?

1       A                    Security.   Um, we at that time,

2  there had been incidents, we received reports from the

3  building manager about other suites that were

4  burglarized, suspicious people in suites in the building,

5  things like that.   And it was my understanding that it

6  was encouraged that we did ask people who we did not

7  recognize, it would help them to determine if they were

8  -- if they needed help in getting to where they were

9  going or whether they were not in the space they should

10  be in, et cetera.

11      Q                    Of the ten or so people that you

12  had stopped, prior to this incident with Ms. Scott, were

13  any of them White?

14      A                    Yes.

15      Q                    Do you have a rough idea how many

16  were White and how many were people of color?

17      A                    No.

18      Q                    At the time you stopped Ms. Scott,

19  and spoke with her, did you know her sexual orientation?

20      A                    No.

21                    MR. FLEISCHER:   I have no further

22  questions.   Thank you.

23                    REDIRECT EXAMINATION

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LISA RANSOM** ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 1:06-CV-843 RMC |
| ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT** ) | |
| ) | |
| Defendant ) | |
| ) | |

### AFFIDAVIT OF BETSY JOHNSON

I, Betsy Johnson, state as follows:

1. I am an adult, not under any disability.  Except as otherwise stated herein, I have personal knowledge of the following matters and I am competent to testify as a witness thereto.

2. I am the Executive Director of the Center for Nonprofit Advancement ("Center"), formerly known as the Washington Council of Agencies.  I have held that position since 1988.  As Executive Director I am the chief executive officer of the Center. I report to the Center's Board of Directors.

3. The Center is a District of Columbia nonprofit membership corporation founded in 1979.  The Center is exempt from income tax under section 501(c)(3) of the Internal Revenue Code.  Its sole offices are located at 1666 K Street, N.W., Suite 440, Washington, DC 20006.

4. The Center currently has approximately 1000 members, each of which is a nonprofit organization.

5. The Center is organized to provide services to its members and to the local nonprofit community generally. The Center's services fall into three general categories: education; advocacy and nonprofit community building; and group purchasing programs (limited to members).

6. The Center prides itself on being a diverse, equal opportunity organization. During the period that Lisa Ransom ("Ransom"), also known as Lisa Ransom Brown, was employed by the Center, the Center's Board of Directors consisted of six African Americans, six Caucasians, and one Latino. During that same period, the Center had an average of 15 employees, of whom seven were African American, seven were white, and one was Latina.

7. During the period that Ransom was employed by the Center, the Center had a Personnel Handbook, a copy of which accompanies this Affidavit as Exhibit 11. Section III of the Handbook provides:

> WCA [the Center] is committed to a policy of equal employment opportunity, and does not discriminate in the terms, conditions or privileges of employment on account of race ... or otherwise as may be prohibited by federal or state law.

8. Other provisions of the Handbook state that Center employees are employed at-will (Section II), that the Handbook is not intended as a contract of employment and is subject to change at any time (Section II), that the Center reserves the right to take

-2-

appropriate action in response to performance issues or other workplace problems (Section VII), and that employees who are subjected to discipline, including dismissal, may utilize the grievance procedures set forth in the Handbook (Sections VIII-D and IX).

9. Every Center employee is required, on being hired, to acknowledge in writing that he or she has received and read the Center's Personnel Handbook.

10. The Center evaluates its employees annually in late June or early July.

11. The Center's office suite at 1666 K Street, N.W., Washington, DC includes a conference room that provides a connection between the common hallway and the Center's interior office space.

12. On a number of occasions, unauthorized persons have gained access to the Center's interior office space and have been seen in private offices and using telephones. Building management has also warned of thefts in other suites in the building. As a result, the Center's employees have assumed responsibility to stop and question persons within the Center's interior offices whom they do not recognize.

13. In mid-2003, Ransom applied to the Center for the position of Director of Public Policy and Community Relations. The position had become vacant due to the death of Phyllis Campbell Newsome ("Newsome") in childbirth.

14. Newsome, who was African American, had held the position of Director of Public Policy and Community Relations for eight years prior to her death.

-3-

15. The Center interviewed Ransom twice. The first interview was by Jeff Kost ("Kost"), the Center's Deputy Executive Director. The second interview was by Kost, Angela Jones Hackley ("Hackley"), and me.

16. As Deputy Executive Director, Kost is the second-ranking staff member at the Center. Kost reports to me.

17. Hackley, who is African American, was then a Center board member and an official of DC Action for Children.

18. On or about August 13, 2003, Kost and I jointly decided to offer Ransom the position of Director of Public Policy and Community Relations. A copy of our offer letter, together with a job description for the position, accompanies this Affidavit as Exhibit 10.

19. Ransom accepted the offer and began working for the Center on September 8, 2003. As Director of Public Policy and Community Relations, she was considered a member of senior staff. She reported to Kost.

20. At the time she was hired, Ransom received and receipted for a copy of the Center's Personnel Manual. A copy of her receipt accompanies this Affidavit as Exhibit 12.

21. As Director of Public Policy and Community Relations, Ransom was required to play an active role at the Center in supporting and communicating with local nonprofits on local issues and to perform various specific responsibilities, including analyzing and

-4-

evaluating issues for the local nonprofit sector; monitoring policy and legislation relevant to local nonprofits; developing and maintaining strong relationships with policy makers in all local jurisdictions; and establishing, developing and maintaining strong constituent relations. The position required her to be able to work with people and to have strong written and oral communication skills.

22. Although Ransom's position included a requirement that she interact with Center members in the District of Columbia, Montgomery and Prince George's Counties, Maryland, and northern Virginia, the Center expressly relieved her from interacting with the Center's northern Virginia members.

23. Ransom's position at the Center was unique in that, among other things, she spent more time than any other employee in the field addressing public policy matters for Center members.

24. After Ransom had worked at the Center for about four months, both Kost and I concluded that Ransom was not making adequate progress toward meeting her responsibilities, that she was unfocused in her work, and that she moved from one activity to another without any plan or priority.

25. A number of Center members also complained about Ransom's work. Specifically:

Anx. 137

a. In the late fall of 2003, Michael E. Young of the United Communities Against Poverty telephoned me to question and complain about information given him by Ransom concerning the Center's commitment to participate in a coalition.

b. In the late fall of 2003 or early winter of 2004, Sheri Brady, formerly with the National Council of Nonprofit Associations, told me that Ransom did not do a good job on a congressional staff briefing she (Ransom) had conducted.

c. In the early spring of 2004, Mac Ramsey of The Arc of Prince George's County called me to complain about an unrealistic budget that Ransom had prepared for an upcoming conference.

d. A member nonprofit called Ransom with a problem it was having with a Montgomery County official (an official whose staff Ransom already knew). Ransom met with a staff member for the official and reported back to me that the member nonprofit had misbehaved and would "not get anywhere" with the official. To the best of my knowledge, Ransom ceased all further effort to resolve the matter and never followed up with the member nonprofit.

e. I met with Hackley, a Center Board member and an official of the DC Action for Children, on or about June 6, 2005 and told her that Ransom was going to be fired. Hackley supported the decision and said that Ransom had not done a good job at an event she (Ransom) had facilitated.

-6-

26. Ransom was often late in accomplishing administrative duties, such as getting short pieces about her work to Kost for inclusion in the Center's newsletter; getting reports to me in preparation for Board of Director meetings; and getting time sheets in.

27. On May 27, 2004 I requested all senior staff to submit reports by close-of-business June 1 for inclusion in my quarterly report to the Board. After several follow-up requests by Kost, Ransom submitted her report on the afternoon of June 3. Ransom's report failed to identify issues, it failed to state any planned action, and it contained no analysis of her meetings during the quarter.

28. Most of the Center's staff, including Kost and I, keep our office doors open except when dealing with personnel issues or other confidential or highly sensitive matters. We also communicate with fellow staff members in a face-to-face manner. Ransom frequently worked with her office door shut and she communicated with staff members mostly via e-mail. Kost and I criticized Ransom for these work habits, telling her they breed misunderstandings and signal that she is inaccessible.

29. By mid-January 2004, Kost and I decided that Ransom might benefit from closer supervision in the form of regular, weekly meetings. Kost told me that Ransom resisted the meetings and that he was forced to spend a substantial amount of his time trying to schedule the meetings. From January through May 2004 nine such meetings took place, on January 14, February 20, March 12, April 8, April 27, April 28, May 7, May 17 and May 27.

30.  In preparation for the March 12 meeting, Kost developed a written list of objectives for Ransom, with deadlines for each objective.  The objectives were discussed at the meeting.  Following the meeting, Kost compiled his, Ransom's and my comments regarding the status of the objectives.  Kost followed this same procedure for subsequent meetings among Kost, Ransom and me.  Examples of Kost's compilations accompany this Affidavit as Exhibits 41, 43 and 44.

31.  At numerous meetings with Ransom during the late winter and spring of 2004, Kost and I repeatedly told Ransom that her work was deficient.  I never told Ransom that her work was "just fine" or was otherwise satisfactory.

32.  I am informed and believe that during Ransom's employment at the Center:

a.  An African American colleague of Ransom's named William Terry was asked to conduct a training session at the Center.  During a preparatory meeting in the Center's conference room among Terry, Ransom, and another Center employee who is Latina, and while Terry was using his cell phone, Kost interrupted to ask if he could use the conference room earlier than scheduled because a number of guests of his had already arrived.  Kost said nothing of a racial nature during the interruption and I do not believe his action was racially motivated.

b.  An African American colleague of Ransom's named Carlottia Scott was asked to conduct a training session at the Center.  During a break in a preparatory meeting in the Center's conference room among Scott, Ransom, and another Center employee,

-8-

while Scott was alone in the Center's interior office area, Scott was stopped and questioned by Center employee Jeremy Baird. When I was told that Scott was upset, I called her and apologized on behalf of the Center. I do not believe that Baird's actions were racially motivated.

        c. Ransom invited a Rev. Earl Trent, who is African American, to be the invocation speaker at a function in which she was involved. A Center employee named Barbara Mendoza, who was serving as receptionist for the function, charged Rev. Tent the regular admission price. When Ransom complained to me, I directed that the charge be refunded. I do not believe that Mendoza's actions were racially motivated.

    33. On May 27, 2004, at one of Kost's and my supervisory meetings with Ransom, Ransom called Kost unprofessional and racist. Although I did not believe that Kost was in any way racially motivated, I reminded Ransom of the grievance procedure specified in the Personnel Handbook. Ransom never filed a grievance.

    34. I later learned that the basis for Ransom's accusation against Kost was an earlier incident in which she had asked Kost to accompany her to a meeting in Prince George's County. According to Ransom, Kost responded to her request by saying, "I'm afraid to go there," which Ransom apparently took to be a racist comment. I questioned Kost about the matter and he stated that what he actually told Ransom was, "I'm afraid I can't go" or words to that effect.

35.  In early to mid-May 2004 Kost and I jointly decided to fire Ransom.  At that time, Ransom was working on a 1½-day conference being co-sponsored by the Center, scheduled for June 10-11, 2004.  Because terminating Ransom at that time could have jeopardized the Center's role as co-sponsor and jeopardized the conference itself, Kost and I delayed firing her until after the conference.

36.  Our decision to fire Ransom was made prior to the May 27, 2004 meeting at which Ransom called Kost unprofessional and racist.

37.  On June 15, 2004, Kost and I met with Ransom in my office and told her the Center was terminating her.  Kost then handed Ransom a written notice of termination.  A copy of the termination letter accompanies this Affidavit as Exhibit 52.

38.  The Center never formally evaluated Ransom because she was hired after the 2003 evaluations took place and she was terminated before the 2004 evaluations took place.

39.  At no time during her employment by the Center did Ransom complain to me or, to the best of my knowledge, any Center director or officer that she had been or was being discriminated against because of her race or because of any other protected characteristic.

40.  At no time during her employment by the Center did Ransom file a written grievance with me or, to the best of my knowledge, with any other Center director or officer.

-10-

41. At no time after her termination on June 15, 2004 did Ransom use the Center's grievance procedures to challenge her dismissal.

42. I have never used a racial epithet in Ransom's presence and I have never made any racially derogatory comment to Ransom or in her presence. I have never heard anyone else use a racial epithet in Ransom's presence and I have never heard anyone else make a racially derogatory comment to Ransom or in her presence.

43. On June 17, 2004, I received a copy of a charge Ransom had filed with the District of Columbia Office of Human Rights. At no time prior to receipt of Ransom's charge on June 17, 2004, was I aware that Ransom had filed any such charge. To the best of my knowledge, at no time prior to June 17, 2004 was any other Center director or officer aware that Ransom had filed such a charge.

44. On or about October 1, 2004 Kost and I hired Lee Mason (an existing Center employee) to take the position of Director of Public Policy and Community Relations. Mason is African American.

45. Every person who has held the position of Director of Public Policy and Community Relations since its creation in 1990 has been African American.

46. My decisions to meet with Ransom on a regular basis for supervision and later to fire her, were motivated in each case solely by her unsatisfactory performance as the Center's Director of Public Policy and Community Relations, as described more fully above. Neither of those decisions was motivated in any way by her race.

-11-

_Betsy Johnson_ (signature)

Betsy Johnson

DISTRICT OF COLUMBIA, ss:

Subscribed and sworn to before me this __23rd__ day of January, 2007.

[SEAL]

_Delores Huston_ (signature)

Notary Public, D.C.

My Commission expires: _____

**DELORES HUSTON**
Notary Public District of Columbia
My Commission Expires October 31, 2008

-12-

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LISA RANSOM**

        Plaintiff

   v.

**CENTER FOR NONPROFIT ADVANCEMENT**

        Defendant

)
)
)
)
)
)
)
)
)
)
)

Case No. 1:06-CV-843 RMC

## AFFIDAVIT OF JEFF KOST

I, Jeff Kost, state as follows:

1. I am an adult, not under any disability. Except as otherwise stated herein, I have personal knowledge of the following matters and I am competent to testify as a witness thereto.

2. I am the Deputy Executive Director of the Center for Nonprofit Advancement ("Center"), formerly known as the Washington Council of Agencies. I have held that position since July 2003. I had been with the Center for three years prior to becoming Deputy Executive Director. As Deputy Executive Director I am the second-most-senior staff member of the Center. I report to the Betsy Johnson ("Johnson"), the Center's Executive Director.

3. In mid-2003, Lisa Ransom ("Ransom"), also known as Lisa Ransom Brown, applied to the Center for the position of Director of Public Policy and Community

Relations.  The position had become vacant due to the death of Phyllis Campbell

Newsome ("Newsome") in childbirth.

4.  The Center interviewed Ransom twice.  The first interview was by Johnson and

me.  The second interview was by Angela Jones Hackley (a Center Board member),

Johnson and me.

5.  On or about August 13, 2003, Johnson and I jointly decided to offer Ransom

the position of Director of Public Policy and Community Relations.  A copy of our offer

letter, together with a job description for the position, accompanies this Affidavit as

Exhibit 10.

6.  Ransom accepted the offer and began working for the Center on September 8,

2003.  As Director of Public Policy and Community Relations, she was considered a

member of senior staff.  She reported to me.

7.  At the time she was hired, Ransom received and receipted for a copy of the

Center's Personnel Manual.  A copy of her receipt accompanies this Affidavit as Exhibit

12.

8.  As Director of Public Policy and Community Relations, Ransom was required

to play an active role at the Center in supporting and communicating with local nonprofits

on local issues and to perform various specific responsibilities, including analyzing and

evaluating issues for the local nonprofit sector; monitoring policy and legislation relevant

to local nonprofits; developing and maintaining strong relationships with policy makers in

<div align="center">-2-</div>

all local jurisdictions; and establishing, developing and maintaining strong constituent relations. The position required her to be able to work with people and to have strong written and oral communication skills.

9. Although Ransom's position included a requirement that she interact with Center members in the District of Columbia, Montgomery and Prince George's Counties, Maryland, and northern Virginia, the Center expressly relieved her from interacting with the Center's northern Virginia members.

10. Ransom's position at the Center was unique in that, among other things, she spent more time than any other employee in the field addressing public policy matters for Center members.

11. After Ransom had worked at the Center for about four months, both Johnson and I concluded that Ransom was not making adequate progress toward meeting her responsibilities, that she was unfocused in her work, and that she moved from one activity to another without any plan or priority. I put my criticisms of her in writing in the following instances:

a. Ransom resisted my suggestion that she expand the base of support in opposition to a proposal pending before the Montgomery County Council. I specifically criticized Ransom concerning this matter in an e-mail dated January 13, 2004, a copy of which accompanies this Affidavit as Exhibit 27.

-3-

b.  With respect to that same Montgomery County Council proposal, Ransom and I exchanged e-mails on February 25, 2004, in which I stated I was "disappointed ... [Ransom was] not able to find a way to talk about this ... [in a] timely paragraph," that I was "obviously not communicating what I need from you," and that "[t]his is an ongoing story, but if we don't tell it as time ... passes, we're missing the boat."  Ransom responded that she had insufficient time to focus on and research the matter and that "this is not the type of work that I'm compelled to write."  Copies of the e-mails accompany this Affidavit as Exhibit 29.  I considered Ransom's response to me to be insubordinate.

c.  In an exchange of e-mails between Ransom and me on April 14, 2004, I was critical of Ransom's work on an article in an upcoming issue of a Center electronic newsletter (called an "E-genda").  I stated: "If you are reading any of the previous E-gendas, you would find that we don't publish full articles.  We write brief paragraphs and then lead people to a link for more information.  We have had this discussion before."  A copy of my e-mail accompanies this Affidavit as Exhibit 32.

d.  Ransom failed to consult with Johnson and me regarding issuance of a public policy alert and she failed to produce a timely alert.  I expressed my criticism in a memo to Johnson dated May 12, 2004, a copy of which accompanies this Affidavit as Exhibit 50.

-4-

12. On April 14, 2004, I directed Ransom in writing either to allow the Center to use a photograph of her taken by a Center photographer, or to provide the Center with another photograph. The photograph was to be used in the Center's newsletter and on its website. Ransom refused my directive, responding in writing: "[O]n the advice of counsel, I am electing not to have my photographic image used in any way ... at this time." Copies of my directive to Ransom and her response accompany this Affidavit as Exhibits 37 and 38. I considered Ransom's response to be insubordinate.

13. Ransom was often late in accomplishing administrative duties, such as getting short pieces about her work to me for inclusion in the Center's newsletter; getting reports to Johnson in preparation for Board of Director meetings; and getting time sheets in.

14. On May 27, 2004 Johnson requested all senior staff to submit reports by close-of-business June 1 for inclusion in her quarterly report to the Board. After several follow-up requests by me, Ransom submitted her report on the afternoon of June 3. Ransom's report failed to identify issues, it failed to state any planned action, and it contained no analysis of her meetings during the quarter.

15. Most of the Center's staff, including Johnson and I, keep our office doors open except when dealing with personnel issues or other confidential or highly sensitive matters. We also communicate with fellow staff members in a face-to-face manner. Ransom frequently worked with her office door shut and she communicated with staff

-5-

members mostly via e-mail. Johnson and I criticized Ransom for these work habits, telling her they breed misunderstandings and signal that she is inaccessible.

16. By mid-January 2004, Johnson and I decided that Ransom might benefit from closer supervision in the form of regular, weekly meetings. Ransom resisted the meetings and I was forced to spend a substantial amount of my time trying to schedule the meetings. From January through May 2004 nine such meetings took place, on January 14, February 20, March 12, April 8, April 27, April 28, May 7, May 17 and May 27.

17. I did not single Ransom out in requesting that she attend weekly supervisory meetings. I also conducted weekly supervisory meetings with Rick Rose, another director who reported to me during Ransom's tenure at the Center. Rose is a white male.

18. In preparation for the March 12 meeting, I developed a written list of objectives for Ransom, with deadlines for each objective. The objectives were discussed at the meeting. Following the meeting, I compiled Ransom's, Johnson's and my comments regarding the status of the objectives. I followed this same procedure for subsequent meetings among Ransom, Johnson and me. Examples of my compilations accompany this Affidavit as Exhibits 41, 43 and 44.

19. I repeatedly asked Ransom to sign the compilations to indicate she agreed with the objectives and their status. Ransom refused to do so. I documented Ransom's refusal in a memo dated May 5, 2004 to Betsy Johnson, a copy of which accompanies this Affidavit as Exhibit 42. I considered Ransom's refusal to be insubordinate.

-6-

20. At numerous meetings with Ransom during the late winter and spring of 2004, Johnson and I repeatedly told Ransom that her work was deficient. Contrary to Ransom's assertion in paragraph 9 of her complaint, neither I nor (to the best of my knowledge) Johnson ever told Ransom that her work was "just fine."

21. In February 2004, I had scheduled the Center's conference room for a meeting that I was to conduct. A number of attendees arrived early and were filling the reception area. In an effort to accommodate them, I looked into the conference room through a window and saw Ransom, another Center employee, and an African American male whom I did not recognize. The African American male was then using a cell phone and it appeared to me that whatever meeting had been going on in the conference room was finished. I opened the conference room door and asked if I could use the conference room earlier than scheduled. I said nothing of a racial nature during the interruption and was not racially motivated in interrupting whatever activities were then going on in the conference room.

22. On May 27, 2004, at one of Johnson's and my supervisory meetings with Ransom, Ransom called me unprofessional and racist. I later learned that the basis for her accusation was an earlier incident in which she had asked me to accompany her to a meeting in Prince George's County. According to Ransom, I responded to her request by saying, "I'm afraid to go there," which Ransom apparently took to be a racist comment. What I actually said was: "I'm afraid I can't go" or words to that effect. My declining

-7-

Ransom's invitation was not in any way racially motivated. I did in fact accompany Ransom to a conference in Prince George's County shortly thereafter.

23. In early to mid- May 2004 Johnson and I jointly decided to fire Ransom. At that time, Ransom was working on a 1½-day conference being co-sponsored by the Center, scheduled for June 10-11, 2004. Because terminating Ransom at that time could have jeopardized the Center's role as co-sponsor and jeopardized the conference itself, Johnson and I delayed firing her until after the conference.

24. Our decision to fire Ransom was made prior to the May 27, 2004 meeting at which Ransom called me unprofessional and racist.

25. On June 15, 2004, Johnson and I met with Ransom in Johnson's office and told her the Center was terminating her. I then handed Ransom a written notice of termination. A copy of the termination letter accompanies this Affidavit as Exhibit 52.

26. The Center never formally evaluated Ransom because she was hired after the 2003 evaluations took place and she was terminated before the 2004 evaluations took place.

27. On or about October 1, 2004 Johnson and I hired Lee Mason (an existing Center employee) to take the position of Director of Public Policy and Community Relations. Mason is African American.

28. At no time during her employment by the Center did Ransom complain to me or, to the best of my knowledge, any Center director or officer that she had been or was

-8-

being discriminated against because of her race or because of any other protected
characteristic.

29.  I have never used a racial epithet in Ransom's presence and I have never made
any racially derogatory comment to Ransom or in her presence.  I have never heard
anyone else use a racial epithet in Ransom's presence and I have never heard anyone else
make a racially derogatory comment to Ransom or in her presence.

30.  On June 17, 2004, I learned for the first time that Ransom had filed a charge
of discrimination with the District of Columbia Office of Human Rights.  At no time prior
to that date was I aware that Ransom had filed any such charge.  To the best of my
knowledge, at no time prior to June 17, 2004 was any other Center director or officer
aware that Ransom had filed such a charge.

31.  My criticisms of Ransom, and my decisions to meet with Ransom on a regular
basis for supervision and later to fire her, were motivated in each case solely by her
unsatisfactory performance as the Center's Director of Public Policy and Community
Relations, as described more fully above.  None of those decisions was motivated in any
way by her race.

32.  I do not harbor the racist feelings which Ransom apparently believes I have.
If I did, I would not have chosen to work in such a diverse, multi-cultural environment as
the  nonprofit sector in Washington, DC.

_Jeff Kost_

DISTRICT OF COLUMBIA, ss:

Subscribed and sworn to before me this __23rd__ day of January, 2007.

[SEAL]

_Notary Public, D.C._

My Commission expires: _____

**DELORES HUSTON**
Notary Public District of Columbia
My Commission Expires October 31, 2008

-10-

# Washington Council of Agencies
### WASHINGTON AREA NONPROFITS WORKING TOGETHER

August 13, 2003

Lisa Ransom Brown
13035 Silver Maple Court
Bowie, MD 20715

Dear Ms. Brown:

The Washington Council of Agencies is pleased to offer you the full-time, permanent position of Director of Public Policy and Community Relations with our organization, beginning September 8, 2003. Please accept this letter as an official offer of employment. This letter of employment replaces any previous agreements.

As discussed earlier, the following will apply to this position:

**Position:**    Director of Public Policy and Community Relations
**Supervisor:**  Jeff Kost, Deputy Director for External Affairs
**Type:**        Full-Time Exempt
**Salary:**      $56,000/annually, payable on the 15th and the last day of each month

This position includes all benefits as indicated in the enclosed employee handbook. The job description and duties for this position are attached. The probationary period for this position is 3 months from your first day of employment. Please let me know if you have any questions regarding this letter.

Sincerely,

*Betsy Johnson*
Betsy Johnson
Executive Director

Signed and Accepted by Lisa Ransom Brown:

_____        15 August 2003
Signature                               Date

1666 K Street, NW • Suite 440 • Washington, DC 20006
tel: 202.457.0540 • fax: 202.457.0549 • wca@wcanonprofits.org • www.wcanonprofits.org

Anx. 155



## Director of Public Policy and Community Relations

The Washington Council of Agencies, a membership organization with more than 1,000 nonprofit organizational members in the metropolitan Washington region, is seeking a candidate for its Director of Public Policy and Community Relations position.

The person will play an active role with WCA in supporting and communicating with local nonprofits on local issues and will have the following responsibilities:

- Analyze and evaluate issues for the local nonprofit sector;
- Monitor policy and legislation relevant to nonprofits in the District of Columbia, Montgomery County, MD, Prince Georges County, MD, Arlington, VA, Alexandria, VA, Fairfax County, VA. And other local jurisdictions as necessary;
- Develop and maintain strong relationships with policy makers in all local jurisdictions;
- Establish, develop and maintain strong constituent relations with community members and organizations in order to: 1) solicit information from members of the nonprofit community in preparing issues for advocacy; and 2) coordinate nonprofit participation on issues.
- Work with nonprofits to craft messages and strategies so they can work with their local policy makers;
- Provide guidance for advocacy workshops and trainings sponsored by WCA;
- Work with other collaborating organizations as necessary, including national organizations.

### Skills Desired:
- Political analytical ability;
- Ability to work with people, both organizing and guiding;
- College degree necessary, post-graduate work may be helpful;
- Strong communications skills, both written and oral.

### Salary Range:
Mid 50's, depending on experience.

### Deadline for Applications:
March 10, 2003

### Send resume and cover letter to:
The Washington Council of Agencies
Attn: Public Policy Position
1666 K Street, N.W., Suite 440
Washington , DC 20006

# WCA

# PERSONNEL HANDBOOK

October, 2001



EXHIBIT
11
10-25-06

Apx. 157

# Table of Contents

I.      Introduction

II.     Purpose of This Handbook

III.    Equal Employment Opportunity

IV.     Terms and Conditions of Employment

      A.      At-Will Status
      B.      Classification of Employees
      C.      Exempt/Non-exempt Employees; Overtime Pay
          1. Non-exempt employees and overtime
          2. Exempt employees and overtime
      D.      Time Sheets
      E.      Reporting to Work

V.      Compensation and Benefits

      A.      Pay
      B.      Expenses
      C.      Benefits
          1. Paid holidays
          2. Vacation
          3. Sick leave
          4. Family and medical leave
          5. Bereavement leave
          6. Jury duty
          7. Military leave
          8. Unpaid leave
          9. Worker's compensation
          10. Health insurance
          11. Life insurance, dental insurance and/or disability insurance
          12. Pension plan
          13. Professional development

VI.     Job Performance and Conduct As Employee

VII.    Corrective Action; Dismissal

**Table of Contents** (cont.)

VIII.   Separation from Employment
        A.      Notice
        B.      Lay-offs
        C.      Severance Pay
        D.      Use of Grievance Procedures in Cases of Termination
        E.      Pay Upon Termination

IX.     Grievance Procedure

X.      Discriminatory Harassment

XI.     Sexual Harassment

XII.    Smoking Policy

XIII.   Drug Free Workplace

XIV.    Outside Employment

ACKNOWLEDGMENT

Apx. 159

0229593.01

## I.    Introduction

The Washington Council of Agencies (WCA) welcomes you as a new employee.  As you may know, The Washington Council of Agencies is a nonprofit, 501(c)(3), charitable, tax-exempt organization founded in 1979 whose mission is to strengthen, promote and represent nonprofit organizations based in metropolitan Washington in order to help them better meet the diverse needs of their communities.  It is our goal to help nonprofit organizations be better managed, to help them advocate on their own behalf, and to help them locate resources in this community.

WCA's funding sources include membership dues income, fee-for-service income from such sources as educational seminars and publications, and donations from foundations, corporations and individuals.

WCA has a Board of Directors comprised of members of the community who are elected for 3 year terms. Half of the Members of the Board of Directors must be Executive Directors of member agencies. The Board of Directors establishes WCA's mission and policies and hires the Executive Director to implement them.  It is the Executive Director's responsibility to hire, supervise and make personnel decisions regarding all additional employees, although the Executive Director may choose to delegate some of these responsibilities to other managerial staff within WCA.

Because of our charitable mission and our public support, we believe that WCA's employees have a special responsibility to adhere to the highest standards of ethics and professionalism in representing WCA and carrying out our mission.

## II.    Purpose of This Employee Handbook

This Employee Handbook is intended to serve as a guideline, describing the basic personnel policies and practices ordinarily applied by WCA.  It is not intended to create and is not a contract of employment.  No contractual rights are conferred on the employee by this Employee Handbook; its provisions shall not constitute contractual obligations enforceable against WCA.  The employees of The Washington Council of Agencies are terminable-at-will, meaning that either the employee or WCA may terminate the employment relationship at any time, with or without cause.

The Washington Council of Agencies reserves the right to make changes, from time to time, with or without notice, in the policies and practices described in this Handbook.  Moreover, because it is impossible to anticipate every situation that may arise, WCA  reserves its right to address a situation in a manner different from that described herein if, in WCA's discretion, the circumstances so warrant.

If you have questions about the policies and procedures described in this Handbook, or suggestions for improvement, please see your supervisor or the Executive Director.

## III.    Equal Employment Opportunity

WCA is committed to a policy of equal employment opportunity, and does not discriminate in the terms, conditions, or privileges of employment on account of race, color, creed, religion, national origin, sex, age, physical or mental disability, physical or economic condition, marital or parental status, personal appearance, family responsibilities, matriculation, political affiliation, source of income, place of business or residence, pregnancy, child birth or related conditions,or sexual orientation, or otherwise as may be prohibited by federal and state law.

WCA also has a policy prohibiting discriminatory harassment, including sexual harassment. This policy is described in Sections X and XI below.

## IV. Terms and Conditions of Employment

### A. At-Will Status

**Employees of WCA are employed at will, which means that they are not hired for any definite period of time and either they or WCA may terminate the employment relationship at any time, with or without cause.** *The only exception to this rule* would be an employee who, due to unusual circumstances, has been provided a promise of employment for a particular length of time, which is in writing and signed by the Executive Director.

*Only the Executive Director has the authority to make any promises to employees regarding the duration of employment; to be binding, such promises must be in writing and signed by the Executive Director.* If you believe that you have been made any promises to the effect that your employment will continue for some definite period of time, and that you are not an at-will employee, please consult with the Executive Director immediately.

### B. Classification of Employees

Full-time employees are those employed to work on a regular basis for at least 35 hours per week. They are eligible for all benefits described in this Handbook, so long as they meet the applicable requirements, such as length of service.

Part-time employees are those employed to work on a regular basis for fewer than 20 hours per week. They are eligible for only those benefits that they have been promised in writing (signed by the Executive Director) or that are stated in this Handbook to be available to part-time employees.

Employees working more than 20 hours a week but less than 35 will have benefits prorated.

Temporary employees are those hired with the understanding that their employment will not continue beyond a stated date or beyond completion of a specified project or projects. They are eligible for only those benefits that they have been promised in writing and signed by the Executive Director.

All employees of WCA, whether full-time, part-time or temporary, are employed at will. See previous section regarding at-will employment.

Independent contractors are those non-employees who are paid on a fee-for-service basis to perform certain specified services. Volunteers are those who provide services to WCA without financial compensation, other than reimbursement of authorized expenses.

### C. Exempt/Non-exempt Employees; Overtime Pay

When you were hired, you should have been told whether your position is "exempt" (meaning, among other things, you are exempt from the overtime pay requirements of the Fair Labor Standards Act) or "non-exempt" (meaning you are covered by the overtime requirements.) Generally speaking, exempt employees are those whose jobs are primarily executive, administrative or professional in nature, as defined by federal regulations, and who are paid on a salary basis, again as defined by federal regulations.    · · *000153*

Apx. 161

### 1.  Non-exempt employees and overtime

If you are non-exempt, you will be paid overtime, at the rate of one and one half times your regular hourly rate of pay, for any hours worked beyond 40 hours in a given work week. However, non-exempt employees must obtain advance permission from the Executive Director before working more than 40 hours in a work week.

For overtime purposes, the work week begins Sunday at 12:01 a.m. and ends Saturday at midnight. Only those hours that are actually worked by the employee will be considered "hours worked" in computing whether overtime is due and, if so, how much. Scheduled and unscheduled absences and time off for holidays, vacation, sickness, jury duty, bereavement leave or military leave, or for other reasons, will not count as hours worked for this purpose.

Non-exempt employees may not take compensatory time in lieu of overtime pay, unless the compensatory time is taken within the same work week in which the extra hours were worked. For instance, if this week you work 12 hours on Monday, it is permissible (**with the assignment and advance consent of your supervisor**) to work only 4 hours on Tuesday, so that by the end of the week you will not have worked over 40 hours. In fact, your supervisor may require that you take such compensatory time. However, you may not wait until next week to take the four hours off and use that in lieu of overtime pay.

### 2.  Exempt employees and overtime

Exempt employees are responsible for working as many hours as necessary to get the job done, but may check with the Executive Director during extraordinarily busy times to arrange for compensatory time, which may be granted when, in the Executive Director's discretion, it is appropriate and circumstances permit. **All compensatory leave must be granted by the Executive Director.**

### D.  Time Sheets

All employees including exempt, non-exempt, full-time, part-time and temporary are responsible for completing and submitting time sheets; if you are unaware of the procedures for doing so, please ask your supervisor or the Office Manager. .

### E.  Reporting to Work

The regular, full-time work day is from 9:00 a.m. to 5:00 p.m., with a one hour lunch period not to be taken as the first or last hour of the day. If you are out of work or late for any reason and have not received advance permission for the absence, please call your supervisor and the main office number before 9:00 a.m. to report your absence or lateness. Absence without notice for three days may be considered a voluntary quit.

### F.  Intellectual Property

Work products created by any person employed by WCA are a "works made for hire" under the copyright and trademark laws and are owned by the WCA. Work products include written memorandum, letters, contributions to publications and the website of the WCA, speeches, electronic files, designs, trademarks and service marks. If all or a portion of work product is not deemed owned by WCA, then the employee agrees to sign any documents necessary to assign all right, title and interest in the work product to WCA.

## V.    Compensation and Benefits

### A.    Pay

Employees are paid twice a month on the 15th and the last day of the month. WCA offers direct deposit. Paper checks are issued on the morning of the payday.

### B.    Expenses

Employees must obtain the advance consent of the **Executive Director** before incurring expenses for which they will seek reimbursement. Approved expenses must be documented, with receipts attached, and submitted within 30 days of the date on which they were incurred.

### C.    Benefits

This section describes the fringe benefits currently offered to employees of The Washington Council of Agencies. Except where indicated, these benefits are available only to full-time employees. This section does not apply to temporary employees, whose benefits, if any, will be limited to those stated in writing by the Executive Director.

Some of these benefits are described in more detail in Summary Plan Descriptions and in official plan documents, such as the certificates of coverage prepared by insurance companies. The Summary Plan Descriptions and official plan documents contain information about eligibility, coverage, deductibles, and premiums. Please read these documents carefully; if there is a discrepancy between this Handbook or the Summary Plan Descriptions and the official plan documents, the official plan documents will supersede.

WCA reserves the right, in its discretion, to change the nature of the benefits offered to employees, or to change insurance carriers, deductibles, premiums, or other features of any benefit. In addition, WCA may decide to discontinue one or more benefits. Covered employees will be notified of such changes or discontinuations as soon as practicable.

#### 1.    Paid holidays.

The Washington Council of Agencies observes the following as paid holidays:
**New Years Day
Martin Luther King, Jr. Birthday Holiday
President's Day
Memorial Day
4th of July
Labor Day
Columbus Day
Veteran's Day
Thanksgiving
Day After Thanksgiving
Christmas Eve
Christmas Day**

*000160*

In addition to the holidays designated by WCA, full-time employees are entitled to two religious days each calendar year and, except with regard to the first calendar year in which they are employed, will receive two personal days each calendar year. With regard to the first calendar year of employment with WCA, employees who start working for WCA between January and June will receive two personal days and those who start working between July and November 1 will receive one personal day. Employees who begin work after November 1 will not receive personal days for that year. Religious and personal days do not accrue from year to year.

2.         **Vacation.**   Full-time employees earn vacation or annual leave time according to the following schedule:

| | |
|---|---|
| 1st Year of Employment | 10 Days |
| 2nd and 3rd Years of Employment | 15 Days |
| 4 or more Years of Employment | 20 Days |

Time is accrued per pay period, so employees do not start out with 10 days but achieve it pro rata by year's end. Annual leave should be requested from the employee's supervisor and granted by the supervisor in advance of taking the leave. Leave slips must be filled out, approved by the supervisor and submitted to the WCA Office Manager for filing. Supervisors have the right to deny leave time if they deem the workload to be too heavy.

Ten days of annual or vacation leave may be carried over into the next year.

Employees will be paid for accrued, unused annual leave upon termination. Employees may not, and will not be required by WCA to, use vacation leave as their last weeks of employment. Holidays that fall within an employee's vacation will count as holidays and not as vacation leave.

3.         **Sick leave.**  Sick leave will be granted to full-time employees at the rate of 10 days per year. Sick leave is accrued per pay period pro rata, and so the first 10 days are not fully achieved until the end of the first year of employment.

Employees should notify their supervisor when they take sick leave. Where sick leave is taken for known doctor's visits, leave slips should be filled out in advance and signed by the supervisor and filed with Barbara. In other cases, leave slips should be filled out upon the employee's return to work.

If an employee takes more than a week of sick leave at a time, the Executive Director may require a Doctor's note.

Sick leave will not be advanced to any employee.

Sick leave accrual is limited to 60 days and any amount accrued in one year may be may be carried into the next year if the employees still has less than 60 days accrued.

At termination, sick leave will be converted to annual leave at the rate of five days of sick leave equals one day of annual leave. The days of annual leave thus achieved will be paid at the employee's regular rate.

4.    **Family and Medical Leave.**   Although WCA by its size is not subject to either the federal or the District of Columbia Family and Medical Leave Act, it has voluntarily adopted the following policy. Full-time employees may take up to 16 weeks per year of Family and Medical Leave for the birth or adoption of a child or children. Employees may use any accrued leave or take the time unpaid after consultation with their supervisor or the Executive Director. Employees will continue to accrue leave and enjoy other benefits (uninterrupted health coverage and payments to the employee's retirement plan if applicable) for the 16 weeks.

For leave greater than 16 weeks, benefits are discontinued and the specific job of the employee may not be guaranteed upon the employee's return.

5.    **Bereavement leave.** Full-time  employees who have completed at least three months of continuous employment and who experience the death of a parent, parent-in-law,  parent of one's partner, spouse or partner, sibling, child, or grandchild, or a step-parent, step-sibling, step-child, or step-grandchild, may take up to 3 days of paid bereavement leave.

6.    **Jury duty.**  Necessary time off without loss of pay shall be granted to employees called for typical jury duty. No refund to WCA of per diem fees and other allowances will be required. Employees should notify their supervisor when they receive notice to serve and shall provide the notice or other receipt for personnel records. Leave for long term jury duty must be worked out with the employee's supervisor AND the executive Director. You may be required to take leave without pay or reduce your salary by the amount of the per diem.

7.    **Military leave.** If you must be absent from work due to serve in the uniformed services, please notify your supervisor as much in advance as possible, so that we may make plans for your absence. WCA complies with federal law regarding re-employment of persons who leave work to serve in the uniformed services.

8.    **Unpaid leave.** Full-time and part-time employees may request unpaid leave, not covered by any of the other policies included herein, by filing a written request with the Executive Director.  The Executive Director may grant or deny the request, in his/her discretion, depending on the circumstances of the request and/or the needs of WCA. An employee does not accrue vacation leave or sick leave while on unpaid leave (except in the case of the first 12 weeks of Family/Medical Leave).  If a request for unpaid leave is granted, WCA will, in its discretion, determine whether any benefits will continue through the leave, and at what cost, if any, to the employee. This will depend upon a number of factors, including the nature and extent of the leave.

9.    **Worker's compensation.** All employees of WCA are covered by worker's compensation insurance, as required by law.  Employees must report any work-related injury or illness immediately to the Executive Director.

10.    **Health insurance.**  WCA provides individual health insurance (including $5,000 of life insurance and dental insurance) coverage to all full-time employees. Employees who desire family or dependent coverage may purchase it through WCA's policies.

The benefits provided, as well as the exclusions, deductible amounts, requirements for eligibility and other terms and conditions of coverage, are summarized in the Summary Plan Description, and are more fully described in the certificate of coverage, which you should receive from the insurer when you enroll.  If, for any reason, you do not have a copy of these, please see your supervisor.

You and/or any members of your family who are covered under your group health insurance plan will have the right to continue coverage under the group plan for 18 months, at your or your family member's expense, even after eligibility would otherwise terminate due to your death, termination of employment, divorce or various other qualifying events. For further information about the right to continued coverage, and any requirements you must fulfill to be eligible, please see the Manager of Health Program Administration.

     **11.**    **Pension plan.** WCA currently participates in a 403(b) tax sheltered annuity plan. Any full-time employee may contribute to his/her own account from date of hire. WCA will contribute 5% of employee's salary after completion of two years of service. After 10 years of service, WCA will contribute 9% of the employee's salary to his/her retirement plan. See office manager for enrollment information.

## VI.   Job Performance and Conduct As Employee

Generally, performance reviews of employees will be conducted on an annual basis, although usually a new employee will be reviewed at the end of the first three months, as well. Performance reviews are intended to identify both those aspects of the job which are being performed well and those aspects that need attention. They are also a formal opportunity for you to express any concerns you might have about the job or about your employment with WCA. However, if you do have concerns, there is no need to wait until your next review to express them; your supervisor and/or the Executive Director is available throughout the year to meet with you about issues, problems or questions related to your employment.

In addition to expecting employees to perform their jobs competently and reliably, WCA expects employees to conduct themselves in a professional, ethical and responsible manner that reflects well upon WCA, that promotes a spirit of cooperation and teamwork among employees, and that is respectful of the members, volunteers, and other members of the public with whom we interact. Failure to do so may lead to corrective action, including dismissal.

Although it is impossible to anticipate in advance every possible kind of misconduct that would be of concern to WCA and that could lead to corrective action, including dismissal, the following conduct is prohibited and will not be tolerated by WCA. This list of prohibited conduct is illustrative only and is not intended to be exhaustive:

1.    Violation of any of the policies described in this Handbook or otherwise communicated to employees.

2.    Conduct, including speech, that physically harms or threatens others or that is abusive to or disrespectful of WCA's directors, employees, contractors, members, volunteers or other persons involved with WCA.

3.    Failure to adhere to the work schedule that has been established for you. This includes absence without notice to WCA, except where an emergency prohibited the giving of notice and notice was given as soon as reasonably possible.

4.    Failure to be honest in your communications with WCA and/or falsifying records or other documents.

5.    Theft or misappropriation of property owned by WCA, a co-worker, a member, or anyone else who has property that you may come into contact with through your employment.

Apx. 166

6.   Unlawful conduct during non-work hours that might lead our members or the public to lose confidence in you or in WCA.

7.   Insubordination.

8.   Failure to conduct yourself in a professional and cooperative manner while carrying out your duties.

9.   Neglect of duty; failure to perform your responsibilities in a manner acceptable to WCA.

## VII.   Corrective Action; Dismissal

When performance issues are identified with respect to an employee, when instances of unacceptable conduct occur, or when for any reason the employment relationship has become problematic from the point of view of WCA, any of a variety of steps might be taken, up to and including termination. In some cases, the employee might be given an oral or written warning. In other cases, immediate probation, suspension (with or without pay), demotion, termination or other corrective action might take place. WCA reserves its right to determine what it believes is an appropriate response, and to implement it.

## VIII.   Separation from Employment

As stated above, all employees of the Washington Council of Agencies are employed at will, meaning that they or the employer may terminate the employment relationship at any time, with or without cause. The following policies apply to those who are separating from WCA's employment.

### A.   Notice

Employees are asked to give at least two weeks notice of resignation. Some employees, upon hiring, will be asked to give more notice than this, because of the nature of their employment. WCA reserves the right to pay a resigning employee for the notice period, but to prohibit the employee from working for WCA during that time.

### B.   Lay-offs

There may be times when WCA determines that it is necessary to make cutbacks or reductions in staff, leading to the lay-off of one or more employees. In determining which employee(s) shall be laid off, WCA may consider any and all factors that it deems relevant, including, without limitation: the needs of WCA as a whole; the skills, qualifications and performance histories of individual employees; anticipated changes in funding received or services to be provided by WCA; seniority; budgetary constraints; and any restrictions or guidelines imposed by law or by funding sources.

### C.   Severance Pay

Severance pay is not available to employees who are dismissed or who resign for reasons related to misconduct as an employee, including violations of WCA's policies.

000164

Full-time employees who have completed at least one year of full-time employment with WCA and who are laid off because of cutbacks or reductions in staff, or terminated involuntarily for reasons not connected with misconduct, are entitled to severance pay calculated at the rate of one week's pay for each full year of WCA employment up to a maximum of two weeks of severance pay, so long as they:

(1)    continue to work until the last day scheduled for their employment, unless this requirement is expressly waived by the Executive Director or, in the case of the Executive Director, by the President of the Board of Directors;

(2)    turn in all reports and paperwork required to be completed by them when due and no later than the last day of work;

(3)    return any files, documents, equipment, keys, software or other property belonging to WCA, and pay any money they owe to WCA;

(4)    participate in an exit interview, upon the request of their supervisor; and

(5)    agree to sign a release of employment-related claims against WCA, upon the Executive Director's request or, in the case of the Executive Director, upon the request of the President of the Board of Directors.

Notwithstanding the above, employees who violate WCA's policies or who demonstrate unacceptable conduct (including insufficient effort on the job) during the remainder of their employment following notice of the termination or lay-off may be denied severance pay and/or may be dismissed prior to the agreed-upon termination date, in the discretion of the Executive Director or, in the case of termination of the Executive Director, in the discretion of the President of the Board of Directors.

**D.    Use of Grievance Procedures in Cases of Termination**

Employees (other than temporary employees) who have been employed for at least six consecutive months and who are dismissed from employment may use the Grievance Procedures described in Section IX below to challenge the dismissal. However, WCA is not required to keep such employees on the payroll or enrolled in any benefits pending completion of the grievance process.

**E.    Pay Upon Termination**

Upon voluntary or involuntary termination of the employment relationship, regardless of the reason, the employee will be paid any wages earned but not yet paid, and any accrued but unused vacation pay and converted sick leave. The employee will not be paid for accrued but unused personal days or religious leave. Severance pay will be paid only as authorized in Section VIII.C, above.

**IX.    Grievance Procedure**

If an employee feels that inappropriate corrective action or any improper action has been taken against him/her, and the employee has been unable to resolve the matter informally by speaking with the supervisor, the employee has ten business days from the taking of the action to pursue the matter by filing a written grievance with the Executive Director . The Executive Director will conduct an investigation of the incident, where

appropriate, and will generally provide a written response to the employee within 20 business days. If more time is needed to respond to the complaint, the person filing the complaint will be so notified. The decision of the Executive Director is final.

If an employee has a complaint about the Executive Director, the employee shall take up that complaint directly with the Executive Director. If that does not resolve the matter, the employee has ten days to choose to pursue the matter by making a written complaint about the matter to the Board President. The Board President is required to consult with the Executive Director about the matter in pursuit of resolution of the complaint.

The filing of a grievance does not operate to suspend the action being complained of. For instance, if the employee is complaining that s/he was unfairly suspended without pay, s/he will remain suspended without pay for the period initially determined, unless and until the Executive Director reverses the decision leading to the suspension. Similarly, WCA has no obligation to keep a terminated employee on the payroll or enrolled in any benefits not ordinarily available to terminated employees, pending completion of the grievance process. However, if the action is reversed, the Executive Director may determine, in his/her discretion, that the employee should be reimbursed for some or all of the pay and/or benefits lost during the interim.

Temporary employees and employees who have not completed at least nine months of continuous employment with WCA are not entitled to use the formal Grievance Procedure outlined above, but are encouraged to discuss any concerns they may have with their supervisor.

## X.    Discriminatory Harassment

It is a violation of federal and/or state law to harass anyone at work because of their race, color, age, religion, sex, disability, national origin, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, source of income, place of business or residence, pregnancy, child birth, or related conditions.

If you believe that you have been subject to discriminatory harassment by a co-worker, supervisor, volunteer, client or vendor, or by anyone else during the course of your employment, please report your concerns immediately to the Executive Director (first) or the Board President (in the case of a complaint against the Executive Director). Retaliation against an employee by any person under WCA's control for opposing such harassment, for filing a bona fide complaint of discriminatory harassment or for providing information in good faith regarding another employee's complaint will not be tolerated.

Once a complaint of discriminatory harassment has been filed, an investigation will be conducted. The nature and extent of the investigation will depend upon the complaint. The intent is to obtain further information about the events/conduct complained of, to enable the person(s) named in the complaint to tell his/her side of the story, to determine whether discriminatory harassment has in fact occurred, and to develop an appropriate resolution. You may be asked to put your complaint in writing, or the person with whom you discuss your complaint might take notes and ask you to sign them. All employees are expected to cooperate with any WCA-sponsored investigation of a complaint of discriminatory harassment, upon the request of the Executive Director or the Board President.

Any employee who is determined to have committed discriminatory harassment or retaliation or who fails to cooperate with a WCA-sponsored investigation of discriminatory harassment or retaliation will be subject to disciplinary action, up to and including termination.

000166

## XI.    Sexual Harassment

Sexual harassment is a form of discriminatory harassment and will be treated in accordance with the discriminatory harassment policy outlined above.   However, because it is the subject of a great deal of controversy and misunderstanding, we have chosen to define it in more detail in this Handbook.

Sexual harassment is unwelcome conduct of a sexual nature when:

(a)    submission to such conduct is made (explicitly or implicitly) a term or condition of the individual's employment;

(b)    submission to or rejection of such conduct is used as the basis for employment decisions affecting the individual; or

(c)    the conduct has the purpose or effect of unreasonably interfering with the individual's job performance or creating an intimidating, hostile, or offensive working environment.

Examples of some of the kinds of conduct that violate our Sexual Harassment policy include:

1.    Sexual assaults, including rape and molestation, and attempts or threats to commit these assaults;

2.    Unwanted intentional contact of a sexual or suggestive nature, such as touching, pinching, patting, grabbing, kissing, brushing against or poking a person's body;

3.    Unwanted sexual advances, propositions or comments,   including sexually oriented gestures, jokes or comments about a person's sexuality or sexual experience;

4.    Preferential treatment or the promise of preferential treatment to an employee for engaging in sexual conduct;

5.    Displaying or publicizing pictures, posters, reading materials, calendars, objects, etc. that are sexually suggestive, sexually demeaning or pornographic; and

6.    Disciplining or retaliating against an employee in any way because s/he has resisted, reported or complained about sexual harassment.

If you feel that you have been sexually harassed during the course of your employment, or if you believe you have witnessed another employee being sexually harassed, report your concerns immediately, as described in Section XII, above, "Discriminatory Harassment".  The procedures outlined in that section will apply.

## XII.    Smoking Policy

Because we wish to provide a healthy environment for all of our staff, volunteers and clients, smoking is prohibited throughout our offices.

## XIII.  Drug Free Workplace

WCA is committed to the well-being of our employees, to the safety of the workplace, and to provision of high-quality services to our clients.  For all of these reasons, we cannot tolerate the unlawful possession, use, manufacture, distribution, or dispensation of controlled substances in the workplace or during work time. Moreover, employees must come to work free from the influence of alcohol, illegal drugs, and unlawfully used prescription medications.

If you suffer from a substance-abuse problem and wish to seek help, see your health care provider.

Any employee who violates this Drug Free Workplace Policy will be subject to disciplinary action, up to and including dismissal.  Legal consequences may follow, as well.

Under federal law, any employee who is convicted of a criminal drug statute violation occurring in the workplace must notify his/her employer of the conviction within 5 days. .

## XIV.  Outside Employment

Employees of WCA must obtain the prior consent of their supervisor before accepting other work to be performed concurrently with their work here (i.e. a "moonlighting" job).  This requirement serves the purpose of ensuring that the employee is able to devote sufficient time and effort to perform effectively his/her work with WCA.

Apx. 171

0229593.01

## ACKNOWLEDGMENT

I have received a copy of the WCA Employee Handbook, have reviewed it and had the opportunity to ask my supervisor questions about it. I understand the policies described in the Handbook and agree to abide by them.

**I understand that this Handbook does not represent a contract of employment, but rather serves as a guideline.**

I acknowledge that no representative of WCA has promised me employment for any definite period of time, and that no one is authorized to make such promises to me unless they are in writing signed by the Executive Director. I understand that as an employee of WCA, I am employed at will, meaning that either I or WCA may terminate my employment at any time, with or without cause.

I understand that this Employee Handbook, and the policies and benefits described in it, may be changed from time to time, with or without advance notice, in WCA's discretion.

Signed _____

Please Print Name _Lisa Ransom Brown_

Date _8 September 2003_

EXHIBIT
12
10-05-06

**From:**            Lisa Ransom Brown [LRB@theransomgroup.biz]
**Sent:**            Sunday, August 17, 2003 12:04 PM
**To:**              jeffk@wcanonprofits.org
**Subject:**         Information Inquiry


Good morning Jeff,

Thank you for forwarding my letter of employment and WCA's employment manual.  I've
reviewed the manual and will bring the letter and manual form with me on Monday, September
8th.    I'm very excited about joining the WCA team.  Thank you for the opportunity.

If possible, would you kindly provide me with information about the parking facilities in
or around the building?  As I move closer to my start date, I'd like to have some idea of
where I may park my vehicle on my first day along with the cost associated, and what
arrangements, if any have been made regarding long-term parking for employees.

I very much appreciate your assistance in this matter.

Sincerely,

Lisa Ransom Brown



| | |
|---|---|
| **From:** | Lisa Ransom Brown [lisar@wcanonprofits.org] |
| **Sent:** | Tuesday, January 13, 2004 10:32 AM |
| **To:** | lisar@wcanonprofits.org; Jeff Kost |
| **Cc:** | Betsy Johnson |
| **Subject:** | Re: Draft Letter for 'at home' edition of Post |

Jeff,

I don't have a problem, nor do I think that there is a problem with other nonprofits
signing on to the letter.  I was only sharing with you the nature of the discussion during
the meeting last week. The nonprofits at the table expressed 'concern' about being
financially impacted by the council in the future if they signed on.  However, expanding
the request for signature to a broader range of MC nonprofits overall as a show of unity
is something I support. I will contact Ron this morning and discuss this in greated detail
and get back with you.

Lisa

---------- Original Message ---------------------------------
From: "Jeff Kost" <JeffK@wcanonprofits.org>
Date:  Tue, 13 Jan 2004 08:57:25 -0500

>I will reiterate my message from yesterday:  While I think the letter
>is fine, it's not nearly as strong coming from a few umbrella groups as
>it is including as many nonprofits in Montgomery County receiving money
>or potentially could receive money from the County.  It requires
>rolling up our sleeves and emailing and calling the nonprofits, but
>Betsy and I think this is the way to go.  If you can't communicate this
>to Ron or Henry, let me know as soon as possible.  I don't feel like we
>(WCA) had a voice in this decision and that troubles me.  Sorry to have
>to communicate this way, but I don't know when I am going to see you in
>the office and you're going to have to "work" on this (calling Henry,
>Ron, Becky) from home if you're not in the office, before it's too late.
>
>----- Original Message -----
>From: "Lisa Ransom Brown" <lisar@wcanonprofits.org>
>To: <lisar@wcanonprofits.org>; <rkrasnow@uwnca.org>;
><rwagner@communityministrymc.org>; <hbogdan@mdnonprofit.org>
>Cc: <RHalber@JCouncil.org>; "Theresa Cameron (E-mail)"
><exec@creativemoco.com>
>Sent: Monday, January 12, 2004 6:03 PM
>Subject: Re: Draft Letter for 'at home' edition of Post
>
>
>> Henry,
>>
>> You did a really fine job on the letter. Thank you for your work. Ron
>> has
>what he needs from WCA to send it off. Please give me a call in the
>office if there is anything else needed.
>>
>> Thanks again.
>>
>> Lisa Renee'
>>
>>
>>
>>
>> ---------- Original Message ---------------------------------
>> From: "Henry Bogdan" <hbogdan@mdnonprofit.org>
>> Reply-To: <hbogdan@mdnonprofit.org>
>> Date:  Mon, 12 Jan 2004 12:54:15 -0500



## Jeff Kost

| | |
|---|---|
| **From:** | Lisa Ransom Brown [lisar@wcanonprofits.org] |
| **Sent:** | Wednesday, February 25, 2004 5:38 PM |
| **To:** | Jeff Kost |
| **Subject:** | RE: Resolution 15 article. |



Montgomery
County Nonprofits.d..

Jeff,

The attached seems to be the type of work you are looking for.

However, this is not the type of work that I'm compelled to write. It begs the question of what's next without supplying credible options. Hence, I am therefore uncomfortable on a myriad of fronts of with this type of journalism. I have a sample of the 'type' of writing that I think would represent WCA far better. Working substance for WCA members should always takes precedence over 'after the fact' info. For instance, I am desperately trying in my 48-hour day to review the FEC's proposed advisory opinion that has the potential to 'gag' nonprofits from being advocates. That's more of an issue of value to our members and to WCA's goal to empower nonprofits as it relates to policy.

Lisa

-----Original Message-----
From: Jeff Kost [mailto:JeffK@wcanonprofits.org]
Sent: Wednesday, February 25, 2004 10:54 AM
To: lisar@wcanonprofits.org
Cc: Betsy Johnson
Subject: Re: Resolution 15 article.


We need to talk. I am obviously not communicating what I need from you. This is for the E-genda. I am looking for no more than a paragraph--no article development necessary. Timely news, not instruction on how to work with the county executive and council. The last sentence should be something like, "WCA will continue to monitor the County's budget and keep WCA members informed on how to work with the County Executive and Council Members to address any shortfalls in the budget." This is an ongoing story, but if we don't tell it as time goes passes, we're missing the boat. Remind me to show you some examples. Jeff


----- Original Message -----
From: "Lisa Ransom Brown" <lisar@wcanonprofits.org>
To: "Jeff Kost" <JeffK@wcanonprofits.org>
Sent: Wednesday, February 25, 2004 10:49 AM
Subject: Re: Resolution 15 article.


> Jeff,
>
> I'll be happy to take a few minutes to chat with you about this before
> my
review meeting with Arminda the afternoon. However there are some considerations that should be factored in, in terms of article development on this or any other issue that I think are important across the board.
>
> Writing requires both time for focus and substance/research  the
> former
usually in short supply, however in this case, both have been limited.
>

1



EXHIBIT
29

> For the record, every active nonprofit in Montgomery County 'knows'
> that
WCA was a sponsoring partner of the Caring Alliance which was the primary vehicle in
defeating the measure. They know it because we were visible and engage throughout the
process, from the planning to the vote. We were also one of the few organizations that
polled the council members to determine the vote before the first hearing and shared our
findings with the alliance. That is not old news, it's 'no' news – worse, it's
grandstanding.
>
> Rather than reinterate the obvious, my article will focus on 'with the
defeat of Resolution 15, the knowledge that Montgomery County is suffering a $100 million
(plus) funding gap, the state's financial abdication of support and the need to maintain
existing programs and services offered by the county's service providers, i.e., the
nonprofit industry – how should/can nonprofits work with the county executive and county
council to address budget shortfalls and prepare themselves for a what looks to be a long,
rocky financial ride.
>
> As noted in earlier Email, that type of writing requires insight from
folks in the council or county exec's office (like Valerie Ervin, Lou D'Ovidido and
Saralee Todd and even Carolyn Colvin) that have seen or worked on an actual 'budget' or at
least a baseline budget – which has not been completed yet, won't be completed until March
15 and not available for public review until March 25.
>
> Because what we offer should be 'useful' as well as informative, I
> don't
write about anything that doesn't give folks an understanding about the 'what's next',
especially in a situation like this when there is an opportunity to help people become in
engaged in the implementation process and take steps to protect their interest.
>
> Writing about what happened with the Resolution without addressing the
issue that there is still a budget deficit – with social service cuts expected but with no
sense of direction as to where those cuts will be made, can cause panic and confusion –
something I don't think WCA is inclined to do.
>
> It is always more important to have something to say that enlightens
> and
empowers rather than just informs – especially if the information is fragmented because it
simply isn't available yet.
>
> See you later this afternoon.
>
> Lisa
>
>
>
>
>
>
> ---------- Original Message ----------------------------------
> From: "Jeff Kost" <JeffK@wcanonprofits.org>
> Date:  Wed, 25 Feb 2004 09:03:56 -0500
>
> >Lisa,
> >I am disappointed that you're not able to find a way to talk about
> >this.
I
> >am not looking for "the whole package," I am looking for a timely
paragraph
> >that talks about the victory of Resolution 15 in Montgomery County.
> >If w
e
> >don't talk about it to our members, how do they know we're "on top of
it?"
> >It's been a long time since we've had anything in the E-genda,
> >besides
EITC
> >and the election information, that talks about the coalition building

2

```
> >and public policy work we're doing at WCA.  Let's talk about this
> >when you're available. Jeff
> >
> >----- Original Message -----
> >From: "Lisa Ransom Brown" <lisar@wcanonprofits.org>
> >To: <jeffk@wcanonprofits.org>
> >Sent: Tuesday, February 24, 2004 5:53 PM
> >Subject: Resolution 15 article.
> >
> >
> >> Jeff,
> >>
> >> Given what I'm writing about, there is no way to provide you with a
> >> Resolution 15 piece at this time.  As a follow up to our earlier
> >discussion,
> >> I did spoke with Becky Wagner about the 'what's next' situation.
> >> The
point
> >> is, until we get even a baseline budget from the county exec. (the
budget
> >> would be out until 10 days following the March 15 release) - which
> >> I
have
> >> not received from Saralee, we won't really know ANYTHING to
> >> determine
what
> >> things look like.  Ron Halber is on travel and won't even be
> >> available
to
> >> speculate until tomorrow morning (where I will be at the Prince
> >> Georges Stadium).  I have not heard by from Valerie Ervin in
> >> Council member Leventhal's office (George chairs the council's
> >> Health and Human
Services
> >> Committee)  While I know you want to add something to the E-genda
> >> about
> >this
> >> issue, I think it's more important to write something of substance
> >> with practical information that people can really use - which
> >> requires a
little
> >> more information than any of us has right now.
> >>
> >> Lisa
> >>
> >>
> >
> >
>
```

3

Apx. 177

**Montgomery County Nonprofits: Looking Over the Resolution 15 Horizon**

With the defeat of the Andrews Praisner resolution in early February, Montgomery County nonprofits join the rest of the county in waiting to see how County Executive Doug Duncan's proposed budget will impact FY 05 funding streams. Resolution 15 would have eliminated all government community grants to private non-profits in FY 2005. Fortunately, it failed to garner sufficient support to call for a vote before the full legislative body. As a member of the Caring Alliance, an ad-hoc coalition created to advocate for the support of essential funding for Montgomery County nonprofits, WCA worked with the nonprofit community and members of the County Council to bring a unified voice of concern on this issue.

In FY 2004 nonprofit organizations received approximately 3.4 million dollars to maintain critical health and human service programs for Montgomery County's most vulnerable communities. However with the defeat of Resolution 15, nonprofits are still left wondering how they will manage to provide quality services for county residents when the county faces a minimum estimated shortfall of no less than $100 million. . Montgomery County has a long tradition of partnering with non-profit agencies, enabling the County to consistently meet the most basic human needs of the County's most vulnerable residents. With County Executive Duncan's budget expected out on March 15, WCA will continue to monitor the county's budget and keep WCA members informed on practical ways to work with the County Executive and Council Members to address anticipated budget shortfalls.

**From:** Jeff Kost [JeffK@wcanonprofits.org]
**Sent:** Wednesday, April 14, 2004 12:23 PM
**To:** lisar@wcanonprofits.org
**Subject:** Re: FEC article for Egenda

**Now that Rick is on board, we're working on policies and procedures related to the E-genda, Agenda, Web site, etc. If you are reading any of the previous E-gendas, you would find that we don't publish full articles. We write brief paragraphs and then lead people to a link for more information. We have had this discussion before. Hopefully the policies and procedures will clear this up once and for all.**

----- Original Message -----

**From:** Lisa Ransom Brown

**To:** Jeff Kost

**Cc:** Rick Rose ; Betsy Johnson

**Sent:** Wednesday, April 14, 2004 11:31 AM

**Subject:** RE: FEC article for Egenda

Good morning Jeff,

Thank you for the update on my FEC article for the upcoming Egenda. I'm please to know that it will be included in some way. Please note that I was not made aware of the specific word count requirement regarding articles for the Egenda. Had I known what the word count limitation was prior, I would have tried to keep the body of text for my short articles within those parameters. Thank you for that information.

Lisa

-----Original Message-----
**From:** Jeff Kost [mailto:JeffK@wcanonprofits.org]
**Sent:** Wednesday, April 14, 2004 10:11 AM
**To:** Lisa Ransom Brown
**Cc:** Rick Rose; Betsy Johnson
**Subject:** FEC article for Egenda

EXHIBIT
32
10-25-06 MHM

**I have written a teaser for the FEC article, taken from your longer story for the E-genda. The teaser links to the WCA web site where they can read the full story you have written. Since your story was**

Apx. 179

**over 400 words and typical E-genda submissions are between 75 and 200 words, I had no choice but to format it this way and drive people to our Web site for more information.**

Celebrating 25 Years of Serving the Greater Washington Nonprofit Community

**Jeff Kost**
*Deputy Director for External Affairs*

JeffK@wcanonprofits.org

1666 K St., NW Suite 440
Washington, DC 20006

tel:  202-457-0540 x207

*Signature powered by Plaxo*

*Add me to your address book...*

*Want a signature like this?*

Apx. 180

----- Original Message -----
From: Lisa Ransom Brown
To: Jeff Kost
Cc: Betsy Johnson
Sent: Wednesday, April 14, 2004 4:41 PM
Subject: RE: Documents

14 April 2004


Good day Jeff,

I am responding to the documents you left in my chair this morning and your Email of April 14, 2004; I am attempting to address your concerns as noted.

Regarding your memo concerning the photo to the newsletter, based on what you wrote, I find it necessary to clarify a few of your comments. You indicated that I was unwilling to discuss the placement of my photo in the upcoming newsletter. This is incorrect statement in that:

1.  My first comments regarding the photographs were with Rick Rose, our communications director. As you know, staff was not notified that pictures were being taken until we arrived at work that morning, March 18 for the organization board meeting. I express my concern at that time because I had recently been diagnosed with an infection in my left cheek, which distorted the structure of my face. I was told the photographer would be able to adjust the lighting and angle of the picture to hide the facial problem. When Rick shared the photos with me a couple of weeks later, these artistic 'adjustments' proved to be ineffective. The photographs of me were not appropriate. When Rick asked me which photo I would like used on the website, I told his that I would not authorize the use of my image in this distorted fashion. I explained that my face is an important part of the professional image I am required to project in order to promote WCA to both the nonprofit community and the various governing bodies. I did tell him that I would be willing to re-shoot the photo when photos were taken with the rest of the board members, provided that my face had healed by that time. Rick indicated that he would speak to you about that.

2.  On yesterday afternoon, April 13, 2004, you approached me on the matter of the photos. You did not indicate how they would be used, but you did say that the photo would be a small, black and white image. Again, I made it clear that I was not comfortable with the use of my facial image in a distorted form and would not authorize the use of the earlier

06/29/2004



pictures. I explained that the size of the photo was not important in that anyone could download the photo from the Web and enlarge, thereby making the facial distortion much more evident. Again, you did not state that you intention was to use the photo for the newsletter. I did offer at that time, to have pictures done on my own at some point – but again, because there was no reference to the newsletter in our afternoon discussion, I assumed that the photos were being used for the website and had no immediate urgency as the website was only now just beginning the updating process. In fact, during our discussion, I stated that I had experience with website photos and knew that once your photo is on the World Wide Web, although you can remove it, you can't really pull it back.

However, based on your memo this morning and on the advice of counsel, I am electing not to have my photographic image used in any way either in print or on the Web by WCA at this time.

Regarding the draft you've prepared stating the list of objectives for the Director of Public Policy and Community Relations, I am acknowledging receipt of the document, but can not sign it.

As you are aware, I prepared and submitted a very detailed Public Policy/Advocacy Activities report on March 5, 2004 to assist our Executive Director Betsy Johnson in preparation for the March 18, 2004 WCA Board Meeting. This was a detailed follow up to my February 20, 2004 update brief. A good percentage of the objectives listed in the document you presented on March 12, 2004 (along with subsequent copies) during the advocacy discussion I had with Betsy and you, were already addressed in my original March 5 activities report. The content of my activities report included (but are not limited to):

- The development of an Advocacy Committee (completed)
- The nomination process of the PCN Public Policy Leadership Award – to be conducted by the Advocacy Committee with a launch date to be determined by the committee chair,
- Updating of the Advocacy Web page (soon to be completed),
- Creation of three CNLL advocacy workshops (completed),
- The on-going development of the Prince Georges Human Services conference scheduled for June 10 and 11 (although I am not the development officer for our organization, I am chair the fundraising and finance committee for the joint WCA and Human Service Coalition of Prince Georges County Conference, responsible for securing funding for the event in two months as well as access/outreach of elected officials and their participation in the conference),
- On-going one-on-one site visits or meetings with nonprofit organizations (approximately *37 nonprofit organization meetings to date* within the District of Columbia, Montgomery and Prince Georges counties, *excluding repeat meetings, group meetings, phone meetings (excluding Sharon Friedman) and meeting requested by me but unscheduled or meetings that are schedule by have not occurred yet like my Monday meeting with Liz Baumgarten with Charity Lobbying in the Public Interest - CLPI)* and
- Meetings with elected officials and agency heads.

In addition, I have contacted and requested introductory meetings with new WCA member organizations whenever Jeremy releases that information to staff. Also, as you recall during

our last advocacy meeting on April 8, 2004, I requested a list of the regional public policy directors and other executive management staff of additional nonprofit organizations that both Betsy and you would like me to meet with in order to include them in my outreach efforts.

All of the objectives are important. In my 6-½ months with WCA – without the aid of a public policy associate, many of the objectives have been completed, some are in the process of completion and some – like nonprofit organization meeting outreach and site visits and elected/agency officials are on going. I have worked very hard and continue to work to address the interest of WCA, its members and potential members.

By example, my involvement in the current FEC Advisory Opinion regarding the potential restriction of nonprofit advocacy allowed me to interact with the larger organizations both Betsy and you advised me to work with. By serving as co-sponsor of the congressional staff briefing on the issue, I was able to make positive initial contacts with Alliance for Justice (Liz Town and Abby Levine), CLPI (Liz Baumgarten and Bob Smucker), NCRP (Rick Cohen) and NCNA (Audrey Alvardo and Sheri Brady). Please note that I have during my brief tenure with WCA brought four organizations to the WCA membership to include: Prevent Child Abuse Maryland, Patriots Technology Training Center, American Civil Liberties Union of the National Capital Area and the Laborer's International Union of North America. The latter is a high dollar membership of $1,170.00

I have also reinvigorated my efforts to share my activities with management as much as possible. While you receive my weekly activities schedule, since I am "in the field" a great deal of the time and because our organization has both limited staff support and a abundance of activities throughout the day, I found it productive to share my activities with you via Email. However, you stated that because I send too many Emails for you to read, you would prefer that I meet with you frequently to discuss what I am doing and whom I am meeting with. This has become an uncomfortable situation for me in that once I have discussions with you, it seems that I must have those same discussions with both Betsy and you if I want to ensure that my follow up comments are actually noted. As a result of this unfortunate outcome, I have – per my discussion with Betsy, forwarded my Email activities to her directly along with my weekly calendar. I have also found it more productive to talk directly with Betsy regarding my meeting activity, as her historical frame of reference is helpful.

Given the magnitude of the work I am required to do and in fact am doing, the articles for both the Nonprofit Agenda and the Egenda (including those that go unpublished), the number of organizations and officials I have met with and am tasked to meet within the District of Columbia, Montgomery and Prince Georges counties – subject to *__their__* willingness and availability, the up front, out of pocket expense associated with these various meetings – mileage, parking, meals, etc., the short-term, fundraising coordination of the Prince Georges County conference along with the weekly and/or bi-weekly conference meetings in Glenarden, Maryland, coupled with our regular staff meetings, senior staff meetings, staff team meetings alone, - aside from the coordination of a WCA board member infused Advocacy Committee, I am still very committed to supporting the Washington Council of Agencies in providing the best service in the most professional way possible to the benefit of WCA members.

However, to continue to do the work required, it is important that I receive the full staff support, respect, professional courtesy, resources and positive working environment required to implement my portion of WCA's strategic work plan. I am willing to meet with Betsy and you and possibly a neutral mediator to determine a mutually productive solution to address our current situation.

06/29/2004

Thank you.

Lisa R. Ransom

-----Original Message-----
**From:** Jeff Kost [mailto:JeffK@wcanonprofits.org]
**Sent:** Wednesday, April 14, 2004 10:08 AM
**To:** Lisa Ransom Brown
**Cc:** Betsy Johnson
**Subject:** Documents

Lisa,
**I left two documents on your chair that require your immediate attention. Please sign the memo and return to me by close of business (5 pm) today. Please read the memo and respond , as requested.**



**Jeff Kost**                                                    1666 K St., NW Sui
*Deputy Director for External Affairs*                            Washington, DC
JeffK@wcanonprofits.org                                          tel: 202-457-054C

*Signature powered by Plaxo*          *Add me to your address book...*          *Want a signature l*

06/29/2004

**Washington Council of Agencies**

# Memo

**To:**       Lisa Ransom Brown

**From:**   Jeff Kost, Deputy Director for External Affairs

**Date:**    4/14/2004

**Re:**        Photo in Newsletter

---

Lisa,

As you were unwilling to discuss placement of your photo in the upcoming newsletter, I have removed the photo from your article for this issue.

It is our intention to put photos of all senior staff who write articles in the newsletter beside their byline.  You have two choices:

1. We can publish your photo in the print version of the newsletter and remove the photo from the online version of the newsletter that is posted on our Web site if you have a concern about the image on the Web site.

2. You can have another photo taken (at your own expense) before the deadline for the next issue and it will be published in the next and any future newsletters, both in print and online.

These are your two options.  Please let me know by close of business today, what you choose.  If I don't hear from you, I will make a decision in the best interest of the organization.



000045

**Washington Council of Agencies**
**Director of Public Policy and Community Relations**
**Objectives**
**March 12 – June 30, 2004**

1.  Write and conduct a needs assessment to determine advocacy needs and wants from WCA member organizations by March 30. Compile results by April 9.

2.  Meet with 3 nonprofit organizations in DC and 2 nonprofits in Montgomery County each week.

3.  Meet with 2 elected or appointed officials in DC and 2 in Montgomery County each week that have not met with WCA's current Director of Public Policy until contact has been made with each official by April 12.

4.  Begin development of a WCA Advocacy Committee that includes board and non-board regional representation by April 21.

5.  Update WCA website re: advocacy and public policy, including contact information for elected officials and government agencies by April 16.

6.  Develop at least 3 advocacy workshops per trimester on average for CNLL.

7.  Establish criteria and award review committee for PCN Public Policy Leadership Award by May 14.

8.  Work with Prince George's County government and Human Services Coalition to deliver a nonprofit conference that includes an advocacy component, planning completed by June 30.



9. Establish/maintain database of organizations involved in meetings with policymakers, appointed officials, or about local nonprofit public policy by March 31.

10. Contact at least 3 *new* (CLPI, Advocacy Institute, Alliance for Justice, etc.) national advocacy organizations to enhance the resources of local nonprofits by June 30.

11. Develop a plan for expanding WCA's advocacy program into Prince George's County, while strengthening connections in DC and Montgomery County by March 31.

*[handwritten annotations across top: "Liz Damgard...", "CPI", "DNP for the Alliance for Justice (instead of Liz Towne)"]*

**Washington Council of Agencies**
**Director of Public Policy and Community Relations**
**Objectives**
**March 12 – June 30, 2004**

Objectives review date _8th Apr 04_

Staff person responsible for review: _LD_

*These objectives are SMART (Specific, Measurable, Attainable, Realistic, and Time-based).*

1. Write and conduct a needs assessment to determine advocacy needs and wants from WCA member organizations by March 30.  Compile results by April 9.
   Status:

2. Meet with 3 nonprofit organizations in DC and 2 nonprofits in Montgomery County each week. _update →_
   Status:

3. Meet with 2 elected or appointed officials in DC and 2 in Montgomery County each week that have not met with WCA's current Director of Public Policy until contact has been made with each official by April 12.
   Status:

4. Begin development of a WCA Advocacy Committee that includes board and non-board regional representation by April 21.
   Status: _Angela or Cornelius_

5. Update WCA website re:  advocacy and public policy, including contact information for elected officials and government agencies by April 16.
   Status:  _All HDC Fairfax Falls Church_

6. Develop at least 3 advocacy workshops per trimester on average for CNLL.
   Status:



EXHIBIT
40
N 2506  IWW

7. Establish criteria and award review committee for PCN Public Policy Leadership Award by May 14. *Advocacy Committee*
   Status:

8. Work with Prince George's County government and Human Services Coalition to deliver a nonprofit conference that includes an advocacy component, planning completed by June 30. *Mail - merge  Sodox, IVUM Month'l Diane Associated B/ Charities, WHUR*
   Status:

9. Establish/maintain database of organizations involved in meetings with policymakers, appointed officials, or about local nonprofit public policy by March 31.
   Status:

10. Contact at least 3 *new* (CLPI, Advocacy Institute, Alliance for Justice, etc.) national advocacy organizations to enhance the resources of local nonprofits by June 30.
    Status:

11. Develop a plan for expanding WCA's advocacy program into Prince George's County, while strengthening connections in DC and Montgomery County by March 31.
    Status:

I agree with the status of these objectives, as reported above. These objectives are within the scope of my job description and failure to achieve these objectives may result in a formal performance evaluation and/or written corrective action.

_____          _____
Signature of employee              Signature of supervisor

Date of next meeting:_____

*000170*

Apx. 189

**Washington Council of Agencies**
**Director of Public Policy and Community Relations**
**Objectives**
**March 12 – June 30, 2004**

Objectives review date: <u>April 8, 2004</u>

Staff person responsible for review: <u>Jeff Kost</u>

*These objectives are SMART (Specific, Measurable, Attainable, Realistic, and Time-based).*

1.  Write and conduct a needs assessment to determine advocacy needs and wants from WCA member organizations by March 30. Compile results by April 9.

    **Status:** *This has been put on a back burner for the moment, due to FEC briefing and fundraising for Prince George's County Forum. It was started but needs to be finished.*

2.  Meet with 3 nonprofit organizations in DC and 2 nonprofits in Montgomery County each week.

    **Status:** *(2) Met with Family Service Agency and Consumer Action Agency.*

3.  Meet with 2 elected or appointed officials in DC and 2 in Montgomery County each week that have not met with WCA's current Director of Public Policy until contact has been made with each official by April 12.

    **Status:** *LRB stated that she has met with all council members or their staffs already, except for Howard Denis and Michael Knapp on Montgomery County Council.*

4.  Begin development of a WCA Advocacy Committee that includes board and non-board regional representation by April 21.

    **Status:** *Had one meeting with Angela Jones, who will chair the committee. The first meeting of the committee will be scheduled. Rose Krasnow and Cornelius Baker have agreed to also serve.*

5.  Update WCA website re: advocacy and public policy, including contact information for elected officials and government agencies by April 16.

    **Status:** *Trying to spend 15-30 minutes each day on the Web site. Currently working on Maryland and the District.*

6.  Develop at least 3 advocacy workshops per trimester on average for CNLL.



EXHIBIT
41
10-25-06

000043

**Status:** *Completed for Spring 2004.*

7. Establish criteria and award review committee for PCN Public Policy Leadership Award by May 14.

   **Status:** *This is for discussion with the Advocacy Committee.*

8. Work with Prince George's County government and Human Services Coalition to deliver a nonprofit conference that includes an advocacy component, planning completed by June 30.

   **Status:** *Conference slated for June 10-11.*

9. Establish/maintain database of organizations involved in meetings with policymakers, appointed officials, or about local nonprofit public policy by March 31.

   **Status:** *Not yet. LRB stated she needs to start recording the data.*

10. Contact at least 3 *new* (CLPI, Advocacy Institute, Alliance for Justice, etc.) national advocacy organizations to enhance the resources of local nonprofits by June 30.

    **Status:** *(2) Independent Sector's Pat Read, Alliance for Justice's Liz Towns.*

11. Develop a plan for expanding WCA's advocacy program into Prince George's County, while strengthening connections in DC and Montgomery County by March 31.

    **Status:** *Pushed to the second week in April by LRB.*

I agree with the status of these objectives, as reported above. These objectives are within the scope of my job description and failure to achieve these objectives may result in a formal performance evaluation and/or written corrective action.

_____          _____
Signature of employee                              Signature of supervisor

Date of next meeting:_____

000044

**Washington Council of Agencies**

# Memo

| | |
|---|---|
| **To:** | Betsy Johnson, Executive Director |
| **From:** | Jeff Kost, Deputy Director for External Affairs |
| **Date:** | 5/5/2004 |
| **Re:** | Public Policy Objectives memo – April 8, 2004 |

---

Betsy,

As we discussed with Lisa Ransom Brown, Director of Public Policy and Community Relations, I submit this memo to be added to her personnel file along with the attached document titled "Objectives Status – March 12 – June 30, 2004", dated April 8, 2004.

You reviewed the document and approved it, based on notes that you and I both took during the April 8 meeting, prior to my delivering the memo to Lisa.   On three separate occasions: April 14, April 27 and April 28, Lisa refused to sign this document.  The first request was by me, via email.  The second and third attempts were face-to-face meetings with you, me and Lisa.

The document provides status on the objectives drafted by me as her supervisor and first presented to Lisa on March 12, 2004.

The document states that the employee agrees with the status of these objectives as told to you and me and reported in the document.  These objectives are within the employee's scope of her job description and failure to achieve these objectives may result in a formal performance evaluation and/or written corrective action.



EXHIBIT
42

**Washington Council of Agencies**
**Director of Public Policy and Community Relations**
**Objectives**
**March 12 – June 30, 2004**

Objectives review date: <u>May 7, 2004</u>

Staff person responsible for review: <u>Jeff Kost</u>

*These objectives are SMART (Specific, Measurable, Attainable, Realistic, and Time-based).*

1.  Write and conduct a needs assessment to determine advocacy needs and wants from WCA member organizations by March 30.  Compile results by April 9.
    **Status:** *This objective has not yet been addressed due to deadlines for raising money for the Empowerment Conference.  Lisa has started to compile questions for the needs assessment.*

2.  Meet with 3 nonprofit organizations in DC and 2 nonprofits in Montgomery County each week.
    **Status:** *No meetings this week.  Lisa is meeting with Esther Park of Korean Community Service Center of Greater Washington on Friday, May 7, 2004, regarding Montgomery County Council members George Leventhal and Steve Silverman directly and Carolyn Colvin indirectly regarding their recent exclusion (or what she thinks is an exclusion) from the Montgomery County budget.*

3.  Meet with 2 elected or appointed officials in DC and 2 in Montgomery County each week that have not met with WCA's current Director of Public Policy until contact has been made with each official by April 12.
    **Status:** *Lisa reported that she has met directly or indirectly (with staff) with all councilmembers in Montgomery County.  In DC, she is trying to get into Councilmember Sandy Allen's office regarding the June 10th hearing.*

4.  Begin development of a WCA Advocacy Committee that includes board and non-board regional representation by April 21.
    **Status:** *Lisa has developed a survey to determine a meeting date for the committee to be sent out on May 7, 2004.*



5. Update WCA website re: advocacy and public policy, including contact information for elected officials and government agencies by April 16.
   **Status:** *The web site is up-to-date, except for the Northern Virginia section; she removed the school board information and is researching links to maps of jurisdictions to add to the site.*

6. Develop at least 3 advocacy workshops per trimester on average for CNLL.
   **Status:** *Done for spring 2004. Five workshops have been developed. First is May 25. One of the five will be held as part of the Empowerment Conference.*

7. Establish criteria and award review committee for PCN Public Policy Leadership Award by May 14.
   **Status:** *This will be an activity of the Advocacy Committee of the board.*

8. Work with Prince George's County government and Human Services Coalition to deliver a nonprofit conference that includes an advocacy component, planning completed by June 30.
   **Status:** *Pending. WCA staff will meet next week re: media and publicity.*

9. Establish/maintain database of organizations involved in meetings with policymakers, appointed officials, or about local nonprofit public policy by March 31.
   **Status:** *Lisa is starting to compile this information.*

10. Contact at least 3 *new* (CLPI, Advocacy Institute, Alliance for Justice, etc.) national advocacy organizations to enhance the resources of local nonprofits by June 30.
    **Status:** *Completed. Independent Sector, CLPI, NCNA. Lisa is attempting to get meetings with Liz @ Alliance for Justice and Rick @ NCRP.*

11. Develop a plan for expanding WCA's advocacy program into Prince George's County, while strengthening connections in DC and Montgomery County by March 31.
    **Status:** *Prince George's County: Conference, trust building, make Prince George's County nonprofits familiar with WCA. WCA will be doing membership outreach at the conference. Lisa is trying to revitalize the Montgomery Alliance: talked with a media*

Apx. 194

*person who was also with a nonprofit foundation in Montgomery County (not part of the Alliance). Betsy and Jeff suggested she start with the original Alliance steering committee. Betsy named a list of at least five original steering committee members.*

I agree with the status of these objectives, as reported above. These objectives are within the scope of my job description and failure to achieve these objectives may result in a formal performance evaluation and/or written corrective action.

_____     _____
Signature of employee                          Signature of supervisor

Date of next meeting:_____

Apx. 195

**Washington Council of Agencies**
**Director of Public Policy and Community Relations**
**Objectives**
**March 12 – June 30, 2004**

Objectives review date: <u>May 17, 2004</u>

Staff person responsible for review: <u>Jeff Kost</u>

*These objectives are SMART (Specific, Measurable, Attainable, Realistic, and Time-based).*

1.  Write and conduct a needs assessment to determine advocacy needs and wants from WCA member organizations by March 30.  Compile results by April 9.
    **Status:** *None.  Lisa reported that she had not touched the needs assessment since our last meeting.*

2.  Meet with 3 nonprofit organizations in DC and 2 nonprofits in Montgomery County each week.
    **Status:** *Breathe Free, DC/Campaign for Tobacco Free Kids; community Service Agency—AFL/CIO.  Dealing with the Esther Parks issue in Montgomery County with George Leventhal.*

3.  Meet with 2 elected or appointed officials in DC and 2 in Montgomery County each week that have not met with WCA's current Director of Public Policy until contact has been made with each official by April 12.
    **Status:** *As part of a coalition led by Washington Legal Clinic for the Homeless, Lisa will be in meetings with Brazil, Fenty and Evans (DC Councilmembers) this week.*

4.  Begin development of a WCA Advocacy Committee that includes board and non-board regional representation by April 21.
    **Status:** *She is waiting for responses to the date survey sent to committee members.*

5.  Update WCA website re:  advocacy and public policy, including contact information for elected officials and government agencies by April 16.
    **Status:** *Lisa reported that there was no activity this week.*

6.  Develop at least 3 advocacy workshops per trimester on average for CNLL.
    **Status:** *Done for spring 2004.*



7. Establish criteria and award review committee for PCN Public Policy Leadership Award by May 14.
   **Status:** *This will be an activity of the Advocacy Committee of the board.*

8. Work with Prince George's County government and Human Services Coalition to deliver a nonprofit conference that includes an advocacy component, planning completed by June 30.
   **Status:** *Pending. 12 funders invited. Betsy and Jeff asked Lisa to send a report listing revenue to-date pledged v. received.*

9. Establish/maintain database of organizations involved in meetings with policymakers, appointed officials, or about local nonprofit public policy by March 31.
   **Status:** *Lisa has requested the list from the Washington Legal Clinic for the Homeless meeting.*

10 Contact at least 3 *new* (CLPI, Advocacy Institute, Alliance for Justice, etc.) national advocacy organizations to enhance the resources of local nonprofits by June 30.
   **Status:** *Completed. Still trying to contact Advocacy Institute and Alliance for Justice.*

11. Develop a plan for expanding WCA's advocacy program into Prince George's County, while strengthening connections in DC and Montgomery County by March 31.
   **Status:** *In Prince George's County, same as last report. No other progress reported.*

I agree with the status of these objectives, as reported above. These objectives are within the scope of my job description and failure to achieve these objectives may result in a formal performance evaluation and/or written corrective action.

_____     _____
Signature of employee                              Signature of supervisor

Date of next meeting:_____

**Washington Council of Agencies**
**Director of Public Policy and Community Relations**
**Objectives**
**March 12 – June 30, 2004**

Objectives review date: <u>May 27, 2004</u>

Staff person responsible for review: <u>Jeff Kost</u>

*These objectives are SMART (Specific, Measurable, Attainable, Realistic, and Time-based).*

1.  Write and conduct a needs assessment to determine advocacy needs and wants from WCA member organizations by March 30. Compile results by April 9.
    **Status:** *None. Not until after the Conference on June 10-11.*

2.  Meet with 3 nonprofit organizations in DC and 2 nonprofits in Montgomery County each week.
    **Status:** *Met with Consortium of Universities (non-member), DC Fiscal Policy Institute, Bureau of Rehabilitation and Cultural Alliance of Greater Washington. Scheduling a meeting with Sharon Freedman and her SPI mentee, Consumer Action Network.*

3.  Meet with 2 elected or appointed officials in DC and 2 in Montgomery County each week that have not met with WCA's current Director of Public Policy until contact has been made with each official by April 12.
    **Status:** *As part of a coalition led by Washington Legal Clinic for the Homeless, Lisa may be in meetings with Brazil, Fenty and Evans (DC Councilmembers) next week. Lisa reported that she has already met with all Montgomery County elected officials.*

4.  Begin development of a WCA Advocacy Committee that includes board and non-board regional representation by April 21.
    **Status:** *Meeting date is set for June 16, 1:30 – 3:30 pm.*

5.  Update WCA website re: advocacy and public policy, including contact information for elected officials and government agencies by April 16.
    **Status:** *Lisa reported that she is cleaning up the advocacy page of the web site and adding content this afternoon. Adding DC Council members and updating the Montgomery County section.*

6.  Develop at least 3 advocacy workshops per trimester on average for CNLL.


EXHIBIT
45

**Status:** *Done for spring 2004. First scheduled workshop was moved to the conference. The second was cancelled and has not been rescheduled.*

7. Establish criteria and award review committee for PCN Public Policy Leadership Award by May 14.
   **Status:** *This will be an activity of the Advocacy Committee of the board.*

8. Work with Prince George's County government and Human Services Coalition to deliver a nonprofit conference that includes an advocacy component, planning completed by June 30.
   **Status:** *Pending. Betsy and Jeff asked Lisa to send an up-to-date report listing revenue received.*

9. Establish/maintain database of organizations involved in meetings with policymakers, appointed officials, or about local nonprofit public policy by March 31.
   **Status:** *Much discussion about this and Jeff and Betsy attempted to clarify the purpose of establishing and maintaining a database of this kind.*

10. Contact at least 3 *new* (CLPI, Advocacy Institute, Alliance for Justice, etc.) national advocacy organizations to enhance the resources of local nonprofits by June 30.
    **Status:** *Completed. Still trying to contact Advocacy Institute and Alliance for Justice.*

11. Develop a plan for expanding WCA's advocacy program into Prince George's County, while strengthening connections in DC and Montgomery County by March 31.
    **Status:** *Same as last report. No progress reported.*

I agree with the status of these objectives, as reported above. These objectives are within the scope of my job description and failure to achieve these objectives may result in a formal performance evaluation and/or written corrective action.

_____          _____

Signature of employee                              Signature of supervisor

Date of next meeting:_____

## Washington Council of Agencies

# Memo

| | |
|---|---|
| **To:** | Betsy Johnson, Executive Director |
| **From:** | Jeff Kost, Deputy Director for External Affairs |
| **Date:** | 5-12-2004 |
| **Re:** | Public Policy Alert |

Betsy,

This is for the personnel file of Lisa Ransom Brown, Director of Public Policy and Community Relations.

I discovered that Lisa was working on a public policy alert to members regarding the FY05 DC Budget at approximately 5 pm this afternoon. This alert was most likely being written in response to your email (sent at 3 pm) about the Nonprofit Roundtable's role in the DC Budget, issuing an email today to their membership with timely information, useful links, and a list of nonprofits and coalitions working on the issue. Neither you nor I had any knowledge that Lisa was working on an alert until I discovered it by knocking on her door; she did not approach either of us to discuss strategy, and now, in the 11th hour is putting together a public policy alert.

I discussed with Lisa a process for getting the alert out:

- She would need to request a list of DC members from Jeremy and put him on alert that this Public Policy Alert was going out.

- I requested the opportunity to review it since I had no idea what it contained and she hadn't shared her thoughts with you or me.

She left WCA at 5:45 pm telling Jeremy and me that she sent us both an email about the alert. As of 7:15 pm, I have no email from her and neither does Jeremy.

I believe that this alert could have been out today before noon if she had focused on it, strategized with you and/or me, and rescheduled two meetings that were "extracurricular" and not time-sensitive. She had a Sunshine Committee meeting yesterday at 2 pm and a conference call with Bowie Baysox to discuss staff retreat and other ideas for the Sunshine Committee at 10:30 am.

Apx. 200



# Washington Council of Agencies
## WASHINGTON AREA NONPROFITS WORKING TOGETHER

June 14, 2004

Lisa Ransom Brown
13035 Silver Maple Court
Bowie, MD  20715

Dear Lisa:

This letter is to inform you that effective Tuesday, June 15 2004, your employment with the Washington Council of Agencies will be terminated. As stated in the WCA Personnel Handbook, all employees of the Washington Council of Agencies are employed at will, meaning that they or the employer may terminate the employment relationship at any time, with or without cause.

This termination is based upon the lack of progress you made against the objectives we agreed to during our meetings from March 12-May 27. Specifically, the following key areas of responsibility were not fulfilled. The areas include the following:

- Prioritization of staff requests and long term projects
  -establish and maintain a database of organizations involved in public policy with elected and appointed officials or about local public policy
  -develop a plan for expanding WCA's advocacy program into Prince George's County while strengthening in DC and Montgomery County.
- Responding to assignments in a timely manner
  -write and conduct a needs assessment of WCA members to determine needs related to public policy
  -provide comprehensive and timely updates to the advocacy portion of the web site
- Attentiveness to deadlines
  -perpetually late with timesheets and reports to the executive director for reporting to the board
- Providing leadership in public policy on behalf of WCA

As I mentioned during our meeting on June 15, 2004, this termination reflects most on the lack of fit between you and the scope of the job responsibilities outlined. WCA is a small organization and it is extremely important that we have individuals that have the skills, abilities and dedication to effectively perform under their job responsibilities.

Your health, dental and life insurance coverage will terminate June 30, 2004. Please contact Helen Watkins at Benefits Plus, Inc. should you need information on a COBRA plan to continue your coverage. The contact information for Benefits Plus is as follows:

18310 Montgomery Village Avenue, Suite 230
Gaithersburg, MD 20879
Phone: (301) 840-6624.  Fax: (301) 840-9678

EXHIBIT
52
10.25.06

As severance pay, you will receive credit for one month of employment (*two pay periods*) equal to 140 hours according to your schedule, and you will be compensated for your annual leave

balance of 42 hours.  You have less than 5 days of sick leave available, so you will not be compensated for that unused time.  You will not accrue any further annual or sick leave after June 15, 2004.  Any unused personal or other leave is forfeited.  Both of these payments are subject to tax withholding.  Payment for one month of severance will continue to be deposited directly into your account.  Payment for the balance of your annual leave should be received via US mail no later than July 15, 2004.

Please note that there should be no unauthorized removal of any WCA equipment or information.  Please return your key fob directly to me before you leave the office for the day.  You are not authorized to stay in the office beyond the close of business at 5 pm.

Sincerely,

Jeff Kost
Deputy Director for External Affairs

cc:  Personnel File

Apx. 202