# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————
|  |  |
|---|---|
| LISA RANSOM, | ) |
|  | ) |
| Plaintiff | ) |
|  | ) |
| v. | ) Case No. 1:06-CV-843 RMC |
|  | ) **ORAL ARGUMENT REQUESTED** |
| CENTER FOR NONPROFIT ADVANCEMENT | ) |
|  | ) |
| Defendant | ) |

———————————————————————

## PLAINTIFF LISA RANSOM'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CENTER FOR NONPROFIT ADVANCEMENT'S MOTION FOR SUMMARY JUDGMENT

Dated: March 23, 2007

Plaintiff Lisa Ransom opposes Defendant's Motion for Summary Judgment on the grounds that she has evidence that raises triable issues of fact. Plaintiff's Statement of Material Facts is attached and incorporated by reference herein.

## REQUEST FOR HEARING

Plaintiff respectfully requests an opportunity to be heard on this Opposition to Defendant's Motion.

_____/s/_____
Donald M. Temple [407849]
1229 15th Street, NW.
Washington, DC 20005
Phone No. (202) 628-1101
Fax No.: (202) 628-1149
E-mail: dtemplelaw@aol.com
*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS

TABLE OF AUTHORITIES

INTRODUCTION

SUMMARY

ARGUMENT

       I.     LEGAL STANDARD

       II.     PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF

EMPLOYMENT DISCRIMINATION UNDER 42 U.S.C. § 1981

       A.     Ms. Ransom is a Member of a Protected Class

           A.     Ms. Ransom Suffered Adverse Employment Action

               1.     Termination

               2.     Ms. Ransom Was Given a Negative Evaluation Used to

Substantiate Her Termination

B.    Defendant's Conduct Gives Rise to An Inference of Discrimination

III.    THE RECORD SUPPORTS A FINDING THAT DEMONSTRATES DEFENDANT'S

ALLEGEDLY LEGITIMATE BUSINESS REASONS FOR SUBJECTING HER TO ADVERSE

EMPLOYMENT ACTION ARE PRETEXTUAL

IV.    THE RECORD SUPPORTS A FINDING THAT DEFENDANT RETALIATED

AGAINST MS. RANSOM

CONCLUSION

**TABLE OF AUTHORITIES**

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006)

*Anderson*, 477 U.S. at 247-48, 106 S.Ct. 2505

*Howard Univ. v. Green*, 652 A.3d 41, 45 (D.C. 1994)

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

*Tex. Dept. Of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)

*Mastro v. Potomac Elec. Power Co*., 447 F.3d 843, 850 (D.C. Cir. 2006)

*Dancy v. American Red Cross*, 972 F. Supp. 1, 3-4 (D.D.C. 1997)

*Taylor v. Small*, 350 F.3d 1286 (D.C. Cir. 2003)

*Forkkio v Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002)

*Honor v. Booz-Allen & Hamilton*, 383 F.3d 180 (4th Cir. 2004)

*Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir.1993)

*Murray v. Coughlan v. American Seafoods Co.*, 413 F.3d 1090, 1096

*Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005)

*Dancy v. American Red Cross*, 972 F. Supp. 1, 3-4 (D.D.C. 1997)

*Aka v. Wash. Hosp. Ctr*., 156 F.3d 1284, 1289 (D.C.Cir. 1998)

*St. Mary's Honor Ctr. v. Hicks,* 113 S. Ct. 2742, 2748 (1993)

*Barbour v. Merrill,* 48 F.3d 1270, 1277 (D.C. Cir. 1995)

*Hayes v. Shalala,* 902 F. Supp. 259, 263 (D.D.C. 1995)

*Ross v. Runyon,* 859 F. Supp. 15, 21-22 (D.D.C. 1994)

*Burlington Northern and Santa Railway Co. v. White,* No. 05-259, 548 U.S. ____ (June 22, 2006)

*Broderick v. Donaldson,* 437 F.3d 1226, 1231-32 (D.C. Cir. 2006)

*Singletary v. District of Columbia,* 351 F.3d 519 (D.C. Cir. 2003)

*Mitchell v. Baldridge,* 759 F.2d 80, 86 (D.C. Cir. 1985)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
LISA RANSOM,                            )
                                        )
              Plaintiff                 )
                                        )
       v.                               )  Case No. 1:06-CV-843 RMC
                                        )  **ORAL ARGUMENT REQUESTED**
CENTER FOR NONPROFIT ADVANCEMENT        )
                                        )
              Defendant                 )
_____ )

### PLAINTIFF LISA RANSOM'S MEMORANDUM IN OPPOSITION TO DEFENDANT CENTER FOR NONPROFIT ADVANCEMENT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Lisa Ransom opposes Defendant's Motion for Summary Judgment on the grounds that there are disputed issues of material fact that should be determined by a jury in this case.

### SUMMARY

The pertinent facts are set forth in detail in the Plaintiff's accompanying Statement of Material Facts in Dispute / Not in Dispute and are summarized briefly below.  Supporting record

references are included in the Statement of Material Facts; for readability, record references have generally been omitted here.

Lisa Ransom is an African-American woman who was employed by Defendant, the Center for Nonprofit Advancement (formerly known as the Washington Council of Agencies) ("the Center," "WCA," or "CNA") from September 8, 2003 until her employment was terminated on June 15, 2004. The Center hired Ms. Ransom as Director of Public Policy and Community Relations on September 8, 2003. Of eight senior staff positions during the time of Ms. Ransom's employment, six were filled with white employees, including the Executive Director, Mary Elizabeth Johnson ("Johnson"). The majority of non-white employees on staff at the Center held administrative support positions. In December 2003, at the end of Ms. Ransom's mandatory three-month probationary period, she requested from Jeff Kost ("Kost"), who then was Deputy Director of External Affairs, the results of her probationary ninety-day review. Kost stated that her work was "just fine," that she had nothing to worry about, and that he therefore would not conduct a probationary review.

Thereafter, Ms. Ransom proposed to host an unprecedented outreach effort in Prince George's County's nonprofit community. This effort was designed to create a partnership opportunity for CNA and the Human Service Coalition of Prince George's County. At all times relevant herein, Prince George's County fell within CNA's outreach and service community. Although this outreach effort was a part of CNA's strategic plan, CNA allocated only $1,000 to the conference, despite the fact that $20,000 had been approved. The conference in Prince

George's County was highly successful. The conference had more than 200 participants, including philanthropists and legislators from federal, state, and county governments. The conference's participating individuals and organizations were predominantly African-American and/or served African-American communities.

In a meeting on May 27, 2004, Plaintiff expressed concerns that Kost was consistently unwilling to engage in joint activities with Plaintiff that would benefit Defendant. Plaintiff further expressed, among other things, concern and dissatisfaction that she was held to a different standard than her white colleagues, and that the African-American trainers and presenters whom she had recruited to volunteer for Defendant were not treated appropriately. Shortly thereafter, on or about June 15, 2004, Defendant terminated Plaintiff's employment, stating that Plaintiff was not a "good fit" for the organization.

Ms. Ransom maintains that she was treated differently from her white colleagues because of her race, in violation of federal and District of Columbia law. She also claims illegal retaliation and negligent supervision.

The instant case merits adjudication at trial. Not only has Defendant failed to meet its Rule 56 summary judgment burden, but also, notwithstanding that failure, Ms. Ransom has conducted extensive discovery and uncovered significant facts from which a reasonable fact-finder could find that Defendant unlawfully discriminated against her. For these reasons, Defendant's motion for summary judgment should be denied.

**ARGUMENT**

## I.    LEGAL STANDARD

A party is entitled to summary judgment only if it demonstrates the "absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact where the relevant evidence in the record, taken as a whole, indicates that a reasonable fact finder could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) ("*Anderson*"). In making this determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor; the Court must not make credibility determinations or weigh the evidence. *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "The mere existence of some alleged factual dispute between the parties" will not defeat summary judgment; "the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48, 106 S.Ct. 2505. A fact is "material" if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment determination. *Id*. at 248, 106 S.Ct. 2505. An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In the present case, Defendant's Motion fails for several reasons, all of which relate directly to its inability to meet its Rule 56 burden.  First, and relative to Ms. Ransom's federal and state race discrimination claims, she has produced evidence from which a reasonable fact-finder could find in her favor.  In particular, she has established a *prima facie* case of race discrimination, and discovered evidence that demonstrates that any "legitimate business reason" set forth by Defendant in defense of such discrimination is pretextual.  Second, and further to her race discrimination claims, Ms. Ransom has produced evidence that demonstrates that Defendant retaliated against her.

## II.    PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF EMPLOYMENT DISCRIMINATION UNDER 42 U.S.C. § 1981 AND THE D.C. HUMAN RIGHTS ACT

Ms. Ransom has brought claims against Defendant for unlawful race-based employment discrimination in violation of 42 U.S.C. § 1981 and D.C. Human Rights Act. Section 1981 states, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* The D.C. Human Rights Act similarly precludes employment discrimination on the basis of race and national origin, but also precludes discrimination on the basis of sexual orientation. The standards applied in evaluating a claim of race discrimination in employment under § 1981 and the Human Rights Act are the same as those applied in actions under Title VII. *See Howard Univ. v. Green*, 652 A.3d 41, 45 (D.C. 1994).

In order to prove race-based discrimination, a Plaintiff may provide direct evidence of discrimination or proceed under the burden-shifting proof scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*"). Under the *McDonnell Douglas* test, once the Plaintiff establishes a *prima facie* case, she raises a presumption of discrimination. *Id.* at 12. However, once the employer offers a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination

11

drops from the case and the Plaintiff bears the burden of demonstrating that the defendant's

explanation is pretextual.  *Tex. Dept. Of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Indeed, the federal circuit courts have recognized that establishing a *prima facie* case for a

discrimination claim is a relatively easy test.  *Burdine, supra*, at 253.  To state a *prima facie* case

of disparate treatment discrimination, a plaintiff must establish that (1) she is a member of a

protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action

gives rise to an inference of discrimination.  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843,

850 (D.C. Cir. 2006) ("*Mastro*").

## A.     **Ms. Ransom is a Member of a Protected Class**

The fact that Ms. Ransom is of African-American origin is not in dispute.  Indeed,

Defendant concedes her status as a member of a protected class.  *See* Def. Br. at 9.

## B.     **Ms. Ransom Suffered Adverse Employment Action**

An "adverse employment action" within the meaning of *McDonnell Douglas* is "a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing significant change in benefits."

*Taylor v. Small*, 350 F.3d 1286 (D.C. Cir. 2003) (*citing Burlington Indus., Inc. v. Ellerth*, 524

U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).  Indeed, actions short of an outright firing

can be adverse within the context of employment discrimination.  *Forkkio v Powell*, 306 F.3d

1127, 1130 (D.C. Cir. 2002).

12

Here, the record contains numerous facts, several of which are not in dispute, that indicate that Ms. Ransom suffered adverse employment action within contemplation of federal and local anti-discrimination laws.

### 1.     Termination

As Director of Public Policy and Community Relations, Ransom was required to "play an active role with . . . [the Center]. in supporting and communicating with local nonprofits on local issues" and to perform various specific responsibilities, including analyzing and evaluating issues for the local nonprofit sector; monitoring policy and legislation relevant to local nonprofits; developing and maintaining strong relationships with policy makers in all local jurisdictions; and establishing, developing and maintaining strong constituent relations. The position required her to be able to work with people and to have strong written and oral communication skills. Johnson Aff. ¶ 21 [Def. Apx. 136-37]; Kost Aff. ¶ 8 [Def. Apx. 146-47]; Ex. 10 [Def. Apx. 155].

Ms. Ransom maintains that she was terminated for both discriminatory and retaliatory reasons.  Defendant alleges that after Ransom had worked at the Center for about four months, both Johnson and Kost concluded that Ransom was not making adequate progress toward meeting her responsibilities, that she was unfocused in her work, and that she moved from one activity to another without any plan or priority. Johnson Aff. ¶ 24 [Def. Apx. 137]; Kost Aff. ¶ 11 [Def. Apx.147].  However, the record in this case establishes that Plaintiff had concluded a highly successful conference event in Prince George's County, and was carrying out her responsibilities as outlined in Paragraph 22 of Defendant's Statement of Material Facts; Ex. 10.

*Inter alia,* Plaintiff met with (then) D.C. Councilman Adrian Fenty (now Mayor), Montgomery County Councilmember George Leventhal, Prince Georges County Councilmember Douglas Peters, TJ Sutcliffe of the DC organization SOME, Prince Georges County Council Chair Peter Shapiro, Jewish Community of Greater DC, the Hispanic Chamber of Commerce, and many others.  Ransom's Interim Report, Ex. 25; Expense Reimbursement for Lisa Ransom, Ex. 24; also see Ex. 22 and Ransom's calendar, Ex. 6.

Moreover, the record in this case evinces that in December 2003, at the end of Plaintiff's mandatory three-month probationary period, she requested from Kost, who then was Deputy Director of External Affairs, the results of her probationary ninety-day review.  Kost stated that her work was "just fine," that she had nothing to worry about, and that he therefore would not conduct a probationary review.  Ransom Dep. at 228.

Thereafter, Plaintiff proposed to host an unprecedented outreach effort in Prince George's County's nonprofit community.  This effort was designed to create a partnership opportunity for CNA and the Human Service Coalition of Prince George's County, which fell within CNA's outreach and service community.  The conference in Prince George's County was highly successful.  The conference had more than 200 participants, including philanthropists and legislators from federal, state, and county governments.  The conference's participating individuals and organizations were predominantly African-American and/or served African-American communities.  Empowerment Conference Surveys, Letters and Information, Pl. Ex. B; Ransom Dep. at 230; Update to Betsy Johnson, Ex. 30.

14

Although this outreach effort was a part of CNA's strategic plan, CNA allocated only $1,000 to the conference, despite the fact that $20,000 had been approved.  Ransom Dep. 18-22. Significantly, Kost did not work directly on the Prince George's County Empowerment Conference.  Johnson Dep. at 117.  The fact that Kost did not work on this conference further evinces that he had little or no appreciation for Ransom's stellar work in garnering local community support.

The evidence in this case gives rise to an inference that Ms. Ransom was doing an excellent job during the months prior to her termination.  A reasonable jury could determine not only that Ms. Ransom's termination constituted an "adverse employment action, but that it was pretextual and retaliatory.

2. **Ms. Ransom Was Given a Negative , Non-Standard Evaluation Used to Substantiate Her Termination**

The record in this case shows that **Plaintiff was subjected to a non-standard evaluation process:**

> The format in which they chose to evaluate me was unique in that no other person in that organization was evaluated under the same structure, terms.  No other person in that organization received that same evaluation structure and criteria, and to be singled out --
> Ransom Dep. 154.

Plaintiff's sworn testimony evinces that Plaintiff was evaluated based on a process "created specifically" to address issues that Betsy Johnson and Jeffrey Kost "appeared to have," which made no sense to the Plaintiff because "based on what they were asking I [Plaintiff] had already done that work and had documented it."  The Plaintiff testified that she "wanted to understand

15

why a double standard was practiced with me, but I didn't see that occur with Rick or Jeremy or anyone else." Referencing her treatment by Johnson and Kost, the Plaintiff's sworn testimony shows that she was:

> seeking mediation on their treatment of me as a professional and a director and an organization where I'm producing at capacity with no assistance, although assistance had been promised and committed throughout the interview and hiring process. And I'm not getting the support that the organization committed to going into the deal, but I'm still producing the work that I would have had to produce with an assistant. I'm seeking mediation on their tone, their demeanor, their disrespectful behavior. And I felt that I was not safe in my workplace. And I needed someone that was neutral that could navigate a conversation without dire consequences, which I always felt that I was dealing with whenever I had a conversation with them.
> . . . .
> I felt professionally threatened, financially threatened. I felt that my reputation and credibility was threatened by their actions and with their lack of action.
>
> **I had come through my three-month evaluation and was told that I was just fine and didn't need to be evaluated. Then I'm presented with a document that is clearly a tool for establishing a track record of deficiency,** and I knew that I had no deficiency and I understood what the tool was. And if I'm already doing this work, why would I agree to sign this [Def. Ex. 39]?
> Ransom Dep. 224-231.
> . . .
> Hence, sworn testimony in this matter reveals that Plaintiff was subjected to a

performance evaluation process very different from the evaluation described by Betsy Johnson at her deposition on January 12, 2006, when she testified, **"We have a personnel evaluation form and that's the only document I rely on."** Johnson Dep. 01/12/06 at 33. In striking contrast, Plaintiff was asked to sign on to a document [Def. Ex. 39] Defendant characterizes benignly as a "list of objectives" presented by Johnson and Kost. See Defendant's Motion at 14. Plaintiff disputes the nature of the document she was asked to sign:

> I viewed your Exhibit 39 as a tool for grounds to establish a paper trail to say I agree to certain things that I had already completed. But since people doing the evaluating were subjective, how do I prove it other than to continue to provide a paper trail of documentation for work completed? **I also knew that no other employee in the organization was subjected [to] this kind of evaluation process.** Ransom Dep. 224-231.

Clearly, then, the non-standard performance evaluation was used by Defendant to detrimentally alter the terms and conditions of Ms. Ransom's employment, and therefore constitutes an adverse employment action.

### C.    Defendant's Conduct Gives Rise to An Inference of Discrimination

In the standard race discrimination case, where the plaintiff is a member of a minority group, an inference of discrimination arises when the employer merely carries out an adverse employment action, such as non-promotion or termination, against the plaintiff. *Mastro*, 447 F.3d at 850 (*citing Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir.1993)). A plaintiff also may satisfy the third prong of the *prima facie* test by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class. *Id.* In the present case, then, that burden has been met as a matter of law. If not, genuine issues of material fact preclude the entry of summary judgment in Defendant's favor.

**Ransom Was Treated Differently from the White Senior Staff Members**

Plaintiff was a senior staff member with director-level responsibilities comparable to the director-level responsibilities of her colleagues, regardless of the exact number of hours she spent in the field addressing public policy matters for Center members. Johnson Aff. ¶¶ 16, 19 [Def. Apx. 136]; Ransom Dep. 36, 39-41 [Def. Apx. 21-25]. Plaintiff's sworn deposition testimony

provides evidence that, compared with white senior staff members having director-level

responsibilities, Ransom received substantially disparate treatment from her supervisor, Kost:

> As a supervisor for both Rick and for me, Jeff never ever spent any constructive time, although I sought it, seeking out direction, policy format, procedures on how he wanted things done, because he didn't know. He, however, spent an inordinate amount of time daily with Rick. And I don't just mean office time; coffee break time, lunch time. They were joined at the hip. He was also joined at the hip with other members of WCA staff, but none of them look like me, yet I was under his direct supervision. And when I sought his counsel, I was always given a vague response with no substance. Ransom Dep at 215.

Plaintiff's sworn testimony reveals that her superiors' input regarding her job

responsibilities involves material genuine issues of disputed fact in this case:

> It wasn't just that I wasn't reaching out to nonprofit organizations. Betsy's comment to me was that I was not reaching out to the ***right*** [emphasis added] nonprofit organizations, and I asked her to define what that was. And she said, "Well, you're not talking to the right organizations. You're not talking to the right people." So I asked them repeatedly if they would tell me who these right people were. And after maybe two or three of these meetings, they finally produced a list of who they determined to be the right people. Now, mind you, I had asked for who they wanted me to target when I first got there, but I was never provided that information. However, once they provided a list, I wrote a letter to every single person on that list requesting a meeting. In some cases, those meetings were follow-up meetings, because I had already met with them and talked to them before. But I wanted to make sure that whomever it was that they wanted me to meet with outside from the nonprofits and the elected officials in Montgomery County and the District and Prince George's that I was reaching out to, that I was reaching who they described as the right nonprofits. So every single person on that list got a letter from me, and I followed up with as many people as were willing to meet, because it's one thing to ask for a meeting and it's another thing to have someone be able to schedule it with you. And every week, I reported who I scheduled meetings with, who I met with, and what the discussions were. . . . I had the right to ask them, because they wouldn't tell me when I repeatedly asked, "Who are the right nonprofits? I'll meet with whomever you want me to meet with." Ransom Dep. 122-124.

Kost's writings show that instead of supporting Ransom's efforts in the field, **Kost was constructing a "paper trail" of e-mails to undermine her efforts and document purported problems with Ransom's work.** Moreover, Plaintiff disputes Defendant's characterizations of her responses to Kost's pretextual e-mails. Plaintiff sworn testimony explains her comment about the kind of work she felt "compelled" to write, a comment that Defendant's Motion attempts to characterize as insubordinate:

> What I said to him [Kost] in regard to this was that we were telling our nonprofits information they already had, and we knew they already had it, because it had been out in other publications. So I didn't see how that was helpful to them to give them information they already had when I was told it was our job to give them information they needed that they didn't have to help them move forward.
>
> Q      You and he had a disagreement about what he wanted you to do; is that fair to say?

A      No. I think we had a misunderstanding. Ransom Dep. 188-189.

Ransom's sworn testimony provides evidence of Kost's discriminatory animus when Ransom asked him to participate in the Center's outreach efforts in Prince George's County:

> When I invited him to attend the State of the County brunch for Prince George's County, which was a targeted area where very little outreach had been done, I said, 'Jeff, why don't you come with me, because this would be a great opportunity for you to meet county council members, county officials, and funders.' And he stood at my door, because Jeff rarely came into my office, and said, 'Oh, I'm afraid.' And I looked at him and said, 'What do you mean? What are you afraid of?' No, I said, 'What do you mean?' And he said, 'I'm afraid.' What is there to be afraid of, aside from this is a predominantly African-American county. He would not have been afraid to go to Montgomery County, but I took his statement to mean he was afraid to go to Prince George's County because the county executive and the majority of the county council were African-American. What would there be to be afraid of in an area you say you want to target? Ransom Dep. 112-113.

Likewise, sworn testimony further reveals that the motives of Johnson and Kost, relating to their treatment of non-white senior staff members with director-level responsibilities, were not universally viewed as legitimate business concerns. The January 4, 2006 deposition testimony of Arminda Valles-Hall, a female employee of Mexican descent, raises genuine issues of material fact regarding whether Johnson and Kost exhibited discriminatory animus in their conduct toward Ransom. Valles-Hall testified that "The actions directed at Lisa [Ransom] were discriminatory." Valles-Hall stated that she verbally complained about Johnson's discriminatory actions toward Ransom to Tim Kime, vice chair of the board of directors, on April 8th and 9th, 2004, Valles-Hall Dep. at 82-84.

<u>Defendant's Motion Misapplies the "Same Actor Inference"</u>

Defendant argues that Ms. Ransom is not entitled to draw an inference of discrimination because Johnson is the same person who personally interviewed her, hired her, and gave her substantial raises. In so doing, Defendant relies upon the "same actor inference," adopted by the Ninth and Seventh Circuits. Defendant's argument fails for two reasons. First, Defendant cannot genuinely claim that this Circuit has adopted the "same actor inference." The D.C. Circuit's passing citation in *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) ("*Murray*"), is hardly an endorsement of that doctrine, and this Court is not bound by the Ninth and Seventh Circuit's holdings. Further, Plaintiff, and arguably

20

Defendant, as evidenced by its failure to cite any definitive cases from this circuit, is not aware of any cases from this jurisdiction that have adopted that analysis. In fact, *Murray*'s facts do not even support an argument for the adoption of the doctrine in this circuit. In that case the matter before the court was whether the ***replacement*** of an employee by a member of her protected class gave rise to an inference against discrimination. *See Murray*, 406 F.3d at 715. Facts in support of drawing the "same actor inference" were never before the court.

Second, even if this Court were to adopt the "same actor inference," and it should not, Defendant has grossly misstated it. The "same actor inference" does not, as Defendant unequivocally states, ***preclude*** a fact-finder from finding discrimination and thereby mandate summary judgment. Such a *per se* rule would shield any employer from liability for discriminating against employees that she hires. Rather, the "same actor inference" is just that—an inference that creates a ***rebuttable*** presumption wherein a Plaintiff must corroborate the threshold inference of discrimination with more than just proof of being the member of a protected class and being subjected to adverse employment action. *See Coughlan v. American Seafoods Co.*, 413 F.3d 1090, 1096 (the "same actor inference" creates an inference that there was no discriminatory action). Indeed, evidence of discrimination still may be found, despite the applicability of the "same actor inference." *See id.* at n. 9.

21

**III.    THE RECORD SUPPORTS A FINDING THAT DEMONSTRATES THAT DEFENDANT'S LEGITIMATE BUSINESS REASONS FOR SUBJECTING HER TO ADVERSE EMPLOYMENT ACTION ARE PRETEXTUAL**

At this point, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram*, 336 F.3d at 1088. By "all of the evidence," courts mean any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C.Cir. 1998) (en banc).

Once the sides have been presented, "the fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of ;1599;1599mendacity) may, together with the elements of the prima facie case suffice to show intentional ;1614;1614discrimination."  *St. Mary's Honor Ctr. v. Hicks,* 113 S. Ct. 2742, 2748 (1993) ("*Hicks*").  However, the proffered reasons of the employer "cannot be proved to be a ;1634;1634pretext for ;1636;1636discrimination unless it is shown both that the reason was false, and

that the ;1650;1650discrimination was the real reason." *Hicks*, 113 S. Ct. at 2752.

This rule does not, however, suggest that under *Hicks* a plaintiff must

affirmatively prove ;1679;1679discrimination in addition to proving the

employer's proffered reasons are pretextual. *See id.* Rather, as *Hicks* explained, a

fact finder's rejection of the employer's nondiscriminatory reasons, while not

sufficient to compel a finding of ;1711;1711discrimination, nonetheless suffice to

permit such a finding. *Id.* at 1249. Thus, a plaintiff need only establish a *prima*

*facie* case and introduce evidence sufficient to discredit the defendant's proffered

reasons; at that point, the fact finder, if so persuaded, may infer discrimination.

*Barbour v. Merrill*, 48 F.3d 1270, 1277 (D.C. Cir. 1995).

That a fact finder may infer discrimination is of course relevant to a

Court's analysis under Rule 56. In discrimination cases summary judgment must

be approached with special caution and the Court "must be extra-careful to view

all the evidence in the light most favorable" to the plaintiff. *Hayes v. Shalala*, 902

F. Supp. 259, 263 (D.D.C. 1995) (quoting *Ross v. Runyon*, 859 F. Supp. 15, 21-22

(D.D.C. 1994)). While the fact finder at trial is not compelled to infer

discriminatory ;1852;1852pretext even when the plaintiff has discredited the

employer's proffered reasons, at the summary judgment stage it is inappropriate

for the Court to make that factual determination. If, on the basis of probative

evidence submitted in opposition to summary judgment under Rule 56(e), a

reasonable fact finder could find discrimination, summary judgment is inappropriate.

It is under this framework that Ms. Ransom now focuses on Defendant's lack of credibility and pretext. For reasons made abundantly clear during discovery, and discussed in further detail below, evidence in the record supports a finding that each of Defendant's proffered justifications for adverse employment action is disingenuous, wholly pretextual, and in furtherance of its intent to discriminate against Ms. Ransom.

**A.    Defendant's Conduct Gives Rise to an Inference of Discriminatory Animus**

Ransom testified that Kost's discriminatory animus was revealed by his avoidance of African Americans, even when such avoidance ran counter to the stated objectives of Kost's work at the Center:

> . . . [I]n terms of avoiding them. For instance, Mr. Kost was responsible for development at the Washington Council of Agencies. And during the Empowerment conference, I was able to seat him at a table full of funders, including Freddie Mac, where he was -- I told him, "I've got a seat for you near the Freddie Mac program officer. This will be a great opportunity for you to talk to them." He elected to sit at a table with his colleagues, all white, rather than sit at a table full of funders, but he's responsible for funding and this was an opportunity for him to make inroads to raise money for WCA, which was the purpose of me supporting my supervisor in his role of fund-raising. It just so happened that the program officers for the organizations that were there were African-American. Ransom Dep. 115

**B** **Ms. Ransom's Alleged Inaccessibility to Other Employees is Pretext.**

Plaintiff disputes as **pretext** Defendant's allegations regarding whether other members of the Center's staff keep their doors open or closed. Plaintiff maintains that **Defendant's own assertions evince a genuine material factual dispute** regarding whether and why Ransom was not always "accessible" to talk "face-to-face" in the Center's office. Defendant's Material Fact Statement No. 24 admits that Plaintiff "spent more time than any other employee in the field." Yet, in Defendant's Facts Nos. 31 and 32 Plaintiff seeks to blame Plaintiff for the fact that she was often not accessible in the office. Plaintiff's sworn testimony reveals that **even when she was physically in the office, she was excluded from all-white, closed-door meetings among the other senior staff members**:

> I recall that it was noticeable, because all the senior staff were in Betsy's office with the door closed and everyone in the room was white. The only directors of color would be Arminda and myself, senior directors, and we were not included in those meetings. We had no idea what the discussions were about. But if we -- for me, if I'm supposed to be the policy director and a part of the WCA team, to exclude me from a meeting of all the other directors tells me that there is a double-standard, there is a problem, and it's racially -- it's racially divided, because you racially divided the meeting. Ransom Dep. 149.

Similarly, Plaintiff **disputes as pretext** the paradox that Defendant here claims Johnson and Kost communicate "in a face-to-face manner," yet Defendant supports their pretextual allegations regarding Plaintiff's work in the form of e-mails they sent to her. Clearly, there is a material, genuine discrepancy between what Defendant claims to do, and what actually occurs concerning communication face-to-face or via e-mail in the Center's offices.

**C.      Ms. Ransom's Alleged Unwillingness to Provide a Photograph is Pretextual.**

Plaintiff disputes as **pretext** Defendant's allegations about her choice regarding the use of

her photographic image under the circumstances:

> As I recall, we came to work to learn that we were going to be photographed.  We
> weren't -- I don't recall a discussion prior to asking employees whether they were
> comfortable with being photographed and having their photos used on the Web.
>
> At that time I had a cyst on my face, on my cheek.  I'm trying to remember which
> cheek.  And I had been seeking treatment for it and actually had been going
> through the process of having it drained because it was infected.  The cyst
> distorted my face for a few weeks.  And I remember having a discussion with Jeff,
> and maybe with Betsy, but I know with Jeff, saying that this was not an opportune
> time for me to have my photo taken to be put up on anything because my face was
> distorted.  The cyst was on my cheekbone, so my face was swollen.  And it was
> just unpleasant.  And that I would like to either reschedule for myself or provide a
> photo taken after I had had the treatment that I would pay for myself and submit.
> Jeff's response was that the photographer they were using would be able to
> camouflage or take the photo at such an angle that the cyst would not be visible.
> And I begrudgingly agreed with the stipulation that if I did not like the photo, I
> would not want the photo used in any way.
>
> When I saw the photo, it was terribly unattractive.  If my job -- if part of my job is
> my image and how I project to others, I don't want something that distorts my
> facial features presented.  That causes harm to me professionally and emotionally
> And so I told them that they couldn't use the photo, and that again I would be
> willing to provide a photo or have a photo done, but that they could not use that
> photo.  Ransom Dep. 217-219.

## IV.    THE RECORD SUPPORTS A FINDING THAT DEFENDANT RETALIATED AGAINST MS. RANSOM

Defendant does not dispute that § 1981, and presumably, the Human Rights Act, support

retaliation claims identical to such claims recognized under Title VII.  *See* Def. Br. at __  Title

VII's anti-retaliation provision "forbids an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington Northern and Santa Railway Co. v. White*, No. 05-259, 548 U.S. ____ (June 22, 2006) ("*Burlington*") (*citing* 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must provide evidence that (1) she was engaged in protected activity, (2) her employer took a materially adverse action against her, and (3) a causal connection exists between the two. *Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006).

### A.    Ms. Ransom Was Engaged In Protected Activity

**While no "magic words" are required to satisfy the first prong regarding protected activity, the complaint must in some way allege unlawful discrimination. *Id.* at 1232. The record unequivocally illustrates that Ms. Ransom lodged formal complaints of discrimination or otherwise participated in protected activity:**

> **As a result of earlier meetings, as a result of me expressing my concern about my treatment in the office, as a result of me requesting a mediator to come in and discuss the situation with both Betsy and Jeff, which was denied, as a result of me asking to file a formal grievance with the Governance Committee of the board, which I was told I was not able to do, although, according to the handbook, I'm supposed to be able to do that, as a result of me filing a claim with the Human Rights Commission -- the D.C. Human Rights Commission, I believe I was terminated. Ransom Dep at 135.**

B.     **Defendant Took Material Adverse Action Against Ms. Ransom**

To satisfy the second element of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 13 (internal quotation marks omitted) (*citing Rochon v. Gonzales*, 438 F.2d 1211, 1219). Under its most recent analysis, the Supreme Court reasoned that Title VII's anti-retaliation provision forbids a much broader range of employer conduct than its substantive provision. *Id.* at 7. Thus, "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 9. "This standard does *not* require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge. Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Id.* at 15 (internal citations and quotation marks omitted).

Ms. Ransom has produced evidence that indicates that Defendant took adverse employment action against her after her initial complaint of unlawful racial discrimination that are cognizable under the standard set forth in *Burlington.* Specifically, the record supports a finding that Defendant: Supreme Court in *Burlington. See Burlington*, 548 U.S..

C.    **A Causal Connection Exists Between Ms. Ransom's Complaints of Discrimination and Defendant's Adverse Employment Action.**

Contrary to Defendant's argument and presumably inadvertent failure to set forth the law of this Circuit, the D.C. Circuit has held that a close temporal relationship may alone establish the required causal connection to sustain a retaliation claim. *Singletary v. District of Columbia*, 351 F.3d 519 (D.C. Cir. 2003) (citing *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) ("[G]iven the circumstances of this case, the close temporal proximity of [the plaintiff's] discrimination complaints to the refusal to consider him for the . . . position is sufficient to establish a causal connection"); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985) ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity").  The issues of when, why and by whom the decision was made to fire Ransom raise genuine material factual disputes, including (but not limited to) whether Ransom's termination was

discriminatory and retaliatory.  Ransom testified regarding her concerns about

the timing as well as the motives for her termination:

> I think that I worked really hard and I produced the work that I was
> tasked to do, and I think that there was no justification for their
> rationale, because I was able to document the work that they asked for.
> I also think that the more I was able to document and justify and show
> my work and that it was the work they asked for, there was this -- this
> wasn't what they wanted, and I didn't know why it wasn't what they
> wanted.  It didn't make any sense.  If you ask me to do a job, I'm going
> to do it.  And it was clear that the more I did what they asked me to do,
> the more uncomfortable they were with me doing it.  Ransom Dep. 137.

> And so I followed their procedure as it related to the handbook, and I
> asked -- I sent a memo, I was able to relay the work that I had
> completed, I asked for a neutral mediator and was told I couldn't have
> one.  I asked to go through the process with the governance of the board
> and was told I couldn't do that, that the buck stops with me, as Betsy
> Johnson told me.  Ransom Dep. 138.

> I think that when I state that my work was satisfactory and I understand
> that they feel that there was a problem, when I ask for a mediator to
> address it and they deny me that, that's a problem, because I'm seeking
> a positive resolution so that we can move forward and they're telling me
> that they are not in agreement in seeking a positive resolution.  Ransom
> Dep. 139.

> In the present case, not only does the proximity of Defendant's conduct to Ms.

Ransom's complaints indicate that the two are causally connected, but also,

Defendant's own employees have testified in such a way that a reasonable fact finder

could determine that the adverse action visited upon Ms. Ransom is directly related to her protected activity.

**CONCLUSION**

WHEREFORE, for all of the reasons herein and in the Plaintiff's Statement of Facts, Plaintiff respectfully asks this Court to deny Defendant's Motion for Summary Judgment.

_____/s/_____
Donald M. Temple [407849]
1229 15th Street, NW.
Washington, DC  20005
Phone No. (202) 628-1101
Fax No.: (202) 628-1149
E-mail: dtemplelaw@aol.com
*Counsel for Plaintiff*