# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
LISA RANSOM,                            )
                                        )
            Plaintiff                   )
                                        )
      v.                                )    Case No. 1:06-CV-843 RMC
                                        )    **ORAL ARGUMENT REQUESTED**
CENTER FOR NONPROFIT ADVANCEMENT        )
                                        )
            Defendant                   )
_____

### PLAINTIFF LISA RANSOM'S STATEMENT OF MATERIAL FACTS
### IN DISPUTE/NOT IN DISPUTE

Pursuant to Rule FRCP 56 and LCvR7(h), Plaintiff Lisa Ransom submits the following

Statement of Material Facts in Dispute / Not in Dispute.  Plaintiff respectfully maintains that

substantial material facts in this matter are in dispute, raising genuine issues of fact to be

determined by a jury at trial.

### REQUEST FOR HEARING

Plaintiff respectfully requests an opportunity to be heard on the issues raised in the

Plaintiff's Statement of Material Facts in Dispute.

                                   _____/s/_____
                                   Donald M. Temple [407849]
                                   1229 15th Street, NW.
                                   Washington, DC  20005
                                   Phone No. (202) 628-1101
                                   Fax No.: (202) 628-1149
                                   E-mail: dtemplelaw@aol.com
                                   *Counsel for Plaintiff*

1.      Plaintiff does not dispute that the Center for Nonprofit Advancement ("CNA," "the Center," or "WCA") is a tax-exempt, District of Columbia nonprofit corporation headquartered in the District of Columbia. Johnson Aff. ¶ 3 [Def. Apx. 133].

2.      Plaintiff does not dispute that the Center was founded in 1979 to serve the nonprofit community in the Washington metropolitan area through education, advocacy, nonprofit community building, and group purchasing. Johnson Aff. ¶¶ 3, 5 [Def. Apx. 133-34].

3.      Plaintiff does not dispute that the Center has approximately 1000 members, each of which is, in turn, a non-profit organization. Johnson Aff. ¶ 4 [Def. Apx. 134].

4.      **Disputed**.  Plaintiff disputes this alleged "fact" as grossly incomplete because it does not include the extent, scope and manner in which the Center is "governed" by its Board of Directors.  Johnson Aff. ¶ 2 [Def. Apx. 133].  Defendant's omission is material, because it invites speculation about the Board's level of involvement in the day-to-day operations of the Center.

5.      Plaintiff does not dispute that during the period that Plaintiff Lisa Ransom ("Ransom") was employed by the Center, the Center's Board of Directors consisted of six African-Americans, six Caucasians, and one Latino.  Johnson Aff. ¶ 6 [Def. Apx. 134].

6.      **Disputed**.  Plaintiff disputes Defendant's incomplete description of the Center's paid staff.  Of eight senior staff positions during the time of Plaintiff's employment, six were filled with white employees, including the Executive Director, Mary Elizabeth Johnson ("Johnson").  Ransom Dep. 13-16.  Among the Center's paid staff, Plaintiff and Valles-Hall were

"the only people of color in there that had any director-level responsibilities. . . . Susan Sanow,

Dawn Abrahamsen, Stephanie Smith Dodge or Dodge Smith, Jeremy Baird, Betsy Johnson, . . .

all of them white." Valles-Hall Dep. at 86-89. The majority of racial minorities, *i.e.*, non-white

employees, on staff at WCA held administrative support positions. Plaintiff does not dispute that

Johnson has been the Center's Executive Director since 1988. Johnson Aff. ¶ 2 [Def. Apx. 133].

7. Plaintiff does not dispute that during the period that Ransom was employed by the

Center, the Center had up to 15 employees. Plaintiff does not dispute that of those 15, seven

were African-American, seven were white, and one was Latina. Johnson Aff. ¶ 6 [Def. Apx.

134].

8. **Disputed.** Plaintiff disputes Defendant's selection of the "relevant provisions" of

the Center's Personnel Handbook because Defendant's selection is incomplete. In addition to the

provisions cited in Defendant's Statement of Material Facts Not in Dispute, Plaintiff cites the

following:

> VI. Job Performance and Conduct as Employee
> Generally, performance reviews of employees will be conducted on an annual basis, although usually a new employee will be reviewed at the end of the first three months, as well. Performance reviews are intended to identify both those aspects of the job which are being performed well and those aspects that need attention. They are also a formal opportunity for you to express any concerns you might have about the job or about your employment with WCA. However, if you do have concerns, there is no need to wait until your next review to express them; your supervisor and/or the Executive Director is available throughout the year to meet with you about issues, problems or questions related to your employment.
> [Sec. VI].
>
> X. Discriminatory Harassment
> It is a violation of federal and/or state law to harass anyone at work because of their race, color, age, religion, sex, disability, national origin, personal appearance, sexual orientation, family responsibilities, matriculation, political

affiliation, source of income, place of business or residence, pregnancy, childbirth,
or related conditions.

      If you believe that you have been subject to discriminatory harassment by
a co-worker, supervisor, volunteer, client or vendor, or by anyone else during the
course of your employment, please report your concerns immediately to the
Executive Director (first) or the Board President ) in the case of a complaint
against the Executive Director).  Retaliation against an employee by any person
under WCA's control for opposing such harassment, for filing a bona fide
complaint of discriminatory harassment or for providing information in good faith
regarding another employee's complaint will not be tolerated.

      Once a complaint of discriminatory harassment has been filed, an
investigation will be conducted.  The nature and extent of the investigation will
depend upon the complaint.  The intent is to obtain further information about the
events/conduct complained of, to enable the person(s) named in the complaint to
tell his/her side of the story, to determine whether discriminatory harassment has
in fact occurred, and to develop an appropriate resolution. . . .
Ex. 11 [Def. Apx. 157], WCA Personnel Handbook, Pl. Ex. A.

9.     Plaintiff does not dispute that every Center employee is required, on being

hired, to acknowledge in writing that he or she has received and read the Center's

Personnel Handbook. Johnson Aff. ¶9 [Def. Apx. 135].

    10.    **Disputed**.  Plaintiff disputes Defendant's assertion that the Center

evaluates its employees annually in late June or early July.  The record in this case shows

that **Plaintiff was subjected to a non-standard evaluation process.**

      The format in which they chose to evaluate me was unique in that no other person
in that organization was evaluated under the same structure, terms.  No other
person in that organization received that same evaluation structure and criteria,
and to be singled out --
Ransom Dep. 154.

Plaintiff's sworn testimony evinces that Plaintiff was evaluated based on a process "created

specifically" to address issues that Betsy Johnson and Jeffrey Kost "appeared to have," which

made no sense to the Plaintiff because "based on what they were asking I [Plaintiff] had already

done that work and had documented it." The Plaintiff testified that she "wanted to understand why a double standard was practiced with me, but I didn't see that occur with Rick or Jeremy or anyone else." Referencing her treatment by Johnson and Kost, the Plaintiff's sworn testimony shows that she was:

> seeking mediation on their treatment of me as a professional and a director and an organization where I'm producing at capacity with no assistance, although assistance had been promised and committed throughout the interview and hiring process. And I'm not getting the support that the organization committed to going into the deal, but I'm still producing the work that I would have had to produce with an assistant. I'm seeking mediation on their tone, their demeanor, their disrespectful behavior. And I felt that I was not safe in my workplace. And I needed someone that was neutral that could navigate a conversation without dire consequences, which I always felt that I was dealing with whenever I had a conversation with them.
> . . . .
> I felt professionally threatened, financially threatened. I felt that my reputation and credibility was threatened by their actions and with their lack of action.
>
> **I had come through my three-month evaluation and was told that I was just fine and didn't need to be evaluated. Then I'm presented with a document that is clearly a tool for establishing a track record of deficiency,** and I knew that I had no deficiency and I understood what the tool was. And if I'm already doing this work, why would I agree to sign this [Def. Ex. 39]?
> Ransom Dep. 224-231.
> . . .

Hence, sworn testimony in this matter reveals that Plaintiff was subjected to a performance evaluation process very different from the evaluation described by Betsy Johnson at her deposition on January 12, 2006, when she testified, **"We have a personnel evaluation form and that's the only document I rely on."** Johnson Dep. 01/12/06 at 33. In striking contrast, Plaintiff was asked to sign on to a document [Def. Ex. 39] Defendant characterizes benignly as a "list of objectives" presented by Johnson and Kost. See Defendant's Motion at 14. Plaintiff disputes the nature of the document she was asked to sign:

I viewed your Exhibit 39 as a tool for grounds to establish a paper trail to say I agree to certain things that I had already completed. But since people doing the evaluating were subjective, how do I prove it other than to continue to provide a paper trail of documentation for work completed? **I also knew that no other employee in the organization was subjected [to] this kind of evaluation process.** Ransom Dep. 224-231.

11.     Plaintiff does not dispute that the Center's office suite at 1666 K Street, N.W., Washington, DC includes a conference room that provides a connection between the common hallway and the Center's interior office space. Johnson Aff. ¶ 11 [Def. Apx. 135].

12.     **Disputed**. Plaintiff disputes Defendant's assertion of this alleged "fact." Defendant's pretextual "fact" is as follows: "[o]n a number of occasions, unauthorized persons have gained access to the Center's interior office space and have been seen in private offices and using telephones. Building management has also warned of thefts in other suites in the building. As a result, the Center's employees have assumed responsibility to stop and question persons within the Center's interior offices whom they do not recognize." Johnson Aff. ¶ 12 [Def. Apx. 135]; Baird Dep. 45-47 [Def. Apx. 130-33].

In the context of this discrimination case, Defendant's alleged "fact" is more likely a subterfuge for different treatment to persons of color, treatment that is evidence of discriminatory animus. Plaintiff disputes the above characterization of Defendant's conduct because sworn testimony reveals that Defendant has behaved differently toward non-white visitors. For example, Valles-Hall testified that in early February, 2004, she spoke to Johnson about the "highly disrespectful" conduct directed by Kost at Ransom, Valles-Hall and an African-

American faculty member, Billy Terry, whom Ransom and Valles-Hall were trying to recruit to teach a course on advocacy. During this encounter, Terry was in the Center's conference room for his first contact with the Center for Nonprofit Learning and Leadership. According to Valles-Hall's testimony, Kost's behavior included raising his voice, turning on his heel, then storming out of the room. Valles-Hall testified that she "never saw him [Kost] deal with white colleagues in that kind of fashion." Valles-Hall Dep. at 86-89.

13.    **Disputed**. Plaintiff disputes Defendant's assertion of this alleged "fact." Defendant's pretextual "fact" is as follows: "Former Center employee Jeremy Baird was among the Center employees who stopped and questioned persons within the Center's interior offices whom he did not recognize. During the course of Baird's employment at the Center's K Street offices, he stopped and questioned approximately 10 such persons, including both white and African American persons." Baird Dep. 45-47 [Def. Apx. 130-33]. In the context of this discrimination case, Defendant's alleged "fact" is more likely a subterfuge for different treatment to persons of color, treatment that is evidence of discriminatory animus.

14.    Plaintiff does not dispute that in mid-2003, Ransom applied to the Center for the position of Director of Public Policy and Community Relations. See Ransom's resume, Ex. 7. The position had become vacant due to the death of Phyllis Campbell Newsome ("Newsome") in childbirth. Johnson Aff. ¶ 13 [Def. Apx. 135].

15.    Plaintiff does not dispute that Newsome, who was African American, had held the position of Director of Public Policy and Community Relations for eight years prior to her death. Johnson Aff. ¶ 14 [Def. Apx. 135]; Ransom Dep. 65 [Def. Apx. 43].

16.     Plaintiff does not dispute that the Center interviewed Ransom twice. The first interview was by Jeff Kost ("Kost"), the Center's Deputy Executive Director. The second interview was by Kost, Johnson, and Angela Jones Hackley ("Hackley"), then a Center board member and an official of the DC Action for Children. Johnson Aff. ¶ 15 [Def. Apx. 136]; Kost Aff. ¶ 4 [Def. Apx. 146]; Ransom Dep. 109 [Def. Apx. 60].

17.     Plaintiff does not dispute that Hackley is African American. Johnson Aff. ¶ 17 [Def. Apx. 136].

18.     Plaintiff does not dispute that on or about August 13, 2003, Johnson and Kost jointly decided to offer Ransom the position of Director of Public Policy and Community Relations. Johnson Aff. ¶ 18 [Def. Apx. 136]; Kost Aff. ¶ 5 [Def. Apx. 146].

19.     Plaintiff does not dispute that by letter dated August 13, 2003, the Center offered Ransom the position of Director of Public Policy and Community Relations. Ransom accepted the offer and began working for the Center on September 8, 2003. Ransom Dep. 105, 110 [Def. Apx. 58, 61]; Ex. 10 [Def. Apx. 155].

20.     Plaintiff does not dispute that coincident with her being hired, Ransom received and receipted for a copy of the Center's Personnel Manual. Johnson Aff. ¶ 20 [Def. Apx. 136]; Kost Aff. ¶ 7 [Def. Apx. 146]; Ransom Dep. 110-11 [Def. Apx. 61-62]; Ex. 12 [Def. Apx. 172].

21.     Plaintiff does not dispute that as Director of Public Policy and Community Relations, Ransom was considered a member of senior staff. She reported to Kost, who in turn reported to Johnson. Johnson Aff. ¶¶ 16, 19 [Def. Apx. 136].

22.     **Disputed.**  Plaintiff disputes Defendant's characterization of her job

responsibilities, because it is incomplete.  Plaintiff's sworn testimony reveals that her

superiors' input regarding her job responsibilities involves material genuine issues of

disputed fact in this case:

> It wasn't just that I wasn't reaching out to nonprofit organizations.  Betsy's
> comment to me was that I was not reaching out to the ***right*** [emphasis added]
> nonprofit organizations, and I asked her to define what that was.  And she said,
> "Well, you're not talking to the right organizations.  You're not talking to the right
> people."  So I asked them repeatedly if they would tell me who these right people
> were.  And after maybe two or three of these meetings, they finally produced a list
> of who they determined to be the right people.  Now, mind you, I had asked for
> who they wanted me to target when I first got there, but I was never provided that
> information.  However, once they provided a list, I wrote a letter to every single
> person on that list requesting a meeting.  In some cases, those meetings were
> follow-up meetings, because I had already met with them and talked to them
> before.  But I wanted to make sure that whomever it was that they wanted me to
> meet with outside from the nonprofits and the elected officials in Montgomery
> County and the District and Prince George's that I was reaching out to, that I was
> reaching who they described as the right nonprofits.  So every single person on
> that list got a letter from me, and I followed up with as many people as were
> willing to meet, because it's one thing to ask for a meeting and it's another thing to
> have someone be able to schedule it with you.  And every week, I reported who I
> scheduled meetings with, who I met with, and what the discussions were. . . .  I
> had the right to ask them, because they wouldn't tell me when I repeatedly asked,
> "Who are the right nonprofits?  I'll meet with whomever you want me to meet
> with." Ransom Dep. 122-124.

Plaintiff does not dispute that as Director of Public Policy and Community Relations,

Ransom was required to "play an active role with . . . [the Center]. in supporting and

communicating with local nonprofits on local issues" and to perform various specific

responsibilities, including analyzing and evaluating issues for the local nonprofit sector;

monitoring policy and legislation relevant to local nonprofits; developing and maintaining strong

relationships with policy makers in all local jurisdictions; and establishing, developing and

maintaining strong constituent relations. The position required her to be able to work with people and to have strong written and oral communication skills. Johnson Aff. ¶ 21 [Def. Apx. 136-37]; Kost Aff. ¶ 8 [Def. Apx. 146-47]; Ex. 10 [Def. Apx. 155].

23.    Plaintiff does not dispute that although Ransom's position included a requirement that she interact with Center members in the District of Columbia, Montgomery and Prince George's Counties, Maryland, and northern Virginia, the Center expressly relieved her from interacting with the Center's northern Virginia members. Johnson Aff. ¶ 22 [Def. Apx. 137]; Kost Aff. ¶ 9 [Def. Apx. 147]; Ransom Dep. 102 [Def. Apx. 57]; Ex. 10 [Def. Apx. 155]. Plaintiff **supplements** with her deposition testimony as follows:

> Betsy's comment to me was that she wanted me to focus on working with nonprofit organizations in the local jurisdictions and the issues that concerned them. So that focus would be for the District of Columbia, Montgomery County, and Prince George's County. And Virginia, as I said, was on hold.
> Ransom Dep. 192.

24.    **Disputed**. Plaintiff disputes this alleged "fact" as a grossly incomplete characterization of Ransom's position at the Center. In the context of this case, Plaintiff was a senior staff member with director-level responsibilities comparable to the director-level responsibilities of her colleagues, regardless of the exact number of hours she spent in the field addressing public policy matters for Center members. Johnson Aff. ¶¶ 16, 19 [Def. Apx. 136]; Ransom Dep. 36, 39-41 [Def. Apx. 21-25]. Plaintiff maintains that Defendant's use of the word "unique" is a semantic smokescreen intended to obscure Defendant's disparate treatment. Plaintiff's sworn deposition testimony provides evidence that, compared with white senior staff members having director-level

responsibilities, Ransom received substantially disparate treatment from her supervisor,

Kost:

> As a supervisor for both Rick and for me, Jeff never ever spent any constructive time, although I sought it, seeking out direction, policy format, procedures on how he wanted things done, because he didn't know. He, however, spent an inordinate amount of time daily with Rick. And I don't just mean office time; coffee break time, lunch time. They were joined at the hip. He was also joined at the hip with other members of WCA staff, but none of them look like me, yet I was under his direct supervision. And when I sought his counsel, I was always given a vague response with no substance. Ransom Dep at 215.

Likewise, sworn testimony further reveals that the motives of Johnson and Kost, relating

to their treatment of non-white senior staff members with director-level responsibilities, were not

universally viewed as legitimate business concerns. The January 4, 2006 deposition testimony of

Arminda Valles-Hall, a female employee of Mexican descent, raises genuine issues of material

fact regarding whether Johnson and Kost exhibited discriminatory animus in their conduct

toward Ransom. Valles-Hall testified that "The actions directed at Lisa [Ransom] were

discriminatory." Valles-Hall stated that she verbally complained about Johnson's discriminatory

actions toward Ransom to Tim Kime, vice chair of the board of directors, on April 8th and 9th,

2004, Valles-Hall Dep. at 82-84.

25.    **Disputed**. Plaintiff disputes as **pretext** Defendant's allegation that after Ransom

had worked at the Center for about four months, both Johnson and Kost concluded that Ransom

was not making adequate progress toward meeting her responsibilities, that she was unfocused in

her work, and that she moved from one activity to another without any plan or priority. Johnson

Aff. ¶ 24 [Def. Apx. 137]; Kost Aff. ¶ 11 [Def. Apx.147]. Plaintiff maintains that Defendant's

contentions are **pretextual**. The record in this case establishes that Plaintiff had concluded a

highly successful conference event in Prince George's County, and was carrying out her responsibilities as outlined in Paragraph 22 of Defendant's Statement of Material Facts; Ex. 10. *Inter alia,* Plaintiff met with (then) D.C. Councilman Adrian Fenty (now Mayor), Montgomery County Councilmember George Leventhal, Prince Georges County Councilmember Douglas Peters, TJ Sutcliffe of the DC organization SOME, Prince Georges County Council Chair Peter Shapiro, Jewish Community of Greater DC, the Hispanic Chamber of Commerce, and many others.  Ransom's Interim Report, Ex. 25; Expense Reimbursement for Lisa Ransom, Ex. 24; also see Ex. 22 and Ransom's calendar, Ex. 6.

Moreover, the record in this case evinces that in December 2003, at the end of Plaintiff's mandatory three-month probationary period, she requested from Kost, who then was Deputy Director of External Affairs, the results of her probationary ninety-day review.  Kost stated that her work was "just fine," that she had nothing to worry about, and that he therefore would not conduct a probationary review.  Ransom Dep. at 228.

Thereafter, Plaintiff proposed to host an unprecedented outreach effort in Prince George's County's nonprofit community.  This effort was designed to create a partnership opportunity for CNA and the Human Service Coalition of Prince George's County, which fell within CNA's outreach and service community.  The conference in Prince George's County was highly successful.  The conference had more than 200 participants, including philanthropists and legislators from federal, state, and county governments.  The conference's participating individuals and organizations were predominantly African-American and/or served African-American communities.  Empowerment Conference Surveys, Letters and Information, Pl. Ex. B; Ransom Dep. at 230; Update to Betsy Johnson, Ex. 30.

Although this outreach effort was a part of CNA's strategic plan, CNA allocated only $1,000 to the conference, despite the fact that $20,000 had been approved. Ransom Dep. 18-22. Significantly, Kost did not work directly on the Prince George's County Empowerment Conference. Johnson Dep. at 117. The fact that Kost did not work on this conference further evinces that he had little or no appreciation for Ransom's stellar work in garnering local community support.

26.     **Disputed**. Plaintiff disputes as **pretext** Defendant's alleged "fact" that Kost criticized her work in writing on various occasions. Kost's writings show that instead of supporting Ransom's efforts in the field, **Kost was constructing a "paper trail" of e-mails to undermine her efforts and document purported problems with Ransom's work.** Moreover, Plaintiff disputes Defendant's characterizations of her responses to Kost's pretextual e-mails. Plaintiff sworn testimony explains her comment about the kind of work she felt "compelled" to write, a comment that Defendant's Motion attempts to characterize as insubordinate:

> What I said to him [Kost] in regard to this was that we were telling our nonprofits information they already had, and we knew they already had it, because it had been out in other publications. So I didn't see how that was helpful to them to give them information they already had when I was told it was our job to give them information they needed that they didn't have to help them move forward.
> Q     You and he had a disagreement about what he wanted you to do; is that fair to say?
> A     No. I think we had a misunderstanding. Ransom Dep. 188-189.

27.     **Disputed**. Plaintiff disputes as **pretext** Defendant's alleged "fact" and mis-characterization of her thoughts regarding Kost's ongoing discriminatory motives and conduct. Plaintiff's sworn deposition testimony clearly demonstrates that she felt otherwise about Kost's conduct: "**I think everything Jeff [Kost] did was racially motivated**, but my inquiry was

simply 'give me clarification.'"  Ransom Dep. 214-216.

For example, Ransom's sworn testimony provides evidence of Kost's discriminatory

animus when Ransom asked him to participate in the Center's outreach efforts in Prince

George's County:

> When I invited him to attend the State of the County brunch for Prince George's County, which was a targeted area where very little outreach had been done, I said, 'Jeff, why don't you come with me, because this would be a great opportunity for you to meet county council members, county officials, and funders.'  And he stood at my door, because Jeff rarely came into my office, and said, 'Oh, I'm afraid.'  And I looked at him and said, 'What do you mean?  What are you afraid of?'  No, I said, 'What do you mean?'  And he said, 'I'm afraid.'  What is there to be afraid of, aside from this is a predominantly African-American county.  He would not have been afraid to go to Montgomery County, but I took his statement to mean he was afraid to go to Prince George's County because the county executive and the majority of the county council were African-American.  What would there be to be afraid of in an area you say you want to target?  Ransom Dep. 112-113.

> But this was following the Carlottia Scott incident.  And so for me, it was just a pattern of behavior that I -- and it was also following the Billy Terry incident, so it was a pattern of consistent behavior.  Ransom Dep, 113. [Regarding the Scott incident,] Your earlier comment to me was did I speak to Jeff, and I said I did.  And then he asked me to speak to Jeremy, and I said that I thought that was inappropriate protocol because I am not Jeremy's supervisor, which is why I'm going to you with this.  So in reporting it, he did nothing at all as it relates to the Carlottia Scott incident.  If he is supervising me and I bring in someone that is contributing to my department and he's supposed to have oversight over it and that person is treated poorly and I bring it to his attention and he does nothing, that's a problem. Ransom Dep. 114.

Ransom testified that Kost's discriminatory animus was also revealed by

his avoidance of African Americans, even when such avoidance ran counter to the stated

objectives of Kost's work at the Center:

> . . . [I]n terms of avoiding them.  For instance, Mr. Kost was responsible for development at the Washington Council of Agencies.  And during the

Empowerment conference, I was able to seat him at a table full of funders, including Freddie Mac, where he was -- I told him, "I've got a seat for you near the Freddie Mac program officer.  This will be a great opportunity for you to talk to them."  He elected to sit at a table with his colleagues, all white, rather than sit at a table full of funders, but he's responsible for funding and this was an opportunity for him to make inroads to raise money for WCA, which was the purpose of me supporting my supervisor in his role of fund-raising.  It just so happened that the program officers for the organizations that were there were African-American. Ransom Dep. 115

28.    **Disputed**.  Plaintiff disputes as **pretext** Defendant's alleged "fact" that Center members purportedly "complained" about her work.  **Significantly, each and every purported fact listed in Paragraph 27 is Betsy Johnson's rendition or re-telling of a verbal contact.** Essentially, this "fact" is hearsay, memorialized only by Defendant's own Affidavit, **giving rise to a credibility issue that can only be determined by a trier of fact.**  Hence, Plaintiff disputes the following as **pretext**:

A number of Center members complained to the Center about Ransom's work. Specifically:

a.       In the late fall of 2003, Michael E. Young of the United Communities Against Poverty telephoned Johnson to question and complain about information given him by Ransom concerning the Center's commitment to participate in a coalition. Johnson Aff. ¶ 25a. [Def. Apx. 138].

b.       In the late fall of 2003 or early winter of 2004, Sheri Brady, formerly with the National Council of Nonprofit Associations, told Johnson that Ransom did not do a good job on a congressional staff briefing she (Ransom) had conducted. Johnson Aff. ¶ 25b. [Def. Apx. 138].

c.       In the early spring of 2004, Mac Ramsey of The Arc of Prince George's County called Johnson to complain about an unrealistic budget that Ransom had prepared for an upcoming conference. Johnson Aff. ¶ 25c. [Def. Apx. 138].

d.       A member nonprofit called Ransom with a problem it was having with a Montgomery County official (an official whose staff Ransom already knew). Ransom met with a staff member for the official and reported back to Johnson that the member nonprofit had misbehaved and would "not get anywhere" with the official. Ransom ceased all further effort to resolve the matter and never followed up with the member nonprofit. Johnson Aff. ¶ 25d. [Def. Apx. 138].

e.       Johnson met with Hackley, a Center Board member and an official of the DC Action for Children, on or about June 6, 2005 and told her that Ransom was

going to be fired. Hackley supported the decision and said that Ransom had not done a good job at an event she (Ransom) had facilitated. Johnson Aff. ¶ 25e. [Def. Apx. 138].

29.    **Disputed**.  Plaintiff **disputes as pretext** Defendant's alleged "fact" that Ransom was "often late in accomplishing administrative duties."  Significantly, Ransom did not have an assistant or policy associate, although she had been promised such assistance when she accepted the position.  When reviewing Defendant's Exhibits at deposition, Ransom clearly testified, "This isn't the same job description.  The job description that I received noted that **I would have the assistance of a public policy associate.**" [Emphasis added.]  Ransom Dep. 106.  Plaintiff testified that she was "producing at capacity with no assistance, although assistance had been promised and committed throughout the interview and hiring process.  And I'm not getting the support that the organization committed to going into the deal, but I'm still producing the work that I would have had to produce with an assistant."  See Plaintiff's Statement of Facts No. 10.

30.    **Disputed.**  Plaintiff **disputes as pretext** Defendant's allegation that her report was inadequate.  The following exchange at Ransom's deposition reveals otherwise:

Q     Can you identify Exhibit 25?
A     This is an e-mail that I sent to Jeff to get his feedback on what to give
      Betsy for preparation of the board of directors report.
Q     Did you get feedback from Jeff?
A     I don't recall getting feedback from Jeff.  I recall asking Betsy about it, and
      she said it was fine.
Ransom Dep. 178, Ex. 25.

31.    **Disputed.**  Plaintiff disputes as **pretext** Defendant's allegations regarding whether other members of the Center's staff keep their doors open or closed.  Plaintiff maintains that **Defendant's own assertions evince a genuine material factual dispute** regarding whether and why Ransom was not always "accessible" to talk "face-to-face" in the Center's office.

Defendant's Material Fact Statement No. 24 admits that Plaintiff "spent more time than any other employee in the field." Yet, in Defendant's Facts Nos. 31 and 32 Plaintiff seeks to blame Plaintiff for the fact that she was often not accessible in the office. Plaintiff's sworn testimony reveals that **even when she was physically in the office, she was excluded from all-white, closed-door meetings among the other senior staff members**:

> I recall that it was noticeable, because all the senior staff were in Betsy's office with the door closed and everyone in the room was white. The only directors of color would be Arminda and myself, senior directors, and we were not included in those meetings. We had no idea what the discussions were about. But if we -- for me, if I'm supposed to be the policy director and a part of the WCA team, to exclude me from a meeting of all the other directors tells me that there is a double-standard, there is a problem, and it's racially -- it's racially divided, because you racially divided the meeting. Ransom Dep. 149.

Similarly, Plaintiff **disputes as pretext** the paradox that Defendant here claims Johnson and Kost communicate "in a face-to-face manner," yet Defendant supports their pretextual allegations regarding Plaintiff's work in the form of e-mails they sent to her. Clearly, there is a material, genuine discrepancy between what Defendant claims to do, and what actually occurs concerning communication face-to-face or via e-mail in the Center's offices.

32. **Disputed as pretext**. See Plaintiff's Statement of Facts No. 31.

33. **Disputed as pretext. See Plaintiff's Statement of Facts No. 10.**

34. **Disputed as pretext. See Plaintiff's Statement of Facts No. 10.**

35. **Disputed as pretext. See Plaintiff's Statement of Facts No. 10.**

36. **Disputed as pretext**. See Plaintiff's Statement of Facts No. 10.

37. **Disputed as pretext**. See Plaintiff's Statement of Facts No. 10.

38.    **Disputed.  Plaintiff disputes as pretext Defendant's allegations about her**

**choice regarding the use of her photographic image under the circumstances:**

> As I recall, we came to work to learn that we were going to be photographed.  We weren't -- I don't recall a discussion prior to asking employees whether they were comfortable with being photographed and having their photos used on the Web.
>
> At that time I had a cyst on my face, on my cheek.  I'm trying to remember which cheek.  And I had been seeking treatment for it and actually had been going through the process of having it drained because it was infected.  The cyst distorted my face for a few weeks.  And I remember having a discussion with Jeff, and maybe with Betsy, but I know with Jeff, saying that this was not an opportune time for me to have my photo taken to be put up on anything because my face was distorted.  The cyst was on my cheekbone, so my face was swollen.  And it was just unpleasant.  And that I would like to either reschedule for myself or provide a photo taken after I had had the treatment that I would pay for myself and submit.  Jeff's response was that the photographer they were using would be able to camouflage or take the photo at such an angle that the cyst would not be visible.  And I begrudgingly agreed with the stipulation that if I did not like the photo, I would not want the photo used in any way.
>
> When I saw the photo, it was terribly unattractive.  If my job -- if part of my job is my image and how I project to others, I don't want something that distorts my facial features presented.  That causes harm to me professionally and emotionally And so I told them that they couldn't use the photo, and that again I would be willing to provide a photo or have a photo done, but that they could not use that photo.  Ransom Dep. 217-219.

39.    **Disputed**.  Plaintiff disputes as **pretext** Defendant's allegations about her choice

regarding the use of her photographic image under the circumstances.  At deposition, Ransom

further explains her discussion of this matter with Kost:

> It was said to Jeff, because the comment was in this e-mail that I was willing to have a photo taken for Washington Counsel of Agencies to use once my face had healed or to be photographed when the board was photographed.  So if I am making that suggestion, if I am making those suggestions, I'm clearly saying that I didn't have a problem with having my photograph used; I had a problem with the photograph being used, or else I would never have made the offers.  Ransom Dep.221-222

40.     **Disputed**.  See Plaintiff's Statement of Facts Nos. 38 and 39.

Ransom maintains that Kost's decision to use the issue of the photograph against

her is racially motivated.  Moreover, Plaintiff believes that individuals have some

rights regarding the use of their photographic images, particularly under this

unusual circumstance where Plaintiff's face was distorted by an infected cyst on

her cheekbone.

41.     **Disputed**.  See Plaintiff's Statement of Facts No. 10.  Plaintiff

**disputes as pretext** Defendant's allegations and motives for numerous meetings

with Ransom during the late winter and spring of 2004, where Johnson and Kost

repeatedly railed at Ransom, telling her that her work was deficient. Johnson Aff.

¶ 31 [Def. Apx. 140]; Kost Aff. ¶ 20 [Def. Apx. 151]; Ransom Dep. 229-30 [Def.

Apx. 110-11].

42.     **Disputed**.  Plaintiff maintains that Defendant's rendition of these

events  is incomplete, and that each of these events raises genuine disputed issues

of material fact in the context of this case.

a.     Plaintiff's sworn deposition testimony controverts Defendant's

statement regarding the events concerning Mr. Terry:

Billy Terry is a government affairs manager for Van Scoyvoc & Associates.  He is
a colleague of mine.  I asked him if he would be willing to come in and do a
training for my colleague, Arminda, for her program. . . . I think it was the flow of
federal dollars or something like that for nonprofits, how to access grants,
earmarks, that type of thing.  He agreed to do it pro bono.  He came in to meet
with us to give us an overview of what he proposed in terms of the training, what
materials he would use, how he would present.  And in the middle of his
presentation -- I would say two-thirds of the way through, Jeff walked into the
meeting room, the conference room, and told us that he had people waiting to

come into the conference room. And my colleague, Arminda, told him that we reserved this room for this amount of time, and your folks are -- I think they were like 25, 30 minutes early, and she said, "Would you ask them to wait in the lobby?" Wait a minute. Let me take that back. Barbara Mendoza came in first and then Jeff came in, because I remember there were two interruptions, and I couldn't remember why there were two interruptions. But I remember him coming in and saying, "I have people waiting." And Arminda's response to him was, "Well, we're not finished with the meeting. We have the room until 3:30." And Jeff's response was his standard response. He kind of huffed, spun off on his heel, and closed the door somewhat loudly.

Now, I've never seen him [Kost] act that way in front of any other trainer -- any other potential trainer. I didn't even understand that behavior, but it was embarrassing, because you're bringing someone in, a lobbyist from one of the major firms in the country, to offer to volunteer work and in the middle of their presentation he doesn't even introduce himself. As far as Mr. Terry was concerned, he didn't know who he was. He just came in and interrupted the meeting very rudely with no respect to him, no respect to us as colleagues, spun out, and was gone. Arminda was upset, and we were very apologetic -- very apologetic to Billy. And, you know, he was very gracious, but it was embarrassing. So, again, that was a situation where Arminda said, "This is my training, and I will address this," and I believe she did.

. . . . He [Kost] didn't even say excuse me. I've seen his interaction with other trainers at WCA. With other white trainers, he was always gracious, always polite. Ransom Dep. 125-129.

    b.    Plaintiff's sworn deposition testimony controverts Defendant's statement

regarding the events concerning Ms. Scott:

I invited Carlottia Scott -- I asked her if she would be willing to provide training. I think -- I can't recall what the exact training was for that particular workshop, but it was around understanding the government, advocacy, et cetera, for pro bono complimentary training, and she agreed to do so. I asked her to come in and meet with Arminda, because Arminda oversees the training component, and we met. We had a very productive meeting. And toward the end of the meeting, not quite the end, we had some things to wrap up, and Arminda needed to step away for a moment and somehow I had to give something to Betsy. I remember having to take something to Betsy, and Carlottia needed to use the rest room.

I went to Betsy's office and did whatever I needed to do there very briefly and came back, and Carlottia was in the room where we left her but she was enraged.

That would not be too mild a term.  She was enraged.  And I'm asking her what's wrong, and she tells me that she was confronted in the hallway of our office by my colleague, Jeremy Baird.  She said that she was confronted by a young man who came out of an office that was next to my office, because she knew where my office was.  And by the description she gave, it was Jeremy's office.

She said that he confronted her and wanted to know who she was and what she was doing in the hallway, and that if she was supposed -- if she was there to do some training, that she's supposed to use another entrance and she's not supposed to come through this office.  I don't know -- I did not witness the conversation, but it was enough to have just set her off, because she said it was so racially inflammatory that she had to consider – reconsider doing the training for us.  I apologized profusely and Arminda apologized profusely.  We didn't know what had occurred, but we knew that -- I've known Carlottia for many, many years, and there was no way that -- to go to the ladies room and come back in that short period of time, it was just thoroughly upsetting, and she was upset.  It took us fifteen minutes to just calm her down.  Because the training component fell under Arminda's department, she, I believe, approached Betsy about it.  I wanted to do it, and she said, "Well, no.  This falls under my department, so I should do it.  That would be the appropriate protocol."

But I was embarrassed, because when you bring somebody into your organization to provide a service and they agree to provide a service that they would normally receive a hefty fee for free and they are treated in an abominable fashion, there's no excuse for that.   I described the situation [to Kost], which I believe he was well aware of when it occurred, and his response was one of, **this isn't a big deal**. [Emphasis added.]  I can't tell you his exact words, but his response was, this isn't a big deal. . . .When I left the conference room to go to Betsy's office, Jeff was sitting in Jeremy's office.  When I came back from Betsy's office, Jeff was still sitting in Jeremy's office.  So for that incident to occur in that short period of time, he had to be sitting in Jeremy's office when it happened.

Q      **Is it your belief that Mr. Baird's actions, as they were told to you, were racially motivated?**
A      **Absolutely.**
**An African-American woman with dreadlocks walks in his office that he does not know and that is his initial response to someone, and he's a membership manager?  That was ridiculous.**  [Emphasis added.] Ransom Dep. 52-57.

Also see Plaintiff's Statement of Fact No. 27, which references further evidence to

show why Plaintiff **disputes** Defendant's Fact No. 42.

43    **Disputed**.  The issues of when, why and by whom the decision was made to fire

Ransom raise genuine material factual disputes, including (but not limited to) whether Ransom's

termination was discriminatory and retaliatory.  Ransom testified regarding her concerns about

the timing as well as the motives for her termination:

> As a result of earlier meetings, as a result of me expressing my concern about my
> treatment in the office, as a result of me requesting a mediator to come in and
> discuss the situation with both Betsy and Jeff, which was denied, as a result of me
> asking to file a formal grievance with the Governance Committee of the board,
> which I was told I was not able to do, although, according to the handbook, I'm
> supposed to be able to do that, as a result of me filing a claim with the Human
> Rights Commission -- the D.C. Human Rights Commission, I believe I was
> terminated.  Ransom Dep at 135.
>
> I think that I worked really hard and I produced the work that I was tasked to do,
> and I think that there was no justification for their rationale, because I was able to
> document the work that they asked for.  I also think that the more I was able to
> document and justify and show my work and that it was the work they asked for,
> there was this -- this wasn't what they wanted, and I didn't know why it wasn't
> what they wanted.  It didn't make any sense.  If you ask me to do a job, I'm going
> to do it.  And it was clear that the more I did what they asked me to do, the more
> uncomfortable they were with me doing it.  Ransom Dep. 137.
>
> And so I followed their procedure as it related to the handbook, and I asked -- I
> sent a memo, I was able to relay the work that I had completed, I asked for a
> neutral mediator and was told I couldn't have one.  I asked to go through the
> process with the governance of the board and was told I couldn't do that, that the
> buck stops with me, as Betsy Johnson told me.  Ransom Dep. 138.
>
> I think that when I state that my work was satisfactory and I understand that they
> feel that there was a problem, when I ask for a mediator to address it and they
> deny me that, that's a problem, because I'm seeking a positive resolution so that
> we can move forward and they're telling me that they are not in agreement in
> seeking a positive resolution.  Ransom Dep. 139.

44.    **Disputed**.  Plaintiff disputes that Defendant's No. 44 is a material fact, and if it is

material, Plaintiff disputes it as **pretext and subterfuge** regarding the timing of Plaintiff's

termination.

45.     **Disputed**.  The issues of whether Kost and Johnson are racist and unprofessional reflect genuine material factual disputes, including whether Ransom's termination was discriminatory and retaliatory.  For example, Ransom's sworn testimony regarding weekly meetings raises issues of material facts in dispute and **credibility issues** that should properly be determined by a jury:  "The standard by which he [Kost] and Betsy had weekly meetings was racist.  I attempted frequently to have a rapport with him.  He was not responsive to that.  His weekly meetings were joint meetings with Betsy."  Ransom Dep. 146.

46.     **Disputed**.  Plaintiff disputes Defendant's **pretextual** rationales for her termination.

47.     **Disputed**.  See Plaintiff's Statement of Facts No. 10

48.     **Disputed**.  See Plaintiff's Statement of Facts No. 27.  Plaintiff further testified that:  "She [Betsy Johnson] made some very interesting comments about, well, she was just a Southern white woman and this is how she was raised and so this is the way she thought things should be.  I'm paraphrasing, but that was the gist of her comment.  She said it.  No one told me.  Ransom Dep. 119.

49.     **Disputed**.  See Plaintiff's Statement of Facts Nos. 26, 27, 28, 43, 48.  Plaintiff maintains that under the circumstances, Defendant had rendered it impossible as well as pointless to "use the Center's grievance procedures."

50.     **Disputed**.  See Plaintiff's Statement of Facts Nos. 26, 27, 28, 43, 48.  Plaintiff maintains that under the circumstances, Defendant had rendered it impossible as well as pointless to "use the Center's grievance procedures."

51.     **Disputed. See No. 43. The issues of when, why and by whom the Center learned of Ransom's charge in the DC Office of Human Rights raise genuine material factual disputes, including whether Ransom's termination was discriminatory and retaliatory.**

52.     **Disputed. See No. 43. The issues of when, why and by whom the Center learned of Ransom's charge in the DC Office of Human Rights raise genuine material factual disputes, including whether Ransom's termination was discriminatory and retaliatory.**

53.     **Disputed**. Regardless whether Johnson or Kost ever used racial epithets, Plaintiff disputes as **pretext** Paragraphs 29 through 53 of Defendant's Statement, for all the reasons previously stated in the Paragraphs above as well as the responses provided in detail in Plaintiff's Deposition testimony, incorporated herein in its entirety. Moreover, Plaintiff maintains that in a meeting on May 27, 2004, Plaintiff expressed her concerns that Kost was consistently unwilling to engage in joint activities with Plaintiff that would inure to the benefit of Defendant. Plaintiff further expressed, among other things, concern and dissatisfaction that she was held to a different standard than her white colleagues, and that the African-American trainers and presenters whom she had recruited to volunteer for Defendant were not treated appropriately. See Plaintiff's Deposition. Shortly thereafter, on or about June 15, 2004, Defendant terminated Plaintiff's employment. Ransom Dep. 257-258.

54,     Plaintiff does not dispute that on or about October 1, 2004 Johnson and Kost hired Lee Mason (an existing Center employee) to take the position of Director of Public Policy and

Community Relations. Mason is African American. Johnson Aff. ¶ 44 [Def. Apx. 143]; Kost Aff. ¶ 27 [Def. Apx. 152].

55.    Plaintiff does not dispute that every person who has held the position of Director of Public Policy and Community Relations since its creation in 1990 has been African American. Johnson Aff. ¶ 45 [Def. Apx. 143].  Plaintiff maintains that it is apparent, in the context of this case, that the Center needs to have an individual of color in this position, as the public face of the organization.

56.    Plaintiff does not dispute that between June 2004 and June 2005 Ransom promoted her personal consulting business, known as The Ransom Group, through which she obtained some work and earned some fees. Ransom Dep. 66, 80-83 [Def. Apx. 44, 48-51].

57.    Plaintiff does not dispute that in June 2005, Ransom became a full-time employee of the Center for Policy Alternatives in Washington, DC at an annual salary of $82,000 and with benefits comparable to those she had while previously employed by the Center. Ransom Dep. 8-11 [Def. Apx. 2-5].

Respectfully submitted,

_____/s/_____
Donald M. Temple [407849]
1229 15th Street, NW.
Washington, DC  20005
Phone No. (202) 628-1101
Fax No.: (202) 628-1149
E-mail: dtemplelaw@aol.com
*Counsel for Plaintiff*