# CONDENSED TRANSCRIPT AND INDEX of the Testimony of
# LISA RANSOM

## CASE: LISA RANSOM v. CENTER FOR NONPROFIT ADVANCEMENT

**Date:** October 25, 2006
**Volume:** 1

SLR REPORTING
Phone:(301) 340-0042
Fax:(301) 340-3082
Email:SLRreprtg@aol.com

Case 1:06-cv-00843-RMC   Document 13-3   Filed 03/27/2007   Page 2 of 20

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                    October 25, 2006

**Page 1**

```
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
LISA RANSOM,                     :
                                 :
          Plaintiff,             :
                                 :
v.                               :  Case No.
                                 :  1:06-CV-843 RMC
CENTER FOR NONPROFIT             :
ADVANCEMENT,                     :  VOLUME I
                                 :
          Defendant.             :
                                 :
- - - - - - - - - - - - - - - - x

                           Wednesday, October 25, 2006
                           Bethesda, Maryland
DEPOSITION OF:
              LISA RANSOM
     a Plaintiff in the above-entitled cause,
called for examination by counsel for the Defendant,
pursuant to notice and to agreement of counsel as to
time and place, at the law offices of Oppenheimer,
Fleischer & Quiggle, P.C., 7700 Old Georgetown Road,
Suite 800, Bethesda, Maryland 20814-6100, commencing
at 10:35 a.m., before Marney Alena Mederos, RPR, a
Notary Public in and for the State of Maryland, when
```

**Page 2**

```
1   were present on behalf of the respective parties:
2
3   APPEARANCES:
4        DONALD M. TEMPLE, ESQUIRE
         DHAMIAN A. BLUE, ESQUIRE
5        Temple Law Offices
         1229 15th Street, N.W.
6        Washington, D.C. 20005
         (202) 628-1101
7        On behalf of the Plaintiff.
8        CHARLES H. FLEISCHER, ESQUIRE
         Oppenheimer, Fleischer & Quiggle, P.C.
9        7700 Old Georgetown Road
         Suite 800
10       Bethesda, Maryland 20814-6100
         (301) 986-4056
11       On behalf of the Defendant.
12
13            * * *
```

**Page 3**

CONTENTS

| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| Lisa Ransom | Mr. Fleischer | 7 |

EXHIBITS

| NO. | DESCRIPTION | PAGE: |
|---|---|---|
| 1 | Complaint | 7 |
| 2 | e-mail | 7 |
| 3 | e-mail with attachment | 7 |
| 4 | Plaintiff Lisa Ransom's Initial Disclosures | 7 |
| 5 | Plaintiff Lisa Ransom's Answers and Objections to Defendant's Interrogatories and Request for Documents | 7 |
| 6 | Outlook calendar | 7 |

**Page 4**

E X H I B I T S (CONTINUED)

| NO. | DESCRIPTION | PAGE: |
|---|---|---|
| 7 | Resume | 7 |
| 8 | Resume | 7 |
| 9 | Cover letters | 7 |
| 10 | Offer letter | 7 |
| 11 | WCA Personnel Handbook | 7 |
| 12 | Acknowledgment | 7 |
| 13 | e-mail | 7 |
| 14 | Charge of Discrimination | 7 |
| 15 | OHR Complaint | 7 |
| 16 | Rebuttal | 7 |

Case 1:06-cv-00843-RMC    Document 13-3    Filed 03/27/2007    Page 3 of 20

LISA RANSOM                                                LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                       October 25, 2006

Page 5

```
 1          E X H I B I T S (CONTINUED)
 2  NO.    DESCRIPTION                         PAGE:
 3  17     e-mail with letter attached           7
 4
 5  18     e-mails                               7
 6
 7  19     e-mails                               7
 8
 9  20     e-mail                                7
10
11  21     e-mail                                7
12
13  22     e-mail with attachment                7
14
15  23     e-mail                                7
16
17  24     Expense Reimbursement Request for Lisa 7
18         Ransom Brown
19
20  25     e-mail with attachment                7
21
22  26     e-mails                               7
```

Page 6

```
 1          E X H I B I T S (CONTINUED)
 2  NO.    DESCRIPTION                         PAGE:
 3  27     e-mails                               7
 4
 5  28     e-mails                               7
 6
 7  29     e-mails                               7
 8
 9  30     e-mail with attachment                7
10
11  31-61  (Exhibits premarked but not identified.) 7
12
13  (All exhibits retained by Mr. Fleischer.)
```

Page 7

```
 1              PROCEEDINGS
 2          (Thereupon, Exhibit
 3           Nos. 1 through 61 were
 4           marked for identification.)
 5  Whereupon,
 6              LISA RANSOM
 7  a Plaintiff, called for examination by
 8  counsel for the Defendant, having first been duly
 9  sworn, was examined and testified as follows:
10      EXAMINATION BY COUNSEL FOR DEFENDANT
11        BY MR. FLEISCHER:
12    Q   Tell us your name, Ms. Ransom, please.
13    A   My name is Lisa Renee Ransom Brown.
14    Q   Do you use the Brown?
15    A   I don't.
16    Q   I'm going to call you Ms. Ransom if
17  that's all right.
18    A   That's absolutely fine.
19    Q   Good.
20        What is your home address?
21    A   13035 Silver Maple Court in Bowie,
22  Maryland 20715.
```

Page 8

```
 1    Q   And your current business address?
 2    A   For The Ransom Group, 13035 Silver
 3  Maple Court.
 4    Q   Are you now employed?
 5    A   Yes, I am.
 6    Q   Who do you work for?
 7    A   I work for the Center for Policy
 8  Alternatives.
 9    Q   What is their address?
10    A   1875 Connecticut Avenue, Northwest,
11  Washington, D.C.
12    Q   When did you start there?
13    A   June 2005.
14    Q   Do you remember the exact date?
15    A   Maybe the 8th.
16    Q   Are you full time?
17    A   Yes, I am.
18    Q   What is your title?
19    A   Senior director, state action network.
20    Q   Tell me what you do at that place.
21    A   I'm responsible for establishing
22  network relationships with state legislators around
```

Page 9

1 the country.
2  Q   Does that involve travel?
3  A   Yes, it does.
4  Q   How many days a week are you typically
5 on travel?
6  A   In terms of trips, 10 to 15, 20 trips a
7 year.
8  Q   Okay. And that would be a couple days
9 at a time?
10  A   Three to four days.
11  Q   Who is your immediate supervisor there?
12  A   Tim McFeeley.
13  Q   How do you spell his last name, please?
14  A   M-c-F-e-e-l-e-y.
15  Q   What is his title?
16  A   Executive director.
17  Q   So you report to the executive
18 director?
19  A   That's correct.
20  Q   And I take it he's the chief -- the
21 chief paid staff member?
22  A   Yes, that's correct.

Page 10

1  Q   Is the Center for Policy Alternatives a
2 nonprofit organization?
3  A   Yes, it is.
4  Q   Is it a member of CNA?
5  A   The Washington Council of Agencies?
6  Q   Yes, ma'am.
7  A   Yes, it is.
8  Q   Just for the record, as you know,
9 Washington Council of Agencies has changed its name
10 to the Center for Nonprofit Advancement.
11      If I refer to CNA or the Center, I mean
12 what you used to call the Washington Council of
13 Agencies, okay?
14  A   I understand.
15  Q   Okay. What is your salary at the
16 Center for Policy Alternatives?
17  A   82,000.
18  Q   Was that your starting salary?
19  A   Yes, it was.
20  Q   What benefits do you have?
21  A   Health, dental, standard -- a standard
22 benefits package.

Page 11

1  Q   Are they the same or different from the
2 benefits you had at the Washington Council of
3 Agencies?
4  A   Comparable.
5  Q   When did you apply to the Center for
6 Policy Alternatives?
7  A   I believe it was late spring of '85.
8  Q   Of '85?
9  A   2005. Sorry.
10  Q   Okay. How did you hear about the job?
11  A   I saw it on a website, but I can't
12 recall which one.
13  Q   Okay. What is your date of birth,
14 please?
15  A   09/06/61.
16  Q   Have you ever testified in court
17 before?
18  A   Yes, I have.
19  Q   What was the nature of that?
20  A   I believe I was a witness in a child
21 custody case.
22  Q   Nothing to do with your family?

Page 12

1  A   Nothing at all.
2  Q   All right. Have you ever testified in
3 a deposition before, such as we're doing today?
4  A   I have not.
5  Q   Okay. Your counsel has probably told
6 you about this, but just to be sure, if you don't
7 hear a question of mine, please let me know that you
8 haven't heard it and I'll speak more loudly. If you
9 don't understand a question, please ask me to
10 clarify it.
11      Is that okay?
12  A   Yes, it is.
13  Q   Okay. I'm going to assume that if you
14 answer a question you've heard it and you've
15 understood it.
16      Is that fair?
17  A   That's fair.
18  Q   Okay. Other than this case -- now, as
19 you know, we're in federal court. And prior to
20 that, we were before the D.C. Office of Human
21 Rights. Other than this case or those two cases,
22 have you ever filed a charge of discrimination?

Page 13

1   A   I have not.
2   Q   Okay. Have you ever been a party to a
3   lawsuit before other than this case?
4   A   I have not.
5   Q   I'm going to ask you, Ms. Ransom, to
6   look at a number of exhibits. The court reporter
7   has been kind enough to premark these. I'm going to
8   show you Exhibit 1, and I would like to have you
9   look at it, please.
10      Ma'am, you're welcome to read the whole
11  thing if you want. I'm only going to ask you about
12  specific provisions in that, and that might save
13  time.
14      Can you identify Exhibit 1 as the
15  Complaint that was filed on your behalf in this
16  lawsuit?
17  A   Yes.
18  Q   If you would look at paragraph number 6
19  on page 2 of Exhibit 1, I'm going to read the first
20  sentence aloud. Quote, of eight senior staff
21  positions during the time of Ms. Ransom's
22  employment, six were filled with white employees,

Page 14

1   including the executive director, and then it gives
2   her name.
3       I would like you to identify for me the
4   eight senior staff positions you are referring to
5   there and who occupied them.
6   A   May I refer to Mary Elizabeth Johnson
7   as Betsy Johnson?
8   Q   Sure.
9   A   Betsy Johnson.
10  Q   And give me titles. Betsy?
11  A   Executive director.
12  Q   Okay.
13  A   Jeff Kost, deputy director, external
14  relations.
15  Q   Okay.
16  A   Susan Sanow, and she was the deputy
17  director, but I can't recall what the last part of
18  her title was.
19  Q   Okay.
20  A   Dawn Abrahamsen, and she was the
21  director of the group buying program.
22  Q   Okay.

Page 15

1   A   Rick Rose, director of communications.
2   Q   Okay.
3   A   Stephanie Smith, and she was director
4   of membership.
5       And Barbara Mendoza, who was the office
6   manager.
7   Q   And yourself?
8   A   I thought -- let me clarify the
9   question. I thought your question was to name the
10  six white directors. Was that your question?
11  Q   No. Well, that's fine.
12      What I really asked you was to identify
13  the eight people you're referring to here
14  (indicating).
15  A   Oh, I'm sorry.
16      Arminda Valles-Hall, director of
17  education.
18      And myself, director of policy.
19  Q   Okay. You and Arminda -- I'm going to,
20  just for convenience, use first names -- are women
21  of color?
22  A   That's correct.

Page 16

1   Q   And the other six are white?
2   A   That's correct.
3   Q   Okay. Eight is all the senior staff
4   positions that you know about?
5   A   It's been a minute, so let me remember.
6   Q   Sure.
7   A   There were two managers, but they were
8   not senior staff positions.
9   Q   How do you define senior staff
10  positions?
11  A   By title of director or executive
12  director with the exception of the finance office,
13  which is a different dynamic altogether.
14  Q   What was the racial composition of the
15  finance office when you were there?
16  A   I believe Barbara Mendoza was the
17  office manager, and she dealt with all
18  administrative accounting. And Karen Bailey was the
19  accountant for the group buying service, if I am not
20  mistaken.
21  Q   And Ms. Bailey is what race?
22  A   African-American.

Page 17

1   Q   Okay. Would you look at paragraph 9 of
2   Exhibit 1, please?
3   A   Yes.
4   Q   All right. Have you read it?
5   A   Yes.
6   Q   Okay. Can you put a date on when
7   Mr. Kost said to you that your work was, quote, just
8   fine, closed quote?
9   A   I cannot put a date. I can give you --
10  it was on or around the second week of November, and
11  I can tell you why I remember that.
12  Q   Do you mean November or December?
13  A   I can't recall.
14  Q   Okay. Your paragraph here says
15  December.
16  A   I can't recall.
17  Q   As you sit here, you can't recall?
18  A   Uh-huh.
19  Q   Tell me why you remember that.
20  A   I remember it was around the time of
21  the annual meeting.
22  Q   Okay. And that was in early December?

Page 18

1   A   Uh-huh.
2   Q   Was anyone else present when Mr. Kost
3   said that to you?
4   A   No.
5   Q   Did you make any written record of
6   that?
7   A   I did not.
8   Q   Okay. Are you aware of any documents
9   that reflect his statement to you?
10  A   In regard to the probation?
11  Q   That probation was over, that your work
12  was just fine, that you had nothing to worry about.
13      Were there any documents generated at
14  about that time that reflect the statement?
15  A   Not this particular statement, no.
16  Q   Okay. Would you look at paragraph 12,
17  please.
18  A   (Witness complies.)
19  Q   Are you aware of any documents that
20  reflect your allegation that $20,000 was approved
21  for the conference you're referring to?
22  A   The budget that I submitted for review

Page 19

1   to Jeff and Betsy.
2   Q   Okay. I have not found that in the
3   papers you've produced.
4       Do you have a copy of that?
5       MR. TEMPLE: "That" being the budget?
6       MR. FLEISCHER: Yes, ma'am. I'm sorry,
7   yes, sir.
8       BY MR. FLEISCHER:
9   Q   You can answer.
10  A   Yeah, I believe there is a copy.
11  Q   All right. I did not see it in the
12  papers that were produced to me, so --
13      MR. TEMPLE: We'll look and see if we
14  can track it down. You want the budget for that
15  particular conference?
16      MR. FLEISCHER: Showing $20,000,
17  right.
18      MR. TEMPLE: You know that there's such
19  a budget?
20      THE WITNESS: There is a budget, and
21  the way it was broken down was -- for what I
22  submitted, there was approximately $20,000 for each

Page 20

1   county budget conference that they said they wanted
2   to do.
3       MR. TEMPLE: Excuse me, do you know
4   where the budget is?
5       THE WITNESS: I know I submitted it in
6   my paperwork.
7       BY MR. FLEISCHER:
8   Q   In your paperwork to Mr. Temple?
9   A   Yes.
10      MR. TEMPLE: Okay. I'll check.
11      BY MR. FLEISCHER:
12  Q   Take a look, please, at Exhibit 2.
13  A   (Witness complies.)
14  Q   Do you recognize that?
15  A   Yes, I do.
16  Q   All right. Is that an e-mail that you
17  sent to Rick with copies to various other folks on
18  May 18th of 2004?
19  A   Yes, it is.
20  Q   All right. And in that, you indicate
21  that Washington Council of Agencies is going to
22  contribute $1,000; is that right?

Page 21

1   A   That's what I wrote.
2   Q   All right. And was that your
3 understanding, at least as of May 18th, that there
4 would be a $1,000 contribution?
5   A   That's what I understood.
6   Q   All right. How did you find out that
7 the amount to be contributed was not 20,000 but was
8 1,000?
9   A   After the budget that I submitted was
10 verbally approved by Jeff Kost and Arminda and I
11 went to the HSC meeting to let them know that we had
12 received this support and that we were able to move
13 forward and then we came back from that meeting to
14 talk to both Betsy and Jeff about the outcome, Betsy
15 told us that we didn't have $20,000 in the budget.
16       And my response to her and Arminda's
17 response to her was, "But we were told our budgets
18 were approved. Jeff stood at my door, and I asked
19 him, Is my budget approved for this? And he said,
20 Yes."
21       So we then had to go back to HSC and
22 tell them that we didn't have the $20,000 that had

Page 22

1 been committed earlier, but that WCA was prepared to
2 commit $1,000 to the project.
3   Q   Okay. When did Mr. Kost stand at your
4 door and say the budget was approved? Can you put a
5 date on that?
6   A   I cannot. It was prior to this
7 e-mail.
8   Q   Much prior? I mean, a month, a week,
9 any sense?
10   A   Maybe a month.
11   Q   Take a look, please, at Exhibit 3, if
12 you would.
13   A   (Witness complies.)
14   Q   Do you recognize that?
15   A   Yes, I do.
16   Q   All right. And am I correct in
17 describing this as an e-mail from you to various
18 people concerning the upcoming conference?
19   A   Yes.
20   Q   And on the second page of that, am I
21 correct in seeing that you have Washington Council
22 of Agencies budgeted for $1,000?

Page 23

1   A   That's correct.
2   Q   Okay. Let me go back to Exhibit 1, the
3 Complaint that's in front of you, please.
4       Would you look at paragraph 14, please?
5   A   (Witness complies.)
6   Q   In that paragraph, you're referring to
7 a meeting that took place on May 27, 2004; is that
8 right?
9   A   Yes.
10   Q   Who was at the meeting, please?
11   A   Jeff Kost and Betsy Johnson.
12   Q   And yourself?
13   A   And myself.
14   Q   Where was the meeting?
15   A   In Betsy's office.
16   Q   Do you remember the time of day?
17   A   I do not.
18   Q   How long did the meeting last?
19   A   At least an hour.
20   Q   How did the meeting come about? Who
21 called it or arranged it?
22   A   Jeff and Betsy called the meeting.

Page 24

1   Q   Was this one in a series of weekly
2 meetings that they had asked you to attend?
3   A   It may have been.
4   Q   In the paragraph in the Complaint,
5 you're describing -- if I'm reading it correctly,
6 you're describing certain events at the meeting.
7 You say, for example, that the Plaintiff, you,
8 expressed concerns that Kost was consistently
9 unwilling to engage in joint activities with
10 Plaintiff, you.
11       Did you say that at the meeting?
12   A   I don't recall. I may have.
13   Q   As you sit here today, do you know what
14 joint activities that the Complaint is referring
15 to?
16   A   Would you repeat the question?
17   Q   Yes.
18       As you sit here today, do you know what
19 joint activities that the Complaint is referring
20 to?
21   A   One comes to mind.
22   Q   What is that?

Page 25

1   A   I invited him to attend a State of the
2   County lunch or brunch with me in Prince George's
3   County, Maryland, since the organization had stated
4   in the goals that they wanted to do outreach in
5   Prince George's County and they had not sufficiently
6   done so, and Mr. Kost elected not to attend.
7   Q   Okay. Can you think of any other
8   activities which you asked him to attend that he
9   declined?
10   A   It was not unusual for me to ask him to
11   attend a number of things, so -- and it was not
12   unusual for him to say no, so I did it as a
13   courtesy. I can't recall those right at this
14   point.
15   Q   Okay. Did he accept similar
16   invitations from other senior staff?
17   A   I don't know.
18   Q   So you don't know whether his declining
19   was simply because of scheduling problems or other
20   reasons, do you?
21   A   Not based on his response.
22   Q   I didn't ask the question -- you do or

Page 26

1   you don't know the reason he declined?
2   A   I don't know.
3   Q   Okay. The second -- go ahead. If you
4   think of something further to add to an answer,
5   please feel free to do so.
6   A   No. Go ahead.
7   Q   Okay. Further in paragraph 14, again,
8   you're referring to what you said at the May 27
9   meeting. And it says here, "Plaintiff further
10   expressed, among other things, concern and
11   dissatisfaction that she was held to a different
12   standard than her white colleagues."
13       Tell me which white colleagues you're
14   referring to, please.
15   A   I don't understand the question.
16   Q   Paragraph 14 of the Complaint,
17   Exhibit 1, says that at the meeting, you expressed
18   concern -- a number of concerns.
19   A   Uh-huh.
20   Q   One of those concerns, according to
21   paragraph 14, is that you were held to a different
22   standard than your white colleagues. That's what it

Page 27

1   says here.
2       I want to know who the white colleagues
3   are.
4   A   I would say the majority, if not all,
5   of them.
6   Q   They would be the people that you named
7   earlier?
8   A   Yes.
9   Q   The six white people who constitute
10   senior staff?
11   A   Yes.
12   Q   You were held to a different standard
13   than those six?
14   A   Yes.
15   Q   Okay. In what way? Can you give me
16   examples, please?
17   A   To my knowledge, none of my white
18   colleagues were to asked to meet weekly with the
19   executive director to go over their work product.
20   Q   When did the weekly meetings -- when
21   were you first asked to begin meeting weekly?
22   A   I think it was in the spring.

Page 28

1   Q   Of 2004?
2   A   Yes.
3   Q   Would mid-March 2004 be accurate?
4   A   It may be.
5   Q   All right. So you started at
6   Washington Council of Agencies on September 8 of
7   2003; is that right?
8   A   Yes.
9   Q   So you were not asked to attend any
10   weekly meetings during the period of September
11   through mid-March; is that right?
12   A   Not with the executive director and the
13   deputy director.
14   Q   And those are the meetings that you say
15   distinguish your treatment from the treatment of
16   your white colleagues?
17   A   Yes.
18   Q   Okay. And so you weren't asked to
19   attend any meetings between September and mid-March;
20   is that right?
21   A   I'm not clear on what -- I'm not clear
22   on where you're going.

Page 29

1  Q    Well, where I'm going is another
2  question.
3  A    I'm trying to understand how to respond
4  to you.
5  Q    Sure.
6       You are saying that -- what you're
7  talking about here in paragraph 14 is that you were
8  treated differently from white colleagues because
9  you were asked to attend weekly meetings with Betsy
10 and Jeff; is that right?
11 A    Yes.
12 Q    Okay. And those weekly meetings
13 started in or about mid-March of 2004?
14 A    Yes.
15 Q    Are there any other ways in which you
16 were treated differently from your white
17 colleagues?
18 A    Just in demeanor.
19 Q    Can you give me specifics, please?
20 A    I don't know how to describe demeanor.
21 Q    Whose demeanor?
22 A    Demeanor of Jeff Kost, demeanor of

Page 30

1  Betsy Johnson on occasion, demeanor of Rick Rose.
2  Q    When did their demeanor -- let's start
3  with Jeff.
4       When did Jeff's demeanor toward you --
5  let me ask that question differently.
6       You're saying there is a difference in
7  how Jeff treated you in his demeanor and how he
8  treated his white colleagues?
9  A    Yes.
10 Q    When did that start?
11 A    I don't exactly recall.
12 Q    Did it start day one?
13 A    No.
14 Q    Can you give me an estimate? Was it
15 after a month, after two months, after three
16 months?
17 A    It evolved. I can't tell you. I can't
18 give you an estimate.
19 Q    And the same question as to Betsy
20 Johnson's demeanor toward you. When did you notice
21 a difference between her demeanor toward you and her
22 demeanor toward white employees?

Page 31

1  A    I can't give you a date.
2  Q    Okay. Did it start at the beginning?
3       MR. TEMPLE: The beginning of?
4       BY MR. FLEISCHER:
5  Q    Your employment at Washington Council
6  of Agencies.
7  A    I don't believe so.
8  Q    Okay. And how about Mr. Rose? When
9  did you notice a difference in how he treated you
10 from how he treated white colleagues?
11 A    Shortly after his hire.
12 Q    When was he hired?
13 A    Shortly before I was terminated.
14 Q    Within a month of your termination?
15 A    Maybe a few months. I can't give you
16 exact --
17 Q    Can you give me any specific examples
18 in this demeanor differential, if you will? Did he
19 grimace when he saw you and smile when he saw other
20 people? I mean, how did he act differently toward
21 you? Let's start with Mr. Kost.
22 A    Are you asking me to describe

Page 32

1  behavior?
2  Q    I'm asking what you meant by saying he
3  treated you differently. When I asked you how did
4  he treat you differently, you said demeanor. So I'm
5  saying, give me an example of his demeanor to you
6  and how it differed from his demeanor toward other
7  people.
8  A    He was moody. He would ask questions,
9  I would give him responses, I would meet with him.
10 And one minute, he received my responses. But if I
11 met with him with Betsy, it was like I never had a
12 conversation with him. It was just a night-and-day
13 personality.
14 Q    Night toward you and day toward
15 somebody else? Is that what you're saying?
16 A    I don't understand your description.
17 Q    Well, I guess I don't understand your
18 answer. You said he had a night-and-day
19 personality.
20     Sometimes he was friendly to you and
21 sometimes he wasn't? Is that what you meant?
22 A    Yes.

Page 33

1  Q  Okay. But he was always friendly to
2  his white colleagues? Is that the difference?
3  A  I never witnessed any unpleasantness
4  with his white colleagues.
5  Q  Are there any other ways in which you
6  were held to a different standard from your white
7  colleagues? We've talked about the demeanor of
8  several of the senior people, we've talked about
9  your being asked to attend weekly meetings beginning
10 in March. Are there any other ways in which you
11 were treated differently from your white
12 colleagues?
13 A  Just the process of weekly evaluation.
14 I'm asked to come into a meeting to review the work
15 I'm doing, and there are evaluation forms that I'm
16 asked to sign, allegedly so we're all on the same
17 page, to go over work that I've already done or am
18 doing.
19      And having not received any written
20 review in the probationary period and being told my
21 work is fine, these forms just emerge and we're
22 going through these forms every week for work that

Page 34

1  I'm producing.
2  Q  Okay. And that started in March of
3  2004?
4  A  In the spring of 2004, yes.
5  Q  Mid-March was our best guess?
6  A  That was your best guess.
7  Q  And do you agree with that?
8  A  I'll agree with that.
9  Q  Okay. So it was the meetings and what
10 took place at the meetings, namely evaluating your
11 work and asking you to sign those evaluations?
12 A  Yes.
13 Q  Okay. There are --
14 A  And the negative energy in those
15 meetings. They were very hostile.
16 Q  The meetings were always the three of
17 you: you, Betsy, and Jeff?
18 A  Yes.
19 Q  Who was hostile?
20 A  Both Betsy and Jeff were very hostile.
21 Q  Can you give me specifics or give me
22 examples?

Page 35

1  A  I was constantly told that I wasn't
2  doing what I was doing, I wasn't doing what I was
3  tasked to do, and I was doing it and documenting it
4  and showing the documentation and told I shouldn't
5  document it, and it made no sense. It was
6  confusing.
7  Q  Okay. Are there any other ways in
8  which you were treated differently from your white
9  colleagues?
10 A  When you speak to someone negatively,
11 when you can't provide the support you're
12 requested -- when you don't do what you say you're
13 going to do in terms of providing support but I see
14 my colleagues receiving the support they request,
15 that's a problem.
16 Q  Give me examples, please, of the
17 support that you didn't get that other colleagues
18 did.
19 A  Part of my job description and set in
20 my goals and part of the interview process was that
21 I was supposed to receive an assistant, because my
22 job required that I be out in the field a great

Page 36

1  deal.
2      I was never allowed to make a hire
3  ever. I was constantly told, "Well, let's see where
4  we are down the road." I asked if it was a
5  budgetary issue, and I was told it wasn't.
6  Q  Who was allowed to hire an assistant?
7  A  I don't know that anyone else had a
8  need to hire. I think your question to me was, were
9  differences made, and my -- in terms of support,
10 that was the type of support I needed. Other people
11 may have needed different types of support.
12 Q  Okay.
13 A  But for my department, that was what I
14 needed.
15 Q  Okay. So the hiring of an assistant
16 was unique to your position?
17 A  It was.
18 Q  Okay. Anything else? We've got lack
19 of support, we've got demeanor, and we've got
20 attendance at these weekly meetings which you were
21 being evaluated and asked to sign the evaluations.
22 Any other ways in which you were treated differently

Page 37

1  from your white colleagues?
2      A    I think it's important to understand
3  the nature of that position.
4      Q    That may be, but what I'm after is
5  different treatment. That's what I'm asking about.
6      A    And, again, I think it's important to
7  understand the nature of that position. It required
8  a lot of out-of-office time. And if I'm tasked to
9  also do a good deal of work in-office, then to be
10 told that I don't manage my time effectively because
11 I'm out in the field all day but I'm supposed to be
12 in the office to meet with staff while the rest
13 of -- the majority of my colleagues who were white
14 and in the office can have those meetings, but if I
15 come into the office after 5:30 and my executive
16 director is not there, so to capture the day I send
17 an e-mail saying this is the outline of the day,
18 because I have another meeting tomorrow morning at
19 9:00 out of the office, I was reprimanded for that,
20 because I was told, "You need to come talk to me.
21 You should come talk to me. You shouldn't send me
22 things in writing."

Page 38

1           Well, if I'm tasked to be out of the
2  office and you want me to share with you the
3  discussions that I'm having out of the office with
4  nonprofits and I don't want to lose information, I'm
5  trying to do the best thing that I can to bring you
6  up to speed. That does not mean that when I am able
7  to be in the office that I wasn't constantly in
8  Betsy's office and constantly in Jeff's office
9  giving them verbal updates to supplement my written
10 updates.
11     Q    All right. If I can try to summarize
12 that, you're saying that you were treated
13 differently because you received criticism about
14 your scheduling and being in and out of the office;
15 is that fair to say?
16     A    Which is a part of the job.
17     Q    Okay. Did your white colleagues who
18 behaved similarly not receive criticism?
19     A    My colleagues were able to have
20 adjusted schedules to accommodate their personal
21 agendas, which is fine if that's what you choose to
22 do.

Page 39

1           But if what I am doing is what I am
2  tasked to do and you criticize what I do, because
3  there are 24 hours in a day and I'm spending about
4  12 of them doing what is required for WCA and I'm
5  told that I am not effectively managing my time,
6  there is no consideration or leeway for me doing
7  what I'm doing for the benefit of the organization
8  when other people are allowed to have much more
9  flexible schedules for their personal agendas.
10     Q    Did anyone else's job require them to
11 be in the field as much as you were required to be?
12     A    That depends.
13     Q    Why?
14     A    Because you're asking me to give you
15 information about someone's formal job description.
16 I can't do that.
17     Q    What I'm trying to find out is how you
18 were treated differently from your white
19 colleagues.
20          Was your job unique?
21     A    My job was to maintain relationships
22 with members, with organizations and address their

Page 40

1  public policy concerns.
2      Q    Did anyone else have similar
3  obligations?
4      A    Not as it relates to public policy.
5  But we had membership recruitment, and membership
6  did not recruit with the same kind of outgoing
7  agenda. But membership was headed by, for a while,
8  the membership manager and then a membership
9  director and manager, both white, both gay, and the
10 level of recruitment that occurred there did not
11 compare to the amount of outreach I was tasked to
12 do.
13          If we are a membership organization,
14 you would think membership would be active. That
15 was not the case. In fact, I recruited members on
16 behalf of membership.
17     Q    Is it fair to say that no one spent as
18 much time -- of this group of eight people that
19 we've identified earlier, no one spent as much time
20 in the field as you did; is that fair to say?
21     A    That's almost fair to say. I would say
22 Arminda spent a good amount of time out but not for

Page 41

1  the same purposes.
2      Q    Now, paragraph 14 of Exhibit 1 also
3  says that African-American trainers and presenters
4  were not treated appropriately.
5           Who are you talking about there?
6      A    I'm talking about Carlottia Scott and
7  William or Billy Terry.
8      Q    Anybody else?
9      A    Not as it relates to trainers.
10     Q    Well, is there anybody else who is in
11 this category, trainers and presenters, not treated
12 properly?
13     A    Can you tell me what paragraph that is,
14 please?
15     Q    Paragraph 14 of Exhibit --
16     A    Okay. Okay.
17          MR. TEMPLE: That's the Complaint,
18 right?
19          MR. FLEISCHER: Yes.
20          THE WITNESS: I would include in that
21 the Rev. Dr. Earl Trent as a presenter.
22          BY MR. FLEISCHER:

Page 42

1      Q    E-a-r-l?
2      A    Uh-huh.
3      Q    T-r-e-n-t?
4      A    Yeah, T-r-e-n-t. The Rev. Dr. Earl
5  Trent.
6      Q    Okay. I'm going to ask you about
7  Mr. Taylor (sic) and Ms. Scott later.
8           Tell me about Dr. Trent.
9      A    No. Mr. Terry.
10     Q    Terry, I'm sorry.
11     A    Uh-huh.
12     Q    I'll ask you about Mr. Terry and
13 Ms. Scott later.
14          Tell me about Rev. Dr. Trent.
15     A    Dr. Trent was contacted by me when I
16 worked with Arminda Valles-Hall to put the annual
17 meeting together, which was the responsibility of
18 Jeff Kost. We needed an invocation presenter, and
19 we realized that one had not been secured. So I
20 contacted Dr. Trent and asked him if he would be
21 kind enough to present at the last minute.
22          He agreed, but it wasn't so last minute

Page 43

1  that the organization wasn't aware, because he was
2  listed in the program at the top of the page, and
3  everyone in the organization -- in this organization
4  had reviewed the program.
5           I was responsible for dealing with the
6  awards program. And as I was bringing presenters or
7  awardees into the ballroom, it was a little walk.
8  So the staff at the front desk, which would include
9  Barbara Mendoza, who handled the receipts and the
10 money and the checks, greeted Dr. Trent.
11          And I came downstairs to escort him up,
12 and he informed me that he had to write a check for
13 admittance. And I said, "What do you mean you had
14 to write a check? You're the invocation speaker."
15          And so I approached Ms. Mendoza, who
16 said, "Well, I didn't know who he was, and he said
17 he was the invocation speaker, and I just made him
18 pay."
19          I said, "Well, we have to reimburse
20 him, because he's doing us a favor. He actually
21 rearranged his schedule to provide support for WCA
22 at the last minute, and I told you and everyone here

Page 44

1  to expect him -- because everyone had a list of who
2  to expect -- and you charged him to come in the
3  door."
4           And WCA subsequently did reimburse him.
5      Q    Okay.
6      A    No other presenter was charged, no
7  other.
8      Q    What was the racial composition of the
9  presenters? Were they all white, other than
10 Dr. Trent?
11     A    No.
12     Q    What was the racial composition?
13     A    It was a mixed racial composition.
14 I'll have to think. It was some time ago.
15          Shapiro was white, Ewell was black,
16 Mike Subin was white. Well, Shapiro and Subin are
17 Jewish. Mike Rious, who represented Congressman
18 Williams, was black. And I think I'm missing
19 someone, but I can't recall who it is.
20          And for me, though, the difference was
21 I was at the door to bring all the presenters up. I
22 just couldn't get to Dr. Trent in time.

11 (Pages 41 to 44)

Page 45

1  Q  Why do you think Ms. Mendoza treated
2  Dr. Trent differently on the basis of his race? Is
3  that what you think?
4  A  Yes.
5  Q  Why do you think that?
6  A  I think it's the culture of the
7  organization.
8  Q  Has Ms. Mendoza ever made a
9  racially-derogatory comment in your presence?
10  A  No.
11  Q  Has she ever said she charged Dr. Trent
12  because he was black?
13  A  No.
14  Q  Let's talk about the weekly meetings
15  and evaluations that you were -- go ahead.
16  A  But what she said was, "I didn't know
17  who he was when he identified himself," and that's a
18  problem to me.
19  Q  All right. I don't understand what
20  that has to do with race.
21      Did you complain to anyone else at
22  Washington Council of Agencies about Ms. Mendoza's

Page 46

1  behavior?
2  A  Yes.
3  Q  To whom did you complain?
4  A  Betsy Johnson.
5  Q  And what did Ms. Johnson say?
6  A  She said, "We'll reimburse
7  Rev. Trent."
8  Q  And she did?
9  A  Yes.
10  Q  Let me go back to the weekly meetings
11  and evaluations that you were required to attend.
12      We agreed that they started about
13  mid-March after you had been with the Washington
14  Council of Agencies for roughly six months?
15  A  (Witness nods head.)
16  Q  Is it your belief that that requirement
17  was imposed on you because you are African-American?
18  A  Yes.
19  Q  Tell me why you think that.
20  A  Because no other director experienced
21  that evaluation process, to my knowledge, but me.
22  Q  Did Ms. Valles-Hall experience that

Page 47

1  process?
2  A  I'm not aware of that.
3  Q  So your basis for saying that it was
4  racially motivated is because it happened to you
5  alone and you are African-American; is that right?
6      MR. TEMPLE: Objection.
7      BY MR. FLEISCHER:
8  Q  You can answer.
9  A  Not if there's an objection.
10      MR. TEMPLE: You can answer.
11      BY MR. FLEISCHER:
12  Q  Yes. In fact, you should.
13  A  Yes.
14  Q  So I've got it right?
15  A  (Witness nods head.)
16  Q  Is that right?
17  A  Yes.
18  Q  Okay. Would you look at paragraph
19  number 22 of Exhibit 1, please?
20  A  (Witness complies.)
21  Q  I'm going to read it aloud. Quote,
22  Defendant treated Plaintiff differently from

Page 48

1  similarly-situated white employees in their
2  assignments and performance evaluation criteria,
3  closed quote.
4      Are you saying anything different here
5  from what we've already talked about?
6  A  No.
7  Q  Okay. So whatever you're saying here,
8  we've already covered?
9  A  Yes.
10  Q  Okay. Look at 27, please.
11  A  (Witness complies.)
12  Q  You refer there to expressing concerns
13  about racial bias and discrimination against
14  Plaintiff and African-American volunteer trainers.
15      It's the same question that I asked you
16  before. Are you saying anything different here from
17  what we've already talked about?
18  A  Different from what?
19  Q  From what you've just told me about.
20  In terms of trainers, we've talked about Dr. Trent,
21  we've talked about Ms. Scott, and we've talked about
22  Mr. Terry.

Page 49

1  A  No, we didn't talk about Mr. Terry and
2  Ms. Scott.
3  Q  Well, we've mentioned them.
4     Is there anybody else -- any other
5  trainer that you're referring to here?
6  A  No.
7  Q  Okay. Paragraph 29, please, of
8  Exhibit 1 -- I'm going to ask you about that later.
9     Would you look at paragraph 37, please?
10 A  (Witness complies.)
11 Q  Paragraph 27 (sic) says --
12    MR. TEMPLE: 37?
13    BY MR. FLEISCHER:
14 Q  37 -- I beg your pardon -- says that
15 the Defendant failed to enforce policies of
16 nondiscrimination and nonretaliation.
17    Are you referring to the policies that
18 are in WCA's personnel handbook? Is that what
19 you're referring to?
20 A  Yes.
21 Q  If you look a little further down that
22 page, you are requesting compensatory damages in the

Page 50

1  amount of $250,000.
2     Can you tell me what that 250 consists
3  of?
4     MR. TEMPLE: It says in excess of.
5     BY MR. FLEISCHER:
6  Q  Okay. Can you tell me what your damage
7  claim consists of? How do you get to that number?
8     MR. TEMPLE: Objection.
9     THE WITNESS: I lost my job --
10    BY MR. FLEISCHER:
11 Q  So salary would be part of it?
12 A  -- I depleted all my resources, I lost
13 my benefits, my health insurance.
14 Q  So we have salary and benefits.
15    Anything else?
16 A  My ability to pay bills, my credit
17 rating, all manner of things were threatened and
18 damaged as a result of this.
19 Q  Anything else?
20 A  Isn't that enough?
21 Q  It may be, but is there anything else?
22 A  Forgive me. This just makes me angry.

Page 51

1  My professional credibility was
2  damaged.
3  Q  Anything else?
4  A  That's enough.
5  Q  Okay.
6     MR. TEMPLE: Can we take a five-minute
7  break?
8     MR. FLEISCHER: Sure.
9     (Recess taken 11:32-11:40.)
10    BY MR. FLEISCHER:
11 Q  Ms. Ransom, would you look at
12 Exhibit 4, please?
13 A  (Witness complies.)
14 Q  Have you seen that before today?
15 A  This is the Complaint?
16 Q  No. It's a filing that your attorneys
17 were required to make in court as part of the
18 process of this case.
19 A  Yes.
20 Q  You've seen it before today?
21 A  (No response.)
22 Q  You've seen it before today?

Page 52

1  A  Yes.
2  Q  If you turn to page 2, you identify
3  Ms. Scott as having personal knowledge of being
4  subjected to racial stereotyping and discrimination
5  when she visited Defendant's facility.
6     Tell me what you know about that.
7  A  The situation?
8  Q  Yes, ma'am.
9  A  I invited Carlottia Scott -- I asked
10 her if she would be willing to provide training. I
11 think -- I can't recall what the exact training was
12 for that particular workshop, but it was around
13 understanding the government, advocacy, et cetera,
14 for pro bono complimentary training, and she agreed
15 to do so.
16    I asked her to come in and meet with
17 Arminda, because Arminda oversees the training
18 component, and we met. We had a very productive
19 meeting. And toward the end of the meeting, not
20 quite the end, we had some things to wrap up, and
21 Arminda needed to step away for a moment and somehow
22 I had to give something to Betsy. I remember having

Page 53

1 to take something to Betsy, and Carlottia needed to
2 use the rest room.
3      I went to Betsy's office and did
4 whatever I needed to do there very briefly and came
5 back, and Carlottia was in the room where we left
6 her but she was enraged. That would not be too mild
7 a term. She was enraged. And I'm asking her what's
8 wrong, and she tells me that she was confronted in
9 the hallway of our office by my colleague, Jeremy
10 Baird.
11   Q   Did she use his name?
12   A   I don't recall. I don't recall.
13   Q   Well, I'm going to ask you in a minute
14 how you found out it was Mr. Baird, but go ahead.
15 Continue describing the incident, please.
16   A   She said that she was confronted by a
17 young man who came out of an office that was next to
18 my office, because she knew where my office was.
19 And by the description she gave, it was Jeremy's
20 office.
21      She said that he confronted her and
22 wanted to know who she was and what she was doing in

Page 54

1 the hallway, and that if she was supposed -- if she
2 was there to do some training, that she's supposed
3 to use another entrance and she's not supposed to
4 come through this office.
5      I don't know -- I did not witness the
6 conversation, but it was enough to have just set her
7 off, because she said it was so racially
8 inflammatory that she had to consider -- reconsider
9 doing the training for us.
10      I apologized profusely and Arminda
11 apologized profusely. We didn't know what had
12 occurred, but we knew that -- I've known Carlottia
13 for many, many years, and there was no way that --
14 to go to the ladies room and come back in that short
15 period of time, it was just thoroughly upsetting,
16 and she was upset. It took us fifteen minutes to
17 just calm her down.
18      Because the training component fell
19 under Arminda's department, she, I believe,
20 approached Betsy about it. I wanted to do it, and
21 she said, "Well, no. This falls under my
22 department, so I should do it. That would be the

Page 55

1 appropriate protocol."
2      But I was embarrassed, because when you
3 bring somebody into your organization to provide a
4 service and they agree to provide a service that
5 they would normally receive a hefty fee for for free
6 and they are treated in an abominable fashion,
7 there's no excuse for that.
8   Q   Did you discuss this incident with
9 Mr. Baird?
10   A   I did not.
11   Q   Did you discuss it with Mr. Kost?
12   A   I did.
13   Q   Tell me what you said to Mr. Kost.
14   A   I described the situation, which I
15 believe he was well aware of.
16   Q   Why did you believe that?
17   A   When I left --
18      MR. TEMPLE: Hang on. Did you finish
19 the first question before you interrupted?
20      MR. FLEISCHER: I don't know.
21      MR. TEMPLE: I think you have to let
22 her finish.

Page 56

1      BY MR. FLEISCHER:
2   Q   Okay. Go ahead. I interrupted your
3 answer.
4      THE WITNESS: Would you repeat what I
5 have?
6      (Whereupon, the reporter read back.)
7      THE WITNESS: I described the
8 situation, which I believe he was well aware of when
9 it occurred, and his response was one of, this isn't
10 a big deal. I can't tell you his exact words, but
11 his response was, this isn't a big deal.
12      BY MR. FLEISCHER:
13   Q   Why did you believe he was aware of
14 that?
15   A   When I left the conference room to go
16 to Betsy's office, Jeff was sitting in Jeremy's
17 office. When I came back from Betsy's office, Jeff
18 was still sitting in Jeremy's office. So for that
19 incident to occur in that short period of time, he
20 had to be sitting in Jeremy's office when it
21 happened.
22   Q   Did Mr. Kost suggest that you speak

Page 57

1  with Mr. Baird about it?
2  A  Yes, he did.
3  Q  Did you do that?
4  A  I told him that -- my response to him
5  was that I thought it was inappropriate because I
6  was not his supervisor, and that I would prefer to
7  follow the chain of office protocol, which is why I
8  brought it to him.
9  Q  Is it your belief that Mr. Baird's
10 actions, as they were told to you, were racially
11 motivated?
12 A  Absolutely.
13 Q  And why do you think that?
14 A  An African-American woman with
15 dreadlocks walks in his office that he does not know
16 and that is his initial response to someone, and
17 he's a membership manager?  That was ridiculous.
18 Q  Had Ms. Scott ever been to the
19 Washington Council of Agencies before?
20 A  She had not.
21 Q  Do you know whether she and Mr. Baird
22 had ever met before?

Page 58

1  A  I don't believe they had.
2  Q  All right.  Had she and Mr. Kost ever
3  met before?
4  A  I don't believe they had.
5  Q  Do you know whether Mr. Baird had
6  confronted others whom he did not recognize in the
7  hallway?
8  A  I never heard of a similar incident,
9  but I do know they knew I was meeting with Ms. Scott
10 before she arrived.
11 Q  Would you look at page 3 of Exhibit 4,
12 please?
13 A  (Witness complies.)
14 Q  Under Roman numeral III, it refers to
15 damages in excess of $300,000.
16    Do you see that?
17 A  Yes.
18 Q  Do you know why your damage claim went
19 from in excess of 250,000 in Exhibit 1 to in excess
20 of 300,000 in Exhibit 4?
21    MR. TEMPLE:  It keeps going up.  This
22 was written a month after that.  Now it's 600,000.

Page 59

1    BY MR. FLEISCHER:
2  Q  Is there any reason that you can think
3  of why there was a $50,000 increase?
4  A  I believe my attorneys responded to
5  this.
6  Q  Did anything happen between May 8 of
7  '06 when the Complaint was filed and September of
8  '06 when Exhibit 4 was filed to merit a $50,000
9  increase?  Any events, any damages, any occurrences
10 that would justify the $50,000 increase?
11 A  Would you repeat the question with the
12 dates?
13 Q  Sure.
14    Exhibit 1, the Complaint, was filed on
15 May 8, 2006.  Exhibit 4 was filed on or about
16 September 22, 2006.  Exhibit 1 claims compensatory
17 damages in excess of 250,000.  Exhibit 4 claims
18 compensatory damages in excess of 300,000.
19    Did anything happen between those two
20 filings to justify a $50,000 increase?
21 A  The fact that this is happening at
22 all.  I believe I've responded to this.

Page 60

1  Q  You can't tell me of any specific event
2  that occurred between those two dates?
3  A  No.
4  Q  Okay.  I'm going to ask you to look at
5  Exhibit 5, please.
6    MR. TEMPLE:  Thank you.
7    MR. FLEISCHER:  Off the record.
8    (Discussion off the record.)
9    BY MR. FLEISCHER:
10 Q  Can you identify Exhibit 5, Ms. Ransom,
11 as responses to discovery requests that were
12 submitted on your behalf?
13 A  Yes.
14 Q  You've seen this before today?
15 A  Yes.
16 Q  And is it your signature on page 17,
17 the last page?
18 A  Yes.
19 Q  Okay.  Would you turn to page 4,
20 please, of Exhibit 5?
21 A  (Witness complies.)
22 Q  If you look at answer to Interrogatory

15 (Pages 57 to 60)

Page 61

1  Number 2 -- it's about three quarters of the way
2  down the page -- do you see that?
3      A   Yes.
4      Q   All right.  In there, you're telling us
5  that you kept an electronic appointment book which
6  was maintained on Defendant's computers and that you
7  are currently searching for any other documents in
8  your possession that may reflect your work-related
9  appointments.
10         Have you found any other documents?
11     A   I have not.
12     Q   Okay.  Is it fair to say that -- and
13 I'm going to show you this in a minute
14 (indicating) -- Exhibit 6, which your attorney
15 produced, is the only calendar that you found?
16     A   Yes.
17     Q   Okay.  Let me ask you about Exhibit 6,
18 please.  It looks like a Microsoft Outlook calendar;
19 is that accurate?
20     A   Yes.
21     Q   And this is a calendar that you kept
22 for yourself?

Page 62

1      A   Yes.
2      Q   What computer did you keep it on?
3      A   The computer in my office.
4      Q   You started on September 8, and it has
5  entries beginning on September 1.
6          How did it come to have entries before
7  you actually started at the job?
8      A   I believe this was the computer of my
9  predecessor.  It wasn't a new computer when I
10 received it.
11     Q   Who was your predecessor?
12     A   Phyllis Campbell Newsome.
13     Q   When did she die; do you know?
14     A   I can't remember the year.  I remember
15 it was around Christmas a year and a half before I
16 came, I think.
17     Q   Well, the entries that are on Exhibit 6
18 between September 1 and September 5, did you put
19 those entries in?
20     A   They were automatically logged in.  I
21 think they're on a loop, because they were there
22 when I got there.

Page 63

1      Q   Okay.  Tell me what you used the
2  calendar for.  Obviously, it was for appointments.
3  Did you put all of your appointments in?  Just tell
4  me the scope of what this calendar reflects.
5      A   No, I did not put all of my
6  appointments in this calendar.  The majority of them
7  I put in this calendar.
8      Q   Obviously, they would be appointments
9  for your work for Washington Council of Agencies?
10     A   That's correct.
11     Q   Would they be appointments both in the
12 office and out of the office?
13     A   Several, yes.
14     Q   What criteria did you use in deciding
15 whether to put an appointment on the calendar or not
16 put an appointment on the calendar?
17     A   Generally speaking, if I had to
18 schedule a staff meeting, I wanted to put that on
19 the calendar so that if another opportunity came up
20 to meet with a nonprofit or elected official, I
21 didn't conflict.  If I was on the phone or maybe out
22 of the office, I could at least have this printout

Page 64

1  and say, oh, I have something at that time, and it
2  kept me on schedule with what was going on in the
3  office, be it a board meeting a staff meeting.  They
4  were little ticklers to remind me of things to
5  check.
6      Q   Well, what I'm trying to understand --
7  I think you said a moment ago that this calendar
8  reflects most, but not all, of your appointments?
9      A   That's correct.
10     Q   What appointments didn't you put in
11 here?
12     A   Maybe a nonprofit I was trying to meet
13 with that would call and say, can we meet in the
14 morning, and it's 4:00 in the afternoon.  Sure, I
15 can meet at such and such time.  It didn't make the
16 calendar.  I just went to the meeting.
17     Q   Okay.  So there wasn't a specific
18 category of appointment you didn't put in?  It was
19 just an appointment that popped up at the last
20 minute, typically, that didn't make it to the
21 calendar?
22     A   That didn't necessarily make it to the

Page 65

1  calendar.
2  Q  Okay. The copy of Exhibit 6 as it was
3  provided to me ends with April.
4      Do you know, is there -- are there
5  pages for May and June?
6  A  Well, what is here is probably what I
7  had, and I don't have May and June.
8  Q  I take it you did keep the calendar for
9  May?
10 A  What do you mean?
11 Q  You did continue to use Outlook for
12 appointment scheduling during the month of May of
13 2004?
14 A  I don't recall.
15 Q  Ms. Newsome, you replaced her?
16 A  Yes.
17 Q  What was her race; do you know?
18 A  She was African-American.
19 Q  Okay. Had you ever met her?
20 A  Yes.
21 Q  Under what circumstance?
22 A  She used to work on Capitol Hill.

Page 66

1  Q  Who did she work for?
2  A  Albert Wynn.
3  Q  And you were at that time working for
4  whom?
5  A  I can't recall if I was still on the
6  Hill or not.
7  Q  Go back to Exhibit 5, please. If we
8  look at page 5, Interrogatory Number 6, I ask about
9  whether you've been self-employed, and your answer
10 is -- I'm not going to read the whole thing --
11 Plaintiff states that she has been self-employed
12 between September 2004 and the date of service of
13 these interrogatories.
14     Is the self-employment the work you do
15 under the trade name The Ransom Group?
16 A  Yes.
17 Q  When did you form The Ransom Group or
18 when did you start doing business under that name?
19 A  I believe it was November 2001.
20 Q  Tell me what The Ransom Group does,
21 please.
22 A  It's a public policy and public

Page 67

1  relations consulting firm, government affairs
2  consulting work.
3  Q  Give me an example of the kinds of
4  clients you do work for.
5  A  Some nonprofits. It varies. It
6  varies.
7  Q  You say you started it in 2002, did you
8  say?
9  A  2001.
10 Q  I beg your pardon, 2001.
11     Can you give me an idea of the revenues
12 that you have generated for each of the years 2001
13 and so forth? Let's start with 2001.
14 A  I'm not comfortable with that.
15 Q  You're not comfortable in what respect?
16 A  I think that that's a confidential
17 matter between me and my clients.
18 Q  I'm not going to ask -- I'm not going
19 to ask you about specific clients. I just want an
20 overall revenue figure.
21 A  I'm not comfortable with that.
22     MR. TEMPLE: Can I talk to her for a

Page 68

1  minute?
2      MR. FLEISCHER: Yes.
3      (Recess taken 12:05-12:08.)
4      BY MR. FLEISCHER:
5  Q  Ms. Ransom, can you give me an idea,
6  please, of the revenues generated by The Ransom
7  Group or by you trading as The Ransom Group in each
8  of the calendar years 2001 and so forth? Let's
9  start with 2001, please.
10 A  It was a start-up business, so it
11 wasn't as if I made a lot of money at all.
12 Q  Okay.
13 A  Very little money.
14     I think -- and I started it part time.
15 So the first few years, maybe around $5,000. It
16 varied.
17 Q  Each year?
18 A  It varied, but I don't think more than
19 that.
20 Q  Let's talk about 2002. You would
21 estimate roughly $5,000 in gross revenues for that
22 year?

Page 69

1  A  I would estimate no more than ten.
2  Q  Okay. About how many hours did you
3  devote to The Ransom Group business during 2002?
4  A  Honestly, I don't recall. That was
5  some time ago.
6  Q  Okay. Let's turn to 2003.
7  Approximately what were the revenues -- when I say
8  revenues, I don't mean the net profit. I mean the
9  dollar amount of the cash coming in. Obviously, you
10 have expenses, but I'm talking about revenues.
11     What were the revenues in 2003?
12 A  They -- they were very light. They
13 varied. Again, I can't recall. That was three
14 years ago. I just can't recall.
15 Q  Okay.
16 A  It wasn't a significant amount.
17 Q  Somewhere between 5,000 and 10,000?
18 A  That would be safe to say.
19 Q  Okay. Approximately how many hours did
20 you devote to that business during 2003?
21 A  Probably quite a bit, because I took on
22 clients that had a problem paying, and that became

Page 70

1  challenging.
2  Q  So you did a lot of work and made a
3  little. I know the problem.
4     Let's shift to 2004. Same question,
5  revenues and hours?
6  A  I really didn't take on clients, if I'm
7  getting my years correct, because I had taken on
8  this position at WCA. So I didn't do any client
9  work, because my focus and my energies were working
10 with WCA.
11 Q  Well, let me place this in time. My
12 understanding is that you were an employee of WCA
13 from September of 2003 until June of 2004.
14 A  Uh-huh.
15 Q  Does that sound right?
16 A  That's right.
17 Q  During that period, was The Ransom
18 Group active at all?
19 A  Virtually not, no.
20 Q  Okay. During that period, did you
21 devote any hours to Ransom Group business?
22 A  Practically none, no.

Page 71

1  Q  Okay. When you say practically none,
2  give me your best estimate of the hours you
3  devoted.
4  A  I think I did a very small speech for a
5  client, a couple hours.
6  Q  And that was it?
7  A  That was it.
8  Q  Okay. And the revenues earned during
9  that period?
10 A  Less than $1,000.
11 Q  Okay. Would you turn to page 9 of
12 Exhibit 5, please?
13 A  (Witness complies.)
14 Q  In Interrogatory Number 18, I ask about
15 physical therapy, and you answered that you were
16 receiving physical therapy in 2003 and/or 2004. And
17 you say that you are currently locating records that
18 indicate the dates of your therapy sessions.
19     Have you located those records?
20 A  I placed a call to the physical
21 therapist and asked them to put something together.
22 I just have not received it yet.

Page 72

1  Q  What was the nature of the therapy?
2  What part of your body was being treated?
3  A  Neck and back.
4  Q  When did you start that physical
5  therapy?
6  A  I don't remember the exact -- actually,
7  I don't -- I remember going to physical therapy and
8  I remember that it was cold. I remember that, but I
9  can't give you the dates right now.
10 Q  Was it before you started with WCA?
11 A  No.
12 Q  It was while you were employed at WCA?
13 A  Yes.
14 Q  What event, if any, occurred which
15 prompted you to start physical therapy?
16 A  I woke up in pain one day and stiffness
17 and realized I had been eating Advil for about two
18 or three weeks and thought that was a problem.
19 Q  Okay. The Advil was the problem or the
20 Advil was --
21 A  No. I thought that the fact that I was
22 taking it to address the pain and I couldn't figure

Case 1:06-cv-00843-RMC    Document 13-3    Filed 03/27/2007    Page 20 of 20

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 73

1  out where it was coming from was the problem.
2      Q    And what then did you do? Did you see
3  a physician?
4      A    I did.
5      Q    Who was that?
6      A    Dr. Towana Spriggs.
7      Q    Where is Dr. Spriggs located?
8      A    In Silver Spring.
9      Q    What is his specialty?
10     A    Her specialty.
11     Q    What is her specialty?
12     A    She's an internist.
13     Q    And what did she tell you was wrong?
14     A    She thought that I needed to go to
15 physical therapy and made arrangements for me to do
16 so.
17     Q    Is it a therapy center or an individual
18 therapist you were seeing?
19     A    It's a therapy center in Silver
20 Spring. I had an individual therapist, yes.
21     Q    But what's the name of the center?
22     A    I can't remember what it's called. I

Page 74

1  can see it, but I can't remember the name. But I
2  can tell you who owns it is a gentleman named Ed
3  Lee. It's in Silver Spring and it's a physical
4  therapy center.
5      Q    What is the name of your physical
6  therapist?
7      A    I can't remember his name. I can't
8  remember his name.
9      Q    Are you still undergoing physical
10 therapy?
11     A    I am not.
12     Q    When did you stop?
13     A    I stopped while I was at WCA.
14     Q    Okay. So sometime during the period of
15 your employment there, you started and then stopped
16 physical therapy?
17     A    That's correct.
18     Q    Approximately how long did the therapy
19 last? How many months were you in therapy?
20     A    I'm not sure. Four weeks, maybe five,
21 something like that.
22     Q    Did it do the trick?

Page 75

1      MR. TEMPLE: Objection. Form.
2      BY MR. FLEISCHER:
3      Q    Did it cure your back and neck
4  problem?
5      A    It helped greatly.
6      MR. FLEISCHER: I'm sorry, I was a
7  little colloquial there.
8      BY MR. FLEISCHER:
9      Q    How often did you go to therapy?
10     A    I think it was once or twice a week.
11     Q    And how long were the sessions?
12     A    They were two to three hours.
13     Q    If you would turn to page 10, please,
14 of Exhibit 5, beginning on page 10 and the following
15 pages are a list of documents that I requested and
16 your attorney's response to my request.
17     I'm going to start with number 2. I
18 asked for transcripts, certificates, degrees, and
19 diplomas relating to post-secondary education.
20     Have you produced everything in that
21 category that you're aware of?
22     A    Everything that I have, yes.

Page 76

1      Q    Number 4, applications for employment
2  at any time after September 2003, have you produced
3  everything that you're aware of?
4      A    Yes.
5      Q    Number 5, written employment offers,
6  and your response is, "Plaintiff is in the process
7  of locating any written employment offers she may
8  have received. If any such documents exist, they
9  will be produced in a supplemental production."
10     Have you found any employment offers?
11     A    Not at this time.
12     Q    All right. Let me just get a little
13 history here. You were terminated on June 15 of
14 2004?
15     A    Uh-huh.
16     Q    I'm sorry, you have to say yes.
17     A    Yes. I'm sorry. I apologize.
18     Q    Prior to that time while you were an
19 employee of WCA, had you begun a job search?
20     A    I had not.
21     Q    After your termination, did you begin a
22 job search?