**Page 77**

```
 1      A    Not immediately. I was so traumatized
 2  by this, no. It was not -- I needed to regroup. I
 3  was not expecting this.
 4      Q    When did you begin a job search?
 5      A    I would imagine later in the summer,
 6  maybe, but I can't tell you when. I don't know.
 7      Q    Okay. How did you go about searching
 8  for work?
 9      A    Through the normal channels. I went
10  through the paper, I looked on the Internet, I got
11  on the phone and started calling colleagues and
12  friends.
13      Q    Did you secure any interviews?
14      A    Yes.
15      Q    When was your first interview?
16      A    Oh, I don't recall.
17      Q    Who was it with?
18      A    I think it was with the Federal Home
19  Loan Bank.
20      Q    What happened to that?
21      A    There were a series of interviews.
22      Q    At Federal Home Loan Bank?
```

**Page 78**

```
 1      A    Uh-huh.
 2      Q    Did you ultimately receive an offer?
 3      A    I did not.
 4      Q    Who else did you interview with?
 5      A    I'm not sure of the exact title, but I
 6  want to say the Interfaith Alliance. I think that's
 7  the name of the organization.
 8      Q    When was that interview?
 9      A    I remember it was cold, but I can't
10  tell you the date. I remember it was chilly
11  outside, so I'm thinking weather in terms of time
12  and months.
13      Q    The fall --
14      A    I would say the fall, yes. It wasn't
15  winter.
16      Q    -- of 2004?
17      A    Yes.
18      Q    What happened with that prospect?
19      A    I had a series of interviews and was
20  not made an offer.
21      Q    Okay. Who else did you interview with?
22      A    I don't believe I had another interview
```

**Page 79**

```
 1  until the spring of the following year.
 2      Q    And that was with whom?
 3      A    My employer.
 4      Q    How many interviews did you have with
 5  your employer?
 6      A    Two.
 7      Q    And then you received an offer?
 8      A    Yes, I did.
 9      Q    When did you receive the offer?
10      A    I think it was late May.
11      Q    That would be of 2005?
12      A    Uh-huh.
13      Q    And you started there when?
14      A    Early June.
15      Q    You were on unemployment for a while?
16      A    Yes.
17      Q    During what period were you receiving
18  unemployment?
19      A    Through the period of -- from the time
20  I left Washington Council of Agencies until I
21  exhausted my benefits.
22      Q    Six months?
```

**Page 80**

```
 1      A    Yes.
 2      Q    Was The Ransom Group active between
 3  your termination from WCA and your being hired by
 4  your present employer?
 5      A    Yes.
 6      Q    Approximately what was its revenues
 7  during that period of time? That's June 15, '04
 8  until June of '05, so approximately a year.
 9      A    Well, it wasn't a year for me, because
10  it took me quite a few months to calm down and
11  refocus and be emotionally stable enough to be able
12  to go back out and work to recruit clients. So I
13  would say more like the winter and spring of 2005.
14      Q    All right. So between June 15 of 2004
15  and, let's say, January of 2005, The Ransom Group
16  was not active?
17      A    Yes, it was. I had one client at that
18  time.
19      Q    When did you secure that client?
20      A    Late fall. It was a last-minute
21  client.
22      Q    A last-minute client, did you say?
```

Page 81

1  A  Yes.
2  Q  When did you start seeking clients
3  after your termination from WCA?
4  A  I got on the phone and called as many
5  people as I could as soon as the situation
6  occurred. So in terms of seeking clients, I started
7  in July.
8  Q  All right. You told me a moment ago --
9  and I understand what you're saying, or I think I
10 understand -- that you were upset --
11 A  Yes.
12 Q  -- and you needed to settle down and
13 prepare yourself to go back out into the world, as
14 it were?
15 A  Well, understand that I didn't take on
16 any clients while I was at WCA, and any clients that
17 I would have taken on, I didn't. So I had kind of
18 put the company to bed for a minute. And had I
19 known that I was going to have this experience, I
20 would have maintained a client base, but I didn't,
21 so it forced me to regroup.
22     So to have to go back out into the

Page 82

1  world and tell people, oh, I'm no longer working but
2  I'm going to pick up clients again meant that folks
3  then had to become comfortable with me in terms of
4  my ability to be stable in providing consulting
5  work. So while I was on the phone saying I'm
6  looking for work, that doesn't necessarily mean I
7  received it.
8  Q  Okay. So you started that in July --
9  A  Yes.
10 Q  -- of 2004?
11 A  Yes.
12 Q  And you picked up a last-minute client
13 in the fall of 2004?
14 A  Yes.
15 Q  And then you started actively engaging
16 in business --
17 A  Yes.
18 Q  -- sometime in January of 2005?
19 A  Yes.
20 Q  Okay.
21 A  January, February, yes.
22 Q  You went to work for your present

Page 83

1  employer in June of 2005?
2  A  That's correct.
3  Q  What has since happened to The Ransom
4  Group?
5  A  The Ransom Group is -- has not taken on
6  any clients of late.
7  Q  So it's back on hold again?
8  A  It's back on hold again because of the
9  nature of the work that I do and the amount of
10 travel that I do.
11 Q  During the period when you were job
12 searching, did you incur any expenses associated
13 with your searching?
14 A  Printing, postage, those types of
15 expenses.
16 Q  Printing of resumes?
17 A  Yes.
18 Q  Mailing of resumes?
19 A  Yes.
20 Q  Anything else?
21 A  Maintaining my Internet service to be
22 able to search and transportation back and forth.

Page 84

1  General costs associated with a job search.
2  Q  All right. Let's try to quantify
3  those, please. Printing, can you give me an
4  estimate?
5  A  I cannot. I can't tell you what I
6  spent.
7  Q  Would it be under $100?
8  A  Oh, no.
9  Q  Over $100?
10 A  Yes.
11 Q  Under $500?
12 A  Maybe.
13 Q  All right. Well, let's say $500.
14    How about postage?
15 A  Maybe a couple hundred dollars.
16 Q  Internet service, what's that, $20 a
17 month?
18 A  No. Internet service runs you about
19 $60 a month.
20 Q  $60, okay.
21    So roughly $600, $700 in Internet
22 service?

Page 85

1  A   That would be about right.
2  Q   Okay. Do you use Internet service
3  personally as well? Do you use it for personal
4  matters?
5  A   Yes.
6  Q   Mileage, any sense of the number of
7  miles?
8  A   I did job search in the District and in
9  Baltimore. I live in Bowie. Each is approximately
10 30 miles one way, so --
11 Q   These would be driving to interviews?
12 A   They would be job fairs or anything
13 that opened up an opportunity for me to seek
14 employment. I can't give you a quantitative number
15 because I don't know.
16 Q   Any other expenses associated with job
17 searching?
18 A   Standard dry cleaning, making sure you
19 have a proper appearance so you can interview.
20 Q   Can you put a dollar amount on that?
21 A   $30, $40 a week if you were going to --
22 if I were going to do that. I would say per month,

Page 86

1  maybe $60 a month in dry cleaning.
2  Q   So maybe another $600 --
3  A   Yes.
4  Q   -- in dry cleaning?
5  A   Uh-huh.
6  Q   Any other expenses associated with your
7  job search?
8  A   Women have different needs for job
9  searches than men do, so we have cosmetic needs,
10 however you want to define that.
11 Q   I'm glad they do.
12     Can you give me a dollar amount?
13 A   I cannot.
14 Q   200? 500?
15 A   It costs $100 to get your hair done.
16 Q   Women certainly do have different
17 needs.
18     $1,000?
19 A   That would be reasonable.
20 Q   All right. Any other expenses
21 associated with job searching?
22 A   Not that I can think of at this

Page 87

1  moment.
2  Q   All right. On page 11 of Exhibit 5, I
3  asked for copies of bills, invoices, canceled
4  checks, and other documents evidencing or relating
5  to expenses incurred in searching for employment,
6  and you say that you're currently locating documents
7  that may be responsive.
8      Have you located any documents?
9  A   I have not.
10 Q   In number 12, I asked for federal
11 income tax returns for 2003, 2004, and 2005. I
12 believe you produced 2005 for me, but I haven't seen
13 2003 or 2004.
14     Do you have those available?
15 A   I don't have access to them. My
16 accountant actually has them, but he has been on
17 travel, so I'm waiting for him to return so that I
18 can get them and turn them in.
19 Q   Okay.
20     MR. TEMPLE: What number was that?
21     MR. FLEISCHER: That was request
22 number --

Page 88

1      MR. TEMPLE: 12?
2      MR. FLEISCHER: 12, yes.
3      BY MR. FLEISCHER:
4  Q   Who is your accountant?
5  A   Huh?
6  Q   Who is your accountant?
7  A   Jonathan Nesbitt.
8  Q   N-e-s-b-i-t?
9  A   b-i-t-t.
10 Q   Where is he located?
11 A   In Prince George's County, Maryland.
12 Q   In what town?
13 A   Mitchellville.
14 Q   Are you claiming, Ms. Ransom, that the
15 physical therapy that you underwent was related to
16 discrimination you suffered at Washington Council of
17 Agencies?
18 A   Yes, I am.
19 Q   Can you put a dollar amount on the cost
20 of that therapy?
21 A   I can provide you with the cost of that
22 therapy once I receive the information from the

Page 89

1  center.
2  Q  Have you incurred any other medical
3  expenses that you claim were the result of
4  discrimination you suffered at Washington Council of
5  Agencies?
6  A  Not that I can recall, no.
7  Q  Other than the documents that you have
8  already produced for me and the ones you promise to
9  produce, do you have any other documentation that
10 supports the dollar amount that you're claiming in
11 this lawsuit?
12 A  No.
13 Q  The meeting that you had with Mr. Kost
14 in November or December of 2003 at which he told you
15 that you were doing just fine and so forth, is that
16 on your calendar?
17 A  It wasn't a meeting.
18 Q  Okay.  Tell me how it came about.  Was
19 it just a casual encounter?
20 A  It was a casual encounter.  I
21 approached him and asked him what I needed to do to
22 prepare for my probationary evaluation, and I

Page 90

1  believe we were standing in the hallway when he
2  said, "Oh, you don't have anything to worry about.
3  You're fine.  You don't have anything to worry
4  about."
5  Q  Would you look, please, at Exhibit 7?
6  A  (Witness complies.)
7  Q  Is this a copy of the resume you were
8  using when you were interviewing with Washington
9  Council of Agencies?
10 A  Yes, it is.
11 Q  Was it accurate at that time?
12 A  Yes, it was.
13 Q  If I'm reading this correctly, you were
14 with the National Congress for Community Economic
15 Development from October of '95 through February of
16 2002?
17 A  That's correct.
18 Q  Why did you leave them?
19 A  The organization downsized
20 considerably.
21 Q  Who was your immediate supervisor at
22 the time you left them?

Page 91

1  A  Roy Priest.
2  Q  P-r-i-e-s-t?
3  A  Yes.
4  Q  Do you know where he is?
5  A  I believe he's retired.  The
6  organization has since folded.
7  Q  Working backwards, you were with
8  Congressman Olver --
9  A  Olver.
10 Q  Olver?
11 A  Uh-huh.  Yes.
12 Q  -- from 2003 to 2005 (sic)?
13 A  That's correct.
14 Q  And why did you leave the congressman?
15 A  Because the House had a change in
16 leadership, and the congressman sat on a committee
17 that -- he sat on the Appropriations Committee.  And
18 rather than hire one appropriations staff person, he
19 dispersed the appropriations staff budget throughout
20 the staff.
21     So when the leadership changed, he took
22 a budget cut for his staff budget, and I was offered

Page 92

1  an opportunity to stay on part time, but financially
2  that would not have been a good move for me.
3     MR. TEMPLE:  Where are you referring to
4  on this question?
5     MR. FLEISCHER:  This would be the
6  second page of Exhibit 7.
7     MR. TEMPLE:  Did you say 2000?
8     MR. FLEISCHER:  1993 to 1995.
9     MR. TEMPLE:  All right.  That was just
10 for clarification.
11    MR. FLEISCHER:  I may have misspoke,
12 but that's what this says here.
13    MR. TEMPLE:  If we're going for another
14 hour, I need to take a break.
15    MR. FLEISCHER:  Sure.
16    (Whereupon, at 12:40 p.m., the
17    deposition in the above-entitled matter
18    was temporarily recessed to reconvene
19    at 1:15 p.m. this same day.)
20
21
22

Page 93

1      AFTERNOON SESSION
2      (1:32 p.m.)
3      BY MR. FLEISCHER:
4    Q  We were looking at Exhibit 7,
5  Ms. Ransom.
6    A  Uh-huh.
7    Q  What did you do between the time you
8  left the National Congress for Community Economic
9  Development and your being hired by the Washington
10 Council of Agencies?  It looks to me -- let me
11 just --
12   A  I want to make sure -- that really
13 wasn't the question we stopped on.
14   Q  I know it wasn't.
15   A  Oh, okay.
16   Q  It looks like there's a gap from
17 February of '02 to September of '03, about a year
18 and a half?
19   A  That's right.
20   Q  What did you do during that year and a
21 half?
22   A  I took a little time off to do some

Page 94

1  work with the Democratic party.
2    Q  Volunteer work?
3    A  I was elected to the Democratic Central
4  Committee at that time and was actively involved in
5  the Democratic politics with the state.
6    Q  The state of Maryland?
7    A  Uh-huh.
8    Q  Is that on your resume?  Is it here?
9    A  It is in my resume, but it's just
10 listed under Public Offices Held, Elected and
11 Appointed.
12   Q  Was that compensated work --
13   A  No, it wasn't.
14   Q  -- or volunteer?
15   A  No, it wasn't.
16   Q  Did you have any sources of income?
17   A  I was married at the time.
18   Q  I see.
19     (Discussion off the record.)
20     BY MR. FLEISCHER:
21   Q  I think I was asking you about
22 Congressman Olver and why you left him, and I think

Page 95

1  you answered that.
2      Before that, you were with Congressman
3  Waters for --
4    A  Actually, I want to correct the dates.
5  I was with John Olver from 1992 to 1995.
6      (Discussion off the record.)
7      BY MR. FLEISCHER:
8    Q  Okay.  We've got that correction.
9      Now, Congressman Waters, you were with
10 her for a year and a couple of months?
11   A  That's correct.
12   Q  Why did you leave her?
13   A  Because I had an opportunity to work
14 for Congressman Olver.
15   Q  And why was that desirable?
16   A  Because he was a Massachusetts member
17 and not a California member, because I have a
18 personal relationship with Congresswoman Waters and
19 my agreement was to help her as she got into her
20 first year of office, and because I wanted to stay
21 as closely related to the committee that Congressman
22 Olver was on at the time, the Education and Labor

Page 96

1  Committee.
2    Q  What is your relationship with
3  Congressman Waters?
4    A  She's a family friend.
5    Q  All right.  And then before that, you
6  were with Congressman Hawkins?
7    A  That's correct.
8    Q  You were with him for nine years?
9    A  That's correct.
10   Q  All right.  And why did you leave him?
11   A  Because he retired.
12   Q  Okay.  Let me ask you about your
13 education.
14     Where did you go to high school?
15   A  I went to Bethesda-Chevy Chase High
16 School and John F. Kennedy High School in Montgomery
17 County, Maryland.
18   Q  And you have a high school degree?
19   A  I do.
20   Q  How about secondary -- post-secondary
21 education?
22   A  I'm completing my post-secondary

**Page 97**

1  education.
2  Q  Where are you doing that?
3  A  At the University of Maryland
4  University College.
5  Q  Are you in a degree program?
6  A  I am.
7  Q  What degree are you seeking?
8  A  Bachelor of science.
9  Q  Any particular specialty?
10 A  Government.
11 Q  When do you expect to have that?
12 A  As soon as time and money allow.
13 Q  How close are you?
14 A  A year.
15 Q  If you were going full time?
16 A  I would be done in a year.
17 Q  Let me ask you to look at Exhibit 8,
18 please.
19 A  Okay.
20 Q  Can you identify Exhibit 8 as a later
21 resume?
22 A  Yes.

**Page 98**

1  Q  When did you prepare this?
2  A  I don't recall. After joining WCA.
3  Q  Did you prepare it while you were still
4  there?
5  A  Probably.
6  Q  Did you have use of a current resume in
7  connection with your duties for WCA?
8      MR. TEMPLE: Objection. Form.
9      THE WITNESS: No.
10     BY MR. FLEISCHER:
11 Q  All right. I'm curious why you
12 prepared a resume while you were working at WCA.
13 A  To update whatever I had available
14 while I was there so I would be current. It just
15 makes it easier.
16 Q  All right. I think you told me earlier
17 that while you were with WCA, you did not do any job
18 searching.
19 A  That's true.
20 Q  Did there come a point during the
21 course of your employment with WCA when you decided
22 that your employment relationship would end one way

**Page 99**

1  or another or it was likely to end one way or
2  another?
3  A  Yes, when they terminated me.
4  Q  Prior to that time, you had no
5  intention of leaving?
6  A  I had no intention of leaving.
7  Q  Prior to that time, were you aware of
8  your -- you reported to -- let me strike that.
9      You reported to Jeff Kost?
10 A  Yes.
11 Q  Prior to your being terminated, did
12 you -- were you aware of any dissatisfaction by Jeff
13 Kost of your job performance?
14 A  Yes.
15 Q  When did you become aware of
16 dissatisfaction?
17 A  In an earlier -- one of the earlier
18 weekly meetings when I learned from Betsy and Jeff
19 that, according to Jeff, I had not been having
20 weekly discussions with him or -- let me strike
21 that -- regular discussions with him about the
22 meetings I had out of the office, and that was not

**Page 100**

1  true.
2      He basically said he didn't know what I
3  was doing, and I knew that was not true, and I
4  realized it was that he didn't understand what I was
5  saying to him in the political relationship as it
6  related to what the nonprofits were sharing with
7  me.
8      So every meeting that I had with Jeff
9  would end in, "Well, we need to discuss this with
10 Betsy," and I realized he could not give me any
11 political counsel whatsoever. But at the same time,
12 he didn't want me to talk to Betsy by myself.
13     And at some point, Betsy said, "Well,
14 you can come and sit and talk with me." So I would
15 talk to her separately and I would talk to Jeff, and
16 then they got together and Betsy was saying that she
17 didn't know what I was doing because Jeff had no
18 idea what I was doing. It wasn't because I wasn't
19 telling him. It was because he didn't understand
20 what I was telling him.
21 Q  And this was during -- this occurred to
22 you that he was dissatisfied with your work in one

Page 101

1  of your weekly meetings?
2  A  Yes.
3  Q  I think we established earlier that
4  those weekly meetings started in or around the
5  middle of March of 2004?
6  A  Yes.
7  Q  Was it one of the earlier weekly
8  meetings, one of the middle weekly meetings, or
9  later? When was it?
10 A  I think it was in the earlier weekly
11 meetings, but I can't be certain.
12 Q  Are there any inaccuracies that you're
13 aware of in Exhibit 8, your later resume?
14 A  Would you define inaccuracy, please?
15 Q  Let me ask the question differently.
16    Is there anything in Exhibit 8 that
17 isn't completely reflective of the facts?
18    MR. TEMPLE: Hold on a second.
19    Objection. Form.
20    THE WITNESS: The only caveat I would
21 say is that while I was tasked to cover Montgomery
22 County, Prince George's County, Maryland, the

Page 102

1  District of Columbia, and the areas of Arlington,
2  Alexandria, and Fairfax, which was part of my job
3  description, I was told by Betsy and Jeff that until
4  I had an assistant that I didn't need to deal with
5  Virginia. So I didn't deal with Virginia, because I
6  waited for an assistant that I didn't receive.
7     BY MR. FLEISCHER:
8  Q  So your focus, as it turned out, was
9  the District of Columbia and Montgomery and Prince
10 George's Counties?
11 A  That's correct.
12 Q  Other than that, is there anything in
13 this resume that is untrue or misleading?
14 A  No.
15 Q  Is there anything that's omitted from
16 this resume that would -- anything that's omitted
17 from this resume?
18 A  A resume is a summary of what you do,
19 so this is a summary of what I do or what I did.
20 Q  All right. Would you look at
21 Exhibit 9, please?
22 A  Uh-huh.

Page 103

1  Q  I will represent to you that this is a
2  collection of all the letters that were produced to
3  me by your attorney directed to prospective
4  employers.
5     Can you identify that as -- are these
6  all the letters that you wrote to prospective
7  employers after your termination by WCA and before
8  your hiring by your current employer?
9  A  This is what I have available.
10 Q  Were there other letters written?
11 A  I sent out several resumes. I didn't
12 keep copies.
13 Q  Do you know approximately how many
14 resumes you sent out?
15 A  Maybe 50.
16 Q  And did you write a cover letter with
17 each of them?
18 A  No.
19 Q  Are these the only prospective
20 employers to whom you actually wrote letters to?
21 A  No.
22 Q  Okay. So there are letters to other

Page 104

1  prospective employers which I do not have; is that
2  right?
3  A  There are -- I don't have copies.
4  These are what I had copies of (indicating).
5  Q  Is there any way to retrieve copies of
6  the other letters you wrote?
7  A  Not that I'm aware of.
8  Q  Approximately how many letters did you
9  write?
10 A  I don't know. I think you're asking me
11 to remember things at an incredibly stressful time
12 when I'm also trying to figure out how I'm going to
13 pay bills and how I'm going to deal with a number of
14 things. So this was incredibly important, as were
15 quite a few other things, and I just don't know.
16 Q  That's a fine answer if that's the
17 answer.
18    Did you generate these letters on a
19 computer?
20 A  Yes.
21 Q  Is it one at home?
22 A  At the time, it was an older computer,

**Page 105**

1  yes.
2  Q  And the other letters that you don't
3  have copies of, did you generate those letters from
4  that same home computer?
5  A  Yes.
6  Q  Have you searched that computer to see
7  whether copies of the letters are there?
8  A  That computer has been disposed of. It
9  was broken. I got rid of it. I got a new computer.
10  Q  Did you write any letters using the new
11  computer?
12  A  No. I didn't purchase the new computer
13  until after I got my new job.
14  Q  Would you look at Exhibit 10, please,
15  for me?
16  A  (Witness complies.)
17  Q  Can you identify this as the offer
18  letter that you received from Washington Council of
19  Agencies?
20  A  This is the offer letter that I
21  received.
22  Q  And the second page is a job

**Page 106**

1  description?
2  A  It is a job description.
3  Q  Is it a description for -- what was
4  your title when you were hired?
5  A  Director of public policy and community
6  relations, and then they included the word advocacy
7  at some point.
8  Q  Your starting salary was 56,000 --
9  A  Yes, it was.
10  Q  -- per year?
11  A  Uh-huh.
12  Q  Did that change while you were there?
13  A  No, it did not.
14  Q  The job description that's attached to
15  page -- attached to Exhibit 10, is that an accurate
16  description of the job as you actually performed
17  it?
18  A  This isn't the same job description.
19  The job description that I received noted that I
20  would have the assistance of a public policy
21  associate.
22  Q  Do you have that -- have you produced

**Page 107**

1  that job description? Do you have it?
2  A  Yes. Actually, I produced it in
3  earlier documentation, so you should have that.
4  Q  All right. Have you seen page 2 before
5  today?
6  A  I believe I saw it around the time of
7  my termination. It was the subject of discussion.
8  Q  All right. If you'll see on page 1 of
9  Exhibit 10, it says, "The job description duties for
10  this position are attached."
11      Was there an attachment to this offer
12  letter when you got it?
13  A  I don't recall.
14  Q  So I take it you also don't recall
15  whether the attachment that I've got attached was
16  the one that came with the offer letter?
17  A  There was a job description that was
18  given to me that included something else. It
19  included the public policy associate in the
20  description that I would be working with and that I
21  would be responsible for hiring.
22  Q  Other than that item, is page 2 of

**Page 108**

1  Exhibit 10 an accurate description of the job as you
2  actually found it?
3      MR. TEMPLE: Objection.
4      THE WITNESS: Having not seen it for
5  three years and knowing that something is omitted, I
6  can't answer that question.
7      BY MR. FLEISCHER:
8  Q  Well, we've taken care of the
9  omission. What I want to know is, other than that,
10  does this describe what you were asked to do when
11  you actually got there?
12  A  Generally, yes, but I can't tell you
13  that this is accurate.
14  Q  Do you see anything that is inaccurate
15  about it other than the omission that you've already
16  told me about?
17  A  I can't speak to this, because there's
18  something about this that's not right, and I can't
19  tell you what it is.
20  Q  When you say you can't tell me what it
21  is, is it because it doesn't jump out at you?
22  A  There's something about it that's off.

Case 1:06-cv-00843-RMC    Document 13-4    Filed 03/27/2007    Page 9 of 14

LISA RANSOM                                              LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                     October 25, 2006

Page 109

1  It doesn't jump out at me, but I know this is not
2  accurate.
3      Q    Were you told at the time you
4  interviewed that a college degree was a
5  prerequisite?
6      A    No.
7      Q    Who interviewed you?
8      A    Jeff Kost initially interviewed me, and
9  then I was interviewed on a second interview by Jeff
10 Kost, Betsy Johnson, and Angela Jones, who is a
11 member of the board of directors.
12     Q    Had you known Ms. Jones prior to that
13 interview?
14     A    I had not.
15     Q    How long was the first interview?
16        MR. TEMPLE:  Objection.
17        MR. FLEISCHER:  Grounds, Counsel?
18        MR. TEMPLE:  Relevance.
19        Go ahead.  You can answer.
20        THE WITNESS:  It was a standard
21 interview time, 30, 45 minutes.
22        BY MR. FLEISCHER:

Page 110

1      Q    And how about the second one?
2      A    Maybe a little longer, because it was
3  three people.
4      Q    In either of the interviews, was your
5  education discussed?
6      A    No.
7      Q    How soon after the second interview
8  were you offered the job?
9      A    It wasn't very long.  I think within
10 that week.
11     Q    And how soon after receiving the offer
12 did you accept it?
13     A    I believe I accepted it the following
14 day, but I'm not sure.  I didn't accept it right
15 away.
16     Q    Would you look at Exhibit 11, please?
17     A    (Witness complies.)
18     Q    Can you identify Exhibit 11 as a copy
19 of WCA's personnel handbook?
20     A    That's what it appears to be, yes.
21     Q    Did you receive a copy of the handbook
22 coincident with you starting your job?

Page 111

1      A    Yes, I did.
2      Q    If you would look at Exhibit 12 for me,
3  please, can you identify that?
4      A    Yes.
5      Q    Is that a receipt for a copy of the
6  handbook?
7      A    Yes, it is.
8      Q    And that's your signature on
9  Exhibit 12?
10     A    Yes, it is.
11     Q    And if you would look at Exhibit 13,
12 please, can you tell me what that is?
13     A    This is an e-mail that I sent to Jeff
14 in response to him forwarding me a letter of
15 employment.
16     Q    Okay.  You say in the e-mail, quote,
17 I've reviewed the manual and will bring the letter
18 and manual form with me on Monday, closed quote.
19        Have you reviewed the manual?
20     A    I have reviewed the manual, yes.
21        (Discussion off the record.)
22        BY MR. FLEISCHER:

Page 112

1      Q    At any time during your tenure at
2  Washington Council of Agencies, have you ever heard
3  Jeff Kost use a racial epithet?
4      A    No.
5      Q    Have you ever heard him make a
6  derogatory remark about African-Americans?
7      A    In my opinion, yes.
8      Q    Tell me about it.
9      A    When I invited him to attend the State
10 of the County brunch for Prince George's County,
11 which was a targeted area where very little outreach
12 had been done, I said, "Jeff, why don't you come
13 with me, because this would be a great opportunity
14 for you to meet county council members, county
15 officials, and funders."
16        And he stood at my door, because Jeff
17 rarely came into my office, and said, "Oh, I'm
18 afraid."
19        And I looked at him and said, "What do
20 you mean?  What are you afraid of?"  No, I said,
21 "What do you mean?"
22        And he said, "I'm afraid."

Page 113

1    What is there to be afraid of, aside
2    from this is a predominantly African-American
3    county. He would not have been afraid to go to
4    Montgomery County, but I took his statement to mean
5    he was afraid to go to Prince George's County
6    because the county executive and the majority of the
7    county council were African-American. What would
8    there be to be afraid of in an area you say you want
9    to target?
10   Q    Did he say anything else in that
11   exchange that you've just described to me?
12   A    No, he didn't. He just walked away.
13   Q    Did you confront him with what you
14   perceived to be racism?
15   A    No, I didn't.
16   Q    Go ahead.
17   A    But this was following the Carlottia
18   Scott incident. And so for me, it was just a
19   pattern of behavior that I -- and it was also
20   following the Billy Terry incident, so it was a
21   pattern of consistent behavior.
22   Q    We haven't talked about the Billy Terry

Page 114

1    incident, but we will.
2         What did Jeff have to do with the
3    Carlottia Scott incident?
4    A    Your earlier comment to me was did I
5    speak to Jeff, and I said I did. And then he asked
6    me to speak to Jeremy, and I said that I thought
7    that was inappropriate protocol because I am not
8    Jeremy's supervisor, which is why I'm going to you
9    with this.
10        So in reporting it, he did nothing at
11   all as it relates to the Carlottia Scott incident.
12   If he is supervising me and I bring in someone that
13   is contributing to my department and he's supposed
14   to have oversight over it and that person is treated
15   poorly and I bring it to his attention and he does
16   nothing, that's a problem.
17   Q    All right. We'll talk about the Terry
18   matter in a bit.
19        You've mentioned Terry, you've
20   mentioned Carlottia Scott, and you've mentioned
21   Mr. Kost telling you that he was afraid to accompany
22   you to Prince George's County?

Page 115

1    A    Uh-huh.
2    Q    Has Mr. Kost, other than those three
3    matters, said or done anything derogatory toward
4    African-Americans in your presence?
5    A    In terms of avoiding them. For
6    instance, Mr. Kost was responsible for development
7    at the Washington Council of Agencies. And during
8    the Empowerment conference, I was able to seat him
9    at a table full of funders, including Freddie Mac,
10   where he was -- I told him, "I've got a seat for you
11   near the Freddie Mac program officer. This will be
12   a great opportunity for you to talk to them."
13        He elected to sit at a table with his
14   colleagues, all white, rather than sit at a table
15   full of funders, but he's responsible for funding
16   and this was an opportunity for him to make inroads
17   to raise money for WCA, which was the purpose of me
18   supporting my supervisor in his role of
19   fund-raising. It just so happened that the program
20   officers for the organizations that were there were
21   African-American.
22   Q    When was this?

Page 116

1    A    This was during the Empowerment
2    conference in June. I want to say June 10th and
3    11th, I think, but I'm not quite sure on the dates.
4    Q    When he said he was afraid to accompany
5    you to Prince George's County, did he say because
6    that county is predominantly African-American?
7    A    I asked him what he meant, and he
8    repeated his statement.
9    Q    Did he say he was afraid because that
10   county is predominantly African-American?
11   A    He did not say that.
12   Q    When you suggested he sit at a
13   particular table and he chose to sit at another
14   table, did he say that he was making that choice
15   because he didn't want to sit with
16   African-Americans?
17   A    No, he did not say that. What he said
18   was that he chose to sit with his colleagues, who
19   were all white.
20   Q    Have you ever heard Mr. Kost make a --
21   use an epithet or make a derogatory remark about
22   Hispanics or Latinos?

29 (Pages 113 to 116)

### Page 117

1  A   No.
2  Q   Has anyone ever told you that Mr. Kost
3  used an epithet or a derogatory remark that was
4  racist?
5  A   No.
6  Q   Have you ever heard anyone else in
7  Mr. Kost's presence use a racial epithet?
8  A   I have not.
9  Q   Have you ever heard anyone else in
10 Mr. Kost's presence say something derogatory about
11 African-Americans or Latinos or Hispanics?
12 A   No. But then I was not in his presence
13 very often, except usually in a one-on-one
14 environment, unless it was a staff meeting.
15 Q   Did you ever hear anyone at a staff
16 meeting say something racist or derogatory toward
17 African-Americans or Hispanics?
18 A   No.
19 Q   Betsy Johnson was the executive
20 director at the WCA the whole time you were there?
21 A   Yes, she was.
22 Q   Have you ever heard her use a racial

### Page 118

1  epithet?
2  A   No.
3  Q   Have you ever heard her say something
4  derogatory about African-Americans or Latinos or
5  Hispanics?
6  A   Not directly.
7  Q   Has anyone ever told you that
8  Ms. Johnson used a racial epithet?
9  A   I've been told that Ms. Johnson has
10 made interesting cultural comments.
11 Q   Tell me about that.
12 A   My colleague met with Ms. Johnson and
13 had expressed some concerns about the exchanges that
14 they had -- Arminda Valles-Hall -- and was very hurt
15 when told that her perspective must be a cultural
16 thing.
17 Q   And who told you about that
18 conversation?
19 A   Arminda told me about that
20 conversation.
21 Q   Other than that conversation, has
22 anyone ever told you that Ms. Johnson used a racial

### Page 119

1  epithet or said something derogatory about
2  African-Americans or Hispanics or Latinos?
3  A   I guess it's just subject to
4  interpretation. During our mediation, she made some
5  very interesting comments about, well, she was just
6  a Southern white woman and this is how she was
7  raised and so this is the way she thought things
8  should be. I'm paraphrasing, but that was the gist
9  of her comment. She said it. No one told me.
10 Q   And that was the mediation in this
11 case?
12 A   Yes, it was.
13 Q   Have you ever heard anyone else use a
14 racial epithet in Ms. Johnson's presence?
15 A   I have not.
16 Q   Have you ever heard anyone else say
17 something derogatory about African-Americans or
18 Latinos or Hispanics in Ms. Johnson's presence?
19 A   I have not.
20 Q   Would you take a look, please, at
21 Exhibit 14?
22 A   (Witness complies.)

### Page 120

1        (Discussion off the record.)
2        BY MR. FLEISCHER:
3  Q   Have you looked at Exhibit 14?
4  A   Yes.
5  Q   Do you recognize this as the Charge of
6  Discrimination that you filed with the D.C. Office
7  of Human Rights?
8  A   Yes.
9  Q   And that's your signature --
10 A   Yes, it is.
11 Q   -- at the bottom of page 1?
12 A   (Witness nods head.)
13 Q   All right. On the first page, the
14 third paragraph, you say that the executive director
15 and the deputy director for external affairs -- and
16 I assume you mean Betsy Johnson and Jeff Kost; is
17 that right?
18 A   Yes.
19 Q   -- that at a variety of meetings, they
20 told you that you were not adequately reaching out
21 to nonprofit organizations.
22     Did they tell you that at meetings?

Page 121

1  A  Yes, they did.
2  Q  And you say in that same paragraph that
3  the Respondent -- that would be your employer at the
4  time -- subjected you to hostile e-mails which
5  ridiculed the quality of your work.
6     Did you get e-mails that criticized
7  your work?
8  A  From Jeff Kost, yes.
9  Q  Did you have copies of all of those
10 e-mails?
11 A  Yes. I had what I had, and I submitted
12 it.
13 Q  Okay. And then you say, "Respondent's
14 deputy director, Jeff Kost, made
15 racially-insensitive remarks."
16    Have we talked about all the
17 insensitive remarks that you're referring to in this
18 charge?
19 A  I think so. But if I recall something
20 else, I'll be happy to add it.
21 Q  Okay. And you also say that he
22 exhibited inappropriate behavior relative to

Page 122

1  African-Americans?
2  A  Yes.
3  Q  Have we talked about all of that
4  inappropriate behavior or is there more?
5  A  We have not discussed the Billy Terry
6  situation.
7  Q  Okay. Why don't we do that now. Tell
8  me about the Billy Terry situation.
9  A  Well, I need to go back here for a
10 minute, because there's a line in here that says --
11 and it's true -- that I did not adequately reach out
12 to nonprofits.
13    THE WITNESS: Could you repeat his
14 question to me about that?
15    (Whereupon, the reporter read back.)
16    THE WITNESS: I would like to go back
17 to the question, because it wasn't just -- this is
18 paraphrased here. It wasn't just that I wasn't
19 reaching out to nonprofit organizations.
20    Betsy's comment to me was that I was
21 not reaching out to the right nonprofit
22 organizations, and I asked her to define what that

Page 123

1  was. And she said, "Well, you're not talking to the
2  right organizations. You're not talking to the
3  right people."
4     So I asked them repeatedly if they
5  would tell me who these right people were. And
6  after maybe two or three of these meetings, they
7  finally produced a list of who they determined to be
8  the right people.
9     Now, mind you, I had asked for who they
10 wanted me to target when I first got there, but I
11 was never provided that information. However, once
12 they provided a list, I wrote a letter to every
13 single person on that list requesting a meeting. In
14 some cases, those meetings were follow-up meetings,
15 because I had already met with them and talked to
16 them before.
17    But I wanted to make sure that whomever
18 it was that they wanted me to meet with outside from
19 the nonprofits and the elected officials in
20 Montgomery County and the District and Prince
21 George's that I was reaching out to, that I was
22 reaching who they described as the right

Page 124

1  nonprofits.
2     So every single person on that list got
3  a letter from me, and I followed up with as many
4  people as were willing to meet, because it's one
5  thing to ask for a meeting and it's another thing to
6  have someone be able to schedule it with you. And
7  every week, I reported who I scheduled meetings
8  with, who I met with, and what the discussions
9  were.
10    BY MR. FLEISCHER:
11 Q  Did Betsy and Jeff as your bosses have
12 the right to tell you who they wanted you to meet
13 with?
14 A  Sure, they did. But I had the right to
15 ask them, because they wouldn't tell me when I
16 repeatedly asked, "Who are the right nonprofits?
17 I'll meet with whomever you want me to meet with."
18 Q  All right. Any other clarification on
19 your earlier answers?
20    MR. FLEISCHER: Go off the record,
21 please.
22    (Recess taken 2:16-2:23.)

Page 125

1    (Whereupon, Mr. Temple is no longer
2    present at the deposition, and Mr. Blue
3    is now present.)
4    (Whereupon, the reporter read back.)
5    THE WITNESS: No.
6    BY MR. FLEISCHER:
7    Q    I was then asking you about the deputy
8    director's inappropriate behavior relative to
9    African-Americans, and I asked you have we already
10   talked about everything you're referring to here,
11   and then you said, if I recall, well, we haven't
12   talked about the Billy Terry incident. So let's do
13   that now. Tell me about the Billy Terry incident.
14   A    Billy Terry is a government affairs
15   manager for Van Scoyvoc & Associates. He is a
16   colleague of mine. I asked him if he would be
17   willing to come in and do a training for my
18   colleague, Arminda, for her program. I'm trying to
19   remember what it was on now. I think it was the
20   flow of federal dollars or something like that for
21   nonprofits, how to access grants, earmarks, that
22   type of thing.

Page 126

1        He agreed to do it pro bono. He came
2    in to meet with us to give us an overview of what he
3    proposed in terms of the training, what materials he
4    would use, how he would present. And in the middle
5    of his presentation -- I would say two-thirds of the
6    way through, Jeff walked into the meeting room, the
7    conference room, and told us that he had people
8    waiting to come into the conference room.
9        And my colleague, Arminda, told him
10   that we reserved this room for this amount of time,
11   and your folks are -- I think they were like 25,
12   30 minutes early, and she said, "Would you ask them
13   to wait in the lobby?" Wait a minute. Let me take
14   that back.
15       Barbara Mendoza came in first and then
16   Jeff came in, because I remember there were two
17   interruptions, and I couldn't remember why there
18   were two interruptions. But I remember him coming
19   in and saying, "I have people waiting."
20       And Arminda's response to him was,
21   "Well, we're not finished with the meeting. We
22   have the room until 3:30." And Jeff's response was

Page 127

1    his standard response. He kind of huffed, spun off
2    on his heel, and closed the door somewhat loudly.
3        Now, I've never seen him act that way
4    in front of any other trainer -- any other potential
5    trainer. I didn't even understand that behavior,
6    but it was embarrassing, because you're bringing
7    someone in, a lobbyist from one of the major firms
8    in the country, to offer to volunteer work and in
9    the middle of their presentation he doesn't even
10   introduce himself.
11       As far as Mr. Terry was concerned, he
12   didn't know who he was. He just came in and
13   interrupted the meeting very rudely with no respect
14   to him, no respect to us as colleagues, spun out,
15   and was gone.
16       Arminda was upset, and we were very
17   apologetic -- very apologetic to Billy. And, you
18   know, he was very gracious, but it was
19   embarrassing.
20       So, again, that was a situation where
21   Arminda said, "This is my training, and I will
22   address this," and I believe she did.

Page 128

1    Q    Who was in the room when Mr. Kost came
2    in?
3    A    Arminda, myself, and Mr. Terry.
4    Q    You said that Ms. Mendoza had --
5    Ms. Mendoza had come into the room earlier?
6    A    Yes.
7    Q    Did that have anything to do -- why did
8    she come in?
9    A    She came in to tell us that there were
10   people that were there waiting to use the room, and
11   Arminda's response to her was that the room had been
12   reserved for the time that we were in it and they
13   were extremely early.
14   Q    Was Ms. Mendoza rude?
15   A    She was not.
16   Q    How soon after she came in did Mr. Kost
17   come in?
18   A    One or two minutes.
19   Q    How long was Mr. Kost in the room, ten
20   seconds?
21   A    Twenty, thirty seconds, maybe.
22   Q    Mr. Kost has testified that he looked

Page 129

1  into the room and saw a gentleman. He didn't know
2  it was Mr. Terry, but he saw a gentleman on his cell
3  phone, and that's when he came in.
4       Is that true, as far as you know?
5    A  Yes, it was.
6    Q  Mr. Terry was on a cell phone when
7  Mr. Kost came in?
8    A  Yes, he was. He was checking his
9  office to check on materials for us. He said, "Let
10 me check on this," whatever it was, and placed a
11 quick call.
12   Q  Did Mr. Kost say anything of a racial
13 nature when he came in?
14   A  No. He didn't even say excuse me.
15   Q  Assuming that Mr. Kost behaved rudely,
16 what leads you to believe that he was racially
17 motivated?
18   A  I've seen his interaction with other
19 trainers at WCA. With other white trainers, he was
20 always gracious, always polite.
21   Q  At the time he interacted with other
22 white trainers, did he know that they were

Page 130

1  trainers? Did he know who they were?
2    A  I don't know if he did or he didn't.
3    Q  Okay. If you would go back to
4  Exhibit 14, please --
5    A  But I know that he knew who Mr. Terry
6  was, because I told him that he was coming in to
7  meet with us for that reason.
8    Q  Okay. If we could go back to
9  Exhibit 14, please, I'm looking at the phrase there,
10 "Deputy director made racially-insensitive remarks
11 and exhibited inappropriate behavior relative to
12 African-Americans."
13      I think we've covered the
14 racially-insensitive remarks. Have we now covered
15 all of the inappropriate behavior that you're
16 referring to here?
17   A  I think his behavior toward the junior
18 staff in group buying was relatively insensitive.
19   Q  Can you give me examples, please?
20   A  The way that he interacted with the
21 young women in that department was very offhand.
22 One of my -- one of the young women was pregnant

Page 131

1  very visibly pregnant. And as a gentleman, he had a
2  series of very heavy envelopes that he wanted
3  mailed, and he wanted this woman to carry these
4  incredibly heavy envelopes downstairs a few floors
5  to the mail room.
6       And I just thought about that, and I
7  said that that didn't make any sense to me, because
8  I think if she were pregnant and white he would have
9  carried them himself. He had no problems asking her
10 to do so. And as such, I carried them downstairs.
11      His mannerism was very offhand, very
12 condescending to the women in group buying, but all
13 the women in group buying were black except the
14 director.
15   Q  Who was the director?
16   A  Dawn Abrahamsen.
17   Q  How did he treat Ms. Abrahamsen?
18   A  Very politely.
19   Q  Is Carlottia Scott your aunt?
20   A  No.
21   Q  Do you refer to her that way?
22   A  Sometimes.

Page 132

1    Q  Would you look at Exhibit 15, please?
2    A  (Witness complies.)
3    Q  Do you recognize Exhibit 15 as an
4  amendment to your Complaint before the Office of
5  Human Rights?
6    A  Yes, I do.
7    Q  All right. Is that your signature on
8  the second page?
9    A  Yes.
10   Q  The first paragraph of Exhibit 15 says,
11 "In a meeting on May 27, 2004, I expressed my
12 concerns," and then you go on and describe what you
13 expressed at the meeting.
14      Was there a meeting on May 27th?
15   A  I don't recall. If this was written,
16 that means there was. That was two years ago. I
17 don't recall the date.
18   Q  Do you remember a meeting in late May
19 at which you expressed concerns that are described
20 here?
21   A  Yes.
22   Q  Who was present at the meeting?