Page 133

1  A  Betsy Johnson and Jeff Kost.
2  Q  How long did the meeting take?
3  A  Those meetings averaged about an hour.
4  They were incredibly stressful.
5  Q  In the first sentence of Exhibit 15,
6  you say that you expressed concerns that the deputy
7  director, Mr. Kost, was consistently unwilling to
8  engage in joint activities with me, closed quote.
9      Now, we've seen that language earlier,
10 and I asked you for examples of his unwillingness to
11 engage in joint activities.  Have you told us today
12 about all the examples you can think of?
13 A  I think I've given you examples.  One
14 other may be that we -- I invited him to come out to
15 a Montgomery County hearing in the evening regarding
16 Proposition 15, which he also declined, but --
17 Q  Did that have anything to do with race?
18 A  No, I don't think it did in that
19 instance, so I didn't take it as that.
20 Q  That paragraph goes on and references
21 racially-insensitive remarks.
22     Have you told us about all of the

Page 134

1  racially-insensitive remarks or remarks that you
2  believed exhibited racial insensitivity?
3  A  All that I can recall.
4  Q  It goes on to say that there was bias
5  in my professional treatment -- your professional
6  treatment -- and in treatment of black trainers,
7  presenters.
8      Have you told us everything you mean
9  about that?
10 A  Yes.
11 Q  All right.  And then the next sentence
12 says, "As a result, in the meeting on June 15, 2004,
13 Respondent terminated my employment in retaliation."
14     Who was present when your employment
15 was terminated?
16 A  Betsy Johnson and Jeff Kost.
17 Q  What time of day did that take place?
18 A  It was in the late afternoon.
19 Q  Where did it take place?
20 A  In Betsy Johnson's office.
21 Q  When you start off that sentence saying
22 as a result, are you meaning as a result of your

Page 135

1  having earlier expressed concerns?
2      MR. BLUE:  Objection.
3      Answer if you can.
4      BY MR. FLEISCHER:
5  Q  Result of what?  What do you mean by
6  the word result here?
7  A  Would you clarify the question?
8  Q  Well, I'm trying to understand what you
9  mean by the -- let me strike everything else.
10     What do you mean by the word result?
11 A  As a result of earlier meetings, as a
12 result of me expressing my concern about my
13 treatment in the office, as a result of me
14 requesting a mediator to come in and discuss the
15 situation with both Betsy and Jeff, which was
16 denied, as a result of me asking to file a formal
17 grievance with the Governance Committee of the
18 board, which I was told I was not able to do,
19 although, according to the handbook, I'm supposed to
20 be able to do that, as a result of me filing a claim
21 with the Human Rights Commission -- the D.C. Human
22 Rights Commission, I believe I was terminated.

Page 136

1  Q  Do you know when Washington Council of
2  Agencies learned about your Complaint to OHR, the
3  Office of Human Rights?
4  A  I do not know when they learned about
5  it.
6  Q  When did you file it?
7  A  In April.
8  Q  Do you have any basis to think that
9  they knew about it on June 15th when you were
10 fired?
11 A  I think it's probable.
12 Q  Is that just a guess on your part?
13 A  I think it's probable.
14 Q  Why do you think it's probable?
15 A  It was a long process, it was tedious,
16 and I think that they were aware.  I think that they
17 have very good relationships with offices in the
18 District government, and I think they were aware.
19 Q  Has anyone ever told you that they were
20 aware?
21 A  No.
22 Q  Have you seen any document which would

Page 137

1  indicate they were aware by June 15th?
2    A   No.
3    Q   Why do you think your firing was as a
4  result of your complaints? How do you make the
5  link?
6    A   I don't understand that question.
7    Q   Okay. Well, you say that your firing
8  was a result of your having taken certain actions?
9    A   I think that I worked really hard and I
10 produced the work that I was tasked to do, and I
11 think that there was no justification for their
12 rationale, because I was able to document the work
13 that they asked for.
14        I also think that the more I was able
15 to document and justify and show my work and that it
16 was the work they asked for, there was this -- this
17 wasn't what they wanted, and I didn't know why it
18 wasn't what they wanted. It didn't make any sense.
19 If you ask me to do a job, I'm going to do it. And
20 it was clear that the more I did what they asked me
21 to do, the more uncomfortable they were with me
22 doing it.

Page 138

1         And so I followed their procedure as it
2  related to the handbook, and I asked -- I sent a
3  memo, I was able to relay the work that I had
4  completed, I asked for a neutral mediator and was
5  told I couldn't have one. I asked to go through the
6  process with the governance of the board and was
7  told I couldn't do that, that the buck stops with
8  me, as Betsy Johnson told me.
9    Q   Well, let me ask my question again and
10 try to make it clearer.
11        You claim here that your termination
12 was the result of your having taken certain earlier
13 actions, and you've told me that -- and I've asked
14 you why you link those two.
15        You've told me that your work was
16 satisfactory --
17   A   Yes.
18   Q   -- at least in your mind?
19   A   Yes.
20   Q   So that's one reason why you think the
21 firing must have been as a result of your having
22 taken these previous actions?

Page 139

1    A   I think that when I state that my work
2  was satisfactory and I understand that they feel
3  that there was a problem, when I ask for a mediator
4  to address it and they deny me that, that's a
5  problem, because I'm seeking a positive resolution
6  so that we can move forward and they're telling me
7  that they are not in agreement in seeking a positive
8  resolution.
9    Q   Has Betsy or Jeff ever told you that
10 you were being fired because you had made previous
11 complaints?
12   A   No.
13   Q   Have you ever seen a document which
14 would indicate that your firing was motivated by
15 your having made previous complaints?
16   A   No. They told me I wasn't a good fit
17 for the organization.
18   Q   Has anyone else other than Betsy and
19 Jeff ever told you that you were fired because you
20 had made previous complaints?
21   A   No.
22   Q   Would you take a look, please, at

Page 140

1  Exhibit 16?
2    A   (Witness complies.)
3    Q   Have you looked at Exhibit 16?
4    A   Yes, I glanced through it.
5    Q   Do you recognize it as your response
6  filed with the Office of Human Rights?
7    A   Yes.
8    Q   Would you look at page 3, please, of
9  Exhibit 16?
10   A   (Witness complies.)
11   Q   If you look down at the third
12 paragraph, the one that begins "these experiences,"
13 I'm going to read aloud the last sentence of that
14 paragraph. Quote, I also stated during that meeting
15 with senior management that I no longer trusted the
16 deputy director to conduct business in an honest,
17 courteous, and professional manner regarding my work
18 product or his interaction with me and that I was
19 uncomfortable with the current supervisory
20 circumstances and working environment as presented,
21 closed quote.
22        When you say "that meeting," what

Case 1:06-cv-00843-RMC   Document 13-5   Filed 03/27/2007   Page 3 of 18

LISA RANSOM                                       LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 141

1  meeting are you referring to?
2     A   I don't recall what meeting it was.
3     Q   Do you recall a meeting in which you
4  said you didn't trust the deputy director?
5     A   Yes, I do.
6     Q   Who was present at that meeting?
7     A   Betsy Johnson and Jeff Kost.
8     Q   What was it that you didn't trust about
9  the deputy director?
10    A   As I stated in my rebuttal, I met with
11 him regularly after meeting with nonprofits or local
12 elected officials to give him feedback on the
13 outcome of those meetings and the nature of those
14 discussions. And he listened, but I realized he had
15 no clue what I was talking about or did not know how
16 to give me feedback to respond appropriately if I
17 needed that.
18        It got to the point where no matter
19 what I said to him, his response was, "We need to
20 run this by Betsy." That was counter to what he
21 told me what when I was hired, that he wanted me to
22 run things past him first to determine whether I

Page 142

1  should tell Betsy, because she was very emotional
2  about some of our members or certain other people
3  out in the nonprofit industry. Some people she
4  liked, some people she didn't, and he felt he had a
5  more objective ear. So I did what he asked me to
6  do.
7         The problem was, when I met with them
8  together, he had told her that I hadn't had any
9  discussions with him and he had no idea what I was
10 doing and how I was doing it, and this was not
11 true. It was just a lie. So then I had to defend
12 the work that I had been doing and the conversations
13 I had been sharing with him simply because either he
14 didn't understand it or he didn't know how to convey
15 it back to her. I really don't understand it at
16 all.
17        But I knew at that point that I
18 couldn't trust him either to convey the information
19 to her properly or to convey the information for
20 whatever his reasons were for not sharing it with
21 her.
22    Q   Does that have anything to do with

Page 143

1  racism? I mean, let's assume he is rude, let's
2  assume he is inexperienced in the kind of work that
3  he's expecting you to do, let's assume he's not a
4  good supervisor. Let's assume all of those things
5  about him. What does that have to do with racism?
6     A   When he supervises Rick Rose, who is
7  the director of communications, and he knows very
8  little -- what he knows -- it's not clear what his
9  experience is in communications, but he spent every
10 day with Rick. They worked on projects together.
11        It got to the point where there was an
12 article coming out in the newsletter, and the timing
13 of it could have had an impact on Montgomery
14 County's budget based on the information we put
15 out. I had done an interview with the County
16 Executive's Office, and so I approached Rick and
17 said, "We really need to slow the publication of
18 this so that this doesn't kind of come out
19 prematurely."
20        He told me that I had to run -- if I
21 was going to -- if we were going to delay, I had to
22 run it past Jeff. So I took it to Betsy, and I

Page 144

1  said, "Betsy, this is what I think is going to be
2  the situation," because Jeff was not available at
3  the time.
4         Betsy and I go down the hall to talk to
5  Rick, and Rick's response to us is, "Well, I have to
6  run it past Jeff before I can do anything."
7         And Betsy was a little taken aback, and
8  she said, "Well, I'm saying we need to hold it under
9  these circumstances."
10        "Well, I need to wait for Jeff to tell
11 me that."
12        MR. FLEISCHER: I'm sorry, could you
13 read my question back, please?
14        (Whereupon, the reporter read back.)
15        BY MR. FLEISCHER:
16    Q   I'm afraid I have to ask you the
17 question again.
18    A   He was comfortable enough to establish
19 a positive working rapport with my colleague, the
20 director of communications, because he happened to
21 be white, male, and gay. He was not comfortable
22 establishing that rapport with me, although I sought

Page 145

1  it.
2  Q  I think you said during your answer a
3  moment ago that he spent a lot of time with Rick?
4  A  Yes.
5  Q  All right. But when he sought to have
6  weekly meetings with you, you took that as evidence
7  of racism?
8  A  That's not what I said. I sought to
9  engage him in updates, I invited him to attend
10 activities outside the office, which was the nature
11 of my job. He did not invest the same amount of
12 time or interest in me as a director under his
13 department, but he did invest that time and interest
14 in Rick as a director of -- another department under
15 his supervision.
16 Q  Okay.
17 A  You can't have a double-standard.
18 Q  Jeff's efforts to have weekly meetings
19 with you, was that racist or was that an effort to
20 establish a rapport with you?
21     MR. BLUE: Objection.
22     Answer if you can.

Page 146

1     THE WITNESS: The standard by which he
2  and Betsy had weekly meetings was racist. I
3  attempted frequently to have a rapport with him. He
4  was not responsive to that. His weekly meetings
5  were joint meetings with Betsy.
6     BY MR. FLEISCHER:
7  Q  Ms. Ransom, it seems like senior
8  management at Washington Council of Agencies spent
9  an extraordinary effort to help you succeed.
10    Do you disagree with that?
11 A  Yes.
12 Q  Would you look at page 6 of Exhibit 16,
13 please?
14 A  (Witness complies.)
15 Q  The bottom paragraph in the middle of
16 it, you refer to mistreatment of voluntary skilled
17 professionals I brought to WCA.
18    Are you talking here about Mr. Terry
19 and Ms. Scott and Dr. Trent?
20 A  Yes.
21 Q  Anybody else?
22 A  Not that I can recall.

Page 147

1     MR. BLUE: Counsel, I don't mean to
2  interrupt. Exactly where are you?
3     MR. FLEISCHER: Page 6 of
4  Exhibit 12 (sic) in the middle of that bottom
5  paragraph.
6     MR. BLUE: 12?
7     MR. FLEISCHER: Exhibit 16. I beg your
8  pardon, page 6 of Exhibit 16.
9     MR. BLUE: Which paragraph?
10    MR. FLEISCHER: The bottom paragraph.
11    MR. BLUE: Okay. Thank you.
12    BY MR. FLEISCHER:
13 Q  In that same sentence, it says, quote,
14 senior management's negative manipulation and
15 omission of verbal interaction, closed quote.
16    I have no idea what you mean by that.
17 Tell me what you mean by that, please.
18 A  I'm referring to the meetings of senior
19 management of which Arminda and I were excluded,
20 where Betsy Johnson would hold meetings with all the
21 senior directors except Arminda and I in my last few
22 months at WCA, closed-door meetings.

Page 148

1  Q  All right.
2  A  I am referring to meeting with the new
3  membership director, Stephanie Smith, because she
4  was encouraged to meet with all the staff
5  individually, and Betsy came and interrupted our
6  meeting and did not allow her to return to talk to
7  me. And when I approached Ms. Smith to say, "When
8  did you want to finish up our meeting," she told me
9  that she would have to get back to me and she never
10 did.
11 Q  All right. I'll ask you about those,
12 but is there anything else you're referring to in
13 the phrase that I just read?
14 A  No.
15 Q  Okay. Let's start with the senior
16 staff meetings at which you were excluded.
17    You and Arminda were excluded?
18 A  Yes, we were.
19 Q  When were those meetings?
20 A  I think those meetings were in the
21 latter months, maybe May and June, of my time at
22 WCA.

Case 1:06-cv-00843-RMC    Document 13-5    Filed 03/27/2007    Page 5 of 18

LISA RANSOM                                           LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                  October 25, 2006

Page 149

```
 1    Q   How many meetings were there?
 2    A   I don't recall the number.  I recall
 3  that it was noticeable, because all the senior staff
 4  were in Betsy's office with the door closed and
 5  everyone in the room was white.  The only directors
 6  of color would be Arminda and myself, senior
 7  directors, and we were not included in those
 8  meetings.  We had no idea what the discussions were
 9  about.
10        But if we -- for me, if I'm supposed to
11  be the policy director and a part of the WCA team,
12  to exclude me from a meeting of all the other
13  directors tells me that there is a double-standard,
14  there is a problem, and it's racially -- it's
15  racially divided, because you racially divided the
16  meeting.
17    Q   How do you know who was --
18    A   Because you could see through the
19  window in Betsy's door.
20    Q   You said you didn't know how many there
21  were.
22        Give me an estimate if you can.  Was it
```

Page 150

```
 1  two or ten?
 2    A   I don't know.
 3    Q   How many are you aware of?
 4    A   I can't recall.  I know I -- more than
 5  twice.
 6    Q   Fewer than ten?
 7    A   I don't recall.
 8    Q   Okay.  Now, you also mentioned
 9  Ms. Smith had been instructed to get to know the
10  senior staff?
11    A   She was new to staff, and she was
12  encouraged to meet with everyone to learn what
13  everyone's job was and what we did.
14    Q   Okay.  But her meeting with you was cut
15  short and she was forbidden to resume it?
16    A   Yes.
17    Q   The meeting between the two of you,
18  when was that?
19    A   Maybe a week after she arrived.
20    Q   When was that?
21    A   I don't know the date.  I don't
22  remember her hire date.
```

Page 151

```
 1    Q   Was it the spring of 2004?
 2    A   It's possible.
 3    Q   How long did the meeting take before it
 4  was interrupted?
 5    A   It wasn't long at all.  Maybe 15
 6  minutes.
 7    Q   And Ms. Johnson interrupted the
 8  meeting?
 9    A   She did.
10    Q   What did she say?
11    A   She called Stephanie away for a moment,
12  and I thought she was going to return, but she
13  didn't return.  And in an hour or so, I went down to
14  Stephanie's office and asked her if she wanted to
15  schedule a time to resume our conversation, and she
16  said, "Well, I'll get back to you," and never did.
17        I later learned -- and I don't recall
18  how -- that she was told not to meet with me.  Oh,
19  she didn't need to meet with me.
20    Q   Somebody, not Ms. Smith, told you later
21  that she didn't need to meet with you?
22    A   Yes.
```

Page 152

```
 1    Q   And I take it wasn't Ms. Johnson either
 2  who told you that?
 3    A   No, it wasn't Ms. Johnson, and I can't
 4  recall at this time who.  I remember feeling taken
 5  aback, because I didn't understand that, but it felt
 6  ominous to me.
 7    Q   Have you had any further -- did you
 8  have any further conversations with Ms. Smith about
 9  that?
10    A   No.
11    Q   How about with Ms. Johnson?
12    A   No.
13    Q   If you would turn to page 8 of
14  Exhibit 16, please.
15    A   (Witness complies.)
16    Q   The first full paragraph starting
17  "regarding my termination," do you see that?
18    A   Yes.
19    Q   The second sentence says, "At no time
20  did I ever agree verbally or in writing to any list
21  of objectives offered by senior management."
22        Tell me what you mean by that.
```

Page 153

1    A   At the beginning of these weekly
2 meetings, Jeff Kost presented me with a list of
3 objectives that he and Betsy wanted me to follow.
4 As I reviewed the list, they were exactly what I was
5 already doing, but they wanted me to sign off on
6 this list.
7      And Betsy explained that this was not a
8 form of evaluation, but just a way to keep us all on
9 the same page. And my response was, "If this is not
10 a form of evaluation and I'm already doing this
11 work, then I'm not comfortable signing off on
12 this."
13    Q   Did you think it was unreasonable for
14 your employer to ask you to agree to a list of
15 objectives?
16    A   I had already agreed to a list of
17 objectives and had implemented them. I agreed to
18 those objectives in the goal chart, which I was
19 following through on and they were aware of.
20    Q   And it was, therefore, unreasonable for
21 them to ask you to reaffirm that list of
22 objectives?

Page 154

1    A   It was -- in the sense that they
2 evaluated me in a -- there was -- I need a minute.
3      The format in which they chose to
4 evaluate me was unique in that no other person in
5 that organization was evaluated under the same
6 structure, terms. No other person in that
7 organization received that same evaluation structure
8 and criteria, and to be singled out --
9    Q   So you refused to agree to the list of
10 objectives because you felt you were being singled
11 out in a unique way?
12    A   No. I agreed to do all the work that
13 was presented and had been doing the work. I
14 refused to sign a document that I thought was being
15 used as a tool against me.
16    Q   Well, it says here that at no time did
17 I ever agree verbally -- I assume you mean orally --
18 or in writing to any list of objectives offered by
19 senior management.
20      So not only would you refuse to sign
21 it, but you also refused to simply acknowledge that
22 those were your objectives.

Page 155

1 That's what this says to me. Is that
2 what you meant?
3    A   No.
4    Q   Tell me what you meant then.
5    A   The specific list of objectives
6 provided by Jeff Kost was the work that I had
7 already done or was in the midst of doing as it
8 related to the organizational goals. I had agreed
9 to do it and I was doing it.
10      This was a separate document that was
11 repetitive in nature. And because it was repetitive
12 in nature and required my signature for work I had
13 already done, I was uncomfortable signing it.
14    Q   So you refused to sign it because it
15 was repetitive?
16    A   And because I was told it was not going
17 to be used as an evaluation tool against me, but it
18 was, in fact, an evaluation tool.
19    Q   Is it unreasonable for an employer to
20 evaluate its employees?
21    A   It is not; however, there's nothing in
22 the WCA handbook that says that it is appropriate to

Page 156

1 evaluate me on a weekly basis, particularly when
2 there was no written evaluation as it relates to my
3 probationary period. And if there had been an
4 issue, they would have notified me at that time.
5      When I inquired about the status of my
6 probationary period, I was told that I was fine. To
7 come back in the middle of a year when, in fact, the
8 handbook says something different, that's counter to
9 what the handbook says and to what their policies
10 are.
11    Q   In your view, is that sufficient ground
12 for you to refuse to sign?
13    A   Yes.
14    Q   Would you look at page 10, please, of
15 Exhibit 16? It's the last page.
16    A   (Witness complies.)
17    Q   About halfway down that first full
18 paragraph, it says, "Mr. Kost berated my 20 years of
19 Congressional experience."
20      Tell me how he berated your 20 years of
21 Congressional experience.
22    A   Paraphrasing in a discussion about my

Case 1:06-cv-00843-RMC   Document 13-5   Filed 03/27/2007   Page 7 of 18

LISA RANSOM                                          LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT                 October 25, 2006

Page 157

1  interaction with nonprofits and the politicals that
2  I met with, he responded in turn by saying something
3  like, well, your Congressional experience really
4  doesn't apply here.
5        Political experience is political
6  experience, and that's what I was hired for. He
7  basically told me it had no value.
8     Q    When did he tell you that?
9     A    During one of the meetings that I had
10 with him. Not the structured weekly meetings with
11 Betsy, but the meetings where I would come to him,
12 sit down, and say, "Do you have a minute? Let me
13 give you an update on who I met with today and
14 what's going on," that type of thing.
15    Q    Isn't it true, Ms. Ransom, that Jeff
16 and Betsy wanted you to focus on local issues and
17 you wanted to focus on national issues and that was
18 the problem? Isn't that true?
19        MR. BLUE: Objection.
20        Answer if you can.
21        THE WITNESS: I focused on the issues
22 that were expressed to me by the nonprofits that I

Page 158

1  met with.
2        BY MR. FLEISCHER:
3     Q    Isn't it true that there was a conflict
4  between you and Mr. Kost over which issues you
5  should focus on and that he wanted you to focus on
6  local issues and you wanted to focus on national
7  issues?
8     A    I focused on local issues. We had one
9  unique situation that impacted nonprofit
10 organizations, and I was asked to participate in a
11 forum that provided protection to the nonprofits
12 that we represented at a briefing.
13        So I spoke on behalf of the
14 organization to the benefit of nonprofits as it
15 relates to the Sarbanes-Oxley Act, which, by the
16 way, Ms. Johnson continued to do work on after I was
17 gone.
18        (Discussion off the record.)
19        (Recess taken 3:12-3:18.)
20        BY MR. FLEISCHER:
21    Q    Would you look at Exhibit 17, please?
22    A    (Witness complies.)

Page 159

1     Q    Let's start with the second page. Have
2  you seen that page before today?
3     A    Yes.
4     Q    When did you first see it?
5     A    The day it was sent, actually.
6     Q    And how did you come to see it?
7     A    I think Carlottia copied me on it, if
8  I'm not mistaken.
9     Q    Did you get it in the mail or by
10 e-mail?
11    A    e-mail.
12    Q    Was this an attachment to an e-mail?
13    A    I don't recall. I remember pink and
14 yellow flowers on something, but that was not on the
15 letter. So it was on something that had pink and
16 yellow flowers or something, like a background or
17 something.
18    Q    Was it e-mailed to your office?
19    A    Yes.
20    Q    Now, the letter is dated February 26,
21 and it refers to an incident on February 17.
22        Does that sound right to you as the

Page 160

1  date of the incident?
2     A    Yes.
3     Q    Between February 17 and February 26,
4  did you have any conversation with Ms. Scott about
5  that incident?
6     A    Well, I had a conversation with her
7  when it occurred.
8     Q    I understand that.
9        You calmed her down in the conference
10 room, as I recall, as I recall?
11    A    Uh-huh.
12    Q    She was upset at that time?
13    A    Uh-huh.
14    Q    From that time until you got this
15 e-mail, did you have any conversations with her?
16    A    I don't recall having a conversation
17 with her. I apologized to her at the meeting when
18 it happened, but I don't recall having conversations
19 with her.
20    Q    All right. Did you exchange any
21 e-mails with her between the incident itself and
22 this letter?

Page 161

1    A    No, I didn't. And it was because my
2  colleague, Arminda, said that because it fell under
3  training, she would address it, and I left it
4  exactly there. If it fell directly under policy, I
5  would have handled it myself.
6    Q    Did Ms. Valles-Hall report to you that
7  she had contact with Ms. Scott between the time the
8  conference room -- between the time you finished
9  your meeting in the conference room on the 17th and
10 the time this e-mail arrived on the 26th?
11   A    I don't recall the details of that. I
12 remember the energy of what happened that day, but I
13 don't recall the details of it.
14   Q    When you got copied with this e-mail,
15 did it come as a surprise to you?
16   A    No.
17   Q    Did you know it was coming?
18   A    No, but I know Carlottia.
19   Q    Look at the first page of Exhibit 17.
20   A    Okay.
21   Q    Have you ever seen that e-mail before
22 today?

Page 162

1    A    No, I don't recall seeing this. I
2  don't recall seeing it.
3    Q    Assuming it's authentic -- and that's
4  just an assumption on your part. I know you can't
5  verify that. Assuming it's authentic, the e-mail
6  refers to calls, plural, that Ms. Scott received
7  from Ms. Johnson the prior week.
8         Do you know one way or the other
9  whether Ms. Johnson made two or more calls to
10 Ms. Scott?
11   A    I don't know that she did. She told me
12 that she called her. I don't know that she did.
13   Q    Betsy told you that Betsy called
14 Carlottia Scott?
15   A    Yes.
16   Q    The e-mail also says, "Thanks for your
17 concern and kind consideration."
18        Do you know whether Ms. Johnson
19 expressed concern and consideration to Ms. Scott?
20   A    I have no idea.
21   Q    Look at 18, please.
22   A    Okay.

Page 163

1    Q    Can you identify this as an e-mail that
2  you received from Ms. Scott on or about May 19,
3  2004?
4    A    Okay.
5    Q    Is that accurate? Actually, it's two
6  e-mails. The bottom half appears to be an e-mail
7  from you to Ms. Scott, and the top half appears to
8  be an e-mail from Ms. Scott to you.
9    A    Uh-huh.
10   Q    Can you identify them as e-mails you
11 received and sent?
12   A    Yes.
13   Q    Let's start with the bottom one. You
14 refer to her as Auntie Lot?
15   A    Uh-huh. Yes.
16   Q    Is that a way you frequently address
17 her?
18   A    Sometimes.
19   Q    How long have you known her?
20   A    Twenty-plus years.
21   Q    All right. Under what circumstances
22 have you known her?

Page 164

1    A    I knew her on Capitol Hill.
2    Q    You did tell me that. Thank you.
3         I don't know anything about the woman.
4  How old is she? Is she older than you?
5    A    Yes.
6    Q    And that's the reason for the Auntie?
7    A    Yes.
8    Q    Was she connected or friends with your
9  family?
10   A    She worked for a member of Congress,
11 for two, as a matter of fact, out of the California
12 delegation. I worked for two members of Congress
13 out of the California delegation.
14   Q    In the body of the e-mail from you to
15 her, it says, "Jennifer called me last week."
16        Who is Jennifer?
17   A    Jennifer Henderson. Jennifer
18 Henderson.
19   Q    Is she connected in some way with
20 Ms. Scott?
21   A    They sit on various boards together.
22   Q    Okay. In the second sentence of the

Page 165

1  body, it says, "Please tell me what you want me to
2  do and when so I can put things in motion."
3      What are you referring to here?
4  A   I'm not sure. It could have been any
5  number of things.
6  Q   Do the attachments give you any clue as
7  to what you might be referring to?
8  A   Maybe funding. Maybe funding
9  opportunities or board activity. Those are the only
10 things I can think of.
11 Q   What was attachment number 1?
12 A   That was my resume.
13 Q   Why were you sending it to Ms. Scott?
14 A   I think she wanted me to serve on a
15 board or wanted me to consider it, and I just sent
16 it. She sits on a number of boards around the
17 country.
18 Q   This would be a volunteer board?
19 A   I'm not quite sure. Sometimes they're
20 foundation boards.
21 Q   You weren't asking her help to look for
22 a job?

Page 166

1  A   No.
2  Q   Let's turn to the later e-mail, the one
3  up above. About two-thirds of the way down the body
4  of that, it says, quote, Jen told me some stuff that
5  is disturbing. Hope you are weathering the storm
6  okay, closed quote.
7      What is she talking about?
8  A   That may have been a personal matter.
9  Q   And not to do with work?
10 A   I don't think so.
11 Q   Okay. It also thanks you for a
12 Mother's Day card.
13     Had you sent her a Mother's Day card?
14 A   I probably did, yes.
15 Q   I don't have any more questions about
16 that.
17     Would you look at 19, please?
18 A   (Witness complies.)
19 Q   It looks like there's two e-mails here,
20 and I'm just going to ask you about the bottom one.
21     Can you identify this bottom e-mail as
22 an e-mail you sent to Ms. Scott on or about May 20,

Page 167

1  2004?
2  A   Yes.
3  Q   Let's look at the third paragraph, the
4  one that says "AV and I."
5  A   Uh-huh.
6  Q   AV is Arminda Valles-Hall?
7  A   Yes.
8  Q   You say that you were told repeatedly
9  that Betsy had spoken to you, Ms. Scott, and had
10 apologized.
11     Who told you that?
12 A   Betsy.
13 Q   And then you say, "Obviously not."
14     Why do you say that?
15 A   I knew that she hadn't, but I can't
16 remember how I knew that she hadn't. Maybe she had
17 spoken to Arminda. So I don't think that I had a
18 discussion with her about this.
19 Q   "Her" being Ms. Scott?
20 A   I don't recall. I don't recall.
21 Q   Something led you to believe that
22 Ms. Johnson had not spoken with Ms. Scott about the

Page 168

1  hallway incident; is that right?
2  A   Right. Uh-huh.
3  Q   But you don't recall what it is that
4  led you to believe that?
5  A   No, I don't.
6  Q   All right. If Exhibit 17 is authentic,
7  Ms. Scott is thanking Ms. Johnson for Ms. Johnson's
8  concern and kind consideration.
9  A   All right.
10 Q   I guess I don't have a question about
11 that?
12     MR. BLUE: Counsel, I'm going to object
13 to the extent that -- I don't mean to make a
14 speaking objection, but we just went over Exhibit 18
15 that contradicts the conclusion that you've drawn.
16     MR. FLEISCHER: Well, if it does, it
17 does.
18     BY MR. FLEISCHER:
19 Q   Exhibit 19 in the third paragraph goes
20 on to say, "You know I appreciate your being in my
21 corner always."
22     What did you mean by that?

Page 169

1  A  She's always been very supportive.
2  I've known her 20 years.
3  Q  And what was she supportive about this
4  time?
5  A  It could have been anything.
6  Q  Well, I know. But do you know what it
7  was you were referring to?
8  A  It could have been The 21st Century
9  Foundation possibly. We talked about that as well,
10 so it could have very well been that.
11 Q  What's The 21st Century Foundation?
12 A  It's a philanthropic foundation for
13 African-American organizations, and I know Jennifer
14 and Carlottia sit on that board.
15 Q  You say here, "Hopefully I won't be in
16 'this' corner very long."
17    What corner are you talking about?
18 A  I don't recall.
19 Q  Was the corner your job at WCA?
20 A  I honestly don't recall. If it was
21 May 20th, we were working on that conference, so it
22 could have been any number of things.

Page 170

1  Q  And then it goes on, "Yes, I'm working
2  on new possibilities."
3     Tell me what you meant by that.
4  A  I don't know what I meant by that or I
5  don't recall what I meant by that. That was a very
6  hurried time.
7  Q  Were you considering taking a job with
8  The 21st Century Foundation?
9  A  Oh, no. They're in New York. I don't
10 even remember seeing Jennifer.
11 Q  Would you take a look at Exhibit 20,
12 please?
13 A  (Witness complies.)
14 Q  I can tell you I'm only going to ask
15 you about paragraph 6, but you're welcome to review
16 it.
17 A  I'm done.
18 Q  Can you identify this as an e-mail that
19 you sent to Jeff with a CC to Betsy on March 23?
20 A  Yes.
21 Q  All right. Paragraph 6 indicates that
22 you have engaged two new trainers, Carlottia Scott

Page 171

1  and William Terry?
2  A  Uh-huh.
3  Q  I take it they were still both on board
4  as of March 23?
5  A  Yes.
6  Q  Okay. And the incidents that you
7  described to me earlier involving Ms. Scott and
8  Mr. Terry occurred prior to March 23, did they not?
9  A  Yes, only because it took a tremendous
10 amount of convincing.
11 Q  Would you look at Exhibit 21, please?
12 A  (Witness complies.)
13 Q  Is that an e-mail that you sent to
14 Arminda in January of 2005?
15 A  It is.
16 Q  Look at the header, please. Is that
17 your home e-mail?
18 A  It is. It was.
19 Q  It was until when?
20 A  I have another home e-mail address now.
21 Q  Does the W-o-t-o-r-s-o-n have any
22 meaning?

Page 172

1  A  It did. It doesn't now.
2  Q  What did it mean when you used it?
3  A  I was attempting to partner with a
4  colleague, and we decided not to partner after all.
5  But because I had just sent the -- I just kept it.
6  It was easier to keep it than to change it. And
7  then when I finally changed over services, I no
8  longer used it.
9  Q  Who was the colleague?
10 A  A gentleman named Michael Wotorson.
11 Q  And what kind of partnering were you --
12 A  Public policy consulting.
13 Q  On the "To" line of the header, is that
14 Ms. Valles-Hall's home e-mail?
15 A  It is.
16 Q  Look down at the third paragraph,
17 please.
18 A  Uh-huh.
19 Q  On the third line, there's the letters
20 BJ?
21 A  Uh-huh.
22 Q  Is that Betsy Johnson?

Page 173

1   A   Yes, it is.
2   Q   You sound gleeful here that
3   Ms. Johnson's new property in Massachusetts may have
4   been damaged by snow.
5       Were you, in fact, gleeful at that
6   possibility?
7   A   Not at all.
8   Q   What did you mean by, "God don't like
9   ugly"?
10  A   I meant it's unfortunate that when you
11  throw negative energy into the universe, it comes
12  back.
13  Q   And who is throwing negative energy
14  into the universe?
15  A   In this instance, I believe that
16  Arminda and Betsy had had some words and that Betsy
17  had been very unpleasant to her and she was very
18  upset.
19  Q   Okay.  The last line before the closing
20  says, "Wrap up, stay warm - and work on my resume!"
21  A   That's correct.
22  Q   Was Ms. Valles-Hall helping you with

Page 174

1   your resume?
2   A   At that time, I asked her to help me
3   write a resume.
4   Q   Prior to January of 2005, did you have
5   a resume you were using?
6   A   What you have.
7   Q   And what she was working on was
8   something different from what I have?
9   A   Just to freshen it up.
10  Q   Would you look at Exhibit --
11  A   Do you want this one back
12  (indicating)?
13  Q   Yes.
14      Would you look at Exhibit 22?
15  A   (Witness complies.)
16  Q   Can you tell me what Exhibit 22 is,
17  please?
18  A   This is an e-mail that I sent to Jeff
19  and Betsy shortly after I arrived at WCA giving them
20  an overview of what I had done in my first 30 days
21  there.
22  Q   Did you get any feedback from this?

Page 175

1   A   I did not.
2   Q   Nothing positive or negative?
3   A   Nothing.
4   Q   At this point, had you encountered any
5   racism at WCA?
6   A   In my first 30 days?
7   Q   Yes, ma'am.
8   A   No.
9   Q   Would you look at 23, please?
10  A   (Witness complies.)
11  Q   Can you identify this, please, for me?
12  A   This is a memo that I wrote to Jeff.  I
13  don't know where he was that I welcomed him back, so
14  I can't speak to that, but I requested a meeting to
15  talk about the expenses related to my department.
16  Q   Did such a meeting take place?
17  A   I don't recall.  I don't remember.
18  Q   All right.  It says in the first
19  paragraph that you want a meeting, quote, to discuss
20  my advocacy and community relations agenda and the
21  needs for the coming year, closed quote, and then
22  you go on and say another issue, which you then

Page 176

1   describe as expense reimbursement.
2       Do you recall a meeting taking place to
3   discuss your advocacy and community relations agenda
4   and the needs for the coming year?
5   A   There were a number of informal
6   discussions with Jeff, so a conversation could have
7   occurred.  I can't tell you that it was a formal
8   meeting.
9   Q   Okay.  And in the last paragraph, you
10  say, quote, I am requesting WCA's support in
11  offsetting the financial necessities of the
12  position, end quote.
13      What was WCA's response to that
14  request?
15  A   I believe I asked for parking, and I
16  was told that I would have to pay for my own.  And
17  as it related to expenses such as meals or mileage,
18  I would submit mileage reports, which I did, and
19  expenses.  My phone bill was my own, so I did not
20  submit, if I recall, reimbursement for office calls
21  on my personal cell phone.
22      The only person that I believe had a

Page 177

1  credit card for the organization was Betsy. I think
2  that was the case. I don't recall if Jeff had a
3  card or not.
4      Q   Well, if I'm understanding you
5  correctly then, WCA's response was that they would
6  reimburse you for mileage and meals; is that right?
7      A   Yes, that's what they did.
8      Q   You submitted expense reports, and they
9  then reimbursed you for those matters?
10     A   Yes.
11     Q   I'm going to show you what I think is a
12 series of expense reports. Tell me if it is,
13 please, Exhibit 24.
14     A   Yes, it is.
15     Q   Did you get reimbursed for the expenses
16 that are shown on Exhibit 24?
17     A   I did.
18     Q   Were there any expense reports that you
19 submitted for which you didn't get reimbursed?
20     A   Not that I recall.
21     Q   Look at Exhibit 25, please.
22     A   (Witness complies.)

Page 178

1      Q   Can you identify Exhibit 25?
2      A   This is an e-mail that I sent to Jeff
3  to get his feedback on what to give Betsy for
4  preparation of the board of directors report.
5      Q   Did you get feedback from Jeff?
6      A   I don't recall getting feedback from
7  Jeff. I recall asking Betsy about it, and she said
8  it was fine. I recall asking Betsy about it, and
9  she said it was fine.
10     Q   Look at Exhibit 26, please.
11     A   (Witness complies.)
12     Q   Can you tell me what it is, please?
13     A   It's an e-mail to Betsy and Jeff
14 regarding my physical therapy sessions.
15     Q   Okay. Look at the second page,
16 please.
17     A   Uh-huh.
18     Q   In the first e-mail on the first page,
19 it says, "No word on the other test."
20         What are you referring to here?
21     A   It must have been a medical test, but I
22 don't recall what it is.

Page 179

1      Q   Did you tell Betsy or Jeff that you
2  needed physical therapy because of racism at work?
3      A   I told them that I was in pain and my
4  doctor had directed me to take physical therapy.
5      Q   Did you tie the pain to racism at
6  work?
7      A   I tied the pain to the fact that I was
8  having a physical problem due to stress and other
9  things, I imagine.
10     Q   What else were you going through at the
11 time?
12     A   Nothing else. Just work.
13     Q   Did you tell Betsy or Jeff that the
14 pain and the therapy was connected to racism at
15 work?
16     A   I did not tell them that.
17     Q   When did you separate from your
18 husband?
19     A   Why is that relevant?
20     Q   Please answer my question.
21     A   I divorced in 1997.
22     Q   Would you look at Exhibit 27?

Page 180

1      A   (Witness complies.)
2      Q   Can you tell me what it is, please?
3      A   This is an e-mail that I sent to Jeff
4  as a follow-up to a meeting that I attended in
5  Rockville at The Jewish Community Center among
6  Montgomery County nonprofits as it relates to
7  Proposition 15, I think it was. And I believe the
8  discussion was around having the nonprofits of
9  Montgomery County sign on to a letter opposing
10 Proposition 15. I think that's what it was.
11     Q   All right. Am I correct in describing
12 Exhibit 27 as also including an e-mail from Jeff to
13 you?
14     A   Yes.
15     Q   And Jeff is, if I'm understanding this
16 correctly, suggesting that you have a broader base
17 of signatories for the letter; is that correct?
18     A   That is what he is suggesting, that the
19 letter have a broader base.
20     Q   In all the files that I've produced and
21 that you've produced, this is the first one in which
22 I'm aware that Jeff seems to be expressing some

Page 181

1  dissatisfaction with your work or -- maybe that's
2  even too strong of a word -- some disagreement with
3  your approach.
4          Are you aware of any earlier e-mails of
5  that tenor?
6      A    I am not.
7      Q    Are you aware of any earlier
8  conversations between you and Jeff in which he
9  expresses dissatisfaction with your work or
10 disagreement with your approach?
11     A    I am not.
12     Q    Do you agree with my reading of this
13 e-mail that it expresses dissatisfaction with some
14 aspect of your work or disagreement with your
15 approach on this letter matter?
16     A    No, I do not.
17     Q    Okay. He's simply suggesting to get a
18 broader base of signatories?
19     A    No, he is not simply suggesting that.
20 I attended the meeting and I conveyed to him what
21 occurred in the meeting. He took what I said out of
22 context. I explained the process and procedure that

Page 182

1  the groups were comfortable with. Under the
2  circumstances, they were concerned about their
3  individual funding. I also understood WCA's
4  position in trying to maneuver nonprofits to do
5  something that they themselves had decided they did
6  not want to do.
7          And I reported back to him making it
8  clear to him that I had talked to, and was
9  continuing to talk to, nonprofits as -- not just the
10 ones here, because the people he's referring to were
11 people that I knew before I came to WCA. So his
12 e-mail when I received it didn't make any sense,
13 which is why I sent the response that I did.
14     Q    So he misunderstood your earlier report
15 to him?
16     A    Yes.
17     Q    Do you think he intentionally
18 misunderstood your earlier report?
19     A    I have no idea.
20     Q    Do you have any reason to think his
21 misunderstanding was intentional?
22     A    I think he didn't understand a good

Page 183

1  deal of what I told him most of the time.
2      Q    And do you think that misunderstanding
3  was intentional?
4      A    I can't answer that. I don't know. I
5  don't know.
6      Q    The issue that's being referred to in
7  Exhibit 27, did you and he sort that out?
8      A    There were additional meetings that I
9  encouraged him to come to that he didn't come to.
10 What ultimately happened was a rally was held at the
11 county council for an evening hearing where all the
12 nonprofits came together and testified before the
13 county council. And, in fact, Betsy Johnson
14 attended that rally with me.
15     Q    Did you and Jeff get on the same
16 wavelength around this issue?
17     A    I think the issue got transferred to
18 Betsy.
19     Q    Did you and Betsy have any
20 misunderstanding as to the issue?
21     A    No.
22     Q    Look at 28, please.

Page 184

1      A    (Witness complies.)
2      Q    I should have told you that I'm just
3  going to ask you about the earlier e-mail that
4  starts on the bottom and continues over to the
5  second page, the October 24th e-mail.
6          Can you identify the second e-mail on
7  Exhibit 28 as an e-mail that you sent to Betsy and
8  Jeff on or about October 24, 2003?
9      A    Yes.
10     Q    And you had been with WCA for --
11     A    Just about a month.
12     Q    -- a month and a half, September 8th to
13 October 24th?
14     A    Yes.
15     Q    At the close of the e-mail, you say,
16 "Thank you, thank you for all of your guidance and
17 support."
18          Did you mean that?
19     A    I was courteous. That's professional
20 courtesy for me.
21     Q    Did you mean it?
22     A    I try to mean what I say.

Page 185

1   Q   Look at Exhibit 29, please.
2   A   (Witness complies.)
3   Q   Can you tell me what Exhibit 29 is,
4   please?
5   A   It's an e-mail to Jeff Kost about a
6   piece that I wrote that he asked for regarding
7   Proposition 15 in Montgomery County.
8   Q   All right. Would it be more accurate
9   to describe Exhibit 29 as an exchange of e-mails
10  between you and Jeff concerning Article 15 --
11  A   Yes.
12  Q   -- between February 24 and February 25?
13  A   Yes.
14  Q   If you turn to the second page, the
15  e-mail that begins about two-thirds of the way down,
16  it says, "Lisa, I am disappointed that you're not
17  able to find a way to talk about this."
18      Is this the first time he's used
19  disappointment in relation to some work you're
20  doing?
21  A   I don't recall. I don't recall.
22  Q   Did that word have any impact on you?

Page 186

1   Did it jump out at you?
2   A   It upset me.
3   Q   And what did you do about it?
4   A   I spoke to him, which then made me
5   probably wonder why he sent me an e-mail like this
6   when I had just spoke to him.
7   Q   Okay. What did you do after you got
8   the e-mail, after he expressed disappointment in
9   you?
10  A   I responded to his e-mail, because it
11  seemed that he was more comfortable writing than it
12  was talking, so I responded to his e-mail with an
13  e-mail.
14  Q   All right. And your response to that
15  e-mail is the one that begins on the first page of
16  Exhibit 29, "Jeff, I'll be happy to take a few
17  minutes"? Is that your response?
18  A   Yes.
19  Q   And you're telling him that, quote,
20  writing requires both time for focus and
21  substance/research?
22  A   Yes.

Page 187

1   Q   Did you think he was unaware that
2   writing requires time for focus and
3   substance/research?
4   A   Yes.
5   Q   And then his response to that is the
6   e-mail just above it. "We need to talk. I am
7   obviously not communicating what I need from you."
8       Did you interpret this as his being
9   frustrated?
10  A   Yes.
11  Q   And in your response to him, the e-mail
12  just above that, you say, among other things, "I am
13  desperately trying in my 48-hour day to review the
14  FEC's proposed advisory opinion that has the
15  potential to gag nonprofits. That's more of an
16  issue of value to our members than to WCA's goal to
17  empower nonprofits as it relates to policy."
18      Are you telling him what issues are
19  important and what aren't?
20  A   I am telling him as a follow-up to the
21  conversation that I believe occurred between his
22  e-mail and mine that Proposition 15 had already

Page 188

1   occurred, and this other situation was gearing up to
2   happen.
3       So what occurred in the county was
4   already known news, but what was getting ready to
5   happen was news to a broader audience of nonprofits
6   as opposed to just what was happening -- what had
7   already occurred in Montgomery County.
8       However, that said, I still gave him
9   what it was he asked for.
10  Q   All right. And you told him that it's
11  not the type of work I'm compelled to write? You
12  told him you didn't like doing that, but you'll do
13  it anyway, right?
14  A   What I said to him in regard to this
15  was that we were telling our nonprofits information
16  they already had, and we knew they already had it,
17  because it had been out in other publications.
18      So I didn't see how that was helpful to
19  them to give them information they already had when
20  I was told it was our job to give them information
21  they needed that they didn't have to help them move
22  forward.

Page 189

1  Q  You and he had a disagreement about
2  what he wanted you to do; is that fair to say?
3  A  No. I think we had a misunderstanding.
4  Q  But he was your boss, and he had a --
5  A  He was my supervisor.
6     MR. BLUE: Let him finish the question.
7     BY MR. FLEISCHER:
8  Q  Supervisor, fine.
9     And as your supervisor, he had a right
10 to tell you what it is he wanted you to do, did he
11 not?
12 A  Yes, he did. However, I did ask him
13 for guidelines that he did not provide.
14 Q  Was his position -- as uninformed as it
15 may have been about how to address Resolution 15,
16 was his position motivated by racism?
17    MR. BLUE: Objection.
18    Answer if you can.
19    THE WITNESS: I don't know. You'll
20 have to ask him.
21    BY MR. FLEISCHER:
22 Q  I will, but I'm asking you now.

Page 190

1  Do you think --
2  A  I said I don't know.
3  Q  Okay. Look at Exhibit 30 for me,
4  please.
5  A  (Witness complies.)
6     MR. FLEISCHER: Off the record.
7     (Recess taken 4:23-4:25.)
8     BY MR. FLEISCHER:
9  Q  Have you had a chance to look at
10 Exhibit 30, Ms. Ransom?
11 A  Briefly.
12 Q  Okay. Can you tell me what it is,
13 please?
14 A  It looks like a summary of the work --
15 it's a summary of the work that I did from December
16 to March that I prepared for Betsy and Jeff.
17 Q  Okay. And this was done at their
18 request or Betsy's request?
19 A  Yes.
20 Q  Tell me how the request came about.
21 How did she ask you, when did she ask you, and so
22 forth?

Page 191

1  A  I don't remember. I don't remember.
2  Q  How did you view the request? Did you
3  view it as threatening in any way or normal course
4  of business?
5  A  I don't recall. I just prepared it.
6  Oh, yes, I do remember. She was preparing for a
7  board report, and that's what I wrote this for.
8  Q  Do they have quarterly board meetings?
9  A  She was having a board meeting in the
10 spring, I remember that, so I prepared a document to
11 give her an update of what was going on in my
12 department so that she could use what she needed to
13 use for her board report.
14 Q  Is that a request you had received at
15 an earlier time for an earlier board meeting?
16 A  Yes. Actually, we reviewed that
17 document earlier today.
18 Q  Okay. If you would turn to -- well,
19 it's the fourth page of the exhibit, the third page
20 of your report. I'm sorry, go back one page. At
21 the bottom, it says CNA 0095.
22 A  Yes.

Page 192

1  Q  It starts near the bottom of the page,
2  "Public matters at a national level..."
3  A  Yes.
4  Q  Was tracking national-level public
5  policy matters part of your job?
6  A  My job was to track policy issues that
7  impacted nonprofit organizations.
8  Q  Up until this time, had Betsy or Jeff
9  ever said anything to you to discourage you from
10 being involved in national issues?
11 A  They -- Betsy's comment to me was that
12 she wanted me to focus on working with nonprofit
13 organizations in the local jurisdictions and the
14 issues that concerned them. So that focus would be
15 for the District of Columbia, Montgomery County, and
16 Prince George's County. And Virginia, as I said,
17 was on hold.
18 Q  Okay.
19 A  So the issues that impacted nonprofits
20 in those jurisdictions were the issues that I
21 addressed.
22    MR. FLEISCHER: Ms. Ransom, I sense

Case 1:06-cv-00843-RMC   Document 13-5   Filed 03/27/2007   Page 16 of 18

LISA RANSOM                                                    LISA RANSOM
vs. CENTER FOR NONPROFIT ADVANCEMENT              October 25, 2006

Page 193

1  that you may be tired. If you're not, that's just
2  great and we'll continue for a little while longer.
3  If you would like to stop now, that's certainly fine
4  with me. We're going to have to come back for
5  another day in any event, so it's your pleasure.
6      MR. BLUE: I think now is a good time
7  to stop.
8      MR. FLEISCHER: Okay.
9      (Discussion off the record.)
10     MR. FLEISCHER: Ms. Reporter, you kept
11 track of the time and the breaks and so forth?
12     THE REPORTER: Yes.
13     MR. FLEISCHER: All right. Can you
14 tell us on the record how much time we've actually
15 been in deposition today?
16     THE REPORTER: By my calculations, four
17 hours and thirty-six minutes.
18     MR. FLEISCHER: Thank you.
19     (Thereupon, signature not having been
20     waived, the deposition concluded at
21     4:29 p.m.)
22

Page 194

1  CASE: Ransom v. Center for Nonprofit Advancement
   DATE: October 25, 2006
2
3      ACKNOWLEDGMENT OF DEPONENT
4      I, Lisa Ransom, do hereby acknowledge
5  that I have read and examined pages 7 through 192,
6  inclusive, of the transcript of my deposition and
7  that:
8  (Check appropriate box)
9
10     [ ] The same is a true, correct, and
   complete transcript of the answers given by me to
11 the questions therein recorded.
12     [ ] Except for the changes noted in the
   attached Errata sheet, the same is a true, correct,
13 and complete transcription of the answers given by
   me to the questions therein recorded.
14
15
       Date         Signature
16
17
18     Sworn to and subscribed to before me on
19 this      day of         , 200 .
20
21
       NOTARY PUBLIC
22

Page 195

1      SLR REPORTING
       12208 SELINE WAY
2      POTOMAC, MARYLAND 20854
       (301) 340-0042
3
   CASE: RANSOM V. CENTER FOR NONPROFIT ADVANCEMENT
4  DEPOSITION OF: LISA RANSOM
5      Enclosed is the transcript of your
   deposition testimony. Please review the transcript,
6  complete and distribute the signed errata sheet and
   acknowledgment page to all parties, including this
7  office, within 30 days. Any changes and/or
   corrections should be listed below and not made upon
8  the transcript itself.
9  PAGE  LINE  CHANGE OR CORRECTION        REASON
10
11
12
13
14
15
16
17
18
19
20 DATE:        SIGNATURE:
21
22

Page 196

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Marney Alena Mederos, the officer
3  before whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly sworn
6  by me to testify to the truth, the whole truth, and
7  nothing but the truth concerning the matters in this
8  case.
9      I further certify that the testimony of
10 said witness was taken by me in stenotype and
11 thereafter reduced to typewriting under my
12 direction; that said deposition is a true record of
13 the testimony given by said witness.
14     I further certify that I am neither
15 attorney nor counsel, nor related to or employed by
16 any of the parties to the action in which this
17 deposition is taken; and furthermore, that I am not
18 a relative or employee of any attorney or counsel
19 employed by the parties hereto, nor financially or
20 otherwise interested in the outcome of this action.
21
       Marney Alena Mederos
22     Notary Public for Maryland

**WORD INDEX**

# CONDENSED TRANSCRIPT AND INDEX of the Testimony of
# LISA RANSOM

## CASE: LISA RANSOM v. CENTER FOR NONPROFIT ADVANCEMENT

**Date:** October 25, 2006
**Volume:** 1

SLR REPORTING
Phone:(301) 340-0042
Fax:(301) 340-3082
Email:SLRreprtg@aol.com