1                   UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF COLUMBIA

2

3       - - - - - - - - - - - - - - -x

4       LISA RANSOM,

5             Plaintiff,

6       vs                              Civil Action No.

                                        1:06-CV-843 RMC

7       CENTER FOR NONPROFIT

        ADVANCEMENT,                    VOLUME II

8

              Defendant.

9

        - - - - - - - - - - - - - - x

10                      Thursday, December 21, 2006

                        Bethesda, Maryland

11

12      CONTINUED DEPOSITION OF:

13                      LISA RANSOM,

14      called for further oral examination by counsel for

15      the defendant, pursuant to notice and agreement of

16      Counsel, commencing at 10:05 a.m. at the law offices

17      of Oppenheimer, Fleischer & Quiggle, PC, 7700 Old

18      Georgetown Road, Bethesda, Maryland, 20814, before

19      Maureen Donelson, Court Reporter, Notary Public in

20      and for The State of Maryland, when were present on

21      behalf of the respective parties:

22

```
1    APPEARANCES:

2            On behalf of the Plaintiff:

3                TEMPLE LAW OFFICES

4                BY:  DONALD M. TEMPLE, ESQUIRE

5                1229 15th Street, Northwest

6                Washington, DC   20005

7                (202) 628-1101

8

9            On behalf of the Defendant:

10               OPPENHEIMER, FLEISCHER & QUIGGLE, PC

11               CHARLES H. FLEISCHER, ESQUIRE

12               7700 Old Georgetown Road, Suite 800

13               Bethesda, Maryland  20814

14               (301) 986-4056

15

16              I N D E X

17

18   CONTINUED DEPOSITION OF LISA RANSOM

19   EXAMINATION BY:                 PAGE

20       Mr. Fleischer---------     200

21       Mr. Temple------------      --

22
```

```
1                INDEX OF DEPOSITION EXHIBITS

2      EXHIBITS:                          PAGE:

3      62 - E-mail                         200

4      63 - E-mail                         200

5      64 - E-mail                         200

6      65 - E-mail                         200

7      66 - List of therapy sessions       206

8      (Exhibits retained by counsel)

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1              P R O C E E D I N G S

2          (Thereupon, documents were marked

3          Exhibit Nos. 62, 63, 64 and 65)

4     Whereupon,

5                    LISA RANSOM,

6     called for examination by counsel for the Defendant,

7     and having been duly sworn by the Notary Public, was

8     examined and testified as follows:

9        EXAMINATION BY COUNSEL FOR THE DEFENDANT

10    BY MR. FLEISCHER:

11          Q.    Ms. Ransom, last time when you were

12    here I asked you about documentation for your

13    statement that $20,000 was budgeted for the

14    empowerment conference.  And you indicated you had

15    some documentation, that you thought you had perhaps

16    given it to your attorney, but I didn't have it.

17    And you said you would check.

18                    Have you come up with any

19    documentation for that?

20          A.    No more than the budget that was

21    submitted that was turned in.

22          Q.    The only thing I saw showed a one

```
1    thousand dollar budget for the empowerment

2    conference by the center.

3              A.   No, there was no another copy of the

4    budget that I submitted.

5              Q.   That's what we're after.  And you

6    didn't have it last time.  I asked you about it and

7    you said you thought you produced it to your

8    attorney and you'd check.

9              A.   That's correct.

10             Q.   Do we have it today?

11             MR. TEMPLE:  We do not have it.  And

12   we'll look again.

13             MR. FLEISCHER:  Okay.

14   BY MR. FLEISCHER:  (RESUMED)

15             Q.   I want to return for a moment to the

16   episode involving Carlottia Scott.  You testified

17   that Ms. Scott appeared enraged.  I think that was

18   your word.  Does that sound right?

19             A.   I don't recall if that was my word,

20   but she was extremely upset.

21             Q.   And she displayed this in front of you

22   and Arminda Valles-Hall?
```

1           A.   Yes, she did.

2           Q.   You were both in the conference room

3    when she exhibited her being upset?

4           A.   Yes, we were.

5           Q.   I'm going to show you all four of

6    these exhibits.  I've had them marked Exhibits 62

7    through 65.  If you would just take a look at them

8    all, please.

9                (Witness reading documents)

10          Q.   Have you seen those e-mails before

11   today?

12          A.   Some of them I don't recall.  I

13   remember this.

14          Q.   When you say this, which one are you

15   pointing to, 65?

16          A.   Yes.

17          Q.   Okay.

18          A.   It's been two years, so I can't tell

19   you.  I don't recall this one.

20          Q.   When you say this one, which one do

21   you mean?

22          A.   Sixty-two.

1            Q.    Okay.

2            A.    I can't tell you one way or the other

3    whether I've seen this one.  If I was copied on

4    this, I saw it, but again that was two years ago.

5            Q.    Do you have any reason to doubt that

6    they're authentic e-mails sent by Ms. Scott to

7    Arminda Valles-Hall?

8            A.    No.

9            Q.    Do you know why Ms. Scott would say to

10   Ms. Valles-Hall on February 19th, I will be pleased

11   to tell you about my experience in your hallway when

12   we next talk?

13               MR. TEMPLE:   Objection.

14               BY MR. FLEISCHER:   (RESUMED)

15           Q.    If you'll look at 62.

16           A.    Is that what that says?

17           Q.    That's what it says.

18           A.    Well, actually, mine does not say

19   that, because I couldn't read the end of it.

20           Q.    The "I" was cut off as well.

21           A.    So I could not see how that sentence

22   started.

1          Q.    Okay.  Let's ignore the "I".  Will be

2     pleased to tell you about my experience in your

3     hallway when we next talk.

4                Do you know why Ms. Scott would say

5     that to Ms. Valles-Hall on February 19, 2004?

6          A.    Obviously she wanted to continue the

7     discussion that we had when we both walked into the

8     conference room where the objective for us was to

9     just calm her down.

10         Q.    Do you know whether or not Ms. Scott

11    requested Arminda to forward her letter to the

12    executive director?

13         A.    I'm trying to process your question.

14         Q.    That's okay.

15               MR. TEMPLE:  Objection to form.

16               THE WITNESS:  Do I know what?  Would

17    you repeat the question, please?

18               BY MR. FLEISCHER:   (RESUMED)

19         Q.    Yes.  Ms. Scott wrote a letter

20    addressed to the executive director describing the

21    incident in the hallway that you previously

22    testified about.

1              A.    Um-hum.

2              Q.    Do you know whether Ms. Scott

3    requested Ms. Hall to forward that letter to the

4    executive director?

5              A.    She did.

6              Q.    Do you know why she would say in

7    Exhibit 34, please forward to your executive

8    director as may be appropriate?

9                   MR. TEMPLE:  Objection.

10                  THE WITNESS:  I can't tell you why

11   Carlottia wrote what she wrote, why she wrote it.

12                  MR. FLEISCHER:  Do you know Carlottia

13   didn't send the letter directly to the executive

14   director?

15                  MR. TEMPLE:  Objection.

16                  THE WITNESS:  No.

17                  MR. FLEISCHER:  Do you know why Ms.

18   Scott would say, quote, I am so sorry if my letter

19   has caused a furor within your office?

20                  MR. TEMPLE:  What exhibit are you

21   referring to?

22                  MR. FLEISCHER:  Number 65.

1          THE WITNESS:  I think you would have

2    to ask Ms. Scott.

3          BY MR. FLEISCHER:  (RESUMED)

4          Q.   I may well do that.  But do you know

5    why?

6          A.   I don't recall.

7          Q.   Isn't it true, Ms. Ransom, that you

8    and Arminda Valles-Hall encouraged Carlottia Scott

9    to complain about an incident as a way to get even

10   with or punish Betsy Johnson?

11         A.   That's ridiculous.  No.

12         Q.   Okay.  When we last were together at

13   deposition, I asked you about therapy records.  And

14   your counsel has now handed me a two-page document.

15   Can you tell me what that document is, please?

16         A.   This is a record of my appointments

17   for my therapy sessions.

18         Q.   Let's have this marked as No. 66.

19              (Document marked Exhibit No. 66)

20         Q.   Exhibit 66, Ms. Ransom, shows charges

21   from December 12, 2003 through February 11, 2004.

22   Is that so far as you know an accurate statement of

1    the charges you incurred for therapy?

2              A.    As far as I know, yes.

3              Q.    And the dollar amounts in the

4    right-hand column, according to this exhibit,

5    totaled $2,540.  Is that an accurate amount of your

6    costs for this therapy?

7              A.    As far as I know, yes.

8              Q.    Did insurance pay any of that?

9              A.    Some of it, yes.

10             Q.    Do you know how much?

11             A.    Not off the top, no.  I'm sure it's

12   there.

13             Q.    This doesn't show a record of

14   payments.  It just shows a record of charges, so

15   it's not here.

16             A.    Okay.

17             Q.    Can you give me an estimate of how

18   much insurance paid?

19                   MR. TEMPLE:  Objection.

20                   THE WITNESS:  I don't know.  Whatever

21   insurance pays.  I don't know.

22                   BY MR. FLEISCHER:  (RESUMED)

1          Q.    I know whatever they pay.  I'm just

2     wondering if you can give me an estimate of that?

3          A.    I cannot.

4          Q.    When we met last time, I also asked

5     you about tax returns.  I think you had previously

6     produced the 2005 income tax return.

7          A.    Um-hum.

8          Q.    I asked you about 2003 and 2004.  I

9     believe your testimony was that you had a request

10    into your accountant, who at the time was away.

11         A.    That's correct.

12         Q.    Have you since gotten those returns?

13         A.    I have not secured them.

14         Q.    Has your accountant returned?

15         A.    My accountant has been on travel quite

16    a bit.

17         Q.    Since October?

18         A.    Yes.  And I have been on travel quite

19    a bit.

20         Q.    Well, that wouldn't prevent him from

21    producing it to you.  Have you followed up with the

22    request for those?

```
 1              A.   I have put in a request, yes.

 2              Q.   Have you put in a request since our

 3    last deposition?

 4              A.   Yes, I have.

 5              Q.   And to whom did you put the request?

 6              A.   To Mr. Nesbitt.

 7              Q.   You actually spoke with him directly?

 8              A.   I did.

 9              Q.   And what did he say?

10              A.   We're just trying to connect an

11    opportunity to meet.

12              Q.   You need to meet to get them?

13              A.   Yes.

14              Q.   And why is that?

15              A.   That's the process that we use.

16              Q.   He couldn't just copy them and send

17    them to you?

18              A.   That's the process that we use.

19              Q.   You have to meet to get them?

20              A.   Yes.

21              Q.   So you're struggling now to arrive at

22    a date that's convenient for the both of you?
```

1           A.   Yes.

2           Q.   Also last time I asked you about

3    employment offers, and you said there were some

4    written offers but we didn't have them.  Have you

5    had a chance to look for any further offers?

6           A.   I think that I gave you or submitted

7    what I had.

8           Q.   Okay.  Is there anything more that you

9    know of?

10          A.   Not that I know of.

11          Q.   While you were employed at the center,

12   you wrote an article on proposed federal election

13   commission rule making; is that right?

14          A.   I have recollection of that, yes.

15   I've written several articles.

16          Q.   On that topic?

17          A.   No.

18          Q.   I'm talking about the federal election

19   commission rule making.  Did you write an article

20   for that?

21          A.   I remember an article for that.

22          Q.   That you wrote?

1          A.    I remember an article for that, but I

2    can't recall -- I think I wrote it, but I don't know

3    because I haven't seen it.  Again, it's been a

4    while, so you're asking me to remember something and

5    I don't recall.

6          Q.    Do you recall exchanging e-mails with

7    Jeff Kost about that article?

8          A.    Well, if I don't remember whether I

9    wrote it or not, I clearly don't remember exchanging

10   e-mails with Jeff about it.

11         Q.    Would you look at Exhibits 31 and 32,

12   please.

13              MR. TEMPLE:   Number 31 is April 14th?

14   Which is 32?

15              MR. FLEISCHER:  Yes, 31 is April 14th

16   and 32 is also April 14th.  It's a two-page

17   document.

18              MR. TEMPLE:   Which one is the two-page

19   document?

20              MR. FLEISCHER:  Thirty-two is the

21   two-page document.

22              BY MR. FLEISCHER:   (RESUMED)

1          Q.    Can you identify those e-mails, Ms.

2     Ransom?

3          A.    I'm trying to understand the

4     difference between the two.

5          Q.    I believe 32 includes 31.

6          A.    So I don't need to look at 31?

7          Q.    I guess that's the case, yes.

8          A.    All right.

9          Q.    Can you identify those e-mails?

10         A.    I'm familiar with this exchange.

11         Q.    Is it fair to describe this as an

12    exchange of e-mails between you and Jeff Kost?

13         A.    Yes.

14         Q.    And is it fair to say that they relate

15    to an article about FEC proposed rule making?

16         A.    Yes.

17         Q.    Having read these e-mails, is your

18    recollection refreshed that you in fact did write an

19    article on that topic?

20         A.    I obviously did, but I don't recall

21    the content of the article.

22         Q.    Do you recall Jeff being unhappy with

1    your work on this particular topic?

2              MR. TEMPLE:  Objection to form.  I

3    don't understand.  You're talking about the article?

4              MR. FLEISCHER:  Yes.

5         BY MR. FLEISCHER:  (RESUMED)

6         Q.   Do you recall Jeff being unhappy with

7    your work on the article?

8         A.   I recall Jeff being confusing about

9    this work.

10        Q.   He was confusing in his directions to

11   you?

12        A.   Yes.

13        Q.   You don't recall his being unhappy

14   with your work on the article?

15        A.   I recall him being confusing and

16   unpleasant.

17        Q.   Towards you?

18        A.   Yes, in my inquiry.

19        Q.   Your inquiry about what?

20        A.   What he wanted.

21        Q.   If you look at the top e-mail in bold,

22   the one that begins now that Rick is on board, do

1    you see that one?

2            A.    Yes, I do.

3            Q.    The second sentence, quote, if you are

4    reading any of the previous e-gendas, you would find

5    that we don't publish full articles, closed quote.

6                 Did you take that sentence as a

7    criticism of you?

8            A.    I took the sentence as offensive in

9    response to my inquiry.

10            Q.    Do you think Jeff's offensive as you

11    perceived it was racially motivated?

12            A.    I think everything Jeff did was

13    racially motivated, but my inquiry was simply give

14    me clarification, give me a word count.  He couldn't

15    do that.  In reviewing the e-agenda articles, they

16    vary in count, so he could never give me a clear

17    count.

18            Q.    Why do you think his response to you

19    in this regard was racially motivated?

20            A.    Well, it was a pattern of behavior,

21    which this e-mail clarifies for me.

22            Q.    Is there anything specifically about

```
 1       his response that you can tie to racial motivation?

 2              A.    Let's start with the opening sentence.

 3              Q.    Okay.

 4              A.    Now that Rick is on board, we're

 5       working on policies and procedures.

 6              Q.    Um-hum.

 7              A.    As a supervisor for both Rick and for

 8       me, Jeff never ever spent any constructive time,

 9       although I sought it, seeking out direction, policy

10       format, procedures on how he wanted things done,

11       because he didn't know.

12                   He, however, spent an inordinate

13       amount of time daily with Rick.  And I don't just

14       mean office time; coffee break time, lunch time.

15       They were joined at the hip.

16                   He was also joined at the hip with

17       other members of WCA staff, but none of them look

18       like me, yet I was under his direct supervision.

19       And when I sought his counsel, I was always given a

20       vague response with no substance.

21              Q.    By April 14th, you had begun your

22       weekly meetings with Jeff and Betsy, had you not?
```

```
1                 A.    I think so.

2                 Q.    And that doesn't qualify as

3       constructive time?

4                 A.    Oh, no, there was nothing constructive

5       about that time.  It was very verbally abusive.

6                 Q.    You did a congressional staff

7       briefing, did you not, on the proposed federal

8       election commission rule making?

9                 A.    When you say I did, what do you mean?

10                Q.    You conducted a briefing.  You briefed

11      people at Congress.

12                A.    I participated in a collective meeting

13      held by WCA members and offered an aspect at the

14      briefing of the impact to nonprofits to

15      congressional staff.

16                Q.    Did Jeff attend that briefing in which

17      you participated?

18                A.    He came in in the last 15 minutes of

19      the session.

20                Q.    Did he hear you present?

21                A.    I believe that he did.

22                Q.    Did Sheri Brady attend that briefing?
```

1          A.   She was one of the coordinators of

2     that event.

3          Q.   Did you get any negative feedback

4     about your participation in that briefing?

5          A.   Not from anyone in attendance.

6          Q.   From whom did you get negative

7     feedback?

8          A.   Only from Betsy and Jeff.

9          Q.   Jeff was in attendance?

10          A.   For the last 15 minutes of the

11     program, yes.

12          Q.   While you presented?

13          A.   Yes.

14          Q.   Tell me, Ms. Ransom, about the photo

15     incident with Jeff.

16          A.   What would you like to know?

17          Q.   What happened and who said what to

18     whom?

19          A.   As I recall, we came to work to learn

20     that we were going to be photographed.  We weren't

21     -- I don't recall a discussion prior to asking

22     employees whether they were comfortable with being

1    photographed and having their photos used on the

2    Web.

3                    At that time I had a cyst on my face,

4    on my cheek.  I'm trying to remember which cheek.

5    And I had been seeking treatment for it and actually

6    had been going through the process of having it

7    drained because it was infected.  The cyst distorted

8    my face for a few weeks.

9                    And I remember having a discussion

10   with Jeff, and maybe with Betsy, but I know with

11   Jeff, saying that this was not an opportune time for

12   me to have my photo taken to be put up on anything

13   because my face was distorted.

14                   The cyst was on my cheekbone, so my

15   face was swollen.  And it was just unpleasant.  And

16   that I would like to either reschedule for myself or

17   provide a photo taken after I had had the treatment

18   that I would pay for myself and submit.

19                   Jeff's response was that the

20   photographer they were using would be able to

21   camouflage or take the photo at such an angle that

22   the cyst would not be visible.

1          And I begrudgingly agreed with the

2     stipulation that if I did not like the photo, I

3     would not want the photo used in any way.

4          When I saw the photo, it was terribly

5     unattractive.  If my job -- if part of my job is my

6     image and how I project to others, I don't want

7     something that distorts my facial features

8     presented.  That causes harm to me professionally

9     and emotionally.

10          And so I told them that they couldn't

11     use the photo, and that again I would be willing to

12     provide a photo or have a photo done, but that they

13     could not use that photo.

14          Q.    Do you recall sending an e-mail to

15     Jeff on April 14, 2004, saying, quote, on the advice

16     of counsel, I am electing not to have my

17     photographic image used in any way either in print

18     or on the Web by WCA at this time?

19          A.    Yes.

20          Q.    Let me show you the e-mail, which I

21     have marked as 37.  You're welcome to read the

22     entire e-mail.  I want to ask you about the photo

1    matter and I want to ask you about something on the

2    bottom of the next to last page and then the last

3    page.  But you're welcome to read the entire thing

4    if it helps you put it in context.

5                   (Witness reading document)

6         Q.    Can you identify this as an e-mail

7    that you sent to Jeff Kost?

8                   MR. TEMPLE:  She's not finished

9    reading it.

10                  MR. FLEISCHER:  I'm sorry.  She looked

11   up at me.

12                  MR. TEMPLE:  Are you finished reading

13   it?

14                  THE WITNESS:  No, I'm not.

15                  MR. FLEISCHER:  I'm sorry, she looked

16   up.  I thought she was finished.

17             BY MR. FLEISCHER:  (RESUMED)

18        Q.    Can you identify Exhibit 37 as an

19   e-mail from you to Jeff Kost?

20        A.    Yes.

21        Q.    You were responding to a memo that

22   Jeff left on your desk earlier or on your chair

1    earlier that day?

2              A.   Yes, I was.

3              Q.   Is Exhibit 38 what you were responding

4    to?

5              A.   Yes.

6              Q.   Is Exhibit 39 also what you were

7    responding to, a request that you sign off on a list

8    of policy objectives?

9              A.   Yes.

10             Q.   So your e-mail of the 14th, Exhibit

11   37, is responding to 38 and 39; is that right?

12             A.   Yes.

13             Q.   Now, does your e-mail, Exhibit 37, say

14   anything about your willingness to have your photo

15   used after your medical condition resolves?

16             A.   Clarify your question, please.

17             Q.   Yes.   Does Exhibit 37 say anything

18   about your willingness to have your photo used after

19   your medical condition resolves?

20             A.   It doesn't say that in this e-mail.

21   It was said to Jeff, because the comment was in this

22   e-mail that I was willing to have a photo taken for

1    Washington Counsel of Agencies to use once my face

2    had healed or to be photographed when the board was

3    photographed.

4              So if I am making that suggestion, if

5    I am making those suggestions, I'm clearly saying

6    that I didn't have a problem with having my

7    photograph used; I had a problem with the photograph

8    being used, or else I would never have made the

9    offers.

10             Q.   Okay.  You say in Exhibit 37 that your

11   response at least as to the photograph issue is on

12   advice of counsel.

13             A.   That's correct.

14             Q.   Did you have an attorney at that time?

15             A.   I contacted an attorney.

16             Q.   I can't ask you and I won't ask you

17   what advice that attorney gave, but what I want to

18   know is when you contacted an attorney?

19             A.   That day.

20             Q.   Who was the attorney?  Who who was the

21   attorney?

22             A.   Georgia Goslee (phonetic).

         1              Q.    Right below the sentence that I'm

         2    referring to, and I'm going to quote, regarding the

         3    draft you've prepared stating the list of objectives

         4    for the director of public policy and community

         5    relations, I am acknowledging receipt of the

         6    document but cannot sign it.

         7                    Is that what you told to Jeff?

         8              A.    Yes.

         9              Q.    You were unwilling to sign a list of

        10    objectives that he had prepared?

        11              A.    Yes.

        12              Q.    Would you turn to the next page,

        13    please.

        14              A.    Can we go back to this document,

        15    please?

        16              Q.    I'm not asking you any questions about

        17    it.

        18              A.    I'm asking you to give me some clarity

        19    about the origin of the document.

        20              Q.    I'll relay that to your counsel.  I am

        21    not here to answer questions.  I'm sorry.

        22                    If you would look at Exhibit 37,

1      please, at the third page of Exhibit 37.  At the

2      bottom of the third page, the last paragraph, the

3      last sentence, quote, I am willing to meet with

4      Betsy and you and possibly a neutral mediator to

5      determine a mutually productive solution to address

6      our current situation.

7                  Did I read that correctly?

8           A.    Yes, you did.

9           Q.    What were the issues that you

10     suggested be mediated?

11          A.    They were numerous.  I was producing

12     the work I was tasked to do but being told that I

13     wasn't, even though I was producing it and

14     documenting it.  I was unable to have a constructive

15     conversation with Jeff Kost, because I found that

16     everything I told him never went to Betsy.

17                 I would speak to Betsy about the same

18     situation.  Some of her comments were conciliatory,

19     but I realized that in this whole collective

20     meeting, it was like I had done no work.

21                 I also understood that the document I

22     asked you about had been created from material that

1    came out of a workshop conducted by Arminda Hall

2    that Jeff had just restructured, and that this was

3    not a standard evaluation process used by the

4    Washington Counsel of Agencies.

5              It was one that was created

6    specifically to address whatever issue Betsy and

7    Jeff appeared to have, although it made no sense to

8    me, because based on what they were asking I had

9    already done that work and had documented it.

10             Q.   Any other issues?  Any other issues

11   that you were seeking mediation on?

12             A.   I was seeking mediation on the

13   treatment that I received in that office.  I wanted

14   to understand why a double standard was practiced

15   with me, but I didn't see that occur with Rick or

16   Jeremy or anyone else.

17             Q.   Any other issues on which you were

18   seeking mediation?

19             A.   I'm not sure that I really understand

20   the question given that I have answered it.

21             Q.   I want to be sure you have.  That's

22   all.  Your e-mail says --

1           MR. TEMPLE:  Wait a minute, she can

2    finish her answer.  You cut her off.

3           MR. FLEISCHER:  I'm sorry.  Go ahead.

4           THE WITNESS:  I mean, you're asking me

5    if I'm seeking mediation on any issues.  I'm seeking

6    mediation on their treatment of me as a professional

7    and a director and an organization where I'm

8    producing at capacity with no assistance, although

9    assistance had been promised and committed

10   throughout the interview and hiring process.

11          And I'm not getting the support that

12   the organization committed to going into the deal,

13   but I'm still producing the work that I would have

14   had to produce with an assistant.

15          I'm seeking mediation on their tone,

16   their demeanor, their disrespectful behavior.  And I

17   felt that I was not safe in my workplace.  And I

18   needed someone that was neutral that could navigate

19   a conversation without dire consequences, which I

20   always felt that I was dealing with whenever I had a

21   conversation with them.

22          BY MR. FLEISCHER:  (Resumed)

1           Q.    Anything else?

2           A.    That's enough.

3           Q.    When you say you felt you were not

4     safe, did you feel physically threatened?

5           A.    I did not feel physically threatened.

6     I felt professionally threatened, financially

7     threatened.  I felt that my reputation and

8     credibility was threatened by their actions and with

9     their lack of action.

10          Q.    Was Jeff racially motivated, in your

11    opinion, by wanting to use your photo in the

12    newsletter and on the Web site?

13          A.    I can't speak to that.

14          Q.    Okay.  Let me look at the objectives,

15    Exhibit 39, please.

16          A.    Is there a reason why I can't continue

17    to review that document?

18          Q.    You're welcome to.

19          A.    Thank you.

20          Q.    I just want to focus my questions and

21    your attention on 39.

22          A.    Okay.

1          Q.    Why were you unwilling to sign Exhibit

2     39?

3          A.    When I reviewed this document, it had

4     come after I had completed the content of this

5     document and submitted it quite a few times, number

6     one.   Number two, I had come through my three-month

7     evaluation and was told that I was just fine and

8     didn't need to be evaluated.

9               Then I'm presented with a document

10    that is clearly a tool for establishing a track

11    record of deficiency, and I knew that I had no

12    deficiency and I understood what the tool was.

13               And if I'm already doing this work,

14    why would I agree to sign this?

15          Q.    You viewed Exhibit 39 as redundant?

16    Is that a fair word?

17          A.    I viewed your Exhibit 39 as a tool for

18    grounds to establish a paper trail to say I agree to

19    certain things that I had already completed.   But

20    since people doing the evaluating were subjective,

21    how do I prove it other than to continue to provide

22    a paper trail of documentation for work completed?

1               I also knew that no other employee in

2      the organization was subjected it this kind of

3      evaluation process.

4               Q.   How was this document presented to

5      you?

6               A.   It was presented to me in a meeting

7      with Betsy and Jeff.

8               Q.   When was that meeting as you recall?

9               A.   In the spring.  I don't recall the

10     date.

11              Q.   How long did the meeting take?

12              A.   Over an hour and a half.  And it was a

13     painful, railing hour and a half of basically

14     telling me I was incompetent.

15              Q.   Who called the meeting?

16              A.   Betsy and Jeff.

17              Q.   And where did it take place?

18              A.   In Betsy's office.

19              Q.   And at that meeting Betsy and Jeff

20     were critical of your work?

21              A.   They were extremely critical of my

22     work, but the criticism was not specific.  What I

1    received was from Betsy is you're not meeting with

2    the nonprofits.

3                    Betsy, I am meeting with the

4    nonprofits.  I am meeting with nonprofits that are

5    in the WCA system in three jurisdictions where my

6    predecessor only covered one and a half.  I am

7    meeting in three jurisdictions with no staff support

8    as committed.

9                    I am meeting with government officials

10   in all three jurisdictions; Washington, Montgomery

11   County and Prince George's County while I'm meeting

12   with nonprofits based on those organizations or

13   those elected officials' availability and

14   willingness to schedule, which means that if they

15   want to schedule at seven o'clock in the morning,

16   I'm at a meeting at seven o'clock in the morning.

17                    And if they want to schedule at five

18   in the evening, I'm at a meeting at five in the

19   evening.

20        Q.    But you disagreed and I gather you

21   disagreed strongly with their criticism?

22        A.    At first I was stunned by their

1    criticism, because it didn't make sense to me given

2    that I had already done and had documented what I

3    had done and submitted it.  Not only did I document

4    it in my reports, but I documented in my financial

5    reimbursement records, which they obviously agreed

6    that I had done them because they reimbursed me for

7    them.  So it made no sense at all.

8         Q.    How many weekly meetings did you have

9    with Betsy and Jeff between the period March of 2004

10   and the day you were terminated?

11        A.    That's a little redundant, because a

12   weekly meeting is a weekly meeting.

13        Q.    But it didn't happen.  It didn't

14   happen.  That's my point.

15        A.    Actually, it did happen with the

16   exception of the week I believe before the

17   empowerment conference.

18        Q.    All right.  So it's your testimony

19   that you met once a week throughout this period with

20   one exception?

21        A.    Unless they canceled a meeting.  I

22   made myself available because they required that I

1    do so.

2         Q.   That wasn't my question.  My question

3    was how many meetings took place?

4         A.   I don't recall the count.  If it was a

5    weekly meeting, in my mind we met weekly.  But if

6    they for some reason were unable to meet or if I was

7    in the process of this conference, I don't believe

8    the week before the conference I met with them, but

9    I can't recall.  I'm not sure.

10        Q.   Do I understand that there was a

11   weekly meeting scheduled, sometimes it happened and

12   sometimes it didn't?

13        A.   Yes.

14        Q.   What was the schedule?  Was there a

15   specific day and time?

16        A.   The meetings were usually in the

17   afternoon.  I can't tell you what was the specific

18   day, because it may be that Betsy would go to her

19   calendar and looked to see what day the following

20   week worked for her as opposed to we're going to

21   meet on this day at this time.

22        Q.   So a subsequent meeting was scheduled

1      at the meeting taking place?  Is that typically what

2      happened?

3              A.   That's what I recall.

4              Q.   Okay.  And that would be the routine

5      to schedule the weekly meeting, which then sometimes

6      got canceled for one reason or another?

7              A.   I don't recall many cancellations.

8              Q.   Okay.

9              A.   They were too painful for me to think

10     to -- actually, they were painful enough to block

11     out.

12              You know, let me say this.  The

13     process of those weekly meetings is very similar to

14     the process of what's happening here today.  It's

15     like reliving a rape.  You have to go through this

16     process of pain, humiliation, verbal abuse, torture.

17     That's the same process that we're dealing with here

18     today.  That's what those meetings were like for me.

19              And the fact that they could go on for

20     an hour to two hours was ridiculous, because the

21     purpose of those meetings from where I sat, given

22     the lack of information, content, direction,

1    anything that I consistently asked for, was that

2    basically you are not a good fit for this

3    organization without any clarity as to really

4    telling me why.

5          Q.    Let the record show that I have not

6    misbehaved in any way despite the suggestion.  Your

7    counsel is here and he hasn't objected.

8          A.    I didn't say that you did anything

9    physically.  I'm telling you what this experience is

10   like.

11         Q.    Would you look at Exhibit 40, please.

12   Can you identify Exhibit 40?

13         A.    It's a familiar piece.  It's the same

14   piece as Exhibit 39 except it has my handwriting on

15   it.

16         Q.    That was one of my questions.  Is all

17   the handwriting on the document yours?

18         A.    Yes.

19         Q.    Just below the heading I see the date

20   April 8.  Is that the date this took place?

21         A.    If that's the date on the form, yes.

22                MR. TEMPLE:  Where do you see that?

```
1                    MR. FLEISCHER:   Objectives review

2     date.

3                    BY MR. FLEISCHER:   (RESUMED)

4               Q.   And right below that I see initials.

5     Are those your initials?

6               A.   Yes, they are.

7               Q.   Did Betsy or Jeff ask you to sign

8     Exhibit 40?

9               A.   I'm sure they did.

10              Q.   And your response?

11              A.   That I would not sign this.

12              Q.   For the reasons you have given before?

13              A.   That's correct.

14              Q.   Would you look at Exhibit 41, please.

15    Can you identify Exhibit 41?

16              A.   Not really.

17              Q.   I'm going to suggest to you -- but if

18    this doesn't reflect your recollection, that's fine.

19    I'm going to suggest to you that Jeff typed up his

20    notes from an April 8th meeting and presented it to

21    you in this form for your review and signature.

22    Does that sound right?
```

```
 1                    MR. TEMPLE:  Objection.

 2                    THE WITNESS:  I can't respond to that.

 3            BY MR. FLEISCHER:  (RESUMED)

 4            Q.   You don't know?

 5            A.   I don't know.

 6            Q.   You see italicized sentences under

 7      each of the numbered objectives.  You see numbered

 8      objectives and then see the word status and then you

 9      see an italicized sentence or two.  Do you see that?

10            A.   Yes.

11            Q.   If you focus on the italicized

12      sentences, do they accurately reflect the status of

13      the objectives as you reported them to Jeff on April

14      8?

15            A.   I can't answer that question.

16            Q.   And the reason you can't answer it?

17            A.   Because I don't recall.  I would need

18      to go back and look at my reimbursements and my

19      schedule and other documents that indicate where I

20      was that week as it relates to meetings.

21            Q.   Let me try to identify what you would

22      need to look at in order to be able to answer my
```

1    question.  Your reimbursement schedules?

2              A.    That would be one thing.

3              Q.    Anything else?

4              A.    The reports that I submitted.

5              Q.    These are written reports you

6    submitted to Jeff and Betsy?

7              A.    Written reports I submitted to Jeff

8    and Betsy.  But I have to tell you when I look at

9    this it's so suspect because I have had experiences

10   where I've conveyed things to Jeff and his written

11   response would not be what I said to him.  So I

12   can't tell you with any accuracy that I think that

13   this is correct content.

14             Q.    Do you recall Jeff presenting this to

15   you and asking you to sign it?

16             A.    You've asked me that question and I

17   told you I don't know.

18             Q.    Is there anything else you would need

19   to look at?  You identified two types of documents.

20   Is there anything else you would need to look at to

21   determine whether these italicized sentences

22   accurately reflect the status reports you gave to

1    Jeff and Betsy on April 8?

2              A.    My e-mails, probably.

3              Q.    Are those all documents that you have?

4              A.    I don't have access to anything other

5    than what I have submitted.

6              Q.    Okay.  Would you look at Exhibit 43,

7    please.  Can you tell me what that is?

8              A.    It's the same document that you handed

9    me previously only a later version of it, and my

10   responses to you will be the same.

11             Q.    Okay.  Look at Exhibit 44, please.

12                   MR. TEMPLE:  There is no Exhibit 42.

13                   MR. FLEISCHER:  Yes.  I skipped a few.

14                   MR. TEMPLE:  Okay.

15   BY MR. FLEISCHER:  (RESUMED)

16             Q.    Can you identify that exhibit, ma'am?

17             A.    It's going to be the same answer if

18   you keep handing me the same document.

19             Q.    I want to be clear that it's not the

20   same document.  In fact, it has a different date on

21   it.

22             A.    No, no.  I apologize.  Please

1    continue.

2          Q.    The document that I just showed you is

3    dated May 17.  Having pointed that out to you, is

4    your answer still the same?

5          A.    The documents you've handed me for

6    April 8, May 7 and May 17th are all the same type of

7    document with Jeff's response.  And I can't tell you

8    that this is accurate.

9          Q.    Okay.  In each case you do not recall

10   Jeff handing those documents to you for signature;

11   is that correct?

12         A.    I can't say that he did or he didn't.

13   I don't remember this.

14         Q.    And to be clear, in each case you

15   don't recall whether the italicized status report is

16   an accurate reflection of what you told Jeff at the

17   particular meeting; is that correct?

18         A.    Yes.

19         Q.    I have one more.

20         A.    Of the same document with a different

21   date?

22         Q.    Yes, ma'am.

1              A.    Okay.

2              Q.    That is Exhibit 45, which is dated May

3       27.  Can you identify Exhibit 45 as akin to the

4       other documents we've just looked at?

5              A.    I would say that they are akin to the

6       documents that I looked at previously.  I make an

7       exception on point number 8 of this document,

8       however.

9              Q.    You do recall reporting on objective 8

10      on May 27?

11             A.    I reported on every single dollar that

12      I raised to both Betsy and Jeff and the human

13      service coalition on a daily basis.  So I don't

14      quite -- I mean, this just tells me that there is a

15      problem, because every time we got a dollar that

16      came in from a funder for that event, I noted it and

17      made sure everybody knew about it.

18                  So to say that there was not an

19      accurate reporting, it makes it suspect to me.

20             Q.    Other than that, would your answers be

21      the same about whether Jeff asked you to sign it,

22      whether they are accurate reflections of what you

1    reported to him and so forth, your answer?

2            A.    My answers would be the same, sir.

3            Q.    Did you take notes of any of those

4    meetings?

5            A.    Sometimes.

6            Q.    Do you remember taking notes of the

7    April 27 meeting?

8            A.    Frankly, no, I don't remember it.

9            Q.    Would you look at Exhibit 46, please.

10    Can you identify Exhibit 46, please?

11            A.    These are notes that I took during the

12    meeting.

13            Q.    And that meeting is dated 4/27/04?

14            A.    Yes.

15            Q.    And Betsy and Jeff were present, the

16    three of you?

17            A.    Yes.

18            Q.    Looking at Exhibit 46, please, you see

19    one with a circle around it near the top?

20            A.    Yes.

21            Q.    And then it says B.J.  Is that Betsy

22    Johnson?

1         A.    Yes.

2         Q.    Did Betsy Johnson tell you e-mails and

3    closed doors breed misunderstandings?

4         A.    Yes.

5         Q.    And then next to number two it says,

6    the document exists so that Betsy and Jeff can keep

7    up with what's going on.  What document is being

8    referred to here?

9         A.    They are referring to this document.

10        Q.    The objective exhibits that we've been

11   looking at?

12        A.    Yes, that's correct.

13        Q.    Did Betsy tell you at that meeting,

14   wants more focus on the WCA members?

15        A.    Yes, which was confusing to me because

16   that's who I was meeting with.

17        Q.    Below that paragraph it says, what

18   disturbs Betsy is that, and what did Betsy say after

19   that?

20        A.    I don't recall.

21        Q.    Did Betsy tell you, quote, doesn't

22   feel that we are on the same page, believes I am

1    unfocused for WCA, closed quote?

2           A.    She probably did.

3           Q.    Reading down a few lines, quote,

4    having trouble determining my skills and ability and

5    hence have not been able hire -- did I read it

6    correctly?

7           A.    Able to hire an assistant.

8           Q.    Did Betsy say that to you?

9           A.    Yes -- no, Jeff may have said that to

10   me.  It was one of the two.  I don't know which one.

11   When they start tag teaming you, it's very hard to

12   recall who says what.

13          Q.    And then reading down a little bit

14   further, quote, was opposed to WCA participation in

15   the FEC briefing because it took a day away from

16   local nonprofits, closed quote.

17                Did I read that correctly?

18          A.    You read that correctly.

19          Q.    And did Betsy or Jeff say that to you?

20          A.    Yes.

21          Q.    Which one?

22          A.    I don't know.

1              Q.   Is this the first time you heard that?

2    Had you previously heard from Betsy or Jeff that

3    they were opposed to your participation in the FEC

4    briefing?

5              A.   It may have been the first time I

6    heard it.  I find it ironic, though, because having

7    left, Betsy jumped head first into that.  And I

8    found that she was very much involved in this FEC

9    briefing dynamic.

10             Q.   Turn to the next page, please, of

11   Exhibit 46.  About a quarter of the way down the

12   page, problem with closed door, sign, and I can't

13   read the rest of it.  Can you read the rest of that?

14             A.   You mean at the top?

15             Q.   Yes.

16             A.   They had a problem with me keeping my

17   office door closed.

18             Q.   Let me just see if we can read it

19   first and then we can talk about what it means.  It

20   says problem with closed door.  Can you read the

21   rest of those?

22             A.   Signals that people.  I wrote

1    signature but I meant signals.

2                    MR. TEMPLE:  It says problem with door

3    closed, not that it make a difference.

4                    BY MR. FLEISCHER:  (RESUMED)

5            Q.    I'm sorry, did I misread it?

6            A.    Closed door.

7            Q.    Did Betsy or Jeff raise that issue

8    with you at the meeting?

9            A.    Yes, they did.

10           Q.    And what did they say it signals to

11   people?

12           A.    I think, and I'm paraphrasing because

13   I don't know their exact words, but it implied that

14   I was inaccessible.

15           Q.    Now, just below that there are two

16   lines of handwriting.  Would you read those aloud,

17   please?

18           A.    Discussion, things that should be

19   talked about.

20           Q.    Yes, ma'am.

21           A.    Doesn't like to see cliques.

22           Q.    Okay.  Did somebody say that to you at

1    the meeting?

2              A.   I don't recall the statement.  I wrote

3    it down, so it must have been said.  I know I

4    wouldn't have said it.

5              Q.   Does that mean anything to you?  Do

6    you know what was intended?

7              A.   I didn't know what was intended, quite

8    frankly.  It didn't make sense to me because I

9    wouldn't have said it because it's not something I

10   do.  But it was something I witnessed within the

11   organization.  So I found it -- there was irony in

12   them even making a statement like that.

13             Q.   Okay.  The next two lines, could you

14   read those aloud, please?  I'm going to ask you to

15   read slowly for the court reporter, please.

16             A.   It's not a surprise that we've had

17   some trouble.  He didn't know that I didn't trust

18   him.

19             Q.   Did somebody say that to you at the

20   meeting?

21             A.   No.  I said that.

22             Q.   So you're making a note of what you

1   reported?

2          A.    Yes.

3          Q.    What did you mean by some trouble?

4          A.    I remember this part of the

5   discussion, because I remember being stunned by

6   Betsy telling me she had no idea what kind of work I

7   was doing.

8                And I was angered by it because I had

9   been meeting with Jeff when I came in.  He stayed

10  and worked slightly later than Betsy.  Betsy leaves

11  between five and 5:30.  So if I don't get back to

12  the office -- if I didn't get back to the office by

13  that time, it was not likely that I was going to be

14  able to talk with her.

15               So I would come into Jeff's office and

16  sit down and say this is what I did today, this is

17  who I met with today, this is what they shared, this

18  is my perspective on this.

19               And generally his response would be,

20  well, we need to talk this over with Betsy, because

21  he could not provide me any content, direction,

22  contact, resource, nothing, no matter how often I

1    asked.

2              So it didn't -- I knew that in that

3    situation there was just no way that I could trust

4    him to convey my work, because he didn't understand

5    what I was doing.  He didn't have a sufficient

6    policy background to have a clue about what I was

7    doing, which always takes me back to I wasn't quite

8    clear why he was my supervisor at all, because my

9    predecessor answered directly to Betsy.

10             Q.   If I understand what you're saying,

11   the trouble and the lack of trust was Jeff's failure

12   or inability to convey to Betsy what it was you were

13   doing?

14             A.   That's correct.

15             Q.   Just below that, it says Betsy doesn't

16   feel that I'm focused on WCA public policy matters.

17   Did Betsy say that to you?

18             A.   Yes.

19             Q.   And then the next line, Betsy stated

20   that she is completely behind.  Did Betsy say that?

21             A.   Yes.

22             Q.   Who's behind, Betsy or you?  Let me

1    rephrase that.  Was Betsy suggesting that she,

2    Betsy, was behind or that you were behind?

3             A.    No, that she is behind.

4             Q.    She, Betsy?

5             A.    Um-hum.

6             Q.    Then the next line, could you read

7    that aloud, please?

8             A.    Three of us are going to have to work

9    on a way.

10            Q.    Who said that?

11            A.    I don't know.

12            Q.    Do you know what it means?

13            A.    I guess the idea was to try to resolve

14   whatever they thought was the deficiency or whatever

15   I thought was the lack of assistance by coming up

16   with a mutually productive outcome.

17            Q.    Then below that Betsy states that

18   neither she nor Jeff are against me.  Did Betsy say

19   that?

20            A.    She said that, which I thought was

21   quite interesting.  She did say that.  Because why

22   would you make a statement like that if you didn't

1    believe that that was already the thought process on

2    the table?

3              Q.   The next two lines, could you read

4    that aloud, please?

5              A.   It says successful, but what I meant

6    was success is carrying out the goals of WCA, which

7    includes working with everyone else.  I left the one

8    out.

9              Q.   Did somebody say that to you at the

10   meeting?

11             A.   I don't know.  I couldn't just

12   paraphrase it myself.  I don't know.

13             Q.   On the next page, please, of this

14   exhibit, it says a couple of lines down, they prefer

15   verbal exchange.  Did I read it correctly?

16             A.   Yes.

17             Q.   Did somebody tell you that Betsy and

18   Jeff prefer verbal exchange?

19             A.   Yes.

20             Q.   And what did that mean as opposed to

21   e-mail?

22             A.   As opposed to e-mail.  They prefer

1    that I come in and sit down and talk to them about

2    what -- the outcome of my meetings, et cetera, which

3    I did with Jeff, especially because Betsy was not

4    available when I returned to the office from these

5    meetings.

6              I found that to be an unpleasant

7    situation.  Because the more I did that, the more I

8    found I had no way to prove that I had had these

9    meetings when I talked to Jeff.

10             I also found that if I had meetings in

11   the morning throughout the day and the late

12   afternoon and I knew I had meetings the next

13   morning, that I wouldn't have an opportunity to sit

14   down and really go through the detail of what those

15   meetings incurred.

16             So for me to be able to maintain the

17   content in my head, I used the e-mails by laying out

18   the foundation.

19             That didn't mean I wasn't accessible

20   or willing to talk about them, but I wanted to keep

21   the conversation that I had had with the nonprofit

22   fresh in my head so that I wouldn't forget something

1    after I go to two other meetings where I'm having

2    two other conversations.  And that provided clarity.

3              That didn't mean I wasn't willing to

4    talk about them, but I wanted to give them as much

5    content as I could.

6         Q.    If you would look below that, please,

7    it says it looks like ten a.m.  Could you read the

8    rest of that, please?

9         A.    Ten a.m. to hear.  Meet every day to

10   reach a comfortable point.

11        Q.    Is the next line part of that same

12   thought?

13        A.    I don't know that if it's part of the

14   same thought, but if in fact if I wrote that they

15   wanted to meet every day, that's scary to me.  And

16   it probably was scary to me when I wrote it, because

17   if my task is to meet with them every day, how was I

18   supposed to have time to meet with organizations

19   every day.

20        Q.    Let's not get to that second line

21   here.  Let's stop with the first line.  They wanted

22   a ten a.m. meeting every day.  That's what you

1    understood them to be asking for?

2          A.   No.   I'm saying that if I wrote meet

3    every day to reach a comfortable point, that would

4    not have been something that I would have suggested.

5    So someone suggested it.   And I'm sure that my

6    immediate thought was how am I supposed to do this

7    and be out in the field, which I was told I needed

8    to be.

9          Q.   What is the phrase ten a.m. to hear,

10   what does that mean?

11         A.   It may be for a ten a.m. hearing.   It

12   may mean absolutely nothing except that many of the

13   counsels, district counsel, Montgomery County

14   counsel, I may have written a note to remind myself

15   there's a ten a.m. hearing.   I don't know.

16         Q.   So they can be two separate thoughts?

17         A.   Two separate thoughts.

18         Q.   Let's turn to the next line, what's

19   unprofessional at WCA?   What does that mean?

20         A.   I may have written that as a thought

21   but not something that I conveyed.   I don't know if

22   I conveyed it or not.

1          Q.    Tell me what's behind the thought.

2          A.    There were a lot of unprofessional

3     activities going on at WCA, people walking around in

4     bedroom slippers, people lying candy down the hall

5     behind wooden ducts, a lot of the inside family

6     jokes or sidebar comments that you had no idea what

7     was being discussed, a lot of loud laughing and

8     people sleeping in the office, just all manner of

9     things that made it quite uncomfortable to even

10    consider having a meeting in the office, which would

11    have allowed me to be a little more engaged

12    considering I didn't have staff support.

13               But it was not feasible to have

14    meetings in the office with this kind of behavior

15    going on.

16         Q.    If there's a connection between the

17    two lines, that's it, what you've just said?

18         A.    I don't think that there is a

19    connection.  I think there was a separate thought.

20         Q.    Just below that it says call a meeting

21    of the old MC alliance.  Is MC Montgomery County?

22         A.    That's correct.

1          Q.   Tell me what that means.

2          A.   I would imagine that Betsy suggested

3    that I call a meeting of this alliance of nonprofts

4    in Montgomery County that had existed when my

5    predecessor was there that had lied dormant for I

6    believe a year and a half.

7               And during that time a new coalition

8    had been established, of which I was already

9    actively engaged.  As a matter of fact, the new

10   coalition, which we were very engaged in, was part

11   of the resolution 15 defeat that occurred in

12   Montgomery County, which I participated in and

13   attended the hearing.  And Betsy Johnson joined me

14   at that hearing.

15         Q.   What was the name of the new

16   coalition?

17         A.   I can't even remember.  I remember it

18   being a coalition versus an alliance.  I'm trying to

19   think.

20         Q.   So you did not call a meeting of the

21   old Montgomery County alliance because there was a

22   successor organization that you were already

1    involved in?

2              A.    I didn't say that.

3              Q.    Is that accurate?

4              A.    No.

5              Q.    What's inaccurate about it?

6              A.    I was asked to do it.  And I contacted

7    members of the alliance to try to bring them

8    together to call a meeting.  And the response that I

9    received was we've already -- we're already in this

10   existing coalition.  They were the same members.

11   The only difference between the alliance and the

12   coalition is that the alliance had been launched by

13   WCA.

14              The coalition had launched itself

15   because the alliance had sat dormant while the

16   position sat open.

17              Q.    Okay.  Now, Ms. Johnson gave you a

18   list of nonprofits that she wanted you to meet with;

19   is that right?

20              A.    Eventually, yes.

21              Q.    And is Exhibit 49 that list?

22              A.    I've never seen this before.

1          Q.    Ms. Johnson did give you a list of

2    nonprofits she wanted you to visit?

3          A.    No, Jeff Kost gave me a shorter list

4    than that of nonprofits.

5          Q.    And Exhibit 49 is not that list?

6          A.    This is not that list.

7          Q.    The list that Mr. Kost gave you, did

8    you agree to do that?

9          A.    I did.

10          Q.    And did you in fact visit those

11    nonprofits?

12          A.    I scheduled meetings with as many as

13    were willing to meet with me.  I actually took his

14    list and wrote letters to every single one

15    requesting a meeting and scheduled meetings based on

16    those organizations' availability.

17          Q.    Let me turn to the day you were

18    terminated.  Tell me what time of day that took

19    place.

20          A.    In the afternoon.

21          Q.    Can you put a more precise time on

22    that?

1              A.    I can tell you it was late afternoon.

2    But short of that, no, I can't.

3              Q.    Who was present?

4              A.    Jeff Kost and Betsy Johnson.

5              Q.    And where did it take place?

6              A.    In Betsy's office.

7              Q.    Was the door closed?

8              A.    Yes.

9              Q.    No one else present?

10             A.    No.

11             Q.    Tell me who said what.

12             A.    I can't tell you that because I don't

13   recall who said what.  I remember being told that I

14   was not a good fit for WCA and that I did not meet

15   with nonprofits.

16             Q.    Do you remember who said that?

17             A.    They both said it repeatedly.

18             Q.    How long did that meeting take?

19             A.    I don't know.  I remember it was

20   painful.

21             Q.    Was it more than an hour?

22             A.    I don't know.

1          Q.    Were you given a letter of termination

2    at that meeting?

3          A.    I was given a letter of termination at

4    that meeting.

5          Q.    Look at Exhibit 52, please.  Can you

6    identify Exhibit 52 as the letter you were given at

7    the termination meeting?

8          A.    I believe it is.

9          Q.    Were you given an opportunity to

10   resign at the meeting?

11         A.    Yes, I was.

12         Q.    Did you accept that?

13         A.    I did not.

14         Q.    Why not?

15         A.    Having received this letter and

16   knowing I was going to be terminated regardless, I

17   knew that if I resigned I would not be eligible for

18   unemployment, which was interesting.

19         Q.    Exhibit 52 says down at the bottom of

20   the first page, as severance pay you will receive

21   credit for one month of employment, closed quote.

22              Were you offered a month of severance?

1           MR. TEMPLE:  Objection.  The document

2    speaks for itself.

3           THE WITNESS:  They have done whatever

4    the document says, although the document is

5    inaccurate.

6    BY MR. FLEISCHER:  (RESUMED)

7        Q.   Did you get a check for one month of

8    severance?

9        A.   I wouldn't say I got a check for a

10   month of severance.  Yes, I had leave.

11       Q.   I'm going to ask about that

12   separately.

13       A.   I just said fine and left.  I didn't

14   look at the details of that.  It was a very

15   emotional dynamic for me.  So whatever it was they

16   said it was is whatever it is.

17       Q.   Subsequent to this termination, do you

18   recall receiving a check from WCA?

19       A.   Yes.

20       Q.   Do you remember how much the check was

21   for?

22       A.   I do not.

```
 1          Q.   Did you cash the check?

 2          A.   I deposited the check.

 3          Q.   To your knowledge, does WCA owe you

 4   any pay for time you actually worked?  This is not a

 5   trick question.  I know you're claiming that you

 6   were wrongfully fired.  And I'm not trying to get

 7   around that issue in the question.

 8               MR. TEMPLE:  The time that she worked

 9   until the date of termination?

10               MR. FLEISCHER:  Exactly.

11               THE WITNESS:  I don't recall.

12          BY MR. FLEISCHER:  (RESUMED)

13          Q.   As you sit here today, are you aware

14   of a claim for pay for time actually worked up to

15   termination?

16          A.   I don't recall.

17          Q.   Does WCA owe you any money for accrued

18   but unused leave?

19          A.   It's possible, but I don't recall.  I

20   know that WCA did not pay my Maryland state tax even

21   though they deducted it from my paycheck.  And that

22   I had to file a report, file a claim with the
```

1    Maryland comptroller, who had no record of receiving

2    payment from them, which had an impact on my ability

3    to even file taxes.

4            Q.    How do you know WCA didn't pay it?

5            A.    Because I contacted the state

6    comptroller.  And while it was saying on my pay stub

7    what had been deducted for Maryland state tax, the

8    comptroller had no record of WCA submitting payment

9    to them.

10           Q.    How do you know it was WCA's problem

11   and not the comptroller's problem?

12           A.    I'm sure the comptroller contacted

13   them.  But given that I was there from one year to

14   the next, that would seem something that they would

15   address.  But I do not know is the short answer.

16           Q.    Did it get straightened out?

17           A.    I have no knowledge whether it got

18   straightened out or not.

19           Q.    Take a look at Exhibit 53, please, and

20   tell me if you can identify this.

21           A.    These are time sheets.

22           Q.    Are they yours?

1          A.    They are.

2          Q.    Ms. Ransom, I note that these are

3     documents that your attorney produced to me.  I can

4     tell by the Bate stamping on them.  And as they were

5     produced to me, I am missing January, May and June.

6     Do you know whether you have time sheets for

7     January, May and June?

8          A.    I submitted all the time sheets that I

9     had available to me at the time.

10         Q.    Do you know why those time sheets

11    would be missing?

12         A.    I may not have been able to gather

13    them up when I left.

14         Q.    Arminda Valles-Hall's name has come up

15    a number of times in my questioning.  You worked

16    with Arminda, did you not?

17         A.    She was another director whose

18    department worked with mine.

19         Q.    Did you see her socially as well as

20    see her at work?

21              MR. TEMPLE:  Objection.

22              MR. FLEISCHER:  Grounds?

1                       MR. TEMPLE:   Socially, what does it

2      mean?

3                  BY MR. FLEISCHER:   (RESUMED)

4                  Q.   Do you not understand what I mean by

5      the word socially?

6                  A.   I would like some clarity.

7                  Q.   Sure.  Were you friends with her?

8                  A.   We had a friendly professional

9      relationship.  We had lunch once in a while.

10                 Q.   Other than lunch, did you see her

11     outside the office?

12                 A.   No.

13                 Q.   Did you tell her that you had been

14     terminated?

15                 A.   Yes.

16                 Q.   When did you tell her?

17                 A.   Probably that evening as I was

18     gathering up my things to leave.

19                 Q.   Was she still in the office after that

20     termination meeting?

21                 A.   She probably was.  She worked very

22     late.

1          Q.    Do you recall having a conversation

2    with her about your termination?

3          A.    Yes, I remember being very emotional.

4          Q.    Do you remember what you said to her?

5          A.    No, actually I don't.  I just remember

6    being very emotional.

7          Q.    Did you ask her to do anything for

8    you, gather up the photographs in my office,

9    anything like that?

10          A.    Maybe, but I honestly don't recall.

11          Q.    Did she offer to do anything for you?

12          A.    She may have.  Arminda is a very

13    supportive person.

14          Q.    What I want to show you is Exhibit 54,

15    which is a stack of e-mails that your attorney

16    produced to me.  I'm not going to ask you to go

17    through them.  I'm going to describe them to you and

18    then I'm going to ask you some questions generally

19    about the stack as a whole.

20                I can tell you that they are all dated

21    June 15th.  I can tell you that they are all timed

22    from about not quite nine p.m. to around ten a.m.

1    And I can tell you that they are all from Arminda

2    Valles-Hall, her office e-mail to her home e-mail

3    address.

4         A.   Okay.

5         Q.   Do you know why Ms. Haul e-mailed

6    herself approximately 50 e-mails on the night of

7    June 15th?

8         A.   You will have to ask her.

9         Q.   I will, but I'm asking you do you know

10   why she did that?

11        A.   No.

12        Q.   Do you know how you came to have

13   copies of these e-mails?

14        A.   How I came to have copies of these

15   e-mails?

16        Q.   Yes, ma'am.  Your attorney produced

17   them to me in this case.

18        A.   Okay.  I'm sure if he produced them,

19   he got them from Arminda.

20        Q.   To the best of your recollection, did

21   you have anything to do with Arminda's sending these

22   e-mails to herself on the night of June 15th?

1          A.    The short answer is no.

2          Q.    I'll be happy to have the long answer

3     if it would be more accurate.

4          A.    I was too damned emotionally upset and

5     terrified that I had just lost my job and trying to

6     figure out how am I going to pay my bills, and all

7     those things people experience when they become

8     unemployed suddenly after having a successful event

9     two days before.  So, yes, this was not on my radar.

10         Q.    I understand at your new job you are

11    paid twice a month?

12         A.    Yes, that's correct.

13         Q.    Is Exhibit 55 a copy of one of your

14    pay stubs at your new job?

15         A.    Yes, it is.

16         Q.    And am I right in understanding that

17    your annual pay at the new job is $82,000?

18         A.    Yes, it is.

19         Q.    That was what we talked about at your

20    last deposition.  Has that gone up since then?

21         A.    It has not.

22         Q.    Have you received any promotions or

1    any changes in your job since then?

2           A.    Our process does not occur until the

3    first of the year.

4           Q.    Are you anticipating a promotion?

5           A.    There would not be an opportunity for

6    a promotion.

7           Q.    There would not be?

8           A.    Um-hum.

9           Q.    You also received unemployment

10   insurance benefits?

11          A.    Yes.

12          Q.    Is Exhibit 56 a record of those

13   benefits?

14          A.    Yes.

15          Q.    This is for calendar year 2005 as I

16   read it.  Did you receive benefits in 2004?

17          A.    I don't think so, but I don't recall.

18          Q.    How soon after your termination did

19   you apply for unemployment insurance?

20          A.    Probably after I received whatever my

21   last check was.  However, I will tell you that in

22   applying, I was told by the Department of Employment

1    Services that they had no record of my work at WCA

2    and I had to produce my pay stubs to prove that I

3    worked there because there had been no payment into

4    the unemployment compensation for WCA for me.  Once

5    I could prove that I did work there, then they

6    processed the paperwork.

7            Q.    Then you received payments?

8            A.    Yes.

9            Q.    And you did get some payments in 2004?

10           A.    I don't recall.  I really don't

11   recall.

12           Q.    Okay.  We spoke about your 2005 income

13   tax return both earlier today and in our last

14   meeting.  Can you identify Exhibit 57 as the year

15   2005 income tax return?

16           A.    Okay.

17           Q.    Is it?

18           A.    Yes.

19           Q.    Let's look at the first page.  You'll

20   see line seven income.

21           A.    Um-hum.

22           Q.    And the dollar amount is $46,940.

1      What was the source of that income?

2              A.    I don't know because I don't have the

3      attached forms that my accountant has.

4              Q.    Did you earn any income from anyone

5      else other than your current employment in calendar

6      year 2005?

7                    MR. TEMPLE:    It should be calendar

8      year 2004, would it not?

9                    MR. FLEISCHER:    No, it was 2005.

10                   MR. TEMPLE:    It was 2005, okay.

11                   THE WITNESS:    Possibly, but I can't

12     recall.  If it says I did, I did.

13             BY MR. FLEISCHER:    (RESUMED)

14             Q.    If you would turn to the fourth page.

15     You see employee business expenses?

16             A.    Um-hum.

17             Q.    It says line six, job search costs,

18     $398.  Do you know what that consists of?

19             A.    Where are you?

20             Q.    Line six, $398.

21             A.    Okay.

22             Q.    Do you know what that consists of?

1          A.   Printing, mailing, postage, things

2     like that.

3          Q.   Did you prepare this return yourself?

4          A.   I did not.

5          Q.   It says on page two that it was

6     self-prepared, on page two, the second page in.

7          A.   It does.

8          Q.   The bottom of page two.

9          A.   Yes, it does.

10         Q.   Is that inaccurate?

11         A.   My accountant prepares it.  He tells

12    me to sign it, and I sign it.

13         Q.   Would you take a look, please, at

14    Exhibit 59.

15         A.   Okay.

16         Q.   Can you identify Exhibit 59 as a

17    transcript of your course work at University of

18    Maryland?

19         A.   Yes.

20         Q.   And it's dated 10/3/06.  Is this an

21    accurate transcript of your course work through that

22    date?

1              A.    Yes.

2              Q.    So it's fair to say that the last

3      course you took was in the spring of 2003?

4              A.    Yes.

5              Q.    And does this accurately reflect

6      courses taken and credits earned?

7              A.    I believe so.

8              Q.    Are you currently taking any courses

9      at the University of Maryland?

10             A.    I am registered to take courses.

11             Q.    Are you currently doing any course

12     work?

13             A.    Not until January.

14             Q.    Look, please, at Exhibit 60 and tell

15     me what Exhibit 60 is.

16             A.    Some are training certificates and

17     some are certificates of acknowledgement of work

18     done.

19             Q.    What I want to ask you about in each

20     individual case is what it took to earn these

21     certificates.  Let's start with the first one.  This

22     is ITT Dial Com Inc.  What was involved in getting

```
 1    that certificate?

 2            A.    Six months of training.  I remember it

 3    was six months.  House administration.

 4            Q.    I'm sorry, what administration?

 5            A.    House administration.

 6            Q.    This is House of Representatives?

 7            A.    Yes.

 8            Q.    Okay.  Look at the second page.  This

 9    is the state of Maryland.

10            A.    Yes.

11            Q.    Tell me what was involved in getting

12    this certificate.

13            A.    I ran and won elected office.  I'm the

14    first African American woman to hold elected office

15    in Montgomery County, Maryhand.

16            Q.    And the next one, the third one,

17    certificate of appreciation, what did you do for

18    that, please?

19            A.    I was a paid consulant on the Clinton,

20    Gore transition team.

21            Q.    How long were you on the transition

22    team?
```

1        A.    From October to January -- no, it

2    wasn't October.  It was right after the election.

3    So it had to be November.

4        Q.    And then the next one?

5        A.    The following three are connected.

6        Q.    Okay.  Tell me about them, please.

7        A.    Each one was a program that occurred

8    -- overall it was a three-year program, but it was

9    various trainings and off-site training activity.

10        Q.    Let's start with the one that's dated

11    August 15, 18, 1985.  You attended a seminar for

12    those three days?

13        A.    I did.

14        Q.    And that awarded you this certificate?

15        A.    Yes, it did.

16        Q.    And then the next one, you attended a

17    seminar, an institute, I guess, from September 6 to

18    8, 1984?

19        A.    That's correct.

20        Q.    And then that earned you the

21    certificate of training?

22        A.    That's correct.

1          Q.   And then the very last one, you

2    attended an institute on May 11, 1984?

3          A.   That's correct.

4          Q.   I have no further questions.   Thank

5    you very much.

6               MR. TEMPLE:  We'll read.

7               (Thereupon, signature having not

8                been waived, the deposition was

9                concluded at 12:01, p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

1                      12208 SELINE WAY
                 POTOMAC,  MARYLAND 20854
2                     (301) 340-0042
           CASE:  RANSOM vs. CENTER FOR NONPROFIT
3              ADVANCEMENT
           DEPOSITION OF:  LISA RANSOM
4              Enclosed is the transcript of your
       deposition testimony. Please review the transcript,
5      complete and distribute the signed errata sheet and
       acknowledgement page to all parties, including this
6      office, within 30 days.  Any changes and/or
       corrections should be listed below and not made upon
7      the transcript itself.
8      _____

       PAGE     LINE     CHANGE OR CORRECTION     REASON
9      ____     ____     _____     _____
       ____     ____     _____     _____
10     ____     ____     _____     _____
       ____     ____     _____     _____
11     ____     ____     _____     _____
       ____     ____     _____     _____
12     ____     ____     _____     _____
       ____     ____     _____     _____
13     ____     ____     _____     _____
       ____     ____     _____     _____
14     ____     ____     _____     _____
       ____     ____     _____     _____
15     ____     ____     _____     _____
       ____     ____     _____     _____
16     ____     ____     _____     _____
       ____     ____     _____     _____
17     ____     ____     _____     _____
       ____     ____     _____     _____
18     ____     ____     _____     _____
       ____     ____     _____     _____
19     ____     ____     _____     _____
       ____     ____     _____     _____
20
21     DATE_____          SIGNATURE_____
22

1                    ACKNOWLEDGEMENT OF DEPONENT

2

3

4              I, LISA RANSOM, do hereby acknowledge that

5        I have read and examined pages 200 through 278,

6        inclusive, of the transcript of my deposition taken

7        Thursday, December 21, 2006, and that:

8                    (Check appropriate box)

9                    [ ] the same is a true, correct, and

10       complete transcription of the answers given by me

11       to the questions therein recorded.

12                   [ ] except for the changes noted in the

13       attached errata sheet, the same is a true, correct,

14       and complete transcription of the answers given by

15       me to the questions therein recorded.

16

17       _____     _____

18            SIGNATURE                    DATE

19

20

21

22

1       CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC

2               I, Maureen Donelson, Court Reporter, the

3       officer before whom the foregoing deposition was

4       taken, do hereby certify that the witness, LISA

5       RANSOM, was duly sworn by me; that the foregoing

6       transcript is a true, correct and complete record of

7       the testimony given; that said testimony was taken

8       by me stenographically and thereafter reduced to

9       typewriting by me; and that I am neither counsel

10      for, related to, nor employed by any of the parties

11      to this litigation and have no interest, financial

12      or otherwise, in its outcome.

13              IN WITNESS WHEREOF, I have hereunto set my

14      hand and affixed my notarial seal this 3rd day of

15      January, 2007.

16      My commission expires:

17      August 3, 2008

18                      NOTARY PUBLIC IN AND FOR THE

19                      STATE OF MARYLAND

20

21

22