Case 1:06-cv-00843-RMC   Document 13-10   Filed 03/27/2007   Page 1 of 3

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 81

1 the outcome of this one.
2    Q   All right. Going back to issue
3 number 1, which concludes at the top of page 3,
4 you've typed it in bold: To effectively manage and
5 delegate to Lee, it is essential that any requests
6 for his time be cleared and routed through me,
7 closed quote.
8        Did Betsy agree to do that?
9    A   She did.
10    Q   Okay. So other than the fact that
11 Susan Sanow would now be in charge of the award, the
12 concerns expressed in your memo were addressed?
13    A   This wasn't about changing the
14 management of The Washington Post award. This was
15 about a discussion of extending professional --
16 standard professional courtesies to me, and that's
17 what we discussed. I wasn't vying for her to change
18 management. I was trying to understand why she
19 hadn't discussed it with me and why it was handled
20 in a way that hurt me reputationally.
21    Q   She responded to that by explaining why
22 the decision which she characterized as a business

Page 82

1 decision was made, did she not?
2    A   Yes.
3    Q   The concerns that you either expressed
4 here or that are implicit in Exhibit 10, in your
5 view, do they arise out of any discriminatory intent
6 on the part of Ms. Johnson?
7    A   Yes, I believe they do.
8    Q   Okay. Now, a few moments ago, we
9 talked about Susan Sanow taking over the Post award
10 and your being removed from responsibility for that,
11 and you told me that it was retaliation for your
12 close association with Ms. Ransom, and now you're
13 telling me that some of those same issues arise out
14 of discrimination.
15        What happened between April 7 and
16 May 11 to make you believe that Ms. Johnson was
17 motivated by discriminatory intent?
18    A   The actions directed at Lisa were
19 discriminatory. My close association with Lisa
20 resulted in her retaliating against me. My working
21 relationship with Lisa resulted in her retaliation.
22    Q   Had you complained to anyone about

Page 83

1 discrimination against Lisa as of, let's say,
2 May 11, 2004?
3    A   Yes.
4    Q   To whom?
5    A   To Tim Kime.
6    Q   Who was he?
7    A   He was the vice chair of the board of
8 directors.
9    Q   When did you complain to Tim Kime?
10    A   On April the 8th, 2004 and again on
11 April 9th.
12    Q   Did you complain in writing?
13    A   No.
14    Q   How did you complain?
15    A   I called him and I spoke to him in
16 person.
17    Q   On two separate occasions?
18    A   That's correct.
19    Q   How long did those conversations last?
20    A   The phone call was about 15 minutes.
21 The meeting was about an hour and a half.
22    Q   All right. So on April 8th, you

Page 84

1 called, and on April 9th, you met with him in
2 person?
3    A   Yes.
4    Q   What did you say to him about the
5 treatment of Lisa that you perceived as
6 discriminatory?
7    A   I told him that there was -- that Lisa
8 was being treated in a discriminatory way and that I
9 was in the cross hairs of that.
10    Q   Because of your association with her?
11    A   That's correct.
12    Q   And what did he say?
13    A   He invited me to lunch. We had lunch
14 together on the 9th, and I told him how things had
15 been transpiring.
16    Q   All right. And what was his reaction?
17    A   He listened closely. He asked me what
18 I wanted him to do about it, and I said I didn't
19 know.
20    Q   Did he do anything about it to your
21 knowledge?
22    A   No.

Case 1:06-cv-00843-RMC    Document 13-10    Filed 03/27/2007    Page 2 of 3

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 85

1   Q   Did he take notes?
2   A   No.
3   Q   Was he then the executive director of
4   Leadership Washington?
5   A   Yes.
6   Q   That's where you previously worked?
7   A   That's correct.
8   Q   Okay. The phone call was on April 8,
9   and the meeting was on April 9, the luncheon
10  meeting?
11  A   That's correct.
12  Q   And the decision to replace you as
13  being in charge of the Post award was made on
14  April 7 or earlier?
15  A   I learned of it on April 7th.
16  Q   So obviously the decision was made then
17  or earlier?
18  A   (Witness nods head.)
19  Q   Yes?
20  A   Yes.
21  Q   So that decision could not have been in
22  retaliation for your complaint to Tim Kime; is that

Page 86

1   right?
2   A   Right.
3   Q   Had you made any earlier complaints
4   about what you perceived as discriminatory treatment
5   directed at Lisa?
6   A   No. Well, no. I'm sorry, yes.
7   Q   Tell me about that.
8   A   I spoke to Betsy about an incident with
9   a faculty member, Billy Terry, who Lisa and I were
10  trying to recruit to teach a course on advocacy.
11  And the behavior directed at the faculty member --
12  the prospective faculty member, Lisa, and me by Jeff
13  Kost was highly disrespectful, and it was done in
14  the presence of the faculty member, and I did report
15  that to Betsy Johnson.
16  Q   When was that?
17  A   The date was early February -- I think
18  the 9th -- of 2004.
19  Q   Describe for me the behavior of
20  Mr. Kost which you viewed as disrespectful. Was
21  that your word?
22  A   Yes.

Page 87

1   Q   Okay. Describe that behavior for me,
2   please.
3   A   He interrupted our meeting because we
4   were -- well, we were using one of the two halves of
5   the conference room. I had arranged -- I had
6   reserved that conference room for my meeting with
7   Mr. Terry and Lisa Ransom. Mr. Terry was using the
8   white boards to outline what he would teach during
9   the advocacy course.
10           About 30 minutes before -- 25 minutes
11  before we were to vacate the space, because one of
12  Jeff's -- one of the groups with which he's
13  affiliated, the Association of Fund-Raising
14  Professionals, had also reserved that same space
15  following our meeting. I'm not sure if it was 2:30
16  to 3:00 or 3:00 to 3:30, but we were -- let's say we
17  had the room until 3:30.
18           At about 3:05, if that's the right time
19  frame -- I don't remember that specifically --
20  Barbara Mendoza came to the conference room and
21  interrupted our meeting and said that some of the
22  AFP members had started to arrive, and she was

Page 88

1   wondering if, you know, I had gotten the times
2   wrong.
3            I went to check my computer calendar
4   where I kept meeting room reservations and informed
5   her that they didn't have the space until 3:30, for
6   another 25 minutes, and she left. I told her to let
7   them wait in the lobby, and she left.
8            Approximately five minutes later, Jeff
9   Kost stormed into the room, didn't knock --
10  Q   When you say stormed, tell me what you
11  mean.
12  A   Didn't knock, didn't -- the door was
13  closed, and he didn't knock, didn't say excuse me,
14  and just launched into the situation. "I have
15  people waiting, and they are waiting in the lobby."
16           And I said, "Well, Jeff, they don't
17  have the room until 3:30."
18           And he said, "Well, what do you want me
19  to do, make them wait?" And he raised his voice at
20  me in the presence of Ms. Ransom, in the presence of
21  Billy Terry, and then he stormed out of the room.
22  He turned on his heel and walked out. He was

Case 1:06-cv-00843-RMC   Document 13-10   Filed 03/27/2007   Page 3 of 3

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 89

1  clearly very upset.
2       It was shocking to me that he treated
3  us that way. It was embarrassing. The trainer was
4  very annoyed by it. He was surprised and shocked to
5  be witnessing it. I was embarrassed that he
6  witnessed it. This was his first contact with the
7  Center for Nonprofit Learning & Leadership, the
8  education program. So that's what happened.
9       Q   Do you attribute Mr. Kost's behavior to
10 discrimination?
11      A   I think so.
12      Q   And why do you make that attribution?
13      A   I think so. I never saw him deal with
14 white colleagues in that kind of fashion. Mr. Terry
15 was a black man, Lisa is a black woman, and I'm a
16 woman of color. I'm a Mexican woman.
17      Q   Have you ever seen him behave
18 differently under the same factual circumstances
19 where Caucasians are involved?
20      A   No.
21      Q   So you don't have anything to compare
22 it to?

Page 90

1       A   No.
2       Q   Okay. You worked with Beth Schaffer
3  and Ellen Toups --
4       A   I believe it's Toups.
5       Q   -- on some workshops?
6       A   That's correct.
7       Q   Your workshops are evaluated, I take
8  it? You do an evaluation of them afterwards?
9       A   Generally, yes.
10      Q   What's the format of the evaluation?
11 How does that work?
12      A   An on-line evaluation is sent post the
13 meeting.
14      Q   So you encourage attendees to submit an
15 evaluation?
16      A   That's correct.
17      Q   How is the evaluation scaled?
18      A   I don't remember now. I believe it was
19 a 1 through 5 scale.
20      Q   Which is the best, 1 or 5?
21      A   5.
22      Q   Is that similar to the personnel

Page 91

1  evaluation, 1 through 5 with 5 being the best?
2       A   Yes.
3       Q   Let me ask you to take a look, please,
4  at Exhibit 11.
5           MR. TEMPLE: After this -- we've been
6  going about an hour and a half -- can we take a
7  little break?
8           MR. FLEISCHER: Sure. Let's do this,
9  and then we'll be done.
10          BY MR. FLEISCHER:
11      Q   Can you tell me what that is, please?
12      A   This is an e-mail to Beth Schaffer and
13 Ellen Toups titled Positive Feedback dated
14 August 27th, 2003 from me to Beth and Ellen Toups
15 regarding, it looks like, courses -- two courses
16 they had presented.
17      Q   All right. I'm reading, I guess, the
18 second sentence: The overall rating for both
19 workshops averaged 4 on a scale of 1 to 5 with 5
20 being the highest rating. Good marks!
21 Congratulations!
22          Is that what you wrote them?

Page 92

1       A   Yes. The -- yes.
2           MR. FLEISCHER: Okay. Do you want to
3  take a break?
4           MR. TEMPLE: Yes.
5           (Recess from 12:05-12:14.)
6           BY MR. FLEISCHER:
7       Q   The conference room that you described
8  with Mr. Kost, that was in February of 2004; is that
9  right?
10      A   Yes.
11      Q   What grew out of that, if anything?
12 Did you speak to Jeff about that? Did you speak to
13 anybody else about that?
14      A   Yes and yes.
15      Q   All right.
16      A   The next day, I went to Jeff's office
17 and I ruminated about how to ask the question,
18 because I didn't want anything to be exacerbated.
19 My question was very open ended, very general. I
20 just asked him what happened yesterday, and he was
21 very hostile still, very hostile. He wouldn't look
22 me in the eyes. He wouldn't look at me, and he said