# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LISA RANSOM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-843 (RMC)** |
| | ) | |
| **CENTER FOR NONPROFIT** | ) | |
| **ADVANCEMENT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Starting in September 2003, Plaintiff Lisa Ransom worked as a Director of Public Policy and Community Relations for Defendant Center for Nonprofit Advancement ("CNA"). CNA terminated her employment on June 15, 2004. Ms. Ransom, who is African American, contends that CNA discriminated against her based on her race and retaliated against her due to her complaints of discrimination. Because Ms. Ransom failed to present evidence of pretext and because CNA decided to terminate Ms. Ransom prior to her complaint of discrimination, CNA's motion for summary judgment will be granted.

## I.  FACTS

CNA[1] is a nonprofit organization dedicated to serving the nonprofit community through education, advocacy, nonprofit community building and group purchasing. Pl.'s Statement of Facts ("Pl.'s Facts") ¶¶ 1-2. At the time Ms. Ransom was employed there, the Board of Directors

---

[1] CNA was formerly known as the Washington Council of Agencies, as reflected in some of the parties' exhibits.

that governed CNA consisted of six African Americans, six Caucasians, and one Latino.  *Id*. ¶ 5.
The racial make-up of CNA's staff at the time of Ms. Ransom's employment was similar — the
employees consisted of seven African Americans, seven Caucasians, and one Latina.  *Id*. ¶ 7.  CNA's
Executive Director since 1988 has been Betsy Johnson.  *Id*. ¶ 6.  Ms. Ransom reported directly to
Jeff Kost, CNA's Deputy Executive Director, who in turn reported to Ms. Johnson. *Id*. ¶ 21.  Ms.
Johnson and Mr. Kost are Caucasians.

   Ms. Ransom's responsibilities included analyzing and evaluating issues for the
nonprofit sector, communicating with local nonprofits on local issues, monitoring policy and
legislation relevant to nonprofits, developing and maintaining strong relationships with policy-
makers in local jurisdictions, and developing and maintaining strong relationships with CNA's
nonprofit constituent groups.  *Id*. ¶ 22.  The position required Ms. Ransom to have strong
interpersonal skills as well as strong written and oral communication skills.  *Id*.  One of Ms.
Ransom's tasks was to put together a conference in Prince George's County, Maryland (the
"Conference").  *Id*. ¶ 25.  The Conference was sponsored by CNA and designed to create a
partnership between CNA and the Human Service Coalition of Prince George's County.  *Id*.

   CNA evaluates its employees annually, in late June or early July of each year.  Def.'s
Facts ¶ 10.  Because Ms. Ransom was hired in September 2003 and terminated in June 2004, she
was never formally evaluated.[2]  *Id*. ¶ 47.  However, after Ms. Ransom had worked at CNA for about
four months, Ms. Johnson and Mr. Kost became dissatisfied with Ms. Ransom's work, *see* Def.'s
Facts ¶¶ 25-32, and they decided to supervise her more closely through weekly meetings.  *Id*. ¶ 33.

---

  [2] After she had been employed for three months, Ms. Ransom asked Mr. Kost for a ninety-
day review.  He allegedly stated that her work was "just fine."  Pl.'s Facts ¶ 10.

In early to mid May 2005, Ms. Johnson and Mr. Kost jointly decided to terminate Ms. Ransom. *Id*. ¶ 43. They delayed actually firing Ms. Ransom until after the Conference, which was scheduled for June 10-11, 2004. *Id*. ¶ 44. Ms. Johnson and Mr. Kost believed that if they terminated Ms. Ransom before the Conference, the Conference would be jeopardized. *Id*.[3]

In a meeting with Mr. Kost on May 27, 2004, Ms. Ransom told Mr. Kost that she felt she was held to a different standard than her white colleagues. Pl.'s Facts ¶ 53. She also indicated that she felt Mr. Kost "was not willing to engage in joint activities with [her] that would inure to the benefit of [CNA]." *Id*. On June 15, 2004, Ms. Johnson and Mr. Kost met with Ms. Ransom and terminated her employment with CNA. Def.'s Facts ¶ 46. On October 1, 2004, CNA hired Lee Mason, an African American, to take the position that Ms. Ransom had held. Pl.'s Facts ¶ 54.

Ms. Ransom alleges that she was subject to two adverse employment actions: (1) she was supervised via weekly meetings and (2) she was terminated. Pl.'s Opp. at 13 & 15. She filed a Complaint alleging five counts:

> Count I, violation of the D.C. Human Rights Act, D.C. Code § 2-1402.11(a)(1), due to disparate treatment;
>
> Count II, violation of the D.C. Human Rights Act, *id*., due to retaliation;
>
> Count III, violation of 42 U.S.C. § 1981 due to disparate treatment;
>
> Count IV, violation of 42 U.S.C. § 1981 due to retaliation; and
>
> Count V, negligent supervision based on alleged disparate treatment and retaliation by senior staff at the CNA.

---

[3] According to Ms. Ransom, the Conference was highly successful, with more than 200 participants. Pl.'s Facts ¶ 25. The participants were predominately African American or served African American communities. *Id*.

Pursuant to a Minute Entry Order filed August 25, 2006, Counts I and II were dismissed by agreement of the parties. CNA filed a motion for summary judgment on the remaining counts. Because Ms. Ransom failed to respond to the motion for summary judgment with regard to Count V (negligent supervision), Count V is dismissed as conceded.[4] Thus, at issue here is CNA's motion for summary judgment on the remaining counts: Ms. Ransom's claims under § 1981 for discrimination and retaliation (Counts III and IV).

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[4] "It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)). Further, summary judgment must be granted on the negligent supervision claim because a common law claim for negligent supervision cannot be based on an alleged violation of the D.C. Human Rights Act, D.C. Code § 2-1402.11(a)(1), or Title VII, 42 U.S.C. § 2000e. *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007). "[A] negligent supervision action requires a breach by the employer of a duty owed to the plaintiff, and this duty must be one imposed by the common law and not by statute." *Id.* at 576 n.32.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. ANALYSIS

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This prohibition against race discrimination "applies to all phases and incidents of the contractual relationship, including discriminatory contract termination." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994). The burdens of production and persuasion under § 1981 are identical to those for a claim alleging discrimination under Title VII. *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997). Thus, in order to demonstrate a claim under Title VII or under § 1981, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) and the adverse action gives rise to an inference of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). A plaintiff can prove her § 1981 claim through direct evidence or through indirect evidence under the burden-shifting standard established in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802 (1973). *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). Under the burden-shifting standard, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employer's action. *Burdine*, 450 U.S. at 252-53; *McDonnell Douglas*, 411 U.S. at 802. If the defendant meets this burden, then the plaintiff has the opportunity to prove, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons, but were a "pretext" for discrimination. *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804. Although the intermediate evidentiary burden shifts back and forth under the *McDonnell Douglas* framework, the ultimate burden of persuasion rests at all times on the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "Liability depends on whether the protected trait actually motivated the employer's decision." *Id.* at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

A.  Weekly Meetings

First, Ms. Ransom alleges that she was subject to disparate treatment when she was supervised via weekly meetings, referring to the meetings as a "non-standard evaluation process." Pl.'s Facts ¶ 10. The weekly meetings were instituted when Ms. Ransom had worked at CNA for about four months and Ms. Johnson and Mr. Kost determined (1) that they were dissatisfied with Ms. Ransom's work and (2) that Ms. Ransom should be supervised via weekly meetings with Mr. Kost. Johnson Aff. ¶ 24 & Kost Aff. ¶ 11. The meetings were "weekly" in name only — only nine such meetings took place over a period of five months:  on January 14; February 20; March 12; April 8; April 27, April 28, May 7, May 17, and May 27, 2004. Kost Aff. ¶ 16. In preparation for the March meeting, Mr. Kost drafted a list of objectives, and for each meeting thereafter the list was revised

to show the status of Ms. Ransom's work on the objectives.  *See* Kost Aff., Exs. 39, 40, 41, 43, 44.

Mr. Kost repeatedly asked Ms. Ransom to sign the list, but Ms. Ransom refused.  She said in her

deposition, "I'm presented with a document that is clearly a tool for establishing a track record of

deficiency, and I knew that I had no deficiency and I understood what the tool was.  And if I'm

already doing this work, why would I agree to sign this?"  Ransom Dep. at 228.

Ms. Ransom claims that the weekly meetings she was required to attend with her

supervisor constituted discrimination.  However, a "thick body of precedent . . . refutes the notion

that formal criticism or poor performance evaluations are necessarily adverse actions."  *Brody*, 199

F.3d at  458.  "[N]ot everything that makes an employee unhappy" is an adverse action.  *Russell v.*

*Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (quoting  *Smart v. Ball State Univ.*, 89 F.3d 437, 441

(7th Cir. 1996)).  "Actions short of an outright firing can be adverse within the meaning of Title VII,

but not all lesser actions by employers count."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir.

2002).  Some types of adverse actions are obvious, such as discharge or failure to promote.  For those

that are less clear, such as the weekly meetings about which Ms. Ransom complains, a plaintiff must

show an action with "materially adverse consequences affecting the terms, conditions, or privileges

of her employment or her future employment opportunities."  *Brown*, 199 F.3d at 457.   The

employment decision must inflict "objectively tangible harm."  *Russell,* 257 F.3d at 818.  "An

employment decision does not rise to the level of an actionable adverse action . . . unless there is a

tangible change in the duties or working conditions constituting a material employment

disadvantage."  *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (citation omitted).

Here, Ms. Ransom has made no showing that the weekly meetings she was required

to attend affected the terms, conditions, or privileges of her employment or that the meetings caused

her objectively tangible harm.[5]  Since the weekly meetings did not constitute an adverse employment

action, Ms. Ransom cannot state a claim for  discrimination based on these meetings.  Even if the

weekly supervisory meetings were an "adverse action," Ms. Ransom has not submitted evidence that

the weekly meetings were imposed upon her, and not others, in a discriminatory manner due to her

race.  CNA points out that Mr. Kost previously required CNA employee Mike Rose, a white male,

to attend similar weekly meetings for supervision purposes.  Kost Aff. ¶ 17.

          B.  Termination

Ms. Ransom also alleges that CNA discriminated against her by terminating her

employment.  With regard to this claim, she has made out a prima facie case — she is African

American and she suffered an adverse action when CNA terminated her employment.  The issue that

the Court must address is whether the alleged reasons for the termination were non-discriminatory

and whether the alleged reasons were a mere pretext for discrimination.

The record is clear that Ms. Johnson and Mr. Kost were dissatisfied with Ms.

Ransom's job performance for some months.  They determined that Ms. Ransom was unfocused,

without any priorities or plan, and that she was not making adequate progress toward CNA's goals.

Johnson Aff. ¶ 24 & Kost Aff. ¶ 11.  Ms. Johnson indicated that Ms. Ransom was often late in

_____

[5] Ms. Ransom likened the weekly meetings and her deposition to "reliving a rape."

> The process of those weekly meetings is very similar to the process
> of what's happening here today.  It's like reliving a rape.  You have
> to go through this process of pain, humiliation, verbal abuse, torture.
> That's the same process that we're dealing with here today.  That's
> what those meetings were like for me.

Ransom Dep. at 233.  Ms. Ransom's overwrought emotional reaction to the weekly meetings does
not constitute evidence that she suffered objectively tangible harm.  *See Russell,* 257 F.3d at 818.

accomplishing her assignments.[6]  Johnson Aff. ¶ 26.  Further, Mr. Kost had difficulty working with

Ms. Ransom, and she was resistant to his directions, as exemplified by the following:

> 1. In a January 13, 2005 email exchange, Mr. Kost suggested that Ms. Ransom expand the base of support in opposition to a proposal (Resolution 15) pending before the Montgomery County Council. Kost Aff. ¶ 11.   Mr. Kost felt that Ms. Ransom resisted his suggestion.  *Id*.; *see* Kost Aff., Ex. 27.
>
> 2. In a February 25, 2004 email, Mr. Kost asked Ms. Ransom to write a one paragraph article for an E-genda publication letting CNA members know about CNA's "victory" in defeating Resolution 15 in Montgomery County.  Kost. Aff., Ex. 29.  Ms. Ransom objected, claiming that every active nonprofit in Montgomery County already knew about CNA's involvement in defeating Resolution 15, and that this was not news, it was "grandstanding."  *Id*.  She stated that "I don't write about anything that doesn't give folks an understanding about the 'what's next'" and that this type of article would require a great deal of research and time.  *Id*.  Mr. Kost insisted that she write the one paragraph article as he had originally requested — "This is for the E-genda.  I am looking for no more than a paragraph – no article development necessary."  Ms. Ransom responded, "The attached seems to be the type of work you are looking for.  However, this is not the type of work that I'm compelled to write.  It begs the question of what's next without supplying credible options."  *Id*.
>
> 3.  In an email exchange dated April 14, 2004, Mr. Kost told Ms. Ransom that he had rewritten an article she had submitted for the E-genda because the E-genda's articles were always less than 200 words and Ms. Ransom's article was about 400 words.  Kost Aff., Ex. 32. Ms. Ransom responded, "I was not made aware of the specific word count requirement."  *Id*.  Mr. Kost answered, "If you are reading any of the previous E-gendas, you would find that we don't publish full articles.  We write brief paragraphs and then lead people to a link for more information.  We have had this discussion before."  *Id*.
>
> 4.  In a memo dated May 12, 2004 from Mr. Kost to Ms. Johnson, Mr. Kost indicated that he discovered Ms. Ransom "at the 11th hour" putting together a public policy alert without having discussed

---

[6] Ms. Ransom does not contest that she was often late with job assignments.  Instead, she asserts that she was promised an assistant but none was ever provided.  Pl.'s Facts ¶ 29.

strategy with the appropriate individuals at CNA.  Kost Aff., Ex. 50.
She failed to produce a timely alert.  Def.'s Facts ¶ 26.

Further, CNA received various complaints about Ms. Ransom's work from outside sources.[7]  For example, Michael Young of United Communities Against Poverty called Ms. Johnson in the fall of 2003 "to question and complain about information given him by Ransom concerning the Center's commitment to participate in a coalition."  Johnson Aff. ¶ 25.  Around the same time, Sheri Brady of the National Council of Nonprofit Associations reported to Ms. Johnson that Ms. Ransom "did not do a good job on a congressional staff briefing."  *Id*.  Similarly, in the spring of 2004, Mac Ramsey of The Arc of Prince George's County called Ms. Johnson to complain that Ms. Ransom had prepared an unrealistic budget for a conference.  *Id*.

In addition, Ms. Johnson and Mr. Kost criticized Ms. Ransom for working with her door shut and communicating with the other CNA employees mostly through e-mail.  They told Ms. Ransom that these work habits "breed misunderstandings" and showed that Ms. Ransom was inaccessible.  *Id*. ¶ 28; Kost Aff. ¶ 15.  Ms. Ransom does not dispute that she communicated through email and worked behind closed doors.  She does assert that she was not accessible because she spent more time in the field than any other CNA employee.  Pl.'s Facts ¶ 31.

Ms. Ransom's attempt to rebut CNA's evidence of the mounting criticism of Ms. Ransom's work consists of vague and conclusory argument without factual support.  She contends that Ms. Johnson and Mr. Kost's criticisms show that they did not try to support her, but instead were "constructing a 'paper trail' of e-mails to undermine her efforts."  Pl.'s Facts ¶ 26.  She stated at her

---

[7] Ms. Ransom argues that the statements of third parties are hearsay and should not be considered by the Court.  The statements are not hearsay, as they are not offered to prove the truth of the matter asserted, only to show the effect on the listener.  *See* Fed. R. Evid. 801(c).

deposition, "I think everything Jeff [Kost] did was racially motivated." Ransom Dep. at 214. She points to the deposition testimony of her former co-worker Arminda Valles-Hall, who stated, "The actions directed at Lisa [Ransom] were discriminatory." Valles-Hall Dep. at 82.

However, Ms. Ransom fails to cite actual evidence in support of this kind of argument. In support of her claim that Mr. Kost was racist, Ms. Ransom contends that when she asked Mr. Kost to attend the State of the County brunch for Prince George's County, he stated, "I'm afraid." Ransom Dep. at 112. She also testified that Mr. Kost chose to sit with his Caucasian colleagues at the Conference, instead of sitting at a table of African American funders. *Id.* at 115. There is no evidence to support the claim that Mr. Kost's alleged "fear" or his table choice was racially motivated.[8]

Ms. Ransom further notes that in a meeting with Mr. Kost on May 27, 2004, she told Mr. Kost that she felt that African American trainers and presenters whom she recruited were not treated properly. Pl.'s Facts ¶ 53. Her complaint was based on prior incidents in which trainers and presenters visiting CNA offices had been questioned about their presence by Jeremy Baird, a CNA employee. Mr. Baird stopped and questioned people whom he did not recognize, both African American and Caucasian. Def.'s Facts ¶¶ 12-13, Baird Dep. at 45-47. In the past, building management had warned of thefts. *Id.* Again, this allegation does not provide evidence of an

───────────────

[8] Ms. Ransom also argues that Mr. Kost was racist because he wanted to put her photo in the CNA newsletter, while Ms. Ransom did not want her photo included because she was suffering from facial swelling due to a cyst. Ransom Dep. at 217-19. CNA ordinarily put photos of senior staff in its newsletter next to articles written by that staff member. Kost Aff., Ex. 38. Mr. Kost told Ms. Ransom that he wanted to include the photo taken by a photographer hired by CNA or another photo she presented. *Id.* While this incident cannot logically support a claim of discrimination, it does demonstrate the deteriorating relationship between Ms. Ransom and Mr. Kost.

adverse employment action taken against Ms. Ransom and is not tied in any way to CNA's decision to terminate her.

Ms. Ransom also asserts that she and a Latina woman were excluded from closed-door meetings of senior staff at CNA.

> I recall that it was noticeable, because all the senior staff were in Betsy [Johnson's] office with the door closed and everyone in the room was white. The only directors of color would be Arminda [Valles-Hall] and myself, senior directors, and we were not included in those meetings. We had no idea what the discussions were about.

Ransom Dep. at 149. Ms. Ransom offers no evidence about the nature or purpose of these alleged meetings or their length or the dates they occurred. She does not explain how these meeting were related to the decision to terminate her employment nor does she demonstrate how these meetings show that the decision to fire was racially motivated.

Neither Title VII nor § 1981 permit a court to act as a "super-personnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999). The Court may not "second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.3d 94, 100 (D.C. Cir. 1982)). Ms. Ransom argues that Mr. Kost had little appreciation for her "stellar" work on gathering local community support because Mr. Kost did not work with her on the Conference. *See* Pl.'s Facts ¶ 25. Ms. Ransom's subjective assessment of her own performance cannot defeat summary judgment because a "plaintiff's perception of [her]self, and of [her] work performance, is not relevant." *Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000). Rather, it is the perception of the decision-maker that is relevant to determining pretext. *Branson v. Price River Coal Co.*, 853 F.2d 768, 772

(10th Cir. 1988). In determining whether proffered reasons are pretext, the Court does not examine whether the reasons CNA offered were *correct* but instead focuses on whether the supervisors at CNA honestly believed the reasons they offered. *See Fischbach*, 86 F.3d at 1183. Here, the evidence shows that Ms. Ransom's supervisors, Ms. Johnson and Mr. Kost, believed Ms. Ransom's job performance was inadequate and that they fired her for this reason. Ms. Ransom's vague, anecdotal evidence is insufficient to refute CNA's showing on this issue. Thus, the Court will grant summary judgment in favor of CNA on the discrimination claim.

### C. Retaliation

Ms. Ransom also alleges that CNA terminated her employment in retaliation for her complaint of discrimination. To establish a prima facie case of retaliation,[9] a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006); *see Welzel v. Bernstein*, 436 F. Supp. 2d 110, 117 (D.D.C. 2006) (the elements of a retaliation claim are the same under Title VII and under § 1981). To show that the act taken by the employer was adverse, a plaintiff must demonstrate that the action was one that a reasonable employee would have found to be "materially adverse," which in the context of a retaliation claim "means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415 (internal quotation marks

---

[9] The great weight of circuit authority has held that retaliation claims are actionable under § 1981. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, (7th Cir. 2007) (collecting cases from the 1st, 2d, 3d, 4th, 5th, 6th, and 10th Circuits). *But see Little v. United Tech.*, 103 F.3d 956, 961 (11th Cir. 1997) (holding that a retaliation claim is not actionable under § 1981). The D.C. Circuit has assumed that a retaliation claim is available under § 1981, but it has not actually decided this issue. *See Carney v. American Univ.*, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998).

omitted). To be materially adverse, the harm to the employee must be serious and not trivial, although whether a given action is sufficiently serious "will often depend upon the particular circumstances." *Id.* The causation component may be shown by demonstrating that the employer had knowledge of the plaintiff's protected EEO activity and that the employer took the adverse action shortly thereafter. *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998).

  In this case, Ms. Johnson and Mr. Kost assert that they decided to fire Ms. Ransom in early or mid May 2004. *See* Def.'s Facts ¶ 43. On May 27, Ms. Ransom told Mr. Kost that she felt she was held to a different standard than her white colleagues. Pl.'s Facts ¶ 53. She also indicated that she felt Mr. Kost "was not willing to engage in joint activities with [her] that would inure to the benefit of [CNA]." *Id.* On June 4, Ms. Ransom filed a formal charge of discrimination with the D.C. Office of Human Rights, Def.'s Reply, Ex. 1, and on June 15, Ms. Johnson and Mr. Kost fired Ms. Ransom. Def.'s Facts ¶ 46. On June 17, 2004, CNA received a copy of Ms. Ransom's charge of discrimination filed with the District of Columbia's Office of Human Rights. Def.'s Facts ¶ 52, Johnson Aff. ¶ 43.

  Assuming for these purposes that Ms. Ransom's May 27 informal accusation of racism constituted "protected activity" for the purpose of a retaliation charge, Ms. Johnson and Mr. Kost planned to terminate Ms. Ransom *before* the May 27 meeting with Mr. Kost and before her June 4 formal discrimination charge. Ms. Ransom presents argument, but no facts, to contest that the decision to fire her was made before May 27. See Pl.'s Facts ¶ 43. This is clearly insufficient to avoid summary judgment. *Celotex*, 477 U.S. at 322. There can be no requisite causation when an employer merely implements a termination decision that was made before an employee engaged in protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

-14-

> An employee who is being criticized for performance issues may not refuse to address these issues, and instead, file [a discrimination] action in an obvious attempt to immunize herself from any adverse action. Filing a [discrimination] action is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination. Nor can a plaintiff make out a prima facie case of retaliation when the employer was preparing to terminate her before she filed her charge.

*Welzel*, 436 F. Supp. 2d at 128 (citation and quotation marks omitted). Because Ms. Ransom has not submitted any evidence that she engaged in protected activity before CNA decided to terminate her, her retaliation claim fails.

## IV. CONCLUSION

For the reasons explained above, CNA's motion for summary judgment [Dkt. # 10] will be granted. A memorializing order accompanies this Memorandum Opinion.

Date: September 25, 2007                              /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge

-15-